# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **PACIFIC INPATIENT MEDICAL GROUP, INC., on behalf of itself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**ZELIS HEALTHCARE, LLC, ZELIS CLAIMS INTEGRITY LLC, ZELIS NETWORK SOLUTIONS, LLC, AETNA, INC., THE CIGNA GROUP, ELEVANCE HEALTH, INC., HUMANA, INC.**<br><br>**Defendants.** | Case No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

"*Transforming the healthcare consumer experience requires collaboration among all of us.*"

-- Zelis's CEO, Amanda Eisel, September 27, 2023

# Table of Contents

Nature of This Action ................................................................................................ 1

Jurisdiction, Venue, And Interstate Commerce ....................................................... 8

Parties......................................................................................................................... 10

   I.   Plaintiff .................................................................................................. 10

   II.   Defendants ............................................................................................ 11

     A.   Zelis Entities ................................................................................. 11

Co-Conspirators, Agents, Authority, Reciprocal Agency, And Common Corporate Interest...... 14

   I.   Co-Conspirators .................................................................................. 14

   II.   Agents .................................................................................................. 14

   III.   Authority.............................................................................................. 14

   IV.   Reciprocal Agency of Defendants and Co-Conspirators ........................... 15

   V.   Common Corporate Interest of Each Defendant's Related Entities ................. 15

Factual Allegations ................................................................................................... 16

   I.   A Brief History of Conspiratorial Payment Suppression within The Healthcare Industry and Possible Competitive Baseline Periods................................. 16

     A.   The Ingenix Conspiracy Period: 1997-2009 ................................ 16

     B.   The FAIR Health Database Period: 2010-2015 ............................ 17

     C.   A Return to Conspiratorial Normalcy: Development and Implementation of Private, For-Profit, Proprietary Repricing Systems: 2016 to Present ................. 19

     D.   Competitive OON Payment Baseline Periods: Prior to 1997 and 2010-2015 ............. 20

   II.   Zelis Directly Competes with Health Insurance Company Payers, Directly Competes with Other Repricers, and Provides "Repricing" Services Contrary to the Interests of Healthcare Service Providers ................................................. 20

     A.   Zelis's Business, in General, and Applicable Repricing Incentives ............ 20

     B.   Zelis Directly Competes with The Repricing Services of Other OON Claims Repricers 23

     C.   As An Owner, Operator, or Manager of PPO Networks, Zelis Directly Competes with Other Commercial Payers .................................................. 23

   III.   The "Repricing" Services Offered by Zelis ................................................ 27

A.    Zelis's Repricing Services, Generally ............................................................ 27

B.    Zelis's Established Reimbursement Solution® ("ERS"), so-called "Market Pricing". 29

C.    Zelis's Reference-Based Pricing ("RBP") Service ...................................... 31

D.    Even if Marketed Separately, Zelis Acknowledges That Its Pricing Services Operate or Can Be Operated Cohesively ............................................................... 33

E.    Zelis's Communicated Repricing Amounts Cannot Be Considered Proposals, Recommendations, or Suggestions ................................................................. 34

F.    Zelis's Post-Repricing Claims Negotiation and Appeals Process ............... 37

IV.    The Relevant Geographic and Service Markets at Issue ............................... 38

A.    Relevant Market Definition, Generally ......................................................... 38

B.    Relevant Geographic Market ........................................................................ 38

C.    Relevant Service Market ............................................................................... 38

V.    Zelis Has Market Power and Monopsony Power in The Relevant Market ...................... 43

VI.    As Confirmed by the U.S. Supreme Court, OON Payments Made by Commercial Payers to Providers Can Be Price-Fixed and Collusively Suppressed .................................. 45

VII.    Anti-competitive Acts and The Contours of The OON Payment Conspiracy .............. 50

A.    Zelis, the Commercial Payer Defendants, and Their Co-Conspirators Have Formed, Executed, and Enforced an Information Sharing, Price Fixing, and OON Payment Suppression Conspiracy ................................................................................. 50

B.    Agreements to Conspire and Share Competitively-Sensitive Information Between and Among Zelis and Health Insurance Company Payers ...................................... 52

1.    Agreements To Conspire To Suppress OON Payments and To Share Information, Generally ........................................................................................................ 52

2.    Verbal Information Sharing ........................................................................... 53

3.    Written and Contract-Based Information Sharing ........................................ 53

4.    Electronic Information Sharing ...................................................................... 54

C.    Commercial Payers Share CSI and Other Related Information Directly Between and Among Each Other ......................................................................................... 56

D.    Commercial Payers' Sharing of CSI with Zelis and Using Zelis To Set Prices While Knowing That Their Competitors Are Doing The Same Is Price Fixing ............. 57

E.    The Widespread Adoption and Application of Zelis's Repricing Services by Commercial Payers Have Precluded Meaningful Competitive Alternatives and Have Harmed Competition ....................................................................................... 58

iii

F.    Any Possible Procompetitive Justifications Are Legal Nullities Because Zelis's and The Commercial Payers' Conduct Is a Per Se Antitrust Violation ........................................ 58

G.    Providers and Their Patients Suffered Antitrust Injury As a Result of the Zelis Conspiracy. ........................................................................................................................ 59

H.    The Zelis Conspiracy's Existence Is Supported by Direct Evidence of Written Agreements Entered into Between Conspirators .................................................................. 66

I.    In Addition to Direct Evidence, There is Abundant Indirect and Circumstantial Evidence Supporting The Existence of The Zelis Cartel ...................................................... 67

1.    Indirect Evidence and "Plus Factors" Supporting Existence of OON Payment Conspiracy, Generally ...................................................................................................... 67

2.    Collectively High Market Concentration of Conspiracy Members ......................... 67

3.    The Market's High Barriers to Entry ...................................................................... 68

4.    Motives To Conspire ............................................................................................... 69

5.    Previous Participation in Collusive Efforts ............................................................ 70

6.    Opportunities To Conspire ...................................................................................... 71

7.    Acts Against Corporate Self-Interest ...................................................................... 72

8.    Conspiracy-Enforcement Mechanisms .................................................................... 73

9.    Exchange of Private, Confidential, Proprietary, and Competitively-Sensitive Information by Conspiracy Members ................................................................................ 74

10.    Pattern and Course of Dealing Engaged in by Conspirators .................................. 74

J.    Timing of Anti-Competitive Acts .................................................................................. 75

VIII.    Defendants' Efforts to Suppress Payments for OON Healthcare Services Have Been Enormously Successful and Have Destroyed Competition in The OON Commercial Payer Market ...................................................................................................................................... 75

Each New Act By The Defendants To Further Or Preserve The Conspiracy Has Resulted In A Newly-Started Violation Period And Efforts To Conceal The Conspiracy Have Tolled Any Applicable Statute Of Limitations .......................................................................................... 76

I.    Zelis and The Other Commercial Payers Are Engaging in A Continuing Antitrust Violation by Renewing Their Conspiracy with New and Independent Acts ............................................. 76

II.    Fraudulent Concealment ................................................................................................ 77

Anticompetitive Effects Of Defendants' Conduct, Article III Damages, Antitrust Injury, And Antitrust Standing ........................................................................................................................ 80

I.    Summary of Defendants' Anticompetitive Effects .......................................................... 80

II.    Article III Damages......................................................................................................... 81

A.    Collusively-Suppressed OON Payment Amounts ........................................................ 81

B.    Artificially Limiting Professional Choice ..................................................................... 84

III.    Antitrust Injury ................................................................................................................ 86

IV.    Antitrust Standing ............................................................................................................ 91

Class Action Allegations ................................................................................................................ 97

I.    Plaintiff Seeks To Represent And Is A Member of The Following Defined Class .......... 97

II.    Plaintiff Satisfies All Rule 23(a) Requirements ............................................................... 98

A.    The Class Is Ascertainable ........................................................................................... 98

B.    The Number of Members of The Class Is Sufficiently Numerous ............................... 98

C.    Plaintiff's Claims Are Typical of Those of Members of The Class ............................. 99

D.    Plaintiff Will Adequately Protect The Interests of The Class ...................................... 99

E.    An Action Brought Individually on Behalf of Plaintiff Shares Common Legal and
Factual Questions and Answers with an Action Brought on Behalf of The Class ............... 99

III.    Common Legal and Factual Questions Predominate over Individual Questions and
Answers ................................................................................................................................... 99

IV.    Use of The Class Action Mechanism Here Is Superior to Other Methods of Dispute
Resolution ............................................................................................................................. 101

Cause Of Action .......................................................................................................................... 101

Request For Relief ....................................................................................................................... 106

Demand For Jury Trial ................................................................................................................. 107

Plaintiff Pacific Inpatient Medical Group, Inc. ("Plaintiff" or "PIMG") brings this Section 1 Sherman Act class action against the group of companies, collectively known as "Zelis" or the "Zelis Defendants," as well as against a group of other private, commercial health insurance companies (collectively "Defendants"), based on Plaintiff's own actual knowledge, as well as on information and belief and the reasonable investigation of counsel, to pursue relief for those who provided out-of-network healthcare services to patients and thereafter received from health insurance company payers downwardly-adjusted, "repriced" payments in anti-competitively suppressed amounts in violation of Section 1 of the Sherman Act. Plaintiff alleges, as follows:

## NATURE OF THIS ACTION

1. This is an antitrust action brought to correct an illegal and destructive market distortion in the private, commercial health insurance market. Like the combined effect of a pestle and mortar, Zelis has collaborated with private commercial health insurers and other payers, and at least one other repricing competitor to crush the nation's private practice of medicine. Instead of retaining or bolstering the financial incentives to motivate future medical practitioners to sustain the substantial real and opportunity costs associated with deferring income until after gaining the education, training, and other forms of preparation necessary for a medical practitioner to provide appropriate healthcare services, Zelis and its co-conspirators have formed, worked to preserve, and successfully concealed until now a conspiracy designed to suppress payments made to healthcare service providers performing services on an out-of-network basis to the greatest extent that their coordination can achieve. This had the effect of permitting Zelis and its co-conspirators to reap windfall profits on the backs of hardworking healthcare professionals. The conspiracy at issue concerns the unlawful agreement, communication, coordination, and information sharing associated with collusively depressing and setting payments for out-of-network healthcare

services, euphemistically known as "repricing." Even if neutral sounding, such "repricing" is not based on any pre-payment, provider-payer negotiation, and goes only one direction: down.

2. The private, commercial U.S. healthcare system encompasses several types of relationships: (1) the relationship between insured and insurers (generally interpreted); (2) the relationship insurers and insureds have with an insured's employer; (3) the relationship between insurer and employer; (4) the relationship between an insured and a healthcare service provider (as encompassing both medical and dental practitioners); and (5) the relationship between a health insurer and a healthcare services provider. This antitrust matter mostly concerns this fifth relationship – that between the private health insurers, as well as other types of private, commercial health insurance payers ("Commercial Payers"), and the healthcare service providers ("Providers").

3. This fifth relationship has two Provider subtypes: Providers providing "in-network" healthcare services, and Providers providing "out-of-network" (or "OON") healthcare services. Providers performing healthcare services within a particular network of Providers ("preferred provider organization" or "PPO") are often designated as "PPO Providers" or "in-network Providers." In contrast, Providers sometimes choose to practice outside of one or more particular PPO Networks. Practitioners providing healthcare services outside of PPO Networks are regarded as out-of-network healthcare service Providers or "OON Providers". PPOs include private, commercial health insurance company payers who pay in-network Providers based on in-network payment rates. Traditionally, these in-network payments were significantly lower than out-of-network healthcare payments.

4. Sometimes a patient who has health insurance is treated by a Provider who does not work within that patient's particular PPO Network. However, depending on the terms of the patient's

2

particular policy, that patient's insurer may remain obligated to pay for the healthcare services rendered by that OON Provider. Because the Provider performing OON services is not subject to a contract with the Commercial Payer, the Provider is not under its direct control, including as to the cost of the Provider's services. Commercial Payers are dismayed by this lack of direct control and have conspired with repricers, like Zelis, and with each other to regain control over payments made to OON Providers. It is this control and its collusive impacts on the post-healthcare-service Commercial Payer-OON Provider transaction about which this matter is concerned.

5. This antitrust action involves three categories of conspirators: First, Zelis is known in the industry as a private "repricer." Using proprietary databases, methodologies, tools, and information sharing technologies, Zelis acts, in part, as a third-party who communicates out-of-network payments ("OON Payments") ultimately to be paid by payers. The second category concerns the payer-defendants, usually known as health insurance companies or preferred provider organizations ("PPOs"). Abandoning their traditional and independent role as pricing decisionmakers, this category of defendants works with repricers, including Zelis, to pay Providers. The third category includes other non-defendant co-conspirators such as other Commercial Payers and another repricer ("Co-Conspirators").

6. This conspiracy worked to "reprice," that is, downwardly adjust, claims made by out-of-network healthcare service providers in the following ways: First, Zelis obtained confidential, proprietary data, including claims, pricing, and contractual data from Commercial Payers, and developed or acquired technologies, methodologies, and other tools for the calculation and communication of repriced claims to Providers. These tools allowed for maximum amounts or ceilings to supplant any higher, individually-negotiated payment by Commercial Payers. Secondly, as Commercial Payers are incentivized to reduce costs associated with the out-of-

3

network payment part of their insurance-based venture, Commercial Payers agreed to purchase the repricing services from Zelis in order to have leverage over the bills submitted by healthcare service Providers. In exchange for Zelis's repricing services, the Commercial Payers agreed to pay Zelis a commission based on the difference between the amount billed and the amount paid, or the "savings" obtained for the Commercial Payer by the repricer. Third, Commercial Payers were not just obligated to pay for the repricing services in the form of the "savings"-based commission; they also agreed to provide Zelis with private, confidential, proprietary, and competitively-sensitive business information concerning healthcare claims, pricing, and contractual information. This requirement to share such exceptionally sensitive business information, while having access to public materials strongly suggesting or indicating that their competitors were doing the same, was key to having near-complete industry buy-in. Finally, Zelis also entered into agreements that included sharing data with and gaining access to that of a rival repricer.

7. Absent a conspiracy, the entities described above would be fiercely competing. A particular Commercial Payer would be working to persuade Providers to perform healthcare services for it, so that, in turn, their insurance products would interest employers and other consumers.[1] Instead, under the alleged payment suppression conspiracy, Zelis and Commercial Payers seek – and most often obtain – substantial discounts, including those as large as 98% off of Provider invoices.

---

[1] An article published in *The American Journal of Managed Care* by Eline M. van den Broek-Altenburg, PhD and Adam J. Atherly, PhD ("Patient Preferences for Provider Choice: A Discrete Choice Experiment"), indicates that PPO "[p]lans with larger networks have premiums between 6% and 13% higher than those with smaller networks in ACA marketplaces." *See* https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment (visited February 12, 2025) (footnote omitted). Accordingly, PPO Networks (who, in many cases, are also Commercial Payers) have a substantial economic interest in expanding their in-network practitioner directories.

8. The tools, technologies, and methodologies used by Zelis and the Commercial Payer Defendants specifically allow for the Commercial Payers to supplant their competitive negotiations with Providers for OON payments with Zelis's algorithmic or A.I.-based pricing determinations as to percentages, specific amounts, or price ceilings of payments to Providers. Defendants' use of collusively-determined percentages, payment amounts, or price ceilings is *per se* price-fixing in violation of Section 1 of the Sherman Act.

9. Prior to this OON Payment conspiracy impacting Providers, an investigation by the New York Attorney General ("NYAG") revealed that in or around 1997 a UnitedHealthcare subsidiary, Ingenix, Inc. and its associated database, Ingenix, were established to gather competitors' claims and pricing data (subsequently determined to be biased, improperly pooled, and which included downward-based payment incentives), for the benefit of all subscribing Commercial Payers and to the detriment of Providers performing OON healthcare services. Following an investigation, NYAG determined that Commercial Payers used Ingenix to work together with other Commercial Payers to suppress OON payments. The Commercial Payers entered into settlements with the NYAG and others, which required, in part, UnitedHealthcare to cease Ingenix operations, and for all settlors to stop using Ingenix, to pay millions toward the creation of an unbiased source of payment data based on the "usual, customary, and reasonable" (or "UCR") payment approach, and required such payers to use what became known as "FAIR Health" exclusively for a five-year period, approximately from 2010 through approximately the end of 2015, or possibly by as late as the second quarter of 2016.

10. After Ingenix, Commercial Payers based their payment of out-of-network claims on FAIR Health until the exclusive use terms expired in 2015 or early-to-mid-2016. Zelis was ready for the Commercial Payers' exodus from FAIR Health, issuing a press release on June 13, 2016

announcing a merger of four healthcare payment related entities, its "rebranding" to "Zelis," and
-- knowing that its success depended on industry buy-in -- explaining that it "provides a
comprehensive array of network management, claims integrity, payment remittance solutions and
analytical services for medical, dental and workers' compensation claims to **over 500 payor
clients**." *Northlake Chiropractic, Inc. v. Zelis Healthcare Corp.*, No. 1:19-cv-08087 (JZL) (N.D.
Ill. Feb. 29, 2020), at ECF No. 1-2 (Ex. B). (Emphasis added). Commercial Payers, eager to drop
UCR pricing in favor of more aggressive approaches, signed on with Zelis. Its clients now include
"over 770 payers," with an "average client tenure" of "13 years," including the "top 5 national
health plans". *See* "Zelis for Third Party Administrators," https://www.zelis.com/built-
for/payers/third-party-administrators/ (visited March 12, 2025); August 13, 2024 Zelis Press
Release, "Zelis Named to Inc. 5000 List of Fastest-Growing Companies"
https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (visited
March 12, 2025).

11. Armed with the knowledge of significant industry participation, including, from the outset,
the involvement of "the top 5 national health plans," Commercial Payers were enthusiastic about
paying for Zelis's repricing services and joining the conspiracy. On information and belief, at the
heart of this unlawful conspiracy (sometimes referred to herein either as the "Zelis Cartel" or the
"OON Payment Conspiracy") are agreements between Zelis and other Commercial Payers to share
claims, pricing, and contractual information and, based on this information, agreements to fix
and/or suppress the amount of payments issued to Providers for OON healthcare services.

12. Zelis, the Commercial Payer Defendants, and their Co-Conspirators secretly agreed to
suppress OON Payments by limiting their OON Payments to specific amounts, ranges,
percentages, or below certain thresholds, as determined by concealed and "proprietary" analytical

tools, databases, and methodologies owned and operated by Zelis, including Zelis's "Established Reimbursement Schedule" or "Established Reimbursement Solution" ("ERS") and its "Reference-Based Pricing" ("RBP") services. Zelis and its Co-Conspirators are also liable to the extent they incorporated the collusive effects of others' efforts into the Zelis Cartel through agreements reached with a competing repricer, which were then used by Zelis to reprice OON claims.

13. Zelis repriced OON claims by feeding its analytical tools not only its own pricing and claims data, but also otherwise confidential, "proprietary," and competitively-sensitive claims, pricing, and contractual data as submitted by directly-competing Commercial Payers, often in real time and in accordance with written agreements and sharing-enabling technologies. As "inten[ded]," the "repriced" OON payment amounts generated by Zelis were "effective" and "stable," steeply discounted from the original amounts claimed, and priced far below what Commercial Payers would pay Providers absent the OON Payment Conspiracy.

14. The individual Commercial Payers have abandoned their independent pricing roles and responsibilities to their collusion-facilitating repricing agent, Zelis. Further, *County of Stanislaus v. Pacific Gas & Elec. Co*., No. CV-F-93-5866-OWW, 1994 WL 706711 (E.D. Cal. Aug. 25, 1994) confirms that "an entity can incur antitrust liability for the acts of its . . . agents, when acting within the scope of their apparent authority, despite the agent's desire to benefit only him or herself." (citing American Society of *Mechanical Engineers v. Hydrolevel Corp*., 456 U.S. 556 (1992); *City of Vernon v. S. Cal. Edison Co*., 955 F.2d 1361, 1369-1370 (9th Cir. 1992)). Zelis acts within the scope of its apparent authority and as an agent for Commercial Payers when it reprices submitted claims, making Commercial Payers and their co-conspirators liable for the acts of Zelis relating to the conspiratorially-derived downwards adjustment of payment to Providers for their performance of OON healthcare services. Of course, *Duffy v. Yardi Sys., Inc*., No. 2:23-cv-01391-RSL (W.D.

Wash. Dec. 5, 2024), at ECF No. 189 at 7 establishes that a per se violation of the Sherman Act

has occurred when a "[Commercial Payer] entered into a formal agreement with [Zelis] as early

as 2016 to provide its commercially sensitive data, knowing that [Zelis] was collecting similar data

from [that Commercial Payer's] competitors which it would use to generate [out-of-network

payment] rate recommendations that would result in [artificially low payments]." The facts, as

alleged herein, sufficiently follow both *County of Stanislaus* and *Duffy* to plausibly support a

violation of Section 1 of the Sherman Act.

15. To remedy the economic harm caused by Zelis's and the Commercial Payers' illegal and

anticompetitive conduct, Plaintiff PIMG – on behalf of itself and a class of all others similarly

situated – brings this Section 1 Sherman Act action.

JURISDICTION, VENUE, AND INTERSTATE COMMERCE

16. This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 16 of

the Clayton Act (15 U.S.C. § 26). Plaintiff's Sherman Act claim seeks monetary damages,

injunctive relief, costs of suit, and reasonable attorney's fees.

17. This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15

U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

18. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15

U.S.C. §§ 15, 22, and 26; and 28 U.S.C. § 1391(b), (c), and (d), as one or more Defendants resided

or transacted business in this District, is licensed to do business or is doing business in this District,

and as a substantial portion of the affected interstate commerce was carried out in this District.

19. This Court has personal jurisdiction over all Defendants under Section 12 of the Clayton

Act, 15. U.S.C. § 22 and 28 U.S.C. § 1391 because each Defendant: (a) transacted business

throughout the United States, including in this District; (b) paid healthcare providers throughout

the United States, including from this District, to those who provided healthcare services on an out-of-network basis (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business in this District.

20. The activities of Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

21. This conduct includes the Providers' performance and sale of healthcare services and products; the receipt of claims for OON healthcare services by the Commercial Payer Defendants and the Non-Defendant Commercial Payers; the processing of such claims by repricers like Zelis; and the payment of claims to the Providers. Further, the claims submitted by Plaintiff and other Providers include charges for services, products, and facilities supplied to persons who reside in states other than those where Zelis or the Commercial Payer Defendants reside. In addition, Zelis itself owns, manages, or operates PPO Networks in states other than the one where it resides. Further, Zelis, with headquarters in both Boston, Massachusetts and Bedminster, New Jersey, as well as offices located in various states within the United States, often engages in interstate commerce simply by conducting claims-processing, pricing, repricing, or other related services as such efforts involve a Zelis office located in one state, an additional party residing in another state, and, on occasion, yet another Zelis office located in a different state. Further, with respect to patients who receive OON healthcare services from Plaintiff for which the Plaintiff submits a claim to Zelis or any of the Commercial Payer Defendants or Co-Conspirators, and where Plaintiff's claim is then paid, the process of receiving a claim and then providing factional payment thereof

to Plaintiff involves money flowing from a state outside of that where the Plaintiff Provider resides and into the state where the Plaintiff Provider resides, causing Plaintiff economic detriment, harm, and damages on an interstate basis.

22. Zelis and other Commercial Payer Defendants sell and market PPO Networks, PPO Plans, insurance products and services, repricing products and services, and other related products and services to persons who reside in states other than those where Zelis or the Commercial Payer Defendants reside. In addition, Zelis itself owns, manages, and/or operates PPO Networks throughout the United States, D.C. and its territories. Finally, the Commercial Payer Defendants own, manage, and/or operate PPO Networks throughout the United States, D.C., and its territories.

**PARTIES**

I.     **Plaintiff**

23. Plaintiff Pacific Inpatient Medical Group, Inc. ("PIMG" or "Plaintiff"), is a California corporation having its principal place of business in San Francisco, California. PIMG, is a team of some 100 doctors and other healthcare professionals includes internal medicine physicians, doctors of osteopathy, nurse practitioners, and physician assistants who practice medicine in hospitals, skilled nursing homes, and an ambulatory clinic. PIMG's practices include general medical care, specialty consultation, surgical co-management and related services in internal medicine, geriatrics, palliative care, and infectious diseases. In nursing homes, they manage post-acute care and assist in transitioning patients through different phases of illness. PIMG's healthcare professionals have performed out-of-network healthcare services for patients on both an emergency and non-emergency basis during the Class Period. Additionally, PIMG's staff members have provided out-of-network healthcare services to patients and have submitted claims to commercial insurance company payers for payment for those services. Such claims were

10

repriced by Zelis and/or one or more of its repricing subsidiaries.  PIMG suffered harm in the form of collusively-suppressed payments from the repricing efforts of Zelis, one or more of the Defendant Commercial Payers, or their Co-Conspirators. Throughout the Class Period, Plaintiff provided out-of-network healthcare services and received repriced payments in amounts below that which PIMG would have received absent the conspiracy. Throughout the Class Period, Plaintiff provided out-of-network healthcare services and received repriced payments in amounts below competitive levels, and suffered injury, including antitrust injury, because of the violations alleged herein.

## II.   Defendants

### A.  Zelis Entities

24. Defendant Zelis Healthcare, LLC is a limited liability corporation whose "State of Formation" is Delaware and whose principal place of business is 149 Newbury St., Fifth Floor, Boston, MA 02116.   On information and belief, Zelis Healthcare, LLC took over the responsibilities of the now apparently inactive, terminated, or withdrawn entity, Zelis Healthcare Corporation (including "Zelis Healthcare Corp." and "Zelis Healthcare, Inc.").

25. Defendant Zelis Claims Integrity, LLC is a Delaware limited liability corporation whose principal place of business is located at 149 Newbury St., Fifth Floor, Boston, MA 02116 and whose "Business Main Address" is 149 Newbury St., Fifth Floor, Boston, MA 02116

26. Defendant Zelis Network Solutions, LLC is a Georgia "Domestic Limited Liability Company," whose principal place of business is located at 149 Newbury St., Boston, Massachusetts 02116, and whose "Principal Office Address" is 149 Newbury St., Boston, MA 02116.

27. There are more than a dozen Zelis-related legal entities that may engage in the conduct described herein, but whose structure and role are far from transparent. The term "Zelis" encompasses all activities of Zelis Healthcare, LLC, Zelis Claims Integrity, LLC, and Zelis Network Solutions, LLC.

**B. Commercial Payer Defendant(s)**

28. Aetna, Inc. ("Aetna"), is a Delaware Corporation with its headquarters located in Hartford, Connecticut. Aetna is a subsidiary of CVS Health Corporation. One of the largest commercial health insurance payors in the U.S., Aetna has a commercial insurance network that pays both in-network and out-of-network claims from healthcare providers in the District of Columbia and all 50 states. Aetna is the parent company to, or is otherwise affiliated with or related to numerous commercial health insurance plans and prescription drug plans that operate and serve patients and healthcare providers in the U.S. Aetna-related plans issue insurance and/or provide administrative services concerning healthcare claims under fully insured commercial health insurance plans, self-funded administrative service only health plans, including PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

29. The Cigna Group ("Cigna") is a Delaware corporation with its principal place of business located in Bloomfield, Connecticut. Cigna is a parent company to or is otherwise related to various commercial health insurance plans and prescription drug plans that operate in the U.S. Cigna's plans issue insurance or provide administrative services concerning healthcare claims regarding fully insured commercial health insurance plans, self-funded administrative service only health plans, including PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

12

30. Elevance Health, Inc. ("Elevance"), formerly Anthem, Inc., is an Indiana Corporation having its principal place of business located in Indianapolis, Indiana. Elevance is a member of the Blue Cross and Blue Shield Association, which is a joint venture of insurance companies that, together, offer members access to a nationwide network of healthcare providers. As part of its member relationship, Elevance licenses certain trademarks and service marks from the Blue Cross and Blue Shield Association for use in 14 states. Elevance is the parent company or is otherwise affiliated with or related to various commercial health insurance plans and prescription drug plans that operate in the U.S. Elevance's plans issue insurance or provide administrative services concerning healthcare claims regarding fully insured commercial health insurance plans, self-funded administrative service only health plans, including PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

31. Humana, Inc. ("Humana") is a Delaware corporation having its principal place of business located in Louisville, Kentucky. Humana is the parent company of or is otherwise affiliated with or related to several commercial health insurance plans and prescription drug plans that operate in the U.S. Humana's plans issue insurance or provide administrative services concerning healthcare claims regarding fully insured commercial health insurance plans, including PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.

32. Aetna, Cigna, Elevance, Humana and other PPO insurers have each entered into one or more out-of-network repricing agreements with Zelis, have each participated in the conspiracy, committed or omitted acts, and/or made statements in furtherance of, and is a member of, the Zelis Cartel.

### CO-CONSPIRATORS, AGENTS, AUTHORITY, RECIPROCAL AGENCY, AND COMMON CORPORATE INTEREST

## I.     Co-Conspirators

33. Various persons and/or firms, whether currently known or not, not named as Defendants, have participated as co-conspirators in the violations alleged herein and performed acts, made statements, or avoided acts in furtherance thereof.

34. Defendants are jointly and severally liable for the acts of their co-conspirators, whether those co-conspirators are named as Defendants or not.

## II.    Agents

35. The anticompetitive and unlawful acts alleged against Defendants were authorized, ordered, permitted, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the control, direction, operations, or management of the Defendants' businesses and affairs. Defendants are also liable for actions conducted or avoided in furtherance of the conspiracy alleged herein by companies acquired or transformed into Defendants through mergers and/or acquisitions.

36. Each corporate Defendant, through any and all of its respective subsidiaries, affiliates, and/or agents, operated as a single unified entity.

## III.   Authority

37. Each and every agent associated with a particular Defendant acted and operated or avoided action in furtherance of the conspiracy under the authority and apparent authority of its respective principals, including of that particular Defendant.

38. To the extent any agent acted or avoided action in representation or in agency as to more than one Defendant, such agent acted or avoided action in furtherance of the conspiracy under the authority and apparent authority of all associated principals, including of multiple Defendants.

14

## IV.    Reciprocal Agency of Defendants and Co-Conspirators

39. Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

40. Each Defendant and co-conspirator acted as the principal, agent, or joint-venturer of the other Defendants and co-conspirators with respect to the acts, violations and common course of conduct alleged in this Complaint.

## V.    Common Corporate Interest of Each Defendant's Related Entities

41. Several of the entities listed as Defendants include parent and subsidiary entities. When Plaintiff herein refers to a corporate family by a single name concerning the participation within, furtherance of, or concealment of a conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in such conspiratorial acts or meetings on behalf of all Defendant companies included within that corporate family. Because nearly all of Defendants organize, market and promote themselves as corporate families, individual participants in such conspiratorial acts did not always know or realize the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within such a corporate family. All of the Defendant entities included within the corporate families were active, knowing participants in the conspiracy to suppress payments made to Providers for out-of-network healthcare services.

15

FACTUAL ALLEGATIONS

I.    **A Brief History of Conspiratorial Payment Suppression within The Healthcare Industry and Possible Competitive Baseline Periods**

   **A. The Ingenix Conspiracy Period: 1997-2009**

   42. Prior to the OON healthcare pricing conspiracy alleged in this complaint ("Complaint"), there was a previous conspiracy that impacted payments for those providing healthcare services.

   43. From approximately 1997 to 2009, several Commercial Payers avoided competition and worked together to avoid competing with one another by fixing payment rates through a UnitedHealthcare Group subsidiary, known as Ingenix, Inc.

   44. Before 1997, insurers paid out-of-network healthcare service providers based on application of usual, customary, and reasonable ("UCR") rates as established by two independent databases: Prevailing Healthcare Charges System ("PHCS") and Medical Data Resource ("MDR"). PHCS was developed in 1973, while MDR dates from 1987.

   45. Realizing that health insurers stood to gain dramatically from underpaying OON Providers, in the 1997-1998 period UnitedHealthcare subsidiary, Ingenix, Inc. purchased both PHCS and MDR, and then consolidated them around 2001 into a new database called "Ingenix".

   46. Vertically integrated with an insurer, UnitedHealthcare, Ingenix was inherently conflicted. Further, its database was self-servingly "polluted" as it improperly included already heavily discounted *in-network* payment rates and by systematically removing some otherwise valid, but higher, medical payment amounts. The New York Attorney General's Office conducted an investigation, which further revealed that participating insurers would "pre-scrub" data to eliminate higher thresholds of payment amounts prior to submitting the data to Ingenix. As a result, Ingenix was populated with biased, improperly pooled, and inaccurate data, which, paid OON Providers at artificially suppressed payment amounts. An Ingenix employee testified that "Ingenix

16

has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low median or 80th percentile . . . rates charged by health care providers in any given area." Use of Ingenix helped to eliminate independent, UCR-based payment amounts.

47. As part of this healthcare service payment suppression conspiracy, UnitedHealthcare's subsidiary, Ingenix, used claims and payment information as submitted by otherwise competing Commercial Payers in order to calculate healthcare service payment amounts.

48. Following an investigation into Ingenix by NYAG, Commercial Payers, including UnitedHealthcare, Aetna, WellPoint, and others were revealed to have participated in a conspiratorial payment-suppression scheme; that the Ingenix database was consistently understating UCR payment rates; and, as a result, the Ingenix database conspiratorially suppressed payment amounts for OON healthcare services by 10% to 28%.

49. Physicians and patients filed numerous lawsuits against health insurers that used Ingenix. Further, in 2000 the American Medical Association and multiple state-based medical associations filed a class action matter against UnitedHealth alleging violations of various antitrust laws and the Racketeer Influenced and Corrupt Organizations Act. UnitedHealthcare settled this class action in 2009, agreeing to pay $350 million to compensate class members.

**B.  The FAIR Health Database Period: 2010-2015**

50. In 2009, following the NYAG investigation and associated litigation, 12 healthcare insurance companies settled with the Attorney General. Part of the settlement with the NYAG required the settling insurers to devote substantial funds toward the creation of an unbiased and independent database designed to replace Ingenix. This new database became known as "FAIR Health," and its owning/managing company became known as FAIR Health, Inc. The terms of the settlement required the settling insurers to use FAIR Health exclusively for a five-year period.

17

51. As part of UnitedHealthcare's settlement with NYAG, UnitedHealthcare agreed to cease operations of its Ingenix, Inc. subsidiary, including its Ingenix database. As a result, no insurer could use Ingenix anymore. As part of their respective settlements, insurers turned to the source of data from which to base out-of-network payment amounts – FAIR Health. However, in accordance with the 5-year exclusive-use settlement terms, reliance on FAIR Health was short-lived.

52. Fair Health, Inc., the database's owner/operator, was incorporated in 2009 and was released for insurer use by the middle of 2010.

53. As part of the NYAG settlement, the settling insurers agreed not to use or develop any alternative healthcare payment database for a five-year period. As FAIR Health was available sometime between the middle of 2010 or the beginning of 2011, this five-year exclusive-use period began in mid-2010 to early 2011 and extinguished during 2015 and/or in early 2016.

54. In contrast to Ingenix, Inc. and Zelis, FAIR Health, Inc. is a non-profit entity, whose database was designed to provide an unbiased view of healthcare service payment amounts in order to establish usual, customary, and reasonable ("UCR") payment rates. Such UCR rates were based in part on the performance of a particular medical service as conducted in a particular geographic market. Also, in contrast to tying commissions to the amounts "saved" by Commercial Payers, subscribers paid FAIR Health, Inc. a flat annual fee for access to this data.

55. Incorporating rules designed to prevent bias and pollution, the adoption and use of FAIR Health, Inc.'s database began to cause payment levels to course-correct. Use of FAIR Health resulted in an approximate 26% increase in out-of-network payments. While half of that increase was apparently based in cost-of-living increases, the other half represented the true-ing of the data

18

available upon which to base payment for out-of-network healthcare services. However, the Providers' receipt of FAIR Health's more accurately-determined payments was only temporary.

**C. A Return to Conspiratorial Normalcy: Development and Implementation of Private, For-Profit, Proprietary Repricing Systems: 2016 to Present**

56. Participating insurers despised FAIR Health's impact on OON payment levels and their impact on their absolute profits and profit margins.

57. As the exclusive-use periods expired and insurers were free to develop or use other pricing databases, insurers began to replace their reliance on both the concept of applying usual, customary, and reasonable ("UCR") payment amounts, in general, and their reliance on the FAIR Health database, in particular. By mid-June 2016, hundreds of Commercial Payers had already replaced or added to FAIR Health with Premier Health Exchange, Inc. ("PHX"), which eventually became Zelis. On June 13, 2016, at around the expiration of the NYAG settlement's exclusive use term, Zelis issued a press release explaining that it "provides a comprehensive array of network management, claims integrity, payment remittance solutions and analytical services for medical, dental and workers' compensation claims to over 500 payor clients." *Northlake Chiropractic, Inc. v. Zelis Healthcare*, No. 1:19-cv-08087 (N.D. Ill. Dec. 12, 2019), at ECF No. 1-2 (Ex. B).

58. The return to private, for-profit, proprietary repricing systems has been a runaway success for increasing the profits of Zelis, the Commercial Payers and the repricers. By August 13, 2024, Zelis boasted that its "platform serves more than 750 payers, including the top 5 national health plans, BCBS insurers, regional health plans, TPAs and self-insured employers . . . ." Zelis currently asserts that it "[p]artner[s] with over 770 insurance companies."

**D.  Competitive OON Payment Baseline Periods: Prior to 1997 and 2010-2015**

59. Two periods suggest the existence of competition-based[2] OON healthcare pricing: (1) Before Ingenix's arrival in 1997; (2) during operation of FAIR Health around 2010 through 2015.

60. In contrast, from around 2016 to the present, as significant numbers of Commercial Payers migrated from FAIR Health to Zelis's for-profit repricing services like those offered by Zelis, coordinated payment suppression for out-of-network healthcare services became, once again, the norm.

**II.    Zelis Directly Competes with Health Insurance Company Payers, Directly Competes with Other Repricers, and Provides "Repricing" Services Contrary to the Interests of Healthcare Service Providers**

**A.  Zelis's Business, in General, and Applicable Repricing Incentives**

61. Zelis provides to Commercial Payers technology-enabled and override-subservient services that allow for the downward adjustment of payments to be made to Providers who perform healthcare services for patients on an out-of-network ("OON") basis. For example, Zelis touts use of artificial intelligence in helping its clients to obtain savings on submitted claims: Zelis "[l]everage[s] [an] AI-powered dynamic optimization engine to find quality recommended savings on every claim[.]" And: "Our AI-powered optimization engine uses dynamic routing to examine every available saving channel to drive valued savings."

62. Such downward adjustments are described by Zelis as "repricing." There is no pre-pricing negotiation as between Zelis and the healthcare service Provider who receives Zelis's repriced payment amount. Also, although neutral sounding, "repricing" of healthcare services goes only one direction: down.

---

[2] Or, at least periods where blatant, coordinated payment-suppression efforts for out-of-network healthcare services are not reported to have occurred.

63. In addition, the "connected platform" that Zelis uses to downwardly adjust such OON payments does not "align[] interests across payers" and "providers," but, instead," submerges the interests of the healthcare service "providers" under those of the "payers."

64. Whether building technology or buying it, Zelis has worked to bolster its "core payments business" relating to the repricing of OON healthcare services.

65. While still named "Stratose®," Zelis's ancestral entity acquired a company called "PHX" in 2003, thus "integrating claims cost management strategies" into its "innovative wrap network solution" offering.

66. Thereafter, Stratose® acquired "Pay-Plus Solutions" in 2012, thus "bringing payment innovations to our growing platform." Stratose® re-branded itself in 2015, "promising a single-source solution to lower costs." In 2017, Zelis acquired a series of new companies, including Truven (formerly, an independent source of pricing information), Ethicare, Strenuus and the Maverest Dental Network. In 2018, Zelis acquired Netminder. In 2019, Zelis acquired RedCard. Zelis then acquired Sapphire Digital in 2021. Zelis acquired two entities in 2022. First it "[e]xpanded Medicare capabilities, reference-based pricing, and payment integrity with acquisition of PayerCompass." It also "[e]xpand[ed] payments network and capabilities with acquisition of PaySpan." As reported by *AxiosPro* on November 15, 2022, "[t]he acquisition of Payspan gives Zelis capabilities around managing insurance premium payouts, says Yusuf Qasim, president of payments optimization."

67. This same *AxiosPro* article reported that "Zelis generates around $450 million in EBITDA . . . ." Data compilation by "Grojo," which cites articles dating from late April 2022 in its "Zelis News" section, estimates Zelis's annual revenue as "429.5M[.]" More recent data compilation by "leadiQ," indicates that "[a]s of November 2024, Zelis's annual revenue reached $750M."

68. Zelis has been valued as of fall 2024 "at about $17 billion," and that its owners include "Bain Capital and Parthenon Capital[.]" According to a September 27, 2023 piece authored by Zelis's CEO, Amanda Eisel, "[p]rior to Zelis, Amanda was an Operating Partner at Bain Capital focused on technology and healthcare IT companies." Collectively, Bain Capital and Parthenon Capital are majority owners of Zelis. Further, they both maintain positions strongly suggestive of significant influence over Zelis. For example, as part of Ms. Eisel's introduction as Zelis CEO, the August 18, 2021 press release specified "'[a]fter working very closely with the Company [Zelis] during the last two years, we are excited Amanda is now officially joining the Zelis family as its new Chief Executive Officer,' said Devin O'Reilly, Managing Director, Bain Capital Private Equity." The press release further quoted Mr. O'Reilly: "'Amanda is a growth-oriented leader who is exceptionally well-positioned to accelerate Zelis's plans for growth and innovation.'" Bain Capital's influence was not limited to Zelis's CEO. As announced on August 16, 2022, Zelis appointed Wayne S. DeVeydt to its Board of Directors, noting that "Wayne is also a Board Member of Centene Corporation and an Operating Partner at Bain Capital." Not to be left out, Parthenon Capital anointed two of its own with access to the Zelis boardroom. Co-CEO and Managing Partner of Parthenon Capital, David J. Ament "has been involved in a number of portfolio company Board of Directors, including . . . Zelis." Further, Parthenon Capital Vice President, Gabe Moynihan, serves as a "Board Advisor" to Zelis's Board of Directors.

69. In exchange for its downward adjustment of Providers' OON claims, Zelis receives a percentage of the amount that the Payer saves.

70. As explained in a March 6, 2020 order, "'Under Cigna's Cost Savings Program, Zelis and CHP are incentivized to drastically reduce claims amounts payable to providers because the commission they receive is calculated as a percentage of savings.'" *IJKG Opco LLC v. Gen'l Trad.*

*Co.*, No. 17-6131 (KM) (JBC), 2020 WL 1074905, at *5 (D.N.J. Mar. 6, 2020) (citing 2AC at ¶42).

71. Zelis does not dispute using a repricing commissions scheme: "Defendants [including Zelis] contend that the administrative record and discovery already produced indicate that while Zelis received a commission and fee for conducting a bill review [of] the BMC claim, that does not necessarily give right to a conflict of interest." *IJKG Opco LLC v. Gen'l Trad. Co*., No. 17-6131 (KM), 2019 WL 8164381, at *5 (D.N.J. Apr. 29, 2019) (internal citations to the docket omitted).

72. Zelis's repricing incentive scheme is designed such that the less money that is paid to OON Providers from an originally submitted claim, the more money Zelis receives.

**B.  Zelis Directly Competes with The Repricing Services of Other OON Claims Repricers**

73. Zelis's and business operations, incentives, and priorities are similar to those of other repricers. In fact, Zelis is identified as a competing repricer by another repricer in its corporate SEC filings in the areas of "Analytics-Based Services" and "Network-Based Services."

74. Zelis, in addition to providing certain "Network-Based Services," sells and provides "repricing" services to other Commercial Payers. In providing such "repricing" services to other Commercial Payers, Zelis directly competes with other healthcare claims "repricers."

75. To the extent that Zelis incorporated or incorporates anti-competitive conduct by competing repricers into Zelis's systems, repricing "recommendations," and related services, Zelis has furthered its own conspiracy with a horizontal competitor.

**C.  As An Owner, Operator, or Manager of PPO Networks, Zelis Directly Competes with Other Commercial Payers**

76. Zelis directly competes with other health insurance companies, PPO Networks, managed care organizations ("MCOs"), self-funded plans, third-party administrators ("TPAs"), and self-

insured entities (collectively, "Commercial Payers"). Like the other Commercial Payer Defendants and Commercial Payer Co-Conspirators, Zelis is a payer.

77. Zelis's status as a "payer" or "Commercial Payer" is legally significant as Zelis and its Commercial Payer Co-Conspirators engaged in improper and illegal sharing of competitively-sensitive claims, pricing, and contractual information as between direct competitors ***at the moment*** when such information was shared, and at ***every subsequent moment*** such information was shared thereafter. Zelis's status as a Commercial Payer is plain.

78. Take Zelis's own word about its status as a Commercial Payer. Zelis, including its CEO, has repeatedly described itself as a payer. For example:

•        "As a leading payments company in healthcare, we guide, price, explain, ***and <u>pay for care on behalf of insurers and their members</u>***." (Emphasis added).

•        As described by Zelis, Zelis's business includes "[p]ayments and communications targeted to all medical and non-medical payees".

•        Zelis's CEO, Amanda Eisel, describes Zelis as a "payer[]": "The onus is on ***us as payers***, providers and solutions partners to enable improved care decisions and to generate costs savings and opportunities for them." (Emphasis added).

79. Zelis publicly announced in its network business capabilities (included as exhibits to legal filings)that Zelis "provides ***a comprehensive array of network management***, claims integrity, payment remittance solutions and analytical services for medical, dental and workers' compensation claims to over 500 payor clients." *Northlake Chiropractic, Inc. v. Zelis Healthcare Corp.*, No. 1:19-cv-08087 (JZL) (N.D. Ill. Feb. 29, 2020), at ECF No. 1-2 (Ex. B) (June 13, 2016 BusinessWire Press Release) (emphasis added).

24

80. New Jersey's Department of Banking & Insurance includes "Zelis Network Solutions, LLC" among its "Organized Delivery Systems," explaining that an:

> Organized Delivery System (ODS) is a legal entity that contracts with a carrier for the purpose of providing or arranging for the provision of health care services to those persons covered under a carrier's health benefits plan, but which is not a licensed health care facility or other health care provider. [¶] Examples of the types of entities that are an ODS include preferred provider organizations (PPOs), Physician Hospital Organizations (PHOs) and Independent Practice Associations (IPAs).

By New Jersey's definition and determination (a state where Zelis maintains significant operations), Zelis is a type of Commercial Payer.

81. The entity, Change Healthcare, lists Zelis as a "Payer," noting that the Payer Name[d]" Zelis has CPID numbers "6630" and "6731" and Payer ID "88057".

82. Further, other Commercial Payers regard Zelis as a type of Commercial Payer, known as a third-party administrator ("TPA"). As explained by Kaiser Permanente, "KPIC also utilizes another TPA, Zelis Healthcare, to review claims to identify errors and anomalies, and to determine the appropriateness of billing." Similarly, in a "Petition Commencing Assignment for Benefit of Creditors," filed on March 14, 2019 in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida Civil Division in *In re Laser Spine Surgery Center of Cincinnati, LLC*, Zelis Health Solutions PMB 404, 15560 N Frank Lloyd Wright Blvd, Scottsdale, AZ 85260, is listed as one of a number of "Third Party Insurance Payers".

83. As a fellow "payer," Zelis competes directly with the Commercial Payer Defendants and Commercial Payer Co-Conspirators.

84. As part of its direct competition with "payers," including Commercial Payer Defendants, Zelis participates in the PPO Network industry.

85. In its Provider-directed marketing, Zelis confirms its participation in the PPO Network business as it requests Providers to "[j]oin one or more of ***our*** networks, where you'll gain access to healthcare consumers in your area who are shopping for care . . . ." (Emphasis added).

86. Zelis's foundational history is tied directly to participating in the PPO Network industry. As Zelis recounts, "[f]ounded as Stratose® in 1995, we first focused on expanding access and delivering an innovative wrap network solution to small and mid-market players."

87. Zelis not only serves as a "payer," but also as a healthcare network architect. Zelis boasts that it can "[m]odel and build primary, secondary, wrap and specialty networks[.]"

88. Zelis's network-related expertise applies to "any type of network program," which even encompasses workers' compensation-related health networks: "Zelis also offers access to a National Workers' Comp Provider Network that enables payers to take advantage of nationwide and regional network access opportunities and deep discounts. We can customize, build, and manage any type of network program." Zelis's network business also includes dental networks: "Zelis takes an integrated approach to reduce the cost and complexity of managing your dental network . . . ." Zelis also confirms that it has its own "national dental provider network": "Leveraging ***our*** national dental provider network increases network access and savings for your practice." (Emphasis added).

89. Further, with respect to dental networks, Zelis describes itself as "the market leader" in dental network services: "Join the market leader in partnering with dental payers to help build and optimize networks and payment strategies." Zelis further notes that it has "the full suite of solutions for dental payers: Network Analytics, Network Design, Network Access and Savings, Payments and Communications."

26

### III.    The "Repricing" Services Offered by Zelis

#### A.  Zelis's Repricing Services, Generally

90. Zelis provides "repricing" services for private, commercial health insurers, managed care organizations, third-party administrators, PPO Networks, self-funded plans, and self-insured entities ("Commercial Payers"). Further, Zelis's "repricing" services are designed to help Commercial Payers ignore Providers' claims submitted for OON healthcare services, and to replace those amounts with substantially smaller payment amounts.

91. Zelis describes its services in glowing, pious, and self-serving terms, characterizing itself as the source for pricing accuracy, and integrity. For example, it claims that its tools and methodologies "[e]nsure the accuracy and integrity of claims – before you pay. Pre-pay payment integrity solutions . . . reduce billing inaccuracies for your members."

92. On a simplified basis, the following summarizes how Zelis's "repricing" tools function.

93. <u>Emergency Context</u>: With respect to emergencies, a patient that is insured by one of Zelis's Commercial Payer clients/competitors receives healthcare services from a Provider (for example, Plaintiff). If that Provider does not have a pre-existing contract governing the payment associated with providing emergency healthcare services with that insurer, the patient's insurer remains obligated to pay for the emergency healthcare services rendered to the insured individual. The Provider then treats the patient on that emergency basis, and the Provider submits a claim to the insurer reflecting its charges. However, instead of paying the Provider's submitted claim directly, the insurer sends the Provider's claim to Zelis. Zelis then applies its "analytics" tools (which are informed by horizontal competitors' confidential, propriety, and competitive data) to "reprice" (that is, downwardly adjust) the Provider's submitted claim pursuant to Zelis's repricing agreement that it maintains with the insurer. Zelis then presents the Provider's now-repriced (downwardly

adjusted) claim on a take-it-or-leave-it basis. If the Provider does not "accept" Zelis's "repriced" payment amount for such emergency healthcare services, the Provider may engage in time-pressured and one-sided "negotiations" with or "an appeal" of the repriced amount, resulting in further delay in payment of the originally-submitted OON healthcare services claim, possibly at an even further decreased amount only after significant administrative burden and expense.

94. <u>Non-Emergency Context</u>: A similar sequence exists for payment of non-emergency OON healthcare service claims. In this hypothetical circumstance, the patient is a subscriber to a particular health insurance plan, but seeks healthcare services from a Provider that is not among those listed as providing in-network healthcare services as part of the insurer's PPO Network, or from a Provider that is in-network but administered OON services. That is, in this example, the patient seeks and receives out-of-network, non-emergency healthcare services from the Provider. In this non-emergency setting (unlike the emergency context), the Provider has no obligation to provide out-of-network services to the patient. However, such out-of-network care routinely occurs, at least partly based on the understanding that the patient has some kind of health insurance and the Provider will be able to recoup at least some of the costs of that healthcare from that insurer on an OON basis. Further, traditionally, Providers were able to charge more for OON healthcare services in accordance with the competitive dynamic of trading the security of increased patient volume and ease and speed of payment when providing healthcare services on an in-network basis for the possibility of obtaining greater earnings per procedure when working out-of-network. In addition, unless anti-balance billing laws are in effect, the Provider also has the option of recouping the balance for OON services from the patient (so-called "balance billing"). In this example, the OON Provider performs the healthcare services to the patient and the Provider bills the patient's health insurance company. Similar to the emergency context discussed above, rather than process

and pay the Provider's submitted claim, the insurance company sends the Provider's non-emergency claim to Zelis. Zelis then, subject to the agreement Zelis has with that insurer, applies the particular repricing service, technology, methodology, and/or override, which results in the "repricing" of the Provider's submitted non-emergency claim. Finally, Zelis presents the downwardly adjusted "offer" to the OON Provider on behalf of the patient's insurer for payment to the OON Provider. Again, the OON Provider is forced either to accept the severely downwardly adjusted ("repriced") amount as payment; or to engage in time-pressured and one-sided "negotiations" with Zelis or to file an "appeal" of the downwardly-adjusted claim with Zelis, ultimately resulting in the incursion of an expense in the form of delay, if not a further decrease in payment of the Provider's originally-submitted claim.

**B. Zelis's Established Reimbursement Solution® ("ERS"), so-called "Market Pricing"**

95. Zelis has compiled a "proprietary fee schedule," designated as its "Established Reimbursement Schedule (ERS)." *Butler v. Unified Life Ins. Co. (Butler)*, 1:17-cv-00050 (D. Mont.), ECF No. 88-9 at 7 ("*Butler*"). Zelis also calls this service its "Established Reimbursement Solution®."[3] Misleadingly, Zelis refers to ERS as "Market-based Pricing".

96. As explained by David Scanlan, Director of Claims at Allied National, Inc., a Commercial Payer:

> ERS is a Zelis fee schedule representing the market payment rates that providers typically accept as payment for services. ERS is a fee schedule product that has been in place since 2008. It is compiled using a combination of commercially available data sets, CMS/Medicare data, aggregated carrier based PPO rates, and known provider PPO contract rates. Commercial data used in the compilation of ERS include Truven and Milliman.

---

[3] Whether the service is called the "Established Reimbursement Schedule" or the "Established Reimbursement Solution®," the repriced amounts communicated to and amounts paid to Providers as are at issue in this matter here are not "reimbursements," but are payments for services performed by Providers. The use of "reimbursement" to characterize the payments at issue is a misleading and self-preserving misnomer. In any event, the assertion that a "reimbursement" for performance of OON healthcare services cannot be price-fixed is false. *See infra.*

*Id*. at ECF 88-9 at 7-8. Similar to pollution and bias issues in Ingenix, Zelis's ERS offering is

partly made up of "aggregated carrier based PPO rates, and known provider PPO contract rates,"

which, when used to pay ***out-of-network*** healthcare providers, make an improperly-pooled and

downwardly-biased payment data set. ERS is not a market rate service, as Zelis portends. Instead,

it utilizes in-network rates to compensate OON care. Use of the phrase "aggregated carrier"

indicates that payment rates come from more than one Commercial Payer, which is consistent with

the conspiracy alleged herein.

97.  Scanlan also described what Zelis's ERS rates are used for and how often they are used:

> ERS is currently used by Zelis and its clients to price out-of-network/non-PPO claims at
> market-based rates to represent the reasonable and customary payment for services. Zelis
> prices more than 1 million claims per year using the ERS fee schedule and experiences
> more than 90% provider acceptance rate of the amounts allowed.

*Id*. at ECF 88-9 at 8. Scanlan confirms that Zelis's "ERS is currently used . . . to price out-of-

network/non-PPO claims," but, in doing so, uses improperly-pooled "PPO"-based data.

98.  Scanlan then described how CMS/Medicare payment rates are used and how ERS payment

rates compare to those rates:

> Traditionally Medicare is not representative of a commercial plan's usual and customary
> payment. However, commercial plans often use a markup of Medicare (i.e., Medicare plus
> 25% or 50%) as its rate. ERS on average yields a payment range as a percent of Medicare
> between 150% - 225%.

*Id*. at ECF 88-9 at 9. By referencing Medicare prices in setting payment levels, Scanlan confirms

that out-of-network healthcare services can be discretely priced through use of ERS.

99.  Zelis's own Robert Jackson testified that "ERS is a proprietary fee schedule product

offered by Zelis," which "uses – some of this is proprietary. It uses commercially available data

sets that we purchase. It uses CMS or Medicare rate tables. We use our own claims data and PPO

contracting data to build [a] market base[d] reimbursement schedule." *Butler*, 1:17-cv-00050 (D.

Mont. Oct. 5, 2018), ECF 118-11, at 3 (Jackson Depo. at 10:3-8). Zelis's Jackson testified that "[f]or clients that use the ERS product, we receive claims from those clients. And we will apply the fee schedule pricing contained within the ERS fee schedule to typically out-of-network claims." *Id.* (Jackson Depo. at 10:9-17). In addition, Zelis's Robert Jackson testified at deposition that that ERS is made up of "PPO contracting data," which Jackson confirms as the "typical[]" use of ERS for "out-of-network claims."

100. Mr. Jackson further explained that Zelis's ERS product does not even "factor in" what healthcare providers charge for their services:

> Q:    Now, does Zelis' ERS fee schedule is based [sic] upon what providers agree to accept as opposed to what providers charge; is that accurate?
> A:    That is correct.
> Q:    Does the Zelis' ERS Fee Schedule even factor in what providers actually charge for the services?
> A:    No.

*Butler*, 1:17-cv-00050 (D. Mont.) ECF 146-2 at 3 (Robert Jackson Depo. at 19:17-19:23).

## C.  Zelis's Reference-Based Pricing ("RBP") Service

101. Beyond ERS, Zelis uses a "Reference-Based Pricing" solution for repricing, which allows the Commercial Payer to base repricing amounts off of a reference, like Medicare prices.

102. Zelis markets a "Reference-Based Pricing" ("RBP") service offering as "[g]iv[ing] control back to your members by setting maximum reimbursement amounts using pre-defined prices to provide a controlled savings model." Zelis further explains that its "Zelis Open Access Pricing® (RBP) sets maximum reimbursement amounts using pre-defined prices . . . ." In other words, Zelis sets a ceiling at which its horizontally competing members should pay for Providers' services, a naked price fixing agreement.

103. Further confirming this illegal agreement, Zelis's Kaitlin Howard on April 27, 2023, said "[r]eference-based pricing sets a price limit on certain medical services based on a reference point,

such as the Medicare reimbursement rate or the average cost of the service in a particular geographic area." Zelis's Howard then provided a specific example of how RBP functions: "For example, the cost variance of an MRI might range between $800 - $4,000 (or more). But one could argue that the quality of the procedure and care provided is essentially the same. RBP eliminates the price variance with a set amount . . . ." Howard then confirmed that Zelis's repricing services can accommodate collusively-set and specified pricing: "Bottom line: RBP gives the control back to members *by setting maximum reimbursement amounts using pre-defined prices* to provide a controlled saving model." (Emphasis added). Ms. Howard then observed that RBP's pre-defined pricing feature allows Zelis's "clients [to] save up to 28% more than a traditional network plan and realize roughly 73% of savings on individual healthcare claims."

104. In addition to having "pre-defined pricing," Zelis also explains that its "RBP" product allows for a "[c]ustomizable benefit design." As explained by Ms. Howard, "RBP allows for customizable benefit design. Meaning: employers and insurers can tailor the program to meet the needs of their specific population. For example, they can choose which medical services to include in the program and set different price limits for different services." By virtue of its "customizable" design, Zelis's "RBP" offering allows competitors to collude on pricing and set the same or similar "price limits" for OON healthcare services.

105. Further, Zelis's customizable RBP "design" allows Commercial Payers who collusively set payment limits by and through a different repricer to incorporate those collusively-set payment limits into the repricing services performed by Zelis. Further, RBP's accommodation of such "customizable" "limits" confirms that Zelis and its Commercial Payer clients neither need to rely on algorithms nor "A.I." to restrain pricing, but that RBP can be used to apply traditional, collusively-determined price amounts, pricing percentages, or price levels.

106. Citing a Rand Corporation report, Ms. Howard further asserted that "RBP could potentially reduce healthcare spending by up to $9.4 billion per year if it were widely adopted."

107. Even though no state of mind is required for violating Section 1 of the Sherman Act, Zelis is crystal clear about its "intent" concerning its involvement in working with others to set prices or price levels: "***The intent is to provide an effective tool to help stabilize the healthcare claims costs.***" (Emphasis added). Zelis further hoped that implementation of its intent through its "effective tool to help stabilize the healthcare claims costs" will "have a far reaching, ripple effect throughout the entire healthcare industry."

108. Zelis confirms the "inten[ded]" "effective[ness]" of its RBP repricing service, noting as part of its "Key Points" that "2MM+ RBP claims [are] repriced annually"; that its RBP repricing service has resulted in "97% retained savings"; and that it has "<4% member and provider inquiry rate". Zelis further asserts its long-term experience in providing RBP services: "15 years providing RBP solutions."

109. Whether using ERS or RBP, it appears that a specified percentage, amount, or ceiling included, for example, in the pertinent health insurance policy, can be accommodated and govern Zelis's repricing analysis. For example, no matter what Zelis calculates as the repriced payment amount via its ERS or RBP methodologies, such methodologies can accommodate and yield to an insurance policy's "Maximum Allowable Cost," or "MAC" – including a collusively-determined MAC amount.

### D.  Even if Marketed Separately, Zelis Acknowledges That Its Pricing Services Operate or Can Be Operated Cohesively

110. Whether called "ERS," "Market-based," "Reference-Based Pricing," "RBP," "Zelis Open Access Pricing," "MAC," "default," or "override" pricing, Zelis's repricing services function or can function electronically and automatically as a single service.

33

111. Zelis's tools allow Commercial Payers to "[g]ain control over the rising cost of Out-of-Network (OON) claims with a dynamic optimization engine with customizable rules to **automatically route claims to recommended quality savings channels**." (Emphasis added). Within its out-of-network solutions discussion, Zelis explains that "[o]ur AI-powered optimization engine uses dynamic routing to examine every available saving channel to drive valued savings."

112. Zelis's routing procedures confirm that its various repricing offerings actually or potentially operate as a single repricing service.

### E. Zelis's Communicated Repricing Amounts Cannot Be Considered Proposals, Recommendations, or Suggestions

113. Zelis's "repriced" payment amounts communicated by Zelis on behalf of Commercial Payers to OON healthcare service Providers are not proposals, recommendations, or suggestions.

114. The downwardly-adjusted payments communicated by Zelis on behalf of Commercial Payers to Providers are the amounts that Zelis has determined should be paid to Providers and owed by Commercial Payers, notwithstanding the amounts billed by Providers.

115. Zelis's downwardly adjusted payment amounts are based in a delegation of authority by Payers to its repricing agent, Zelis. Zelis's Commercial Payer customers abdicated their pricing roles and responsibilities, and delegated their pricing roles and responsibilities to Zelis. For example, a director of Allied National, Inc. (a Commercial Payer) filed a "Rebuttal Report" with the District of Montana confirming that Zelis determines the repricing amount: "Zelis matches the claim to an eligibility file provided by Allied. If a match is found, *Zelis determines the reasonable and customary (R&C) charge for the medical service at issue*." *Butler*, 1:17-cv-00050 (D. Mont. Sept. 5, 2018), ECF 101-5 (Scanlan Rebuttal Report), at 1 (emphasis added).

116. Commercial Payers delegate pricing authority for OON claims to Zelis and, accordingly, relinquish discretion over Zelis's OON repricing amounts as part of their repricing contracts with

Zelis. Because Zelis's Commercial Payer customers have delegated pricing authority to Zelis and because the Commercial Payer customers have agreed on the repricing methodologies and technologies to be used, the repricing "recommendations" generated by Zelis's repricing tools are accepted by the Commercial Payers and are offered to OON Providers without alteration by those Commercial Payers. In the vast majority of repricings, the Commercial Payer authorizes Zelis to make the repricing offer and for Zelis to negotiate the OON claim on the Commercial Payer's behalf – automatically and in complete abdication of the Commercial Payer's pricing authority to Zelis (a horizontally-positioned competitor in the PPO Network space).[4] This abdication of pricing authority by horizontal competitors to another horizontal competitor itself violates Section 1 of the Sherman Act.

117. Zelis's communications of its repriced OON payments do not represent just a beginning or "starting point" to a pricing negotiation. In by far most circumstances, the repricing communication is the final, take-it-or-leave-it amount and the amount actually paid to the Provider.

118. Zelis boasts on its website that Commercial Payers retain Zelis's "repricing" amounts approximately "97%" of the time for its ERS product by Providers. These high "retention" rates do not constitute satisfaction with the repriced amounts; rather, these "acceptance" rates result

---

[4] Even if the communicated payment could be considered a mere "recommendation" or a proposed "starting point" for a subsequent multi-round OON payment-related negotiation, such a price-fixed "starting point" remains illegal price fixing and can support class certification. *See In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2022 WL 172587, at *12 (N.D. Cal. Nov. 28, 2022) ("This is not unlike a price-fixing case, where the 'price-fixing affects all market participants, creating an inference of class-wide impact even when prices are individually negotiated.'") (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,* 31 F. 4th 651, 671 (9th Cir. 2022) (*en banc*) (in turn, citing *In re Urethane Antitrust Litig.*, 768 F. 3d 1254, 1254 (10th Cir. 2014)). *See also id.* ("Plaintiffs may still argue, using Dr. Singer's analysis, that everyone was injured because the headline rate, which was the starting point for all negotiations, was affected."). Even if the Court finds mere payment "recommendations" or "starting points," it remains actionable price-fixing in violation of Section 1 of the Sherman Act.

from both the widespread participation (including by some 770 insurers) in the Zelis Cartel and

the reality that Providers would have to spend significant administrative time and expense to

challenge the repriced amount with no improvement in the amount offered by the Payer and only

further delay in payment.

119. To the extent that "co-conspirators retain some pricing discretion" or can "deviate" from

the initially-set prices is not determinative. According to Hannah Garden-Monheit & Ken Merber,

*Price fixing by algorithm is still price fixing*, FTC Business Blog (March 1, 2024),

https://www.ftc.gov/buisiness-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing:

> The fact that lessor defendants did not meet as a group but rather used an intermediary . . .
> , to compile their commercially sensitive data and calculate [in that case] the
> supracompetitive rental rate each participate would utilize does not preclude the existence
> of an agreement or change its unlawful nature. As former Federal Trade Commission chair
> Maureen Ohlhausen explained, a "group of competitors subcontracting their pricing
> decisions to a common, outside agent that provides algorithmic pricing services" amounts
> to a "hub-and-spoke conspiracy." . . . . This is so "because the same outside vendor now
> has confidential price strategy information from multiple competitors, [and] it can program
> its algorithm to maximize [or minimize as at issue in Zelis] industry-wide pricing" even if
> "the firms themselves don't directly share their pricing strategies" with each other. . . .
> Competitors act in concert for purposes of Section 1 claim when their conduct "joins
> together separate decisionmakers," such that their agreement "deprives the market place of
> independent centers of decisionmaking." *Am. Needle*, 560 U.S. at 195. That is exactly what
> plaintiffs allege here.

*Id*. See also *Duffy v. Yardi Sys., Inc*., No. 2:23-cv-01391-RSL, Order Denying Defendants' Joint

Motion To Dismiss, ECF 187 at 9. Judge Lasnick "f[ou]nd[] that plaintiffs have plausibly alleged

a conspiracy exists in violation of § 1 of the Sherman Act." *Id*. at 10. This same deprivation of

independent decision-making centers is at issue in the OON Payment Conspiracy here. Even if

repricing document is characterized as an "attached proposal," this language is not dispositive as

the Providers have "'join[ed] together separate decisionmakers.'" Rather, because of the

widespread adoption of Zelis's tools, technologies, and methodologies, Providers have no

reasonably available or practical alternatives and virtually no negotiation leverage from which to adjust upwards repriced claims.

120. Zelis's repricing communications (even if characterized as a "proposal" or "starting point") allow for a finding of Zelis's joint and several liability for the price-fixing efforts of all members of the OON Payment Conspiracy.

## F.  Zelis's Post-Repricing Claims Negotiation and Appeals Process

121. Zelis confuses the Providers' "acceptance" of Zelis's repricing amounts with an absence of inquiry or complaint. For example, Zelis markets its ERS service results in an "inquiry rate" of under "10%" and its RBP service as having a "<4% member and provider inquiry rate."

122. With respect to its "Out-of-Network claims" solutions, Zelis provides "Expert Negotiations," which it characterizes as providing the ability to "[b]lend human expertise and advanced technology to deliver high quality savings by identifying the right claims for negotiation after services have been rendered." Zelis also claims to have "25 years' experience with provider negotiation, contracting and settlement."

123. Zelis shows that its "Claims Negotiations" result in even greater "savings" for the payer-client: "We use advanced technology to identify eligible claims, averaging 60+% savings *from negotiations*." (Emphasis added). Zelis's negotiations generate additional downward pricing to Providers.

124. To the extent that a Provider objects to the repriced payment amounts, otherwise responsible Commercial Payers enforce Zelis's pricing determinations and evade upwards adjustments by referring objecting Providers back to Zelis, who, like the Payers themselves, have a financial incentive to reduce any payments to Providers.

37

### IV.    The Relevant Geographic and Service Markets at Issue

#### A.  Relevant Market Definition, Generally

125. Section 1 of the Sherman Act requires no market definition for a conspiracy to be adequately and properly alleged. Notwithstanding this absence of such a pleading requirement, Plaintiff defines the applicable product and geographic market, as follows.

#### B.  Relevant Geographic Market

126. As the Zelis Cartel is a nationwide scheme, the relevant geographic market here is composed of all fifty States of the United States, the District of Columbia, and all U.S. territories where Providers are paid for out-of-network healthcare services by Commercial Payers.

#### C.  Relevant Service Market

127. The relevant service market at issue is the market for out-of-network healthcare services for purchase by Commercial Payers, including those available for purchase by health insurance companies, managed care organizations, third-party administrators, self-funded plans, and self-insured entities.

128. As discussed in *United States v. Grinnell Corp.*, 384 U.S. 563 (1966), *Brown Shoe Co. v. U.S.*, 370 U.S. 294 (1962), and *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956), a relevant product market under the Sherman Act is composed of commodities, including services, that are reasonably interchangeable by consumers for the same purposes. A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are not likely to shift promptly to offer a defendant's customers a suitably proximate (in both product and geographic terms) alternative. Boundaries of that product or service market are determined by the reasonable interchangeability of use or cross-elasticity of demand between the product and substitutes for it.

129. A "product market" can consist of services (a "service market"), as alleged herein.

130. In the context of Clayton Act enforcement, the Supreme Court determined that a "cluster" of services can support a product or service market definition:

> ha[d] no difficulty in determining the "line of commerce'" (relevant product or services market) and "section of the country" (relevant geographical market) in which to appraise probable competitive effects of appellees' proposed merger. We agree with the District Court that the cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term "commercial banking," *see* note 5, *supra*, composes a distinct line of commerce. . . . In sum, it is clear that commercial banking is a market "sufficiently inclusive to be meaningful in terms of trade realities.

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 356 (1963) (footnotes and internal quotation citation). *See also United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 361 (1970) ("the cluster of products and services termed commercial banking has economic significance well beyond the various products and services involved.") (footnote omitted).

131. Zelis and others have treated the market for out-of-network healthcare services as sold by Providers and as purchased by Commercial Payers as a distinguishable and supportable market for purposes of defining a relevant product or service market. This market is sometimes referred to herein as the "OON Commercial Payer Market".

132. The OON Commercial Payer Market is a market involving private, commercial insurers and other types of private, Commercial Payers; and is distinguishable from the general out-of-network healthcare services market, which includes governmental and charitable institution payers.

133. The OON Commercial Payer Market is also a separate, distinguishable market from the general private commercial insurance market, which includes both out-of-network healthcare services and the payment of in-network healthcare services. Such private, in-network healthcare

services are often paid by Commercial Payers as part of health insurance plans with a designated provider network, often referred to herein as a "PPO Network" or "PPO".

134. The OON Commercial Payer Market at issue here is comprised of a "bundle" or a "cluster" of healthcare products and services. Once a patient is admitted into a hospital, but also when receiving treatment in an office or clinic setting, that patient might undergo a variety of tests and procedures, sometimes in combination, which would not be practical or reasonable to negotiate on a test-by-test, on a procedure-by-procedure, or on an in-combination basis. Further, such diagnostic-steps and/or treatments might need to be applied serially, in a specific sequence, or within a specific timeframe, rendering it impossible for a patient to "negotiate" such tests and/or procedures on a service-by-service basis. A cluster or bundle-based product or service market is appropriate in this matter.

135. In-network healthcare services are not reasonably interchangeable with OON healthcare services. For a particular healthcare service rendered by a particular healthcare practitioner to convert from an out-of-network service to an in-network service, at least the following would have to occur: (1) that healthcare practitioner providing a specific OON healthcare service must agree to perform the same healthcare service for a particular PPO network; (2) that PPO Network must agree to accept that Provider into its network of accepted healthcare practitioners; (3) that PPO Network must cover the test or procedure at issue; and (4) there must be a patient who is a subscriber to that PPO Network willing to undergo that procedure (emergencies notwithstanding) within the confines and constraints associated with the Commercial Payer's network. Three separate parties must agree to have that healthcare service performed under the constraints required by the PPO Network.

40

136. Supporting the separate and distinct nature of the OON Commercial Payer Market, a patient's decision to use OON healthcare services is often based on the ***unavailability*** of the procedure within that patient's (previously-subscribed-to) PPO Network. As patients are usually better off financially when using in-network healthcare services, a patient deciding to "go out-of-network" is often basing this decision in her or his PPO Network ***not providing*** network-based access to a particular Provider or a particular healthcare service at issue.

137. As discussed in a March 31, 2024 MedCentral nationwide survey of 713 commercial plan enrollees, for "General Health care" patients (as opposed to "Mental Health Care" patients), 24% of patients cited the reason that "Providers were not taking new patients," and 22% of patients cited the reason of "Inaccurate in-network provider directories" for why they sought out-of-network healthcare services. "General Health Care" patients simply could not access services or Providers through their PPO Network – ***even when they wanted to do so***. *See* http://ww.medcentral.com/biz-policy/top-reasons-patients-go-out-of-network (visited Aug. 23 2024).

138. As listed by the Patient Advocate Forum ("PAF"), there are various circumstances where a patient might seek out-of-network healthcare services, including for "Emergencies," "Distance Issues," "Specialist Care," and "Out-of-Town Care." PAF noted specifically that "[i]f you have a rare condition, specialists can be limited, so out-of-network care may be your only option. Or if your treating specialist leaves your insurance network, you may choose to continue that care by going out-of-network."

139. As access to a certain Provider or medical procedure is often simply unavailable within a particular PPO Network, in-network healthcare services and OON healthcare services cannot be

considered to be reasonably interchangeable. OON healthcare services are not reasonably interchangeable with in-network healthcare services as they often are not interchangeable at all.

140. Zelis treats the OON Commercial Payer Market as a separate, distinguishable market, legally sufficient for antitrust purposes. For example, within its website under "Solutions," Zelis specifically separates out its "In-Network Pricing" offerings from its "Out-of-Network Solutions" as distinct areas concerning Zelis's "purpose-built solutions."

141. Moreover, others, including David C. Lewis, Principal of Milliman (at least previously one of the providers of healthcare-related data to Zelis), have recognized the relationship between Commercial Payers and OON healthcare service Providers to be a "market." For example, Milliman's Lewis authored a "white paper," titled, "The changing landscape of out-of-network reimbursement." This "Milliman White Paper" repeatedly described the relationship between Commercial Payers and OON Providers as a "market."

142. For example, confirming the control of OON costs as an overall component of a Commercial Payer's overall insurance venture, Mr. Lewis noted that "[c]ommercial out-of-network (OON) provider reimbursement is a topic of great debate in healthcare. Changes on both the payer and provider sides have produced a large disparity *in the OON payment levels* pursued by each. Payers seek ways to limit growth in OON costs while providers look to maintain revenue *in a market* with increasing pressure to accept lower payments." (Emphases added).

143. Milliman's Mr. Lewis noted that there are various perspectives with which Commercial Payers pay out-of-network healthcare service Providers. Mr. Lewis referred repeatedly to the OON Commercial Payer Market as a separate and distinct "market." For example, Lewis lists the **U&C Market Standard**, explaining that "[f]or many years, ***the market standard for OON provider reimbursement*** was to determine a usual and custom[ary] (U&C) level to pay based on the

market." (Emphasis added). Milliman's Lewis also lists the "**Pay At A Percentage of Medicare**" market standard, explaining that with respect to the "Pay At A Percentage of Medicare[,] *[m]any payers are redefining OON reimbursement* as a multiple of Medicare allowable reimbursement. This practice is already common in commercial contracting and benchmarking, and has the advantages of . . . *setting the reimbursement relationship between services more consistently with the market* . . . ." (Emphases added). Lewis further lists the "**Pay At In-Network Levels**" market standard, explaining the use of In-Network payment levels to reference payments made in the OON Commercial Payer Market: "**Pay At In-Network Levels:** This approach sets *OON reimbursement* at a payer's in-network reimbursement levels *for a market*, where the in-network levels may be determined as an average for providers *in the market*, or as a standard base schedule." (Emphases added). And: "Whatever form of *OON reimbursement* approach is used, it is recommended that a payer benchmark its reimbursement levels *to the market* to assess its position . . . ."

144. As Zelis and at least one of its data brokers have treated the OON Commercial Payer Market as a separate, distinguishable market, it is appropriate to regard this market as a sufficient basis, to the extent even necessary, for pleading a violation of the Sherman Act.

## V. Zelis Has Market Power and Monopsony Power in The Relevant Market

145. There is no requirement that a plaintiff assert that Defendants possess market, monopoly, or monopsony power in order to adequately and properly allege a violation of Section 1 of the Sherman Act. However, Zelis possesses market power and monopsony power, as follows.

146. Zelis asserts that it "works for 770 health insurance companies, ranging from national carriers and dental plans, to BCBS and regional plans, to third-party administrators." Zelis further emphasizes that "Zelis is built for all payers," and that Zelis "[p]artner[s] with over 770 health

insurance companies." Zelis also lists as part of its "Key Points" that it has "[r]elationships with over 770 payers" and participates in "$220B annual payment volume."

147. According to the National Association of Insurance Commissioners ("NAIC") U.S. Health Insurance Industry 2023 Annual Results, "[t]he number of health insurers filing the health statement type with the NAIC increased to 1,176 from 1,165 in 2022."

148. Based on 1,176 entities who "fil[e] the health statement type with the NAIC," Zelis participates in at least 65.5% of the OON Commercial Payer Market on a number-of-entities basis. However, based on asymmetrical financial strength and size among Commercial Payers, as well as significant consolidation in the health insurance company industry, Zelis is likely to have a substantially larger market share percentage.

149. According to an August 13, 2024 press release ("Zelis Named to Inc. 5000 List of Fastest-Growing Companies"), Zelis maintains a "platform [that] serves more than 750 payers, ***including the top 5 national health plans***, BCBS insurers, regional health plans, TPAs and self-insured employers." (Emphasis added).

150. Correspondingly, according to a May 1, 2024 AAMC [American Association of Medical Colleges] Research and Action Institute analysis, there continues to be significant insurer consolidation, giving rise to "concern among policymakers about increasing consolidation in the U.S. health care system." *See* https://www.aamcresearchinstitute.org/our-work/data-snapshot/why-market-power-matters (visited February 10, 2025). According to the AAMC, "***[o]verall, our data show that . . . the top three large-group insurers hold an average of 82.2% of the market share in each state.***" *Id*. (emphasis in original). As interpreted by the American Hospital Association, this study indicates that "[t]he top three large-group insurers control an average of 82.2% of the market share in each state . . . ." *See*

https://www.aha.org/news/headline/2024-05-01-aamc-study-examines-impact-health-care-consolidation-states (visited February 10, 2025).

151. Based on its business relationships with "the top 5 national plans" and Zelis' available transaction-related data, it is reasonable to conclude that Zelis's market share in the OON Commercial Payer Market is significantly above 65.5%, and likely above 82.2%.

152. On a transaction basis, Zelis explains on its website that its payments platform, "ZAPP," which stands for "Zelis Advanced Payments Platform," "supports all payment modalities . . . and communications," and which "delivers payments to 750k+ [750,000+] providers," "delivers more than $240B [$240,000,000,000] in payments to providers," and "processes 1B [1,000,000,000] payment transactions annually". Elsewhere on its website, Zelis notes that it is responsible for "$100B [$100,000,000,000] claims priced annually," "$229B [$229,000,000,000] payments processed annually," resulting in $27B [$27,000,000,000] claims cost savings." Zelis has also asserted that it "delivered" "800 million claims communications . . . ."

## VI.    As Confirmed by the U.S. Supreme Court, OON Payments Made by Commercial Payers to Providers Can Be Price-Fixed and Collusively Suppressed

153. With respect to the OON Commercial Payer Market, the Commercial Payers purchase healthcare services from OON Providers. On the sales side of the transaction, Providers are healthcare practitioners who sell their performance of OON healthcare services to those Commercial Payers. It is of no legal significance that a Commercial Payer is not paying for its own use of or benefit from the provided healthcare service.

154. The private commercial health insurance market, in general, encompasses three sets of transactions: The first set of transactions concerns individuals or employers who enter into subscription agreements with Commercial Payers, including health insurers. The second set of transactions concerns individuals (patients) entering into healthcare service-related agreements

with Providers, including hospitals, doctor's offices, and clinics, among others. The third set of transactions concerns partial or full payments made to those healthcare service Providers for claims for healthcare services rendered as submitted to Commercial Payers. There is no dispute that Commercial Payers have a legal obligation to pay for the Providers' delivery of OON healthcare services to the Payer's insureds. The third set of transactions (payments to Providers) is a necessary part of the Commercial Payers' overall insurance-business venture.

155. As part of the context to this third set of transactions, doctors enter into the practice of medicine after years of extensive and expensive training in order to, at least in part, obtain a delayed, but professionally incentivizing, financial reward. That is, doctors and other medical practitioners devote years of study, training, and significant incursion of both real and opportunity costs to enter a possibly lucrative market that concerns the provision of healthcare services *for payment*, as often purchased by Commercial Payers.

156. This third set of transactions can be further broken down, as follows: payments paid to Providers for "in-network" healthcare services; and payments paid to Providers for "out-of-network" healthcare services.

157. Commercial Payers seek to maximize the number and amount of premiums and other fees paid to them, while minimizing the out-of-network obligations they have to pay OON Providers. Zelis also seeks to minimize payments made to healthcare Providers performing OON healthcare services.

158. Contrary to arguments that payments for OON services are not stand-alone products or services and thus the amount of such reimbursement does not constitute a "price" in any relevant product or services market for purposes of antitrust law, OON services can be price-fixed or collusively suppressed.

159. In *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982), the U.S. Supreme Court had no trouble finding physicians to have engaged in price-fixing conduct, notwithstanding their interest in setting "maximum" prices (for the arguable benefit of insureds). *Id*. at 339-342. The U.S. Supreme Court readily found the doctors' conduct to be a per se violation of the Sherman Act even though payments made to Providers represented just one aspect of health insurance.

160. There is no requirement that a Sherman Act action only applies to a standalone product or service, such that the amount of such a reimbursement does not constitute a 'price' in any relevant product or services market for purposes of antitrust law. Rather, the Fifth Circuit explained that: "'The existence of a single conspiracy will be inferred where the activities of one aspect of the scheme are *necessary* or *advantageous* to the success of another aspect ***or to the overall success of the venture***, where there are several parts inherent in a larger common plan.'" *United States v. Therm-All, Inc*., 373 F. 3d 625, 637 (5th Cir. 2004) (quoting *U.S. v. Morris*, 46 F. 3d 410, 416 (5th Cir. 1995)) (second, bolded emphasis added). As with "insurance coverage," that a venture is made up of multiple transaction categories does not prevent price-fixing as to one of those categories.

161. Consistent with *Maricopa* and *Therm-All*, the allegations here support price-fixing and price suppression of payments made to Providers by Commercial Payers for OON healthcare services in furtherance of "'the overall success'" of the Commercial Payers' "venture."

162. The following allegations support a finding that OON payments can be and are based on performance of the "discrete product or service" of performing OON healthcare services.

163. First, out-of-network healthcare services ***can*** be considered "a discrete product or service" as the Defendants have treated them in that way. For example, Zelis's repricing communications specify "repriced" out-of-network payment ***amounts*** and include prohibitions against balance

47

billing for the unpaid difference for specific tests and treatments. Also, the repricing communications specify, for example, the "Patient ID," the "Patient Name," the "Date(s) of Service," the "Claim ID," the "Provider," and the "Total Billed Amount." Also, through Zelis's repricing calculations and pricing services, including its ERS and RBP repricing methodologies, Zelis clearly determines and applies discrete price amounts, percentages, and ceilings for payments to Providers performing specific OON healthcare services.

164. Second, the U.S. government demonstrates that such services can be "discrete[ly]" priced. As part of its "RBP" service, Zelis relies on the U.S. government's Centers for Medicare & Medicaid Services ("CMS") for prices Zelis in turn uses as references to then reprice OON claims. Confirming the ability to price healthcare services discretely, the CMS establishes Medicare prices for healthcare services, as listed within its "Physician Fee Schedule."

165. CMS/Medicare payment amounts, which are presumptively owed to healthcare practitioners serving Medicare patients, are determined by the federal government (CMS), based on rate recommendations by the American Medical Association/Specialty Society Relative Value Scale Update Committee ("AMA/RUC"), and are not determined through the usual operation of a competitive or market-driven process. Instead of letting market forces set prices, CMS uses the "Resource-Based Relative Value Scale," which establishes relative values based on resource costs. Further, CMS assigns a Current Procedural Terminology ("CPT") code for over 10,000 healthcare services. In addition, these Medicare amounts are not necessarily paid by the patients themselves. Rather, as Medicare makes full or partial payment, in either situation Medicare pays the majority share of the cost of healthcare for Medicare patients. The paramount financial relationship at issue is between the federal government as purchaser and the healthcare practitioner as seller.

166. The U.S. government establishes discrete, procedure-based pricing for over 10,000 procedures where the U.S. government is the "payer" and the Provider is the "seller." Such pricing is then often used as a "reference" by repricers, including by Zelis. The notion that OON healthcare procedures cannot be price-fixed, when repricers and Commercial Payers specifically rely on CMS's discretely-determined pricing to then "reprice" these very same procedures based on some percentage or multiple of CMS's procedure-based prices is untenable.

167. Commercial Payers have also argued against the ability to price fix OON payments, asserting that "the commercial reality is that *patients* – not MCOs – are the purchasers of health services from their OON providers and have the obligation to pay for them." *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-6795 (N.D. Ill. Jan. 16, 2025), ECF No. 283 at 43 (p. 37) (emphasis in original). Anti-balance billing laws and contractual prohibitions (as mandated by Defendants' own repricing communications) reject the notion that "patients . . . have the obligation to pay for" the Providers' healthcare services. Also, in the private, commercial health insurance context here, the Commercial Payer most often pays most or all of the charge issued by the OON Provider (in comparison to other potential payers). The paramount relationship at issue is the practical and obvious one existing between the Commercial Payer as purchaser and the OON Provider as seller.

168. Prices for the performance of OON healthcare services can be discretely determined and subject to efforts to price-fix, collusively suppress, and are within the reach of the Sherman Act.

## VII.    Anti-competitive Acts and The Contours of The OON Payment Conspiracy

### A.    Zelis, the Commercial Payer Defendants, and Their Co-Conspirators Have Formed, Executed, and Enforced an Information Sharing, Price Fixing, and OON Payment Suppression Conspiracy

169. Zelis's CEO, Amanda Eisel, wrote on September 27, 2023 that "[t]ransforming the healthcare consumer experience requires collaboration among all of us."

170. Zelis and the other Commercial Payers are direct competitors that have agreed to join, establish, enable, operate, further, preserve, and conceal the OON Payment Conspiracy based in part on commonly-applied methodologies and technologies for the suppression of payments for claims submitted for OON healthcare services, which has unreasonably restrained trade relating to payments made to Providers for OON healthcare services.[5]

171. On information and belief, Zelis has entered into numerous written agreements with hundreds of its horizontally-positioned Commercial Payer competitors in order to exchange confidential, "proprietary," and competitively-sensitive claims, payment, repricing, and contractual data so as to collusively suppress payments and payment thresholds for claims submitted for OON healthcare services and to fix the payment amounts for claims submitted for payment by Commercial Payers for OON healthcare services.

172. On information and belief, the agreements at issue require these horizontally-positioned competitors to agree to share their claims, payment, repricing, and contractual data with Zelis in return for the Commercial Payer to be able to use Zelis's repricing algorithms, tools, and/or methodologies to suppress payments for OON healthcare services.

---

[5] As a reminder, in addition to providing repricing services, Zelis builds, operates, and manages PPO Networks, making it a direct and horizontally-positioned competitor to Commercial Payers who also own, operate, and/or manage PPO Network businesses.

173. The use of such third-party or agent-based pricing algorithms and/or methodologies is price-fixing, especially when a competitor knows or can readily access information that confirms that the algorithm, tools, and/or methodology at issue is based on claims, pricing, or contractual information submitted by competitors as is the case here. For example, federal antitrust and competition regulators regard "replac[ing] once-independent pricing decisions with a shared algorithm" – just as members of the Zelis Cartel have accomplished – is illegal price-fixing. *See, e.g.*, Hannah Garden-Monheit & Ken Merger, *Price fixing by algorithm is still price fixing*, FTC Busines Blog (March 1, 2024), https://www.ftc.gov/business-guidance/blog/2024/03/price-fixing-algorithm-still-price-fixing. *See also* Statement of Interest of the United States of America at 2-3, *Duffy v. Yardi Sys., Inc., et al.*, No. 2:23-cv-01391 (W.D. Wash. Mar. 1, 2024) (ECF No. 149) (when "competitors jointly delegat[e] key aspects of their decision-making to a common algorithm," they "deprive the marketplace of independent centers of decision-making" and thereby violation Section 1 of the Sherman Act.) The same is true in this case.

174. Members of the Zelis Cartel harmed competition by delegating to Zelis industry-wide pricing and negotiation authority concerning the payment of claims submitted for OON healthcare services. Independent, individualized negotiations as between Providers and Commercial Payers are thus made impossible (or a hopeless exercise). This delegation of pricing authority allows Zelis, the Commercial Payer Defendants, and other Co-Conspirators to suppress payments for OON healthcare services far below what they otherwise would be.

175. On information and belief, conspiracy members were able to effectuate the Zelis Cartel by basing OON payments on information shared between and among each other, and through Zelis.

**B. Agreements to Conspire and Share Competitively-Sensitive Information Between and Among Zelis and Health Insurance Company Payers**

**1. Agreements To Conspire To Suppress OON Payments and To Share Information, Generally**

176. Zelis, the Commercial Payer Defendants, and their Co-Conspirators have engaged in a conspiracy designed to collusively set prices and suppress payment levels for claims submitted by Providers performing out-of-network healthcare services.

177. The conspirators can be broken out into the following categories: Repricing Defendant Zelis; Commercial Payer Defendants; and non-defendant Co-Conspirators. Based on these different categories, Defendants improperly shared claims, pricing, and other commercially and competitively-sensitive business information ("CSI") in at least the following ways: (1) Commercial Payers directly shared CSI between and among each other; (2) Commercial Payers shared CSI with Zelis; (3) Zelis shared CSI with Commercial Payers; and (4) Commercial Payers shared CSI **through Zelis** to other Commercial Payers.

178. This matter concerns a conspiracy between Zelis and Commercial Payers that "reprice" Providers submitting claims for performing out-of-network healthcare services. A conspiracy also exists concerning the suppression of out-of-network claims between Zelis and a competing repricer. No other repricer, however, is a named defendant in this action. This matter is limited to "repricing" services performed by or as communicated to Providers by Zelis.

179. On information and belief, this conspiracy functioned and functions by Commercial Payers agreeing that, in exchange for obtaining "repricing" services from Zelis, the Commercial Payers provide claims, pricing data, and contractual information to Zelis. As Zelis obtains such private, confidential, hidden-to-the-public, CSI on information and belief from approximately 770 Commercial Payers involving over $240 billion in payments to Providers, it obtains knowledge

about claims and pricing of out-of-network healthcare services from a substantial portion of the OON Commercial Payer Market. Accordingly, Zelis's Commercial Payer customers are able to pay OON Providers an artificially and collusively-suppressed price for OON services as there are no or virtually no payment sources for OON Providers to which to turn as all or nearly all Commercial Payers are also participants in the OON Payment Conspiracy.

180. Further, by way of agreements and facilitated data access, repricers share claims, pricing, and contract-related information between each other. Their out-of-network repricing amounts are additionally based on the claims, pricing, and methodologically-related information possessed by the other repricer. Through the agreements these repricers have with each other, Commercial Payers can use the relationships they have with one repricer to gain access to claims and pricing-related information housed and managed by the other repricer. Because a conspiracy exists between Commercial Payers and Zelis, as well as between Zelis and fellow repricers, Providers performing out-of-network healthcare services cannot avoid the impact of the conspiracy by rejecting repriced claims by one repricer to the preference of another.

181. Zelis engages in verbal, written, and electronic-based sharing of information, including claims, pricing, and contract-related information, with its healthcare Commercial Payer clients.

### 2. Verbal Information Sharing

182. Among other events and meetings, Zelis hosts an "annual conference" where health insurer personnel are invited to discuss the industry and Zelis's offerings with other existing and potential health insurer clients. These verbal communications have been captured on film.

### 3. Written and Contract-Based Information Sharing

183. Further, Zelis engages in written agreements that contemplate the sharing and access to competitively-sensitive information, including claims, pricing, and contractual information.

184. Zelis boasts that its "Zelis Open Access Pricing® (RBP)" pricing product can "[i]mprove accuracy and reduce frustration with *a technology-enabled way to load and manage contracts*, apply real-time edits and regulatory updates, and process pricing." (Emphasis added).

185. Also, as discussed *infra*, there is direct evidence of Commercial Payers entering into repricing agreements with Zelis. On information and belief, these agreements include information sharing obligations.

### 4. Electronic Information Sharing

186. Finally, Zelis and its healthcare insurance company payer clients have technological relationships, which enable electronic sharing of claims, pricing, and contract-related information.

187. Supporting the existence of its electronic platform for sharing such claims and pricing information, Zelis boasts that it has a "99% auto adjudication rate" and uses "ADI, EDI, or portal integration to make repricing claims easier." As a result, Zelis boasts that it repriced "82M+ claims . . . in 2023," alone. Further, its capabilities allow Commercial Payers to "[a]utomate claims pricing & strengthen provider contracting negotiations[.]"

188. Zelis claims that its information system works with a variety of other claims systems. As explained by Zelis, Zelis's systems "[i]ntegrate with numerous claims systems, including FACETS, to enables [sic] more efficient implementations and workflows[.]"

189. Further, its platform allows for the sharing of information found on or within contracts. For example, Zelis notes that its platform includes the "[a]bility to load contracts on your behalf" and provides "[r]obust reporting & in-depth contract analysis." Zelis further notes that Commercial Payers can "[l]everage *our source pricers for all direct agreements, including* Medicare, Medicaid, *commercial*, and other government programs. We'll load and maintain client contracts & fees schedules, manage the contract inventory, *and price claims against them for all plan*

*types*." (Emphases added). As repeatedly emphasized by Zelis, "[w]e'll even load contracts for you!" Zelis's electronic capabilities allow for the analysis and sharing of "load[ed]" contracts.

190. Zelis admits that its electronic sharing capability "layers" the data from one PPO Network operator with that from other competing, PPO Network operators: "Our proven data analytics platform leverages provider and competitor data with the ability to layer in additional data elements from your organization or our partners . . . ."

191. Further, Zelis explicitly describes how its improperly pooled information can be used: "Disruption – Gain a competitive edge in the sales process *with integrated competitor data* within your disruption analysis. – *benchmark against competition* to underscore your strengths and proactively mitigate weaknesses." (Emphases added).

192. Virtually, if not actually, admitting that its data sets are based on collecting competing Commercial Payers' information, Zelis describes how "Zelis collects data *from hundreds of plans and thousands of networks*. . . . Zelis specializes in organizing and managing this data to support network analytics that you can rely on." (Emphasis added).

193. For its "Reference-Based Pricing" ("RBP") service, Zelis acknowledges that it can "[i]mprove accuracy and reduce friction with a technology-enabled way to load and manage contracts, apply real-time edits and regulatory updates, and process pricing."

194. Zelis's CEO, Amanda Eisel, explained that Zelis is "aggregating and analyzing data and putting it back into the hands of payers, providers, and consumers. More specifically, Zelis is optimizing data to help payers easily assess, *benchmark* and create high-performing networks based on costs, access and quality." (Emphasis added). Also, "at Zelis, we download and process about 27 terabytes of MRF [machine-readable file] data each month for just the top four payers."

195. Zelis shares information back to Commercial Payers. David Scanlan, a director at Allied National, Inc., a Commercial Payer, confirmed that "Claims of insureds are submitted by the provider, either a hospital, doctor, or ancillary provider, to Zelis . . . . Zelis matches the claim to an eligibility file provided by Allied. If a match is found, Zelis determines the reasonable and customary (R&C) charge . . . . *Zelis then includes that information in a file that is delivered to Allied electronically.*" *Butler*, 1:17-cv-00050 (D. Mont.), ECF 101-5, at 1 (emphasis added).

### C.  Commercial Payers Share CSI and Other Related Information Directly Between and Among Each Other

196. Commercial Payers shared and on information and belief continue to share confidential, proprietary, and competitively sensitive information directly with each other.

197. For example, Zelis's "B2B Marketing" advisor, DeSantis Breindel, not only noted that "fanatics" of Zelis shared information between and among each other, but that they did so on film:

> [A]s we knew from our external interviews, there were a lot of Zelis fanatics eager to talk about their exceptional experiences with the company. Many were already sharing their stories as referrals for prospective clients, and we heard things like:
>
> "I'm one of their greatest referrals just because I'll go out there and sell them all day long and I don't even get paid for it."
>
> "I can't tell you how many references I've done for them but it's not a chore. I'm happy to talk about them and how much they do for our organization and what they can do for other people that are thinking about using them."
>
> These referrals were important, but their impact remained limited to individual interactions. To leverage these on a larger scale, we turned to the power of film. During Zelis's annual client conference, we filmed a dozen clients sharing stories about their experience with Zelis. Their passion was evident, and it translated beautifully and genuinely into testimonials for the website. It's one thing for Zelis to say it offers a great experience, and quite another to hear it directly from the clients who have lived it.

As explained by Zelis's B2B Marketing Advisor, DeSantis Breindel, potential Zelis customers "hear[d] it directly from the [existing] clients who have lived it." The webpage where this passage

is found has now been removed from the Internet. Such "direct[]" exchanges of "experience[s,]" as facilitated by Zelis, are examples of information exchanged by direct competitors

198. Commercial Payers knew that the success of their Zelis Conspiracy depended on widespread adoption of Zelis's repricing among the insurance companies. Otherwise, Providers would not accept patients from the one or few insurance companies that utilized Zelis's repricing models because they would receive higher payments from the other Payers that did not reprice their services as dramatically or as uniformly as Zelis. Absent the Zelis Conspiracy, Commercial Payers had no legitimate self interest in encouraging their horizontal competitors to adopt a program that would make them money by downwardly adjusting payments to Providers.

### D. Commercial Payers' Sharing of CSI with Zelis and Using Zelis To Set Prices While Knowing That Their Competitors Are Doing The Same Is Price Fixing

199. To the extent that Zelis has shared CSI with other Commercial Payers and/or with other competing repricers, which, on information and belief, includes "typical," "standard," default reference amounts or percentages, or specific override ("Maximum Allowable Cost") amounts or percentages, directly-positioned competitors have shared private, confidential, "proprietary," and/or competitively-sensitive information in violation of the Sherman Act. There is no need to enter into the debate, about whether use of a third-party's pricing algorithm is or is not price fixing.

200. However, to the extent that the Commercial Payers use Zelis's algorithms and/or "A.I." for setting prices, such efforts are price-fixing and, as applicable here, coordinated price suppression.

201. Commercial Payers know or can readily learn that their competitors are similarly transmitting information to Zelis in order to obtain repricing information based on such information transmitted to Zelis. This determination as to the existence of price-fixing is readily reachable as Zelis publicizes on its website that the "top 5" of the nation's health insurers and how

approximately 770 of the nation's health insurers are customers of Zelis and use Zelis's repricing services. If a Commercial Payer is not using Zelis's repricing services, it would be among the few who are not.

**E.  The Widespread Adoption and Application of Zelis's Repricing Services by Commercial Payers Have Precluded Meaningful Competitive Alternatives and Have Harmed Competition**

202. The harm to competition in the OON Commercial Payer Market has already occurred as Zelis itself has estimated that for its "ERS" product, Providers accept Zelis's payment amounts for OON healthcare services approximately "97%" of the time (described as a "savings retention" rate) with an "inquiry rate" below 10%. Zelis similarly reports that its rate of "retained savings" for its Reference-Based Pricing" product ("RBP") is "97%," and that its "member and provider inquiry rate" is less than "4%."

203. The pervasive adoption and application of Zelis's tools, technologies, and methodologies is astonishing. By 2025, Zelis counts approximately 770 health insurers, including the nation's "top 5" health insurers, among its repricing customers. Zelis also explains that its "ZAPP" repricing platform "processes 1B payment transactions annually," or 2.74 million per day, and "delivers 800M claims communications as well as 800M payment transaction to members annually," or 2.19 million claims communications and payment transactions per day.

204. With such widespread adoption and application, Defendants have harmed competition and have left OON Providers with actually or virtually no available alternatives from which to seek better pricing.

**F.  Any Possible Procompetitive Justifications Are Legal Nullities Because Zelis's and The Commercial Payers' Conduct Is a Per Se Antitrust Violation**

205. Applying the analysis included within Judge Lasnik's Amended Order Denying R.D. Merrill's Motion To Dismiss to the circumstances at issue in the OON Payment Conspiracy, "[i]n

a nutshell, [the Commercial Payer] entered into a formal agreement with [Zelis, the repricer] as early as 2016 to provide its commercially sensitive data, knowing that [Zelis] was collecting similar data from [the Commercial Payer's] competitors which it would use to generate [OON Payment] recommendations that would result in [artificially suppressed] returns. [¶][¶]. . . . Taken in the light most favorable to plaintiffs, the allegations of the [] Complaint amply suggest that [the Commercial Payer] engaged in a [Zelis]-centered conspiracy in violation of the § 1 of the Sherman Act." *Duffy v. Yardi Sys., Inc*., No. 2:23-cv-01391-RSL (W.D. Wash. Dec. 5, 2024), ECF 189 at 7-8.

206. According to the Western District of Washington, "[p]lausible allegations that defendant colluded to fix prices at [below]-market rates and impose those prices on [Providers] is *per se* anticompetitive conduct." *Duffy v. Yardi Sys., Inc.*, No. 2:23-cv-01391-RSL (W.D. Wash. Dec. 4, 2024), ECF 187 at 13. Accordingly, this Zelis matter concerns *per se* violations of Section 1 of the Sherman Act. As a *per se* violation, the liability concerns conduct that is inherently wrong, of which the law contemplates no procompetitive excuse, rendering procompetitive justifications legal nullities.

## G. Providers and Their Patients Suffered Antitrust Injury As a Result of the Zelis Conspiracy.

207. In a The Zelis Conspiracy resulted in Providers receiving less for their healthcare services as well as patients paying more for their healthcare services.

208. In a *New York Times* article published April 7, 2024, "Health Insurers' Lucrative, Little-Known Alliance: 5 Takeaways," Chris Hamby writes: "A private-equity-backed firm . . . has helped drive down payments to medical providers and drive up patients' bills, while earnings billions of dollars in fees for itself and insurers." As reported by Hamby, "[i]n some instances, insurers and [the repricer] have collected more for processing a claim than the provider received

59

for treating the patient." Hamby further writes that repricing efforts cause "low payments [which] also squeeze small medical practices." Hamby provides the following example: "Kelsey Toney, who provides behavioral therapy for children with autism in rural Virginia, saw her pay cut in half for two patients" as a result of repricing. Hamby also explained that "[o]ther providers said they have begun requiring patients to pay upfront because appealing for higher insurance payments can be time-consuming, infuriating and futile."

209. Moreover, repricing efforts instituted by the Commercial Payers have already reduced Providers' salaries and forced private practitioners to consider other business arrangements or to close entirely. In another article published in the New York Times the same day, Chris Hamby reported in "In Battle Over Health Care Costs, Private Equity Plays Both Sides," repricing efforts have "slashed pay for doctors and other medical professionals . . . ." Further, as use of repricing tools began to "spread, patients, doctors and medical facilities began receiving unwelcome surprises. Some practices that had negotiated contracts with [the repricer] found that they no longer received their agreed-upon rate, and patients were no longer protected from big bills." As also reported, medical practices are feeling the impact of repricing and are considering their options: "Dr. Kohan, who has a small practice in Manhattan, said skimpy payments were forcing him to consider joining a large hospital system or private-equity-backed group." The article further quoted Dr. Kohan anticipating that he "may not be able to sustain" his small, independent practice.

210. In yet another April 9, 2024 *New York Times* article, "Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill," Chris Hamby wrote that as a result of repricing efforts by Commercial Payers, "providers have seen their pay slashed, and employers have been hit with high fees, records and interviews show."

211. Finally, in a May 1, 2024 *New York Times* article, "Collusion in Health Care Pricing? Regulators Are Asked to Investigate," Chris Hamby wrote that the Commercial Payers' use of repricing services has dramatically harmed Providers' healthcare businesses:

> One provider reported slashed payments from UnitedHealthcare, Cigna and an Aetna subsidiary after the insurers routed claims to [another repricer's] most aggressive pricing tool. Another said the tool "has decimated my life" and caused "the closing of my business," which has "left patients having to travel 2.5 hours for surgery."

Chris Hamby further noted that "[a]nother reported being billed thousands of dollars 'since they refuse to pay my providers the correct amount.'"

212. Since at least the outset of the alleged conspiracy, U.S. health insurance costs for consumers and businesses have risen and continue to rise (while OON payment amounts have plummeted).

213. According to U.S. health insurance industry data compiled by the National Association of Insurance Commissioners ("NAIC"), the costs of health insurance premiums have increased in a drum-beat and seemingly uninhibited fashion.

214. For example, according to the NAIC's "2023 Annual Results" (currently, the most recent year where annualized results are available), "Comprehensive Hospital & Medical" premiums per member per month ("PMPM") have jumped from $347.49 in 2014 to $524.24 in 2023.



215. More recent information, included in the NAIC's 2024 mid-year report indicates that the U.S. health insurance industry's "Group Comprehensive Hospital & Medical" line of business, "Net Premium PMPM" increased from $470 as of June 30, 2020 to $574 as of June 30, 2024. With respect to the industry's "Individual Comprehensive Hospital & Medical" line of business "Net Premium PMPM" increased from $498 as of June 30, 2020 to $548 as of June 30, 2024.



216. The U.S. health insurers have offered no relief for their consumers. The idea that the Defendants' repricing scheme has provided "savings" to health insurance policyholders is untrue.

217. Commercial Payers, including the Defendant health insurers here, can afford to pay Providers' OON invoiced amounts, according to financial data compiled by the NAIC.

218. NAIC's "U.S. Health Insurance Industry | 2023 Annual Results" reported the health insurance industry increased its profit margin by billions of dollars in 2023. In addition, the U.S. health insurance industry benefited from an "8% ($80 billion) increase in net earned premium to over $1.1 trillion." Further, according to NAIC, "[t]he industry reported a 75% ($5 billion) increase in net investment income earned." As demonstrated by the chart below, the health insurers' net income has dramatically increased since the start of the conspiracy period in mid-2016.



For example, as reported to the NAIC, "health entities who file annual health statements with the NAIC" reported $3.672 billion in net income in 2015. This amount nearly doubled to $7.194 billion in 2016. Then this amount more than doubled again to $16.060 billion in 2017. From 2017 until the last reported period in 2023, the NAIC reported that net income increased yet another $8 billion to $24.8 billion in net income. As shown by the above chart, the net income of U.S. Commercial Payers, as reported to and by the NAIC, dramatically increased toward the expiry of the FAIR Health exclusive use and right around the beginning of the Class Period (June 13, 2016).

219. With respect to 2023 annual reporting, and even when the analysis is limited to only the "Comprehensive Hospital & Medical" segment, the numbers remain astonishingly large. For example, for 2023 alone, the annual "Net Earned Premium" for this segment was listed at $272.26 billion, resulting in a $6.265 billion "Net Underwriting Gain."

220. Zelis's repricing services do not save patients money. Since 2014, "Group Comprehensive" premiums have increased from $166.375 billion to $171.757 billion in 2023. On

the individual side, the growth in premium income for the U.S. health insurance industry has been obscene. "Individual Comprehensive" related premiums have increased over 2 ½ times since 2014; starting at $43.388 billion in 2014 and growing to $113.620 billion in 2023.

221. As reported in NAIC's "2024 Mid-Year Results," earnings resulting from the U.S. health insurance industry's "Direct Written Premium" amounts increased from $411 billion as reported on June 30, 2020 to $590 billion as reported on June 30, 2024, representing an increase of 43.55% over five years. In comparison, the annual U.S. inflation rate over this same period ranged from a high of 7.00% in 2021 to a low of 2.9% in 2024. Such a dramatic increase in "Direct Written Premium[s]" cannot be fully explained by overarching economic trends.

222. Defendants' profitability has not been squeezed by any increase in Providers' claim amounts. On an annual basis, NAIC reports that health insurer entities "reported a 6.5% (over $13 billion) increase in capital and surplus to nearly $215 billion [in 2023] from $202 billion at Dec. 31 2022 . . . . The increase is due primarily to net income of approximately $25 billion, paid in surplus of $6 billion, and $3 billion in unrealized capital gains."

223. Defendants are foreclosed from offering procompetitive justifications as Plaintiffs have sufficiently alleged a *per se* violation of the antitrust laws. However, even if Defendants were permitted to offer such excuses, the financial data compiled by NAIC show that Defendants have neither saved policyholders money, nor that members of the U.S. health insurance industry – the Commercial Payers - are somehow compromised in their ability to pay OON invoices in full, especially with their cash surpluses rising to $215 billion in 2023. Rather, Defendant Commercial Payers are well-positioned to pay in full the Providers' originally invoiced amounts for their performance of out-of-network healthcare services.

**H. The Zelis Conspiracy's Existence Is Supported by Direct Evidence of Written Agreements Entered into Between Conspirators**

224. Direct evidence already obtained firmly establishes that Commercial Payers entered into repricing agreements and have "established business relationships" with Zelis. Zelis entered into repricing agreements with its direct competitors, including other Commercial Payers. In addition to providing repricing services, Zelis directly competes with other Commercial Payers.

225. Teton County's healthcare benefit plan manager, Allegiance Benefit Plan Mgmt, Inc., contracted with Zelis for repricing services. As noted in an April 9, 2024 Board of County Commissioners – Clerk Report, the commissioners considered "[a] pass through fee to Zelis based on Allegiance's contract with Zelis for services related to claims editing and payment integrity."

226. PacificSource Health Plans, a "health plan serving the Northwest since 1933," acknowledges that it "has an agreement with Zelis for high-dollar out-of-network negotiations[.]"

227. Winco Holdings, Inc. Employee Benefit Plan, lists Zelis Healthcare as Winco's "Dialysis Cost Containment Program Administrator," providing "Repricing, Pre-authorization & Network" services. Winco acknowledges that its "Plan has entered into an agreement with a third-party Dialysis Cost Containment Program Administrator for purposes of repricing, prior authorization, utilization review, and case management . . . ."

228. In *California Spine & Neurosurgery Inst. v. Agilent Techs., Inc.*, No. 5:24-cv-05248-EJD (N.D. Cal.), ECF No. 1-11 (Ex. 11), Zelis sent "San Jose Neurospine" a "Settlement Proposal," listing "Anthem Blue Cross & Blue Shield" as the "Payor," in addition to the repricing amount. In a reference to the Commercial Payor, the fax includes the following footer: "This facsimile has been sent by Zelis Healthcare, LLC ("Zelis") to those with an interest in the services provided by Zelis under our ***established business relationship***." (Emphasis added).

I. **In Addition to Direct Evidence, There is Abundant Indirect and Circumstantial Evidence Supporting The Existence of The Zelis Cartel**

1. **Indirect Evidence and "Plus Factors" Supporting Existence of OON Payment Conspiracy, Generally**

229. In addition to the direct evidence of repricing agreements, there also exists extensive and compelling indirect or circumstantial evidence that supports the existence of the Zelis Cartel.

230. As discussed in greater detail below, the OON Commercial Payer Market is characterized by at least the following "plus factors": (1) the collectively high market concentration of conspiracy members; (2) high barriers to entry; (3) sufficient motives to conspire; (4) a history of prior collusion; (5) numerous opportunities to collude; (6) actions taken against self-interest; (7) conspiracy enforcement mechanisms; (8) pervasive, systematic, and contract-based requirements to exchange competitively-sensitive information; and (9) the existence of customary patterns and courses of dealing. Assessed holistically, when considered along with repricing agreement evidence, these "plus factors" support the existence of a horizontal price-fixing and price suppression agreement.

2. **Collectively High Market Concentration of Conspiracy Members**

231. Defendant Zelis's market share, market power, and monopsony power was previously analyzed and alleged in Section V, *supra.*

232. The applicable geographic market includes all fifty States of the United States of America, the District of Columbia, and all U.S. territories. The relevant product/service market is the "OON Commercial Payer Market," described above. On a number of Commercial Payers basis, where Zelis counts 770 Commercial Payer customers (out of approximately 1,176 insurer entities), Zelis has a market share of approximately 65.5%. When considering the unequal size and financial strength of these Commercial Payers, that Zelis counts the "top 5 national plans" among its

customers, and that studies show that industry consolidation has left the nation's top three insurers with an average of 82.2% market share in each State of the United States, Zelis's market share on a transaction basis is likely much higher than 65.5%.

233. This market power has enabled the Zelis Cartel to flourish, its members to impose anticompetitive effects in the relevant market, and is circumstantial evidence of a conspiracy.

### 3. The Market's High Barriers to Entry

234. Entrance into the OON Commercial Payer Market is hindered by high barriers. New market entrants must be able to bear large expenditures of both time and money necessary to develop a network of healthcare Providers large enough to compete against other health insurers and other categories of Commercial Payers (like other managed care organizations, TPAs and self-insured entities). Even without developing a corresponding PPO Network (or similarly functioning entity), there are significant capital outlays required to operate as a Commercial Payer. Entrants then face the challenge of contending with staggering economies of scale that large, incumbent, nationwide health insurers possess. Obtaining name recognition in an industry occupied by longstanding and well-recognized players presents an additional major hurdle.

235. There is also an actuarial risk for new health insurance-related networks. Participating health insurers need a stable of healthy premium-paying subscribers to counteract the costs associated with those subscribers needing healthcare services.

236. As a result of such barriers, the established players in this industry, including members of the Zelis Cartel, are further entrenched and protected by participation in the Zelis Cartel. Also, a new entrant who might decide against participating in the OON Payment Conspiracy places itself at a significant competitive disadvantage and its impact on the market would likely be so small

that it would not be able to undermine the Zelis Cartel members' collective ability to impose repriced payment amounts for OON healthcare services.

237. Moreover, for those seeking to replicate the repricing services provided by Zelis, such a hopeful repricing market entrant would have to have access to significant funds in order to make the cash outlays necessary to purchase or develop source code, algorithms, and software to manage and make accessible such information to the user; to have funds and staff available to make updates to the new entrant's technology; and to hire and train a staff that can, in turn, provide training and support to customers seeking repricing services such that the new technology could effectively reprice OON claims and sufficiently displace existing repricing incumbents – all without infringing, for example, patents, copyrights, trademarks, and other protectible intellectual property as owned, possessed, or controlled by existing repricers.

### 4. Motives To Conspire

238. There are compounding financial and public relations bases that incentivize and motivate existing and would-be cartel participants to conspire.

239. First, Zelis has an exceptionally strong financial incentive to conspire: Zelis receives a percentage of the difference between the amount billed by the Providers and the amount ultimately paid by the Commercial Payers. Zelis has a substantial financial incentive to have Providers receive as low a payment as possible.

240. For example, Auxiant's Administrative Services Health Care Proposal "includes claims surveillance technology which seeks to achieve additional cost savings for the plan . . . (Zelis Fee 25% of Savings). Proposal also includes . . . non-Network Usual Reasonable Customary Reference Based Pricing (RBP) program. ***The fee for this service is 18% of savings***." (emphasis added).

241. Also, third-party administrators (a Commercial Payer) often pay themselves – just like the repricers -- a percentage-of-savings-based "shared savings fee" or "processing fee." Such "savings fees" can result in significant revenue for TPAs. UnitedHealthcare executives have indicated that such "shared saving fees" generate approximately $1 billion annually for the company.[6] Savings fees have also been known to exceed amounts paid to Providers.

242. The Commercial Payers are just as financially motivated to minimize payments made to OON Providers. From a straight profitability perspective, the smaller amount that health insurance companies, self-funded plans, and self-insured entities pay Providers, the better return on their overall insurance business venture.

243. The Commercial Payers' interest in avoiding legal scrutiny for developing their own repricing efforts provides another motive to conspire. In an internal email Cigna's Chief Risk Officer, Eva Borden, explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements) . . . ."

### 5.  Previous Participation in Collusive Efforts

244. Their corporate ancestors, if not some of the exact same Defendants, have a shared history pertaining to the same issue as the subject of this complaint – the price-fixing and collusive suppression of payments made to Providers for out-of-network healthcare services. *See* discussion of Ingenix, NYAG Investigation, and FAIR Health, *supra*.

---

[6] As FAIR Health charges a flat fee, such "savings fees" and "processing fees" can be mostly or entirely avoided by self-insured entities and self-funded plans. No wonder Commercial Payers have strongly encouraged employers to abandon their previous reliance on FAIR Health.

### 6. Opportunities To Conspire

245. Zelis and its Commercial Payer co-Defendants participated in and had numerous opportunities to share information and to engage in coordinated efforts to establish, further, preserve, or conceal the OON Payment Conspiracy, including Zelis's own facilitation of communications among competitors, where they are able to share conspiracy-related information.

246. For example, Zelis hosts "annual client conference[s]" where, according to Zelis's "B2B Marketing" advisor, DeSantis Breindel, "fanatics" of Zelis not only shared information between and among each other, but that they did so on "film":

> [A]s we knew from our external interviews, there were a lot of Zelis fanatics eager to talk about their exceptional experiences with the company. Many were already sharing their stories as referrals for prospective clients, and we heard things like:
>
> "I'm one of their greatest referrals just because I'll go out there and sell them all day long and I don't even get paid for it." [And]
>
> "I can't tell you how many references I've done for them but it's not a chore. I'm happy to talk about them and how much they do for our organization and what they can do for other people that are thinking about using them."
>
> These referrals were important, but their impact remained limited to individual interactions. To leverage these on a larger scale, we turned to the power of film. During Zelis's annual client conference, we filmed a dozen clients sharing stories about their experience with Zelis. Their passion was evident, and it translated beautifully and genuinely into testimonials for the website. It's one thing for Zelis to say it offers a great experience, and quite another to hear it directly from the clients who have lived it.

247. Also, otherwise competing Commercial Payers repeatedly have "individual interactions" where they communicate with each other "'about how much [Zelis does] for our organization . . . .'" Further, at these "annual client conferences," potential Zelis customers "hear[d]" about existing customers' experiences "directly from the clients who have lived it."

248. Zelis participated in a variety of healthcare conferences organized by others, including the SIIA [Self-Insurance Industry Association] Spring Forum, March 25-27, 2024 at the JW

Marriottt Hill Country Resort & Spa in San Antonio, Texas; the SIIA Connect National Conference "in Phoenix on October 8 through 10, 2023," the 2024 National Medicare Advantage Conference, November 4-5, 2024 at the Loews Vanderbilt Hotel in Nashville, Tennessee; the "Zelis Forum," including the conference held on May 13-15, 2024; participated as an "Exhibitor" ("Booth: 604") for the 2024 Annual HFMA Conference; inviting fellow conferees to "see Zelis in Booth #509!"; "Gold Exhibitor[]" at Becker's Hospital Review for the Health IT + Revenue Cycle Conference.

249. With respect to opportunities to collude as exploited by the Commercial Payer Defendants and Commercial Payer Co-Conspirators, several Commercial Payers, including (but not limited to) Aetna, Centene, Cigna, Elevance, HCSC, and Humana, are members of AHIP (formerly, America's Health Insurance Plans). AHIP represents that it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests." Of course, a "shared interest" among AHIP members is controlling OON payments to Providers. AHIP hosts conferences, committee meetings, and board meeting multiple times a year, including meetings where members participate in non-public, closed-door meetings.

250. Numerous executives of Commercial Payers hold positions on AHIP's Board of Directors, including Gil K. Boudreaux, President and CEO of Elevance; David Cordani, Chairman and CEO of Cigna; and Maurice Smith, President, CEO, and Vice Chair of HCSC.

### 7. Acts Against Corporate Self-Interest

251. Members of the Zelis Cartel have taken numerous actions against their own respective corporate interests. Agreements entered into between Commercial Payers and Zelis would, absent a conspiracy, be counter to the Commercial Payers' own independent economic interests. For example, in a world where no other Commercial Payer had entered into such a repricing agreement with Zelis, no out-of-network healthcare Provider would perform services (possibly except for

emergency treatment) for the one Commercial Payer that had decided to enter into a repricing agreement with Zelis. The result would be a single Commercial Payer offering repriced OON Payments at a comparatively underpriced and non-competitive basis -- to its own destruction.

252. However, so long as there is an active conspiracy where most or all Commercial Payers use or apply Zelis's repricing services, such self-defeating effects are eliminated.

253. In addition, the Commercial Payers have, on information and belief, entered into agreements which require sharing with Zelis claims, pricing, or contractual information. Absent a conspiracy, a single Commercial Payer would never elect to share such competitively-sensitive business information with anyone, much less a horizontally-positioned payer.

### 8. Conspiracy-Enforcement Mechanisms

254. One mechanism used to preserve participation by Co-Conspirators was to "film" participants, thus minimizing conspiracy defectors. As noted on Zelis's PR/Marketing firm, DeSantis Breindel's now-removed webpage, "[t]o leverage [Zelis referrals] on a larger scale, we turned to the power of film. During Zelis's annual client conference, we filmed dozens of clients sharing stories about their experience with Zelis . . . ." "[F]ilm" of Zelis "clients sharing stories about their experience with Zelis," is helpful to keep Zelis Cartel members in line.

255. Enforcement mechanisms are not necessarily negative – carrots often work better than sticks. Zelis-hosted conferences have regularly taken place at luxury resorts and hotels.

256. Conspiracy members, including Zelis, have been successful in enforcing and preserving the OON Payment Conspiracy. With respect to "Zelis Open Access Pricing" (RBP), Zelis boasts that it has a "120% client retention rate," suggesting that no client has stopped using it and that clients are recruiting other divisions of their respective companies to start.

### 9. Exchange of Private, Confidential, Proprietary, and Competitively-Sensitive Information by Conspiracy Members

257. As discussed above, on information and belief, members of the Zelis Cartel have agreed to share and have shared private, confidential, proprietary, and competitively-sensitive information, including claims, pricing, and contractual data, which would otherwise be against the interest of the sharing entity to do so. *See supra*. The conspiracy members' willingness to share such important business information is based on the knowledge or analysis of readily accessible information that indicates that their direct competitors have agreed to do the same.

258. The Supreme Court and other Courts have recognized that this type of information exchange is likely to have anticompetitive consequences. *See, e.g., United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("Exchanges of current price information, of course, have the greatest potential for generating anti-competitive effects and, although not per se unlawful, have consistently been held to violate the Sherman Act.") (citation omitted).

259. On information and belief, such information sharing is occurring as required by written repricing contracts and other written and unwritten agreements. Also, on information and belief, Zelis is using this claims and pricing data to share confidential pricing information between members of the OON Payment Conspiracy to fix and collusively suppress OON Payments.

### 10. Pattern and Course of Dealing Engaged in by Conspirators

260. The Commercial Payers have an established history of forming, maintaining, and preserving a similar OON payment suppression cartel. *See supra*.

261. Zelis stood at the ready to form, maintain, preserve, enforce, and conceal its conspiracy upon the expiry of the FAIR Health exclusive use period. Accordingly, Zelis proudly emphasizes the long-term nature of its relationships with Commercial Payers, including with health insurers, PPO Networks, managed care organizations, third-party administrators, self-funded, plans, and

74

self-insured entities. Zelis boasts that it "has been with you at the forefront of modernizing the business of healthcare for 20 years"; that it has "[r]elationships with over 770 payers"; and that the "average client tenure" is "13 years".

### J. Timing of Anti-Competitive Acts

262. Defendants' collusive efforts to artificially suppress payments to healthcare providers performing out-of-network services begun as early as June 13, 2016 and continue to the present.

263. Well within any applicable statute of limitations, Exhibit 11 to the Complaint in *California Spine & Neurosurgery, Inst. v. Agilent Techs., Inc.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024), ECF 1-11 shows Zelis repricing San Jose Neurospine's back surgery services to $567.58 -- approximately 1.455% of the initially billed amount ($39,000.00) on July 11, 2023.

### VIII. Defendants' Efforts to Suppress Payments for OON Healthcare Services Have Been Enormously Successful and Have Destroyed Competition in The OON Commercial Payer Market

264. Payment amounts to providers performing out-of-network healthcare services have cratered following the expiry of the FAIR Health five-year, exclusive-use period.

265. Moreover, the harm to competition is revealed when non-conspiratorial periods are compared to the current state of affairs.

266. Payments to Providers for out-of-network healthcare services began to increase during the period when insurers were required to use the FAIR Health database. Defendants concede that use of a database based in UCR considerations resulted in a 26% increase in out-of-network payments for healthcare providers).

267. The FAIR Health period contrasts starkly to the current situation where out-of-network invoiced amounts might be cut by over 98%. *See supra*. In the context of Zelis's relationships with 770 insurers, including the "top 5 national plans," normal supply-and-demand competitive forces

are no longer at play. Defendants' coordinated efforts to "contain" OON-related costs destroyed competition within the OON Commercial Payer Market.

**EACH NEW ACT BY THE DEFENDANTS TO FURTHER OR PRESERVE THE CONSPIRACY HAS RESULTED IN A NEWLY-STARTED VIOLATION PERIOD AND EFFORTS TO CONCEAL THE CONSPIRACY HAVE TOLLED ANY APPLICABLE STATUTE OF LIMITATIONS**

I.    **Zelis and The Other Commercial Payers Are Engaging in A Continuing Antitrust Violation by Renewing Their Conspiracy with New and Independent Acts**

268. A continuing violation of the Sherman Act restarts the statute of limitations period each time a defendant commits a new, overt act. Here, during the Class Period, Zelis and the other Commercial Payers continue to underpay Plaintiff and members of the Class, adjusting price-fixing agreements to reflect fluctuating economic and market conditions. Each meeting (whether bilateral or multi-lateral), communication, episode of information sharing, and individual effort to "reprice" OON healthcare service claims is an overt act that begins a new statute of limitations as each newly-transpired event advances the objectives of the Defendants' and non-defendant Co-Conspirators' OON Payment Conspiracy, but which involves different facts at the time.

269. Every statement made to establish, further, preserve, enforce, or conceal the conspiracy, and, as related to, each time Zelis, a Commercial Payer Defendant, or a Commercial Payer non-defendant shared private, confidential, proprietary, or competitively-sensitive claims, pricing, and/or contractual information, such a statement or act sprang from the same collusive goal to artificially suppress OON payment levels, but which involved different facts at the time.

270. Based on the serial events at issue where a new limitations period is created each time a new repricing is issued, the statute of limitations has not expired as to at least some of the violations at issue. Rather the violations described herein as rooted in collusive underpayment of Providers for their performance of OON healthcare services have occurred to the present, are continuing, and are ongoing.

II.    **Fraudulent Concealment**

271. The efforts, conduct, statements, and omissions taken to establish, further, and enforce the OON Payment Conspiracy were performed in secret and Plaintiff had no knowledge of the conspiracy, whether actual, constructive, or otherwise. Zelis's repricing efforts, as indicative of antitrust violations, have not been reported in the press and, so far, have evaded antitrust-based litigation. On information and belief, there is no date, so far, that has begun to run any applicable statute of limitations.

272. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed the conspiracy from Plaintiff and the other members of the Class.

273. Because the OON Payment Conspiracy was expansive, encompassing, and secret, there was no practical alternative to which Plaintiff or members of the Class could turn in order to obtain fair payment for out-of-network healthcare services. Because Commercial Payers had insight into the repricing efforts of at least one of Zelis's repricing rivals through the Commercial Payers' relationships with Zelis, Plaintiff and members of the Class could not avoid the impact of the Zelis Cartel even if they turned to those Commercial Payers that exclusively used a competing repricer.

274. There are several examples and occurrences that indicate or suggest that Defendants attempted to conceal the OON Payment Conspiracy.

275. In a letter to the Antitrust Division of the DOJ and the FTC concerning possible algorithmic-based antitrust violations, Senator Klobuchar wrote: "The result is that – instead of competing with each other – insurance companies are pushing ***additional hidden costs*** on to employees and patients." April 8, 2024 Sen. Klobuchar Letter, at 1 (emphasis added).

276. Facilitating concealment, while claiming its services as "defensible" (Zelis claims that its "Established Reimbursement Solution®" tool for "Out-of-Network claims" solutions helps to

"[m]aximize acceptance and minimize appeals with a pricing solution that delivers **defensible**, geographically and adjusted pricing recommendations" (emphasis added)), Zelis has sought to avoid compliance with a subpoena in other litigation, asserting that its "pricing and repricing reports" are "confidential business information" (*In re EthiCare Advisors, Inc.*, No. 20-1886 (WJM), 2020 WL 4670914, at *4, n.4 (D.N.J. Aug. 12, 2020) (citing and analyzing *Peterson v. Cigna Health and Life Ins. Co.*, BER-1-518-18, N.J. Super. Ct. (Law Division) [ECF No. 24])).

277. Claiming that its tools are "defensible," while simultaneously thwarting disclosure by asserting that its methodologies are confidential and "proprietary," is an attempt to legitimize and fraudulently conceal the illicit nature of the OON Payment Conspiracy.

278. Furthering concealment of the OON Payment Conspiracy, according to an April 9, 2024 The New York Times article, "Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill" by Chris Hamby, health insurers resist providing information about their repricing methods to employer-customers. For example, the *New York Times* wrote: "employers have also questioned increased fees and complained about being kept in the dark," leaving Commercial Payers scrambling for ways to respond to objecting customers. *Id*. For example, "[a] UnitedHealthcare account executive emailed colleagues for help explaining the $50,650 fee charged to New England Motor Freight," which "grew out of $152,594 bill, of which just $7,879 was covered." *Id*. When pressed for the basis of such a fee, as reported by the *New York Times*, "UnitedHealthcare initially refused to provide the trucking company with the full underlying data," and "Cigna refused a similar request from auditors for Arlington County, Va., which it had charged $261,000 in one year." *Id*.

279. The legitimacy of such "secretive arrangements" between repricers and Commercial Payers has been publicly questioned. In an April 9, 2024 letter from the American Hospital

Association to Acting Secretary Su of the U.S. Department of Labor, the AHA wrote: "Health care providers are forced to endure these below-cost reimbursements, and employers with self-funded plans report that insurance companies are charging them unpredictable and frequently large processing fees *without transparency* about claims practices or data analytics, making it difficult for them to police or understand these inappropriate practices." *Id*. (emphasis added).

280. Zelis and the Commercial Payers have exerted substantial and prolonged efforts to keep the specifics of their relationships, the ways that repricing amounts are calculated, and the conspiracy to artificially suppress payments for OON healthcare services out of view of patients and Providers.

281. One of Zelis's offerings is its "Reference Based Pricing" ("RBP") product, which in part uses "Medicare" pricing as a reference point, which, in turn, is regarded by health plans to result in payments so low as to be "misleading":

> [The] Medicare-based reference point is misleading. The average consumer doesn't understand how low Medicare rates are. On its surface, a policy to reimburse at a level well above what Medicare pays sounds fair, even generous when compared to the traditional methodology that reimburses at a percentage below U&C. However, when a provider anticipating low reimbursements from payers increases the charges to compensate, the gap between an elevated charge and the bare-bones Medicare reimbursement can be significant.

March 21, 2017 Health Plan Alliance: "A Better Reference for Reference-Based Pricing". Zelis uses or enables the use of the same "misleading" Medicare pricing as "reference" for its "RBP" service.

282. Further, based on the "proprietary" nature of Zelis's claims repricing tools, technologies, and methodologies, Zelis does not share with Providers which particular repricing tool, technology, or methodology was applied. As Zelis does not inform OON Providers as to which of its various tools, including but not limited to its ERS, RBP, or MAC methodologies it applied for

the repricing of a particular claim, the OON Provider has no way of knowing if Zelis's calculation was accurate or appropriate.

283. The conspiracy, by its very nature, was and is self-concealing. Payments for OON healthcare services are not exempt from antitrust regulation, and thus, before recent events, Plaintiff and other Providers considered the OON Commercial Payer Market to be competitive. A reasonable person under the circumstances would not have been previously alerted to investigate the legitimacy of Defendants' unlawful conduct.

### ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT, ARTICLE III DAMAGES, ANTITRUST INJURY, AND ANTITRUST STANDING

### I.  Summary of Defendants' Anticompetitive Effects

284. Defendants' anticompetitive conduct had the following effects, among others:

  a. Price competition has been restrained or eliminated with respect to paying Providers for out-of-network healthcare services;

  b. Payments for out-of-network healthcare services rendered to patients have been fixed, suppressed, stabilized, or maintained at artificially deflated levels;

  c. Plaintiff and members of the Class have been deprived of free and open competition; and

  d. Plaintiff and members of the Class have received payments at artificially suppressed price levels for out-of-network healthcare services.

285. The purpose and actual resulting impact of the conspiratorial conduct of Defendants and their co-conspirators was to decrease, fix, stabilize, and/or maintain at suppressed payment levels, the prices payments to Providers for performance of OON healthcare services. As a direct and foreseeable result, Plaintiff and members of the Class were damaged by receiving payment for OON healthcare services at artificially suppressed prices during the Class Period.

## II.    Article III Damages

### A.  Collusively-Suppressed OON Payment Amounts

286. The price effects of Defendants' conduct have damaged Plaintiff and Class Members through receipt of payments at suppressed price levels for the performance of out-of-network healthcare services during the Class Period, causing both Article III injury, and, as further discussed below, antitrust injury.

287. The Defendants' conspiratorial conduct, along with that of the other Co-Conspirators, caused Plaintiff and members of the Class direct and proximate harm.

288. When the Commercial Payer applies Zelis-enabled repricing, there remains a difference, often including a substantial difference, between what the OON Provider is paid and the amount billed.

289. As David Scanlan testified, "we [Allied National, Inc., a healthcare insurance company Commercial Payer] usually pay something less than what that billed amount is." Butler, 1:17-cv-17-00050 (D. Mont. Aug. 30, 2018), at ECF 94-4 at 2.

290. A representative from Zelis confirmed Zelis's role in paying OON Providers at amounts less than what was billed. When asked, "[w]hen you say accept the ERS rates, does that mean the ERS rates might be something less than [what] the provider billed?," Zelis's Robert Jackson responded: "Yes." Butler, 1:17-cv-00050 (D. Mont. Oct. 5, 2018), at ECF 118-11 at 3.

291. Zelis repeatedly asserts that its repricing tools are highly effective. With respect to the effectiveness, which is to say, the "retention" of the "savings" or "acceptance" by Providers, Zelis's Robert Jackson testified that "90 percent of the providers who receive claims priced by ERS accept the ERS rate." Id. Zelis admits that its services are effective in downwardly adjusting payment amounts for Providers providing out-of-network healthcare services. According to its

August 13, 2024 press release ("About Zelis"), "Zelis sees across the system to identify, optimize, and solve problems holistically with technology built by healthcare experts – driving real, measurable results for clients." (emphasis added).

292. By reason of the alleged violations of the antitrust laws described herein, Plaintiff and the Class have sustained injury to their businesses or property, having received lower payments for performing out-of-network healthcare services than they would have been paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages.

293. The pervasive use and application of Zelis's technologies and methodologies have caused widespread and substantial harm to Providers. As included on Zelis's "Market-based Pricing with Zelis" webpage, "Craig, COO of TPA" apparently said: "'We're the nation's largest Taft Hartley TPA and have been working with our partner Zelis for the past several years. Our clients have enjoyed average savings of 42%.'" Zelis has also indicated that it "delivers more than $240B in payments to providers" – payments which deposition testimony confirms is substantially less than the amount that was originally and collectively billed.

294. On or about January 17, 2023, PIMG received a repricing communication from Zelis, which gave Plaintiff less than a 1-day consideration period: "Proposal Expires: 01/17/2023". This meant that PIMG had less than a single day to decide whether to accept Zelis's and Anthem Blue Cross & Blue Shield's repricing of the Plaintiff's out-of-network healthcare services. *See* below January 17, 2023 Zelis Repricing Communication.



Proposal Expires: 01/17/2023

The attached proposal is being submitted to you for consideration and remittance of payment on the below detailed claim in accordance with the terms and conditions contained herein.

**Details**

| | |
|---|---|
| Patient ID: | |
| Patient Name: | ▮▮▮▮▮▮ |
| Date(s) of Service: | 10/30/22 - 10/30/22 |
| Payor: | Anthem Blue Cross & Blue Shield |
| Claim ID: | ▮▮▮▮▮▮ |
| Provider: | PACIFIC INPATIENT MEDICAL |
| Total Billed Amount: | $1,234.08 |
| Repriced Amount: | $143.24 |

| | |
|---|---|
| Contact: | Pam |
| Phone: | ▮▮▮▮▮▮ |
| Fax: | |

**Terms**    This Agreement outlines Provider's willingness to accept the following terms on the above claim:

1. The Repriced Amount will be agreed to on this claim.

2. Any interest or penalties relating to the claims processed by the Payor will be waived by Provider.

3. In consideration, Provider will receive payment within 10-15 working days from the date this document is received in the Zelis office. The EOB/EOP remark will designate that the discount is through Zelis or PHX.

4. Payment from the Payor will be subject to any benefit plan terms such as deductibles, co-insurance, co-pays, exclusions and code edit reductions per the plan guidelines. Provider agrees not to balance bill the Payor, administrator and/or patient for the difference between the Total Billed Amount and the Repriced Amount in accordance with the terms of this Agreement.

In addition to the application of considerable time pressure, Zelis also communicated in this repricing example a "Repriced Amount" of $143.24, or 11.6% of the originally submitted "Total Amount Billed" of $1,234.08.  Rather than pay at competitive rates, Zelis communicated to PIMG a willingness to pay that was a repricer-and-insurer-imposed 88.39% discount off of the Provider's submitted amount.  Further, confirming Plaintiff's damages, standing, antitrust injury, antitrust standing, and inability to mitigate (among other legal considerations), Zelis's repricing communications, including the above example, conditioned receipt of payment on agreeing to a balance billing prohibition:  "Provider agrees not to balance bill the Payor, administrator and/or patient for the difference between the Total Billed Amount and the Repriced Amount in accordance with the terms of this Agreement."  In other words, whether Plaintiff accepted the repriced and underpaid amount (and was prohibited from balance billing) or rejected the repriced amount (and received no payment whatsoever), Zelis's repricing damaged Plaintiff.

295. An even greater percent discount was applied in *California Spine & Neurosurgery Inst. v. Agilent Techs., Inc.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024), ECF 1-11. As indicated in Ex. 11 to that complaint, Zelis repriced the back surgery services performed by the Provider from an initially-billed amount of $39,000.00 to $567.58, or 1.455% -- or, a 98.545% discount off of the amount originally billed.

296. Zelis, the Commercial Payer Defendants, and other Co-Conspirators have directly and proximately caused Plaintiff and members of the Class harm and damages resulting from the OON Payment Conspiracy. By receiving collusively-determined and suppressed payments in amounts less than what they would have received for competitively-priced OON healthcare services, Plaintiff and members of the Class have suffered Article III damages.

297. The repricing communications are addressed to Providers performing out-of-network healthcare services, and include an "Agreement," which "outlines Provider's willingness to accept . . . The Repriced Amount . . . ." *Id*. This "Agreement" also includes a prohibition against "balance bill[ing]," which specifies the "Provider" as the target of repricing resulting from Zelis Cartel members' collusive conduct, re-confirms the damages experienced by the target of the collusion, and prevents their target from mitigating damages or becoming "whole" again from a damages perspective. Plaintiff and members of the Class have been harmed precisely in the ways Congress intended the federal antitrust laws to be used to prohibit and remedy such harm. Plaintiff and members of the Class have suffered antitrust damages and possess antitrust standing.

**B.  Artificially Limiting Professional Choice**

298. The ***overall*** private, commercial payer market includes both payments made to in-network Providers and payments made to out-of-network Providers. However, the OON Payment Conspiracy touches on the market relating to payments made to in-network Providers, as follows.

299. As between in-network and out-of-network, such healthcare services are often regarded as providing basically or exactly the same service to patients. Yet, traditionally, prices paid to in-network Providers for the same services as performed by out-of-network Providers differ. The difference in price is due, in part, to the economic decision in which the in-network Provider forgoes a higher price for providing specific healthcare services in return for stability, ease or speed of payment, and/or a higher volume of patients for the Provider's services. Providers who remain or decide to go out-of-network often do so, at least in part, precisely in order to charge a higher fee for a given service.

300. By artificially suppressing OON payment levels so that they match or come close to in-network payment levels, there is comparatively greater incentive for a Provider to join a PPO Network, but without the PPO needing to increase in-network payments or to improve in-network services. Without needing to expend any additional costs to improve pay or conditions for Providers, the PPO Network then can charge subscribers more for having a comparatively larger practitioner directory.

301. There is a direct economic and competitive tension between the benefits involved with choosing to practice within a particular PPO plan and the benefits associated with practicing out-of-network.

302. Prior to the Zelis Conspiracy and prior to the Ingenix conspiracy, there was a proper, competitive dynamic available to Providers deciding whether to opt to go in-network or remain out-of-network. The collusive efforts of Zelis, the Commercial Payer Defendants, and the non-defendant Co-Conspirators also operate to deny Providers the economic advantages associated with this competitive dynamic. For example, Milliman's David Lewis specifically noted how repricers and Commercial Payers can use an "In-Network" pricing "reference." By using this

pricing comparator, the Zelis Conspiracy operates explicitly to help eradicate the economic value associated with providing out-of-network healthcare services.[7]

303. By collusively suppressing OON payment levels to come close to or match in-network payment levels, the Commercial Payer Defendants, and the non-defendant Co-Conspirators harm competition in yet another way: By making in-network participation artificially more attractive to Providers, but without needing to increase payment levels or improve service levels for the Providers.

## III.    Antitrust Injury

304. In addition to sustaining Article III harm, as discussed above, Plaintiff PIMG and other members of the Class have also suffered antitrust injury.

305. In applying these antitrust injury considerations, Plaintiff's allegations are sufficient to support a finding of "antitrust injury," as follows.

306. First, the injury suffered by Plaintiff and members of the Class are precisely the type of harm the antitrust laws were meant to prevent. As alleged above, Plaintiff and members of the Class were paid excessively low amounts or paid at levels significantly less than what they would have been paid for their out-of-network healthcare services absent the Zelis Conspiracy. Had the Defendants and other conspirators abided by the nation's antitrust laws, including Section 1 of the Sherman Act, Plaintiff and members of the Class would not have been harmed by way of a conspiracy designed to and effective in suppressing prices on a collusive basis for payments made to Providers performing out-of-network healthcare services.

---

[7] Use of any reference (or none) can still eradicate the difference in economic value between practicing in-network and out-of-network. The key factor is the resultant price. So long as this price is set at or near in-network payment levels, Defendants thwart the availability of this competitive dynamic.

307. Second, the injury suffered by Plaintiff and members of the Class was precisely that which flowed from that aspect of the Defendants' conduct which violated Section 1 of the Sherman act. In other words, Plaintiff and members of the Class were harmed not by Defendants' conduct which can be considered something distinct from violations of Section 1 of the Sherman Act. Rather, Plaintiff and members of the Class were harmed by receiving excessively low and significantly below-market payment for out-of-network healthcare services, which were directly related to the efforts to establish, maintain, preserve, further, and conceal the OON Payment Conspiracy at issue in this matter. For example, by examining Zelis' repricing memoranda issued to Plaintiff and other Providers, it is clear that the injury at issue concerns the amounts by which submitted claims were repriced. To the extent that there is any question about from where the injury "flow[ed]," these repricing communications are addressed to specific healthcare service Providers performing out-of-network healthcare services, and which list the "Total billed Amount," as well as the "Repriced Amount" to be paid to that specifically-addressed Provider. Further, the repricing communications note that "1. The Repriced Amount will be agreed to on this claim," and, preventing the ability to mitigate such conspiracy-derived damages, the repricing communication specifies that the "Provider agrees not to balance bill the Payor, administrator and/or patient for *the difference between the Total Billed Amount and the Repriced Amount* in accordance with the terms of this Agreement." To the extent there is any question from where Plaintiff's injury "flowed," the repricing communications include details that support, if not outright confirm, that the Plaintiff and members of the Class were harmed by that which flowed from the Section 1 Sherman Act-violating OON Payment Conspiracy.

308. Third, Plaintiff can show not only the existence of its own injury stemming from violations of Section 1 of the Sherman Act, but that Defendants' conduct resulted in an antitrust

injury, which also harmed competition. Zelis admits that it has issued "$240B" worth of payments and even the repricing communications found by Plaintiff and included and discussed herein demonstrate that others beside the Plaintiff have been injured a result of the Defendants' and their Co-Conspirators' collusive efforts. Further, however, because approximately "770+" insurers have joined the Zelis Cartel, including the "top 5" nationwide insurers, there is actually, virtually, or practicably nowhere for Providers to turn in order to obtain market-based and non-collusively-determined OON payments. Through the Defendants' and their Co-Conspirators' use of the conspiracy device, Plaintiff and members of the Class are deprived of the ability to benefit from competition between and among non-conspiring and rival Commercial Payers. This harm to competition is further discussed in the paragraph immediately below.

309. Fourth, Plaintiff has sufficiently alleged that competition was harmed by Defendants' and their Co-Conspirators' collusive efforts, which affected the prices, quantity or quality of goods or services associated with out-of-network healthcare services, and not simply as limited to the Plaintiff's own welfare. More specifically, as reflected by the Zelis website touting the "effective[ness]" of its repricing tools and technologies; as reflected by the website's inclusion of customer testimonials, noting, for example, that repricing efforts have given a certain "Taft Hartley TPA" an "average savings of 42%"; and as reflected on the repricing communications not provided by Plaintiff, which concern discounts from 40% to over 98% of the Providers' originally invoiced amounts, "***prices***" of the out-of-network healthcare services have been suppressed by this buyers' side conspiracy collusively suppressing out-of-network payments. Moreover, the OON Payment Conspiracy has caused the "***quantity***" of sources providing non-collusively-determined OON payments to be severely limited or fully eliminated, further harming competition. Because "770+" insurers, including the "top 5" nationwide insurers are customers of Zelis and, presumably,

members of the conspiracy, Plaintiff and members of the Provider Class have virtually or actually nowhere to turn to obtain non-collusively-suppressed payments for their respective out-of-network healthcare services. As reflected in the prices paid not just to Plaintiff, but to many if not all out-of-network healthcare service Providers, Defendants have harmed competition.

310. Fifth, price-fixing efforts are sufficient to support a finding of the correct "type" of injury for purposes of showing antitrust injury. As alleged, collusively-suppressed payments resulting from a price-fixing conspiracy as caused by Zelis's ERS, RBP, and other tools, technologies, and methodologies, including their respective ability to allow collusively-determined "overrides" by specific amounts, agreed-upon specific percentages of a given pricing reference, or by application of an agreed-upon threshold or ceiling, Zelis's repricing tools and technologies as applied by and as used by the Commercial Payer cartel members, support a "type" of injury constituting antitrust injury.

311. Sixth, when a buyers' cartel is alleged, injury to sellers like Plaintiff and members of the Class, inflicted through a horizontal price-fixing conspiracy of buyers, constitutes an antitrust injury which is actionable by the seller. Sellers, as alleged herein, are the Providers performing out-of-network healthcare services. As alleged, this action is one concerning a buyers' cartel or buyers' conspiracy. Such a conspiracy, just as the one alleged herein, often concerns artificially suppressed prices by coordination from fellow buyer-conspirators. A "mirror" of a sellers' conspiracy, which is designed to prop up or maintain prices, antitrust injury can be properly alleged in the context of a buyers' cartel as supported by allegations of collusive efforts, which have suppressed prices below that which would have existed absent the conspiracy at issue. Commercial Payers have coordinated and engaged in efforts, including the sharing of confidential, proprietary, and competitively-sensitive information and the use of and application of Zelis's tools and

technologies, including its ERS, RBP, and other services, to determine on a collusive basis payment levels for OON healthcare services. In disregard of the amounts originally invoiced by the Providers, Defendant Zelis then communicates such repriced amounts to the Providers, which are then paid by the Commercial Payers to the Providers at levels "excessively low" or "significantly below-market" to the Providers' detriment. Absent the alleged buyers' side conspiracy, Providers performing OON healthcare services would have received payment at significantly greater payment levels.

312. Seventh, Plaintiff has sufficiently pleaded the existence of an antitrust injury as Plaintiff and members of the Class received payment for their out-of-network healthcare services in "excessively low prices" or at "significantly below-market" payment levels from members of the buyers' cartel. Receipt of such "excessively low prices" or "significantly below market" payment levels are established by allegations, including that use of the Zelis's repricing tools and technologies resulted in a "Taft Hartley TPA" obtaining an "average savings of 42%" off of out-of-network healthcare service costs and that Anthem Blue Cross used Zelis to reprice back surgery services at more than a 98% discount (repriced from an initially-provided invoice of $39,000 to $567.58). Further, Zelis admits the "effective[ness] of its tools and services, including that its and its Co-Conspirators' efforts have resulted in "$27B" in "claims cost savings." Such savings reflect enormous discounts, including discounts as much as over 88% or over 98%, which can readily be recognized as "excessively low" or "significantly below-market," and which such low prices paid to Providers for out-of-network healthcare services would not have existed absent the OON Payment Conspiracy.[8]

---

[8] Plaintiff invites this Court to consider the existence of any other industry or market where a purchaser is able to lawfully apply self-proposed discounts from over 88% to over 98% of the supplier's offered purchase price.

313. Eighth, harm to competition can readily be shown even if healthcare costs have decreased for patient-consumers (which they have not – *see* analysis, *supra*) as the conspiracy at issue is a horizontal one; that is, one occurring between and among otherwise competing Commercial Payers, including private health insurance companies. Further, this group of Commercial Payers includes Defendant Zelis andand/or architects of PPO Networks. Although Defendant Zelis operates in and competes with other PPO Networks in the PPO Network space, it also performs repricing services. However, as a repricer, Zelis does not perform at a different commercial plane than the other Commercial Payers, but operates as a way to coordinate pricing information, apply uniform pricing strategies, and share private, confidential, and competitively-sensitive business information between and among Commercial Payers. In this way, as Zelis acts as a conductor, conduit, and hub in service of the greater Zelis Conspiracy, any verticality in the relationship between Zelis and other Commercial Payers does not immunize Zelis and any such verticality is overwhelmed by its role in facilitating collusive efforts on behalf of itself and other Commercial Payers to the detriment of Providers performing out-of-network healthcare services. In this circumstance, any "low prices" that might be argued as benefiting consumer-policyholders do not immunize Zelis or any of the Commercial Payer Defendants as (to the extent any such "low [health insurance premium] prices" actually exist in the real world) they result from a horizontal, buyers' side, price-fixing cartel.

314. Plaintiff has alleged details sufficient to establish that competition has been harmed and that Plaintiff and other members of the Class have suffered antitrust injury.

## IV.    Antitrust Standing

315. for the following allegations, among others herein alleged, support Plaintiff's antitrust standing:

91

316. First, with respect to "[t]he causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm," there is no need to prove any specific state of mind to support a violation of Section 1 of the Sherman Act. Nevertheless, Plaintiff has alleged Defendant Zelis's intent to use its technology, tools, and agreements Zelis has with other Commercial Payers to collusively – and effectively – suppress payments for Providers performing out-of-network healthcare services. As Zelis's Kaitlyn Howard stated in an April 27, 2023 description of its "Referenced-Based Product" repricing tool, "[t]he ***intent*** is to provide an effective tool to help stabilize the healthcare claims costs." (Emphasis added). Zelis is clear as to the focus of the RBP tool's "effective[ness]": "RBP could potentially reduce healthcare spending by up to $9.4 billion per year if it were widely adopted." With respect to "Key Points" regarding its "RBP" repricing service: "that 2MM+ RBP claims [are] repriced annually"; that its RBP repricing service has resulted in "97% retained savings"; and that it has "<4% member and provider inquiry rate". In other words, Zelis expressed its "intent" to "stabilize" OON healthcare claims costs, and its website further confirmed that it did so. With respect to whether that harm impacted Plaintiff, analyzing just a single repricing communication received by PIMG on or around January 17, 2023, showing the amount originally invoiced by the Plaintiff and the repriced amount, as well as the corresponding ledger showing the amount actually paid to Plaintiff, it is evident that the amount that was billed by Plaintiff ($1,234.08) differed from the amount that was ultimately paid to the Plaintiff ($143.24) for that same out-of-network healthcare service. This $1,090.94 difference, representing an 88.39% discount, is but a single example of the harm suffered by Plaintiff, which was caused by the Sherman Act violation committed by Defendants.

317. Second, Plaintiff has previously and satisfactorily alleged the existence of "antitrust injury," or "whether the plaintiff's alleged injury is of the type for which the antitrust laws were

intended to provide redress[.]" *Lifewatch Services*, 902 F. 3d at 341-342. Even as indicated by the Third Circuit, "[a]n antitrust injury (1) 'flows from that which makes [the] defendants' acts unlawful' and (2) 'is an injury of the type the antitrust laws were intended to prevent.'" *Id*. at 342 (quoting *West Penn [Allegheny Health Sys., Inc. v. UPMC*], 627 F. 3d [85,] at 101 [(3d Cir. 2010)] (quoting *Brunswick Corp*., 429 U.S. at 489)). As thoroughly discussed *supra*, Plaintiff has fully satisfied this "antitrust injury" test. Further, allegations concerning price-fixing occurring through a buyers' cartel suffices for pleading antitrust injury.

318. Third, Plaintiff has sufficiently pleaded "the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims[.]" *Lifewatch Services*, 902 F. 3d at 342. Plaintiff has alleged a direct connection between the collusive repricing scheme at issue and its resulting harm to Plaintiff. Plaintiff has alleged that the Commercial Payers have reached agreements both between and among other Commercial Payers, as well as between themselves and Zelis, collectively and separately. Further, these agreements specifically concern an agreement to share confidential, proprietary, and competitively-sensitive business information in exchange for the permission to use Zelis' repricing tools, technologies, and methodologies. Also, these agreements specifically concern the repricing of payments owed to Providers performing out-of-network healthcare services. Finally, such repricing is reflected in Zelis repricing communications, which include details concerning the amount billed, the identification of the patient and associated claim, and the amount ultimately paid at the repriced (downwardly adjusted) amount. There is no intervening event or occurrence that separates the agreements at issue entered into by the Defendants, the application of the repricing, which was enabled by those agreements, and the financial impact suffered by the Providers performing out-of-network healthcare services. As shown by the Zelis repricing communications, this injury was

not remote, but is as direct as an impact resulting from a buyers' cartel can be. Taking Zelis at its word, as reflected by Zelis's repricing communications, "[t]his facsimile has been sent by Zelis Healthcare, LLC ('Zelis') to those with an interest in the services provided by Zelis under our established business relationship"; that -- in this example -- the Plaintiff's "Total Billed Amount" is "$1.234.08" and Zelis's and the Commercial Payer's (in this case, "Anthem Blue Cross & Blue Shield") "Repriced Amount" is "$143.24". As the injury at issue is specifically called out as one derived from the "***Repriced*** Amount," the pertinent injury cannot be considered "speculative," and, further, could not be any more "direct[]."

319. Fourth, there are no "more direct victims of the alleged antitrust violations[.]" *Lifewatch Services*, 902 F. 3d at 342. Plaintiff and its fellow class-member Providers performing out-of-network healthcare services were the intended victims of the repricing scheme at issue. The repricing communications were not only addressed directly to the Provider (and not, for example, a patient), and not only include the downwardly adjusted amounts (the amounts which were actually paid to the Providers), but also include a prohibition on balance billing and other terms. The balance billing prohibition, among other effects, conditions the ***Provider***'s receipt of payment on an agreement not to "balance bill." As such, the focus of the repricing is not on some other individual or entity, but on the Provider performing out-of-network healthcare services. Specifically, Zelis conditioned "[p]ayment" on Plaintiff's "agree[ment] not to balance bill the Payor, administrator and/or patient for the difference between the Total Billed Amount and the Repriced Amount in accordance with the terms of this Agreement." Moreover, there is no indication that any other individual or entity has suffered greater or more directly-applied harm by the Defendants resulting from this scheme, or otherwise holds positions in greater danger from the effects of the collusive repricing scheme than the OON Providers. Just as Zelis's Ms. Howard

communicated, the Providers (the source of such "healthcare claims costs") are the intended victims of the collusive repricing scheme and were and are the most direct victims of the repricing scheme at issue; there are no other "more direct victims."

320. There is very little chance of "the potential for duplicative recovery or complex apportionment of damages." Providers perform healthcare services for patients where that Provider is not a member of the patient's PPO Network. Based on the terms of that patient's health insurance policy, the Commercial Payer remains obligated to pay the Provider for such care, even though the Provider is "out-of-network." After such healthcare services are performed, the Provider issues a claim to the patient's insurer. At this point, the insurer could simply pay the Provider the amount invoiced by the Provider. However, this is not what occurs. Instead, the Commercial Payer sends the Provider's claim to the Commercial Payer's repricer; here, Zelis. Zelis then applies its downwards pricing adjustment via its tools, technologies, and/or methodologies to come up with a reduced payment amount. As the Commercial Payer has previously delegated such pricing authority to Zelis, Zelis then issues the Provider a repricing communication reflecting various details, which include the date the healthcare service was rendered, the identification of the patient, the claim ID, the procedure at issue, the Provider performing the procedure, the amount originally billed, and the repriced amount. As occurs most of the time (by far), there is no objection by the Provider and within a particularly specified amount of time, the Commercial Payer pays the Provider at the repriced amount. Subject to expert analysis and refinement, the damages at issue here are represented by the difference between the amounts originally invoiced and the amounts paid at the repriced level. There is no potential for "duplicative recovery"; rather, there is only any recovery if the repriced amount is less than the amount originally billed. Moreover, as these amounts are specifically tied to particularized procedures and patients, as performed on a particular

day by a particular Provider (as indicated on Zelis's repricing communications), there is no risk of multiple payments paid for the same service. Moreover, allocation of damages is straightforward, as specified by the repricing communications. Zelis, as delegated by the respective Commercial Payer) specifies that the repriced amount as included in the repricing communication is tied to a particular procedure performed by a particular Provider on a particular patient on a particular day. Further, that repriced amount is tied to the Provider's specific, invoiced amount. Subject to expert analysis and refinement, the difference between the amount originally invoiced and the repriced payment is what is owed to that Provider. The repricing communications themselves minimize or eliminate entirely the possibility of duplicative recovery or complex apportionment. Further, Defendant Zelis and the Commercial Payer responsible for the payment at issue are both likely to have detailed ledgers and databases, which similarly record and connect the originally invoiced amount and the repriced amount with the Provider performing the out-of-network healthcare service at issue.

321. The harm and damages suffered by Plaintiff and members of the Class constitute an antitrust injury of the type that Congress, through the enactment of the antitrust laws including Section 1 of the Sherman Act, meant to regulate, dissuade, or prevent.

322. In addition to the analysis above, confirming Plaintiff's and the Class Members' antitrust injury, their antitrust standing, and their inability to mitigate damages, the repricing communications at issue specifically prevent and prohibit Providers from recovering the difference between the amount invoiced by the Providers and the amount paid by the Commercial Payers, through the repricing efforts of Zelis.

323. Zelis, as agent of the Commercial Payers and acting within its scope of delegated authority, conditions receipt of payment on the healthcare service Provider's agreement not to

balance bill others in order to obtain full satisfaction of the amount invoiced for performance of out-of-network healthcare services.

324. In the event that a healthcare service Provider seeks to avoid the balance billing restriction, that Provider receives no payment from Commercial Payers for the performance of the out-of-network healthcare services at issue. Accordingly, either the Provider is damaged through receipt of an underpayment or through receipt of no payment whatsoever.

325. As communicated by Premier Health Exchange (PHX), the precursor to Zelis, to the "Provider": "Provider agrees not to balance bill the payor, administrator, and/or patient for the difference between the Allowed Amount and the Repriced Amount in accordance with the terms of this Agreement." *Northlake Chiropractic, Inc. v. Zelis Healthcare Corp.*, No. 1:19-cv-08087 (N.D. Ill. Feb. 28, 2020), at ECF 16-3 (Ex. 3).

326. Due in part to OON underpayments as communicated at repriced amounts and Zelis's inclusion of prohibitions on "balance billing," which are specifically directed to "Provider[s]," there is no question that the intended victim of this antitrust conspiracy is the Plaintiff and Class members, that such Providers have suffered damages, that such Providers have sustained antitrust injury of the type that Congress, through enactment of the Sherman Act, sought to prevent, dissuade, and remedy, and as such, that such Providers possess antitrust standing.

## CLASS ACTION ALLEGATIONS

## I.    Plaintiff Seeks To Represent And Is A Member of The Following Defined Class

327. Plaintiff satisfies Federal Rule of Civil Procedure, Rule 23 and all other pertinent federal class certification requirements to represent the Class described herein.

328. Plaintiff invokes Federal Rules of Civil Procedure Rule 23(a), (b)(2), and (b)(3) on behalf of the following Class:

All persons and entities who received one or more payments that were downwardly-adjusted directly or indirectly by Zelis from either Zelis or from Commercial Payers (as defined herein) for out-of-network healthcare services in the United States, including in any of its States, the District of Columbia, or U.S. territories, from June 13, 2016 to the present (the "Class Period").

Excluded from the Class are Zelis, any of its subsidiaries; any of its officers, directors and employees; any entity in which Zelis has a controlling interest; and any affiliate, legal representative, heir, or assign of Zelis. Also excluded from the Class are the Commercial Payer Defendants, any of their subsidiaries; any of their officers, directors, and employees; any entity in which a Commercial Payer Defendants has a controlling interest; and any affiliate, legal representative, heir, or assign of any Commercial Payer. Also excluded are any federal, state, or local governmental entity; any judicial officer presiding over this action; the members of the judicial officer's immediate family and staff; and any juror assigned to this action.

329. Plaintiff provided out-of-network healthcare services to patients who maintained insurance, but whose insurance did not include Plaintiff among the policy's, the plan's, or the network's in-network Providers. Plaintiff is a member of the Class it seeks to represent.

## II.    Plaintiff Satisfies All Rule 23(a) Requirements

### A.  The Class Is Ascertainable

330. The defined Class is readily identifiable and one for which sufficient and adequate electronic records exist.

### B.  The Number of Members of The Class Is Sufficiently Numerous

331. Due to the nature of the trade and commerce involved, Plaintiff believes thousands of Class Members exist. Defendants know or have records sufficient to determine the exact number of Class members and their identifies.

### C.  Plaintiff's Claims Are Typical of Those of Members of The Class

332. Plaintiff's claims are typical of Class members' claims as the members' claims invoke the same theories of liability, arise from the same course of unlawful conduct, and show that injury of healthcare Providers has occurred in the same way involving the same or similar mechansims: Defendants paid Providers less for the Providers' out-of-network healthcare services than the Defendants would have absent the existence of the Zelis Cartel.

### D.  Plaintiff Will Adequately Protect The Interests of The Class

333. Plaintiff will fairly and adequately protect the interests of the members of the Class as Plaintiff's interests are aligned with, and not antagonistic to, the interests of Class members.

334. Plaintiff has retained counsel competent and experienced in prosecuting class actions, litigating antitrust matters, and both in combination.

### E.  An Action Brought Individually on Behalf of Plaintiff Shares Common Legal and Factual Questions and Answers with an Action Brought on Behalf of The Class

335. As discussed further with respect to Federal Rule of Civil Procedure, Rule 23(b)(3), in the event that Plaintiff was to bring an individual antitrust action against Zelis and the Commercial Payer Defendants, such an action would share many if not all of the same legal and factual inquiries and related resolutions as would a similar action brought on behalf of a proposed Class.

### III.    Common Legal and Factual Questions Predominate over Individual Questions and Answers

336. Common legal and factual question, along with their corresponding resolutions, predominate over individual or individualized questions. These predominating common legal questions, which resolve to common answers, include the following:

- Whether Zelis, the Commercial Payer Defendants, and their Co-Conspirators engaged in an agreement, combination, or conspiracy to suppress, maintain, or stabilize

payments made to Providers for their out-of-network healthcare services and/or products as part of interstate commerce between and among the States, the District of Columbia, and U.S. territories, and in the United States;

•    The identity of the conspiracy's participants;

•    The conspiracy's duration;

•    The acts performed by Zelis, the Commercial Payer Defendants, and their Co-Conspirators in furtherance, maintenance, enforcement, preservation, or concealment of the conspiracy;

•    Whether the conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

•    The effect of the conspiracy on the price of out-of-network healthcare services and products performed in the United States, the District of Columbia, and U.S. territories during the Class Period;

•    Whether Plaintiff and members of the proposed Class suffered antitrust injury as a result of the Zelis Cartel's conspiracy;

•    The appropriate method for measuring damages for injury suffered by Plaintiff and members of the Proposed Class; and

•    Whether Plaintiff and members of the Class are entitled to injunctive relief, and the form, nature, and extent thereof.

337. Many, if not all of the above inquiries resolve to an answer shared between Plaintiff and members of the proposed Class.

338. To the extent there might be differences between those experiences of Plaintiff and Class members, such differences relate to considerations regarding the extent, amount, or timing of the injuries at issue. Such differences do not defeat class certification.

## IV.    Use of The Class Action Mechanism Here Is Superior to Other Methods of Dispute Resolution

339. Here, a class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons: (1) individual joinder of all class members is impractical; (2) prosecution as a class action will eliminate the possibility of duplicative litigation; (3) prosecution of separate actions by individual members of the proposed Class would create the risk of inconsistent or varying decisions and adjudications, creating uncertain and potentially incompatible standards for adjudicating the claims and defenses asserted in this action; (4) the relatively small amount of damages suffered by individual members of the proposed Class, when compared to the expense and burden of individual prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and (5) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

340. Also supporting the superiority of use of the class action mechanism over other methods, the OON Payment Conspiracy members have acted on grounds generally applicable to the Class, making final injunctive relief appropriate as applied to the Defendants and as of benefit to the members of the proposed Class as a whole.

### CAUSE OF ACTION

### Count I: Horizontal Conspiracy in Restraint of Trade in Violation of Section 1 of The Sherman Act, 15 U.S.C. § 1

341. Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint as if set forth herein.

342. Beginning no later than June 13, 2016, Zelis, the Commercial Payer Defendants, and their Co-Conspirators created and executed a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce.

343. The contract, combination, or conspiracy alleged herein has consisted of a continuing horizontal agreement between and among Zelis, the Commercial Payer Defendants, and all of their Co-Conspirators to knowingly and collectively use Zelis's repricing tools to collusively fix payment amounts for healthcare services performed by OON Providers in the United States for OON healthcare services in the OON Commercial Payer Market. This conspiracy has caused Plaintiff to be paid at artificially suppressed payment levels for performance of OON healthcare services during the Class Period.

344. The contract, combination, or conspiracy alleged herein constitutes a horizontal conspiracy between and among direct competitors participating in the OON Commercial Payer Market.

345. In the alternative, the contract, combination, or conspiracy to unreasonably restrain trade and commerce alleged herein has taken the form of a hub-and-spoke conspiracy in which Zelis served and continues to serve as the "hub," the agreements between Zelis and Commercial Payer Defendants, and their Co-Conspirators to use Zelis's repricing tools served and continue to serve as "spokes," and the agreements between the ends of different "spokes" to use Zelis's repricing tools to reprice payments to Providers for OON healthcare services at artificially suppressed levels served and continue to serve as the "rim."

346. The unlawful acts and omissions of Zelis, the Commercial Payer Defendants, and their Co-Conspirators in establishing, maintaining, furthering, reinforcing, concealing and/or preserving the conspiracy and the conspiracy's objectives include, but are not limited to, the following:

- Zelis sold and operated its proprietary analytical tools to determine the amounts of payment for OON healthcare services performed by OON Providers;

- Zelis's Co-Conspirators, including other Commercial Payers, facilitated the use of Zelis's analytical pricing tools by submitting their confidential, proprietary, and competitively-sensitive claims and pricing data to Zelis, often in real time;

- Zelis's Co-Conspirators, including Commercial Payers, outsourced the processing and pricing of OON claims to Zelis, knowing that Zelis would use their claims and pricing data to set payment prices for out-of-network healthcare claims;

- Zelis and its Co-Conspirators, including the Commercial Payer Defendants, paid claims for OON healthcare services at rates or payment levels as determined by Zelis's pricing tools;

- Zelis, the Commercial Payer Defendants, and their Co-Conspirators, including Non-Defendant Commercial Payers, used many methods of bilateral and multilateral communication about claims, pricing, and payments of claims submitted for OON healthcare services, including their use and endorsement of Zelis's repricing tools, all having the purpose and effect of establishing, maintaining, furthering, reinforcing, concealing and/or preserving their anticompetitive scheme; and

- Engaging in efforts to conceal the Zelis Cartel, the methodologies, calculations, and overrides used in determining OON payment levels, and the identities of its participants.

347. The acts and omissions by Zelis, the Commercial Payer Defendants, and their Co-Conspirators in establishment, maintenance, furtherance, reinforcement, and concealment of their conspiracy to restrain trade were authorized, ordered, and performed by the Defendants' and their

Co-Conspirators' officers, employees, agents, or representatives while actively engaged in managing their interstate operations.

348. Zelis, the Commercial Payer Defendants, and their Co-Conspirators possess market power in the relevant antitrust market, the market for payments made to OON Providers by Commercial Payers made up of private health insurers, PPO Networks, PPO Plans, managed care organizations, self-funded plans, and self-insured entities (the OON Commercial Payer Market).

349. The relevant geographic market is the United States, including all fifty states, the District of Columbia, and its territories.

350. The Zelis Cartel has caused past and continuing anticompetitive effects in the form of artificially suppressed payments of claims.

351. As a direct and proximate result of past and continuing violations of Section 1 of the Sherman Act by members of the Zelis Cartel, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their respective businesses and properties by receiving lower payments for out-of-network healthcare claims than they would have received, absent the conspiracy.

352. The Zelis Cartel is a per se violation of Section 1 of the Sherman Act.

353. As the violations at issue include per se violations of Section 1 of the Sherman Act, no delving into procompetitive justifications or excuses is needed or permitted.

354. In the event that a presiding Court determines that the violations at issue are not per se-based, there are no procompetitive justifications or excuses for the Zelis Cartel. Further, to the extent that any to-be-proffered procompetitive justifications exist, they could have been achieved through less restrictive means.

355. In the alternative, the Zelis Cartel's conspiracy violates Section 1 of the Sherman Act under either a "quick look" or a full "rule of reason" analysis. The combination and conspiracy alleged had these effects, among others:

• Price competition in the payment for out-of-network healthcare services has been restrained, suppressed, and eliminated as to interstate commerce in the United States;

• Plaintiff and members of the Class who directly received payments for their respective out-of-network healthcare services from Zelis, the Commercial Payer Defendants, or their Co-Conspirators, including their respective divisions, subsidiaries, and affiliates, were deprived of the benefits of free and open competition with respect to the prices paid for those out-of-network healthcare services.

356. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by suppressing and fixing payments for claims submitted for out-of-network healthcare services throughout the United States as Defendants provide repricing and payment-related services throughout the United States, the District of Columbia, and U.S territories.

357. The conspiratorial acts and combinations have caused unreasonable restraints in the OON Commercial Payer Market.

358. Plaintiff and members of the Class have been injured and will continue to be injured in their respective businesses and properties by receiving smaller payments for their performance of OON healthcare services from Zelis, the Commercial Payer Defendants, and their Co-Conspirators than they would have been paid absent the conspiracy.

359. The alleged contract, combination, coordination, understanding, agreement, collusive conduct, or conspiracy is a per se violation of the federal antitrust laws.

360. Plaintiff and members of the Class are entitled to an injunction against all members of the Zelis Cartel, including Zelis, the Commercial Payer Defendants, and their Co-Conspirators, to prevent and restrain their unlawful conduct.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on its own behalf and on behalf of absent Class members, requests that the Court grant the following relief:

a.  A determination that this action may be maintained as a class action under Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3); appointing Plaintiff as Class representative and its counsel of record as Class Counsel; and directing that notice of this class action as provided by Federal Rule of Civil Procedure, Rule 23(c)(2) be given to members of the Class following certification;

b.  A determination that the conspiracy among Zelis, the Commercial Payer Defendants, and their Co-Conspirators, and all of their respective acts or omissions in establishing, maintaining, furthering, reinforcing, concealing and/or preserving the conspiracy, violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.  The entrance of judgment for Plaintiff and members of the Class against Zelis and the Commercial Payer Defendants for treble damages sustained by Plaintiff and the members of the Class in the form of claim underpayments, lost revenue and profits, and all other economic harm resulting from Zelis's and the Commercial Payer Defendants' violations of the Sherman Act;

d.  An award to Plaintiff and the members of the Class all available damages, including the trebling of all antitrust-based damages as allowed under the federal antitrust statutes for Defendants' wrongful conduct as alleged herein;

e.    An award to Plaintiff and the members of the Class all pre-judgment and post-judgment interest covering the fullest extent of time and calculated at the largest interest rate allowed by law, beginning no later than the commencement of this action;

f.    Permanent injunctive relief enjoining Zelis, the Commercial Payer Defendants, and their Co-Conspirators, affiliates, successors, transferees, assignees, officers, directors, partners, agents, employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing, maintaining, furthering, reinforcing, concealing, preserving, and/or renewing the conduct, conspiracy, or combination and from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device from having a similar purpose or effect, and/or from adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of the Sherman Act or any other federal antitrust law;

g.    An award of Plaintiff's and the Class members' costs and expenses of prosecuting this action, including all reasonable attorneys' fees as permitted by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

h.    Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury, pursuant to Federal Rule of Civil Procedure, Rule 38(b), of all issues so triable.

Dated: March 28, 2025

**CERA LLP**

By:    /s/ *C. Andrew Dirksen*
C. Andrew Dirksen (BBO# 568773)
529 Main St., Suite P200
Boston, MA 94111
Telephone: (857) 453-6555
*cdirksen@cerallp.com*

107

Solomon B. Cera
**CERA LLP**
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 777-2230
*scera@cerallp.com*

Maureen Forsyth (MA Bar. No. 642390
Jason S. Hartley (*pro hac vice forthcoming*)
Jason M. Lindner (*pro hac vice forthcoming*)
Kenneth Frost (*pro hac vice forthcoming*)
HARTLEY LLP
101 W. Broadway, Ste 820
San Diego, CA 92101
(619) 400-5822
*hartley@hartleyllp.com*
*lindner@hartleyllp.com*
*forsyth@hartleyllp.com*
*frost@hartleyllp.com*

Daniel J. Mogin (*pro hac vice forthcoming*)
MOGIN LAW LLP
4225 Executive Square, Suite 600
La Jolla, CA 92037
(619) 687-6611
*dmogin@moginlawllp.com*

Daniel R. Karon (*pro hac vice forthcoming*)
KARON LLC
631 W. St. Clair Ave.
Cleveland, OH 44113
(216) 622-1851
*dkaron@karonllc.com*

Katrina Carroll (*pro hac vice forthcoming*)
Kyle A. Shamberg (*pro hac vice forthcoming*)
CARROLL SHAMBERG LLC
111 W. Washington Street
Suite 1240
Chicago, IL 60602
872-215-6205
*katrina@csclassactions.com*
kyle@csclassactions.com

*Counsel for Plaintiff Pacific Inpatient*
*Medical Group, Inc. and the Putative Class*