**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE:  ZELIS REPRICING ANTITRUST LITIGATION<br><br><br><br>This Document Relates To:<br><br> All Associated Cases | Lead Action Case No.: 1:25-cv-10734-BEM<br><br>*Consolidated with Case Nos.:*<br>*1:25-CV-11092-BEM*<br>*1:25-CV-11167-BEM*<br><br>**AMENDED AND CONSOLIDATED**<br>**CLASS ACTION COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

I.    Nature of Action ................................................................................................1

II.   Jurisdiction, Venue, and Interstate Commerce ...............................................12

III.  Parties...............................................................................................................14

      A.  Plaintiffs .................................................................................................14

      B.  Defendants .............................................................................................17

            1.  Zelis Defendants ..........................................................................17

            2.  Commercial Payer Defendants .....................................................18

            3.  Majority Owner Investors .............................................................18

      C.  Non-Party Majority Owner Investors.....................................................22

            1. Commercial Payer Defendants .....................................................22

            i.    Bain Capital Private Equity and Bain Capital Ventures ..........................22

            ii.   Parthenon Capital .......................................................................24

IV.   Co-Conspirators, Agents, Authority, Reciprocal Agency,
      and Common Corporate Interest........................................................................27

      A.  Co-Conspirators .....................................................................................27

      B.  Agents ....................................................................................................27

      C.  Authority.................................................................................................28

      D.  Reciprocal Agency of Defendants and Co-Conspirators.......................28

      E.  Common Corporate Interest of Each Defendant's Related Entities ......29

V.    Factual Allegations ..........................................................................................29

      A.  A Brief History of Conspiratorial OON Payment Suppression Within the
          Healthcare Industry and Possible Competitive Baseline Periods ..............29

            1.  The Ingenix Conspiracy Period: 1997-2009 ................................29

2. The FAIR Health Database Period: 2010-2015 ....................................33

3. Development and Implementation of Private, For-Profit,
Proprietary Zelis Repricing System: 2016-Present...............................36

B. Zelis Directly Competes with Commercial Payers and Other Repricers,
and Provides Anticompetitive "Repricing" Services....................................37

1. Zelis's Business and Repricing Incentives ...........................................37

2. Zelis Directly Competes with the Repricing Services of
Other OON Claims Repricers ................................................................41

3. As An Owner, Operator, and/or Manager of PPO Networks,
Zelis Directly Competes with Other Commercial Payers.....................41

C. The "Repricing" Services Offered by Zelis ................................................48

1. Zelis's Repricing Services, Generally..................................................48

2. Zelis's Established Reimbursement Solutions® ("ERS"), so-called
"Market-Based Pricing" Unfairly Uses Lower In-Network Pricing
and Is Not "Market-Based".....................................................................52

3. Zelis's RBP Service Is Collusively Determined....................................55

4. Even if Marketed Separately, Zelis Acknowledges That Its
Pricing Services Operate or Can Be Operated Cohesively....................57

5. Zelis's Communicated Repricing Amounts Are Not
Mere Proposals, Recommendations, or Suggestions .............................58

6. Zelis's Post-Repricing Claims Negotiation and Appeals Process is
Effectively Non-Existent .......................................................................61

D. The Relevant Geographic and Service Markets at Issue ............................62

1. Relevant Market Definition, Generally.................................................62

2. Relevant Geographic Market ................................................................63

3. Relevant Service Market.......................................................................64

E. Through Its Agreements and Relationships with Commercial Payers,
Zelis Has Market Power and Monopsony Power in The Relevant Market .................72

F.  OON Payments Made by Commercial Payers to Providers Can Be
     Price-Fixed and Collusively Suppressed ....................................................75

G.  Anti-Competitive Acts and The Contours of The Zelis Conspiracy..........................81

     1.  Zelis, the Commercial Payer Defendants, and Their Co-Conspirators Have
          Formed, Executed, and Enforced an Information Sharing, Price Fixing,
          OON Payment Suppression, and Payer-Camouflaging Conspiracy ....................81

     2.  Agreements to Conspire and Share Competitively-Sensitive Information
          Between Zelis and Commercial Payers ...............................................83

          a.  Agreements to Conspire to Suppress OON Payments and to
               Share Information, Generally..................................................83

          b.  Verbal Information Sharing ......................................................85

          c.  Written and Contract Based Information Sharing ...........................87

          d.  Electronic Information Sharing..................................................87

     3.  Commercial Payers Share CSI and Other Related Information............................93

     4.  Commercial Payers' Sharing CSI with Zelis, Using Zelis To Suppress
          Prices, and Using Zelis To Conceal Responsibility for Payment
          Determinations, While Knowing That Their Competitors Are
          Doing The Same, Is Price Fixing ..........................................................97

     5.  Widespread Adoption and Application of Zelis's Repricing
          Services by Commercial Payers Has Precluded Meaningful
          Competitive Alternatives and Harmed Competition...............................99

     6.  Any Possible Procompetitive Justifications Are Legal Nullities Because
          Zelis's and The Commercial Payers' Conduct Is a
          Per Se Antitrust Violation ..................................................................100

     7.  Providers Suffered Antitrust Injury As a Result of the Zelis Conspiracy............100

     8.  The Zelis Conspiracy's Existence Is Supported by Direct
          Evidence of Written Agreements Entered into Between Conspirators...............106

     9.  In Addition to Direct Evidence, Abundant Indirect and Circumstantial
          Evidence Supports the Existence of the Zelis Conspiracy...................................108

          a.  Indirect Evidence and "Plus Factors" Supporting Evidence of
               Zelis Conspiracy ..............................................................108

b.  Collectively High Market Concentration of Conspiracy Members ..............108

c.  The Market's High Barriers to Entry ............................................................109

d.  Motives to Conspire .....................................................................................110

e.  Previous Participation in Collusive Efforts..................................................112

f.  Opportunities To Conspire ...........................................................................112

g.  Acts Against Corporate Self Interest ...........................................................114

h.  Conspiracy-Enforcement Mechanisms .........................................................115

i.  Exchange of Private, Confidential, Proprietary, and
    Competitively-Sensitive Information by Conspiracy Members .................116

j.  Pattern and Course of Dealing Engaged in by Conspirators........................118

10. Timing of Anti-Competitive Acts ......................................................................119

H. Defendants' Efforts to Suppress Payments for OON Healthcare Services
   Have Been Enormously Successful and Destroyed Competition
   in the OON Commercial Payer Market .....................................................................119

VI.  Each New Act By Defendants To Further Or Preserve the Conspiracy Has
     Resulted In a Newly-Started Violation Period and Efforts to Conceal the
     Conspiracy Have Tolled Any Applicable Statute of Limitations ................................120

A. Zelis and the Other Commercial Payers Are Engaging in a
   Continuing Antitrust Violation by Renewing Their Conspiracy
   with New and Independent Acts ...............................................................................120

B. Fraudulent Concealment ..........................................................................................121

VII. Anticompetitive Effects of Each Defendants' Conduct, Article III Damages,
     Antitrust Injury, And Antitrust Standing .....................................................................127

A. Summary of Defendants' Anticompetitive Effects...................................................127

B. Article III Damages..................................................................................................128

1.  Collusively-Suppressed OON Payment Amounts .........................................128

2.  Artificially Limiting Professional Choice.....................................................132

C.  Antitrust Injury ................................................................................134

D.  Antitrust Standing .........................................................................142

VIII. Class Action Allegations ...................................................................149

A.  Plaintiffs Seek to Represent and Are Members of the Following
Defined Class ...............................................................................149

B.  Plaintiffs Satisfy All Rule 23(a) Requirements ..............................150

1.  The Class Is Ascertainable ....................................................150

2.  The Number of Members of the Class is Sufficiently Numerous ................150

3.  Plaintiffs' Claims Are Typical of Those Members of the Class ................150

4.  An Action Brought Individually on Behalf of Plaintiffs Share
Common Legal and Factual Questions and Answers with an Action
Brought on Behalf of the Class ...............................................151

C.  Common Legal and Factual Questions Predominate Over Individual
Questions and Answers ................................................................151

D.  Use of the Class Action Mechanism Here is Superior to Other
Methods of Dispute Resolution ....................................................152

IX.  Cause of Action .................................................................................153

X.  Request for Relief ..............................................................................156

XI.  Demand for Jury Trial .......................................................................158

Plaintiffs Pacific Inpatient Medical Group, Inc., Frank Scaccia, M.D., F.A.C.S., L.L.C., Dennis C. Ayer, DDS, LLC, and Danny Bachoua Chiropractic, APC bring this Section 1 Sherman Act class action against Zelis Healthcare, LLC, Zelis Claims Integrity, LLC, and Zelis Network Solutions, LLC (collectively, "Zelis" or the "Zelis Defendants"), and against the health insurance company payers Aetna, Inc., The Cigna Group, Elevance Health, Inc., Humana, Inc., and UnitedHealth Group, Inc. (collectively, the "Commercial Payer Defendants"), based on Plaintiffs' own actual knowledge and the reasonable investigation of counsel to pursue relief for those who provided out-of-network ("OON") medical and dental healthcare services to patients and thereafter received from health insurance company payers downwardly-adjusted, "repriced" payments in anticompetitively suppressed amounts in violation of Section 1 of the Sherman Act. "Defendants" is used herein to refer to all of the defendants named in this action including members of the Zelis Defendants group and members of the Commercial Payer Defendants group. In support thereof, Plaintiffs allege:

## I.  Nature of Action

1.  This is an antitrust action brought to correct an illegal and destructive market distortion in the private, commercial health insurance market. Zelis has collaborated with private commercial health insurers and payers, and at least one other competitor, to avoid competition over payment rates for OON healthcare services. The conspiracy involves the unlawful agreement, communication, coordination, and information-sharing, as engaged in by Zelis and the Commercial Payer Defendants, designed to collusively depress and set payments and payment

levels or thresholds for OON healthcare services, euphemistically known as "repricing."[1] Even if neutral sounding, such "repricing" is not based on any pre-payment, provider-payer negotiation, and goes only one direction: down. In addition to and in support of the collusive and artificial suppression of the pricing of OON healthcare services, the repricing conspiracy alleged herein was designed to and was successful in camouflaging the identities of the Commercial Payers who calculated or determined the amount of underpayments for OON services, which could otherwise have been determined by healthcare service providers. Zelis and its co-conspirators formed, worked to preserve, and successfully concealed—until recently—a conspiracy designed to suppress payments made to healthcare service providers performing healthcare services on an OON basis. This conspiracy has resulted in Zelis and its co-conspirators reaping windfall profits at the expense of hardworking healthcare professionals.

2. The private, commercial U.S. healthcare system encompasses several relationships: (1) the relationship between insureds and insurers; (2) the relationship insurers and insureds have with an insured's employer; (3) the relationship between insurers and employers; (4) the relationship between insureds and healthcare service providers (as encompassing both medical and dental practitioners); and (5) the relationship between health insurers and a healthcare services providers. This case mostly concerns the fifth relationship—that between private health insurance companies and other types of private, commercial health insurance payers (collectively, "Commercial Payers"), and the healthcare service providers ("Providers").

---

[1]    *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 9, 2025); *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 9, 2025).

3.   Much like an insurance defense law firm that heavily discounts its hourly rates in exchange for a volume of business, some Providers elect to join networks associated with health maintenance organizations ("HMOs") formed by Commercial Payers.  Such HMOs offer business to those Providers in exchange for, among other conditions, the Providers' agreement to be listed in the HMO's directory and the Providers' acceptance of discounted rates.  Like the trade-off accepted by such insurance defense firms, the HMO model offers discounted insurance rates for consumers, but only provides coverage for healthcare services rendered by participating Providers.  Under the HMO model, a patient cannot, subject to rare exceptions, receive discounted healthcare services from Providers who do not participate in the HMO's network.  As recounted by a Magistrate Judge "[i]n contrast to PPOs, HMOs 'typically provide no coverage for out-of-network care.'"[2]

4.   A Preferred Provider Organization ("PPO") is another insurance model with fewer trade-offs than a HMO.  A PPO combines the discounted rate model of the HMO for "in-network" Providers, but which also allows participating patients ("members") the option to choose an OON Provider who is not part of that PPO's network and still receive healthcare services at discounted rates under the plan, but usually at less favorable rates.  As described by the U.S. government's HealthCare.gov, a "Preferred Provider Organization (PPO) [is] [a] type of health plan where you pay less if you use providers in the plan's network.  You can use doctors, hospitals, and providers outside of the network without a referral for an additional cost."[3]   As discussed by eHealthInsurance, under PPO plans, "You can visit out-of-network providers and still receive

---

[2] *See Plastic Surgery Center, LLC v. Oxford Health Ins., Inc.*, No. 18-2608 (MAS) (ZNQ), 2019 WL 4750010, at *4 (D.N.J. Sept. 30, 2019).

[3] HealthCare.gov, *How to pick a health insurance plan*, https://www.healthcare.gov/choose-a-plan/plan-types/ (last visited May 23, 2025).

partial coverage, thought at a higher cost."[4]  Health insurance companies acknowledge these PPO benefits.  According to UnitedHealthcare, "PPO plans come with many pros, including: . . . – Out-of-Network coverage . . . ."[5]  Medical Mutual of Ohio agrees:  "Unlike HMOs, however, PPO networks do provide some coverage for out-of-network care.  Using a provider who is not in the PPO will still be covered by your health plan, but you will likely have to pay more."[6]  The less onerous trade-off of the PPO is that the patient has the freedom to seek care from any Provider they choose, but potentially at a higher co-pay or lower payment rate.  Providers who refuse to accept the heavily discounted payment rates offered by PPO Networks as an in-network Provider, but who remain willing to provide market-rate services for PPO members, are out-of-network Providers ("OON Providers").

5.  OON Providers are important to our healthcare system because sometimes in-network Provider options are limited or lacking, an existing doctor/patient relationship exists with an OON Provider, specific types of medical services are not offered by nearby in-network Providers, patients suffer injury or fall ill while traveling, or patients need emergency medical care where speed of care is of immediate concern over network participation.  Commercial Payers understand that offering coverage for OON healthcare services is important to consumers when choosing a PPO because, without such coverage, OON Providers might refuse to treat a patient where a Provider and patient had a previous relationship, or the OON Providers might bill the patient for

---

[4]    eHealthInsurance, *What Is a Preferred Provider Organization (PPO) Plan?*, https://www.ehealthinsurance.com/health-plans/ppo (last visited May 23, 2025).

[5] *What is a PPO health plan?,* UnitedHealthcare, https://www.uhc.com/understanding-health-insurance/types-of-health-insurance/understanding-hmo-ppo-epo-pos/what-is-a-ppo (last visited May 23, 2025).  *See also id.* ("Is there coverage for out of-network care? [PPO:]  Yes").

[6] *What is a PPO?    Understanding PPO Health Plans*, Medical Mutual of Ohio, https://www.medmutual.com/Individuals-and-Families/Understanding-PPO-Health-Plans (last visited May 23, 2025) (emphasis added).

all amounts not covered—a practice known as "balance billing."[7]  Under such circumstances, patients, as well as their employers, might question the value of their monthly health insurance premiums.  When comparing the economic value of differing health insurance companies' PPO plans, a PPO providing OON coverage is preferable to one that does not cover such out-of-network healthcare services, *ceteris paribus*.  Thus, there is a market-based incentive for Commercial Payers to provide coverage for OON healthcare services.

6.  Nevertheless, Commercial Payers dislike paying market rates to OON Providers.  As a result, Commercial Payers have conspired with repricers, like Zelis, and with each other to manipulate payments made to OON Providers.  It is this manipulation and its collusive impacts on OON Provider payment rates that gives rise to this case.

7.  This case involves three categories of conspirators (collectively, "Co-Conspirators"):

- First, Zelis is known as a "repricer."  Using proprietary databases, methodologies, tools, and information-sharing technologies, Zelis acts, in part, as a third-party who determines and communicates adjusted OON payment amounts, which are then often paid by Commercial Payers.

---

[7] Studies show that when part of a bill is passed on to a patient, only a percentage of the bill—if anything—is ever collected. *See Insured Patients Account for More Than Half of Bad Debts Written off by Provider Organizations in 2023, According to Kodiak Solutions Analysis*, business wire (Feb. 22, 2024), https://www.businesswire.com/news/home/20240222016295/en/Insured-Patients-Account-for-More-Than-Half-of-Bad-Debts-Written-off-by-Provider-Organizations-in-2023-According-to-Kodiak-Solutions-Analysis. ("For bills of $100 or less, hospitals, health systems and medical practices collect only 69 cents on the dollar. As the bills rise in dollar amount, the collection rate only falls further. The significant drop off in the collection rate when bills exceed $500 may reflect a widely cited KFF survey of consumers released in June 2022: About half of respondents said they would not be able to pay an unexpected $500 medical bill in full or at all.") (last visited Jun. 11, 2025); *Where Do You Fit in Average Dental Office Collections? Current Statistics and Trends*, Dental Intelligence (Nov. 4, 2022), https://www.dentalintel.com/blog-posts/where-do-you-fit-in-average-dental-office-collections-current-statistics-and-trends ("88% of dentists are concerned about their patient's ability to pay." "Many practices have 18% of their accounts receivable past due." Additionally, "[o]ld accounts due lose their value by 7% each month: In general, debts older than 90 days will lose 7% of their value monthly and eventually become a liability. These debts are more expensive in terms of labor and staff time than they're worth, and after a certain period of time, it becomes more cost-effective to write them off as a loss.") (last visited Jun. 11, 2025).

- The second category concerns Commercial Payers, including the Commercial Payer Defendants, which have abandoned their traditional and independent roles as pricing decisionmakers, as delegated to Zelis, and to conspire with Zelis and other Commercial Payers in suppressing payment levels to OON Providers.

- The third category includes other non-defendant co-conspirators, such as horizontal competitors of both Commercial Payer Defendants and Zelis, who have agreed to share confidential claims, pricing, and/or other information to further the goal of the conspiracy to reduce payments to OON Providers.

Importantly, and as further described below, Zelis acts both as a repricer of OON healthcare services where Commercial Payers have delegated their respective pricing roles and responsibilities to Zelis and as a horizontally-positioned player in the PPO Network industry, acting as a Commercial Payer, as a PPO Network owner, operator, manager, and architect, and a purchaser of out-of-network healthcare services.

8.    This conspiracy, sometimes referred to herein as the "Zelis Conspiracy," worked to "reprice," *i.e.*, downwardly adjust, claims made by OON Providers, as follows: ***First***, Zelis obtains confidential claims, pricing, and contractual data from Commercial Payers, and has developed or acquired technologies, methodologies, and other tools for the calculation and communication of repriced claims to OON Providers.  Zelis often communicates its repriced payment amounts directly with the Commercial Payers and OON Providers.  Alternatively, sometimes Zelis communicated its repriced OON payment amounts via one or more third-party information-sharing entities, including at least one with whom Zelis has a "strategic alliance."[8]  Sharing exceptionally sensitive business information, while having access to public materials strongly suggesting or

---

[8] Press Release:  *Zelis and Availity® Announce Strategic Alliance to Streamline Administrative Workflows and Advance Healthcare Payments for Shared Clients,* Zelis (March 21, 2024), https://www.zelis.com/news/zelis-and-availity-announce-strategic-alliance-to-streamline-administrative-workflows/ (last visited June 5, 2025); Press Release:  *Zelis® and Availity® Announce Strategic Alliance,* Availity (March 21, 2024), https://www.availity.com/news/zelis-and-availity-announce-strategic-alliance/ (last visited June 5, 2025).

indicating that their competitors were doing the same, was key to having near-complete industry buy-in.   These tools allowed for maximum amounts or ceilings to supplant any higher, individually-negotiated payment by Commercial Payer Defendants.  ***Second***, because Commercial Payers are incentivized to reduce payments to OON Providers, Commercial Payers agreed to purchase repricing services from Zelis. In exchange for Zelis's repricing services, Commercial Payers agreed to pay Zelis a commission based on the difference between the amount billed and the amount paid, or the "savings" obtained for the Commercial Payers by Zelis.  ***Finally***, Zelis agreed to share data with one or more horizontally-positioned, competitor repricers.  The Repricing Conspiracy additionally concerns the Commercial Payers' use of repricing to interfere with the ability of OON Providers to determine which Commercial Payer, if any, was responsible for calculating the payment amount owed to a particular OON Provider for a particular OON service. By interfering with this ability to identify the particular Commercial Payer responsible for calculating such payment amounts, Defendants deprived the OON Providers of the benefits of differentiating independent centers of decision-making, in contradiction of U.S. antitrust law. Further, by interfering with the OON Providers' ability to associate payment determinations with particular Commercial Payers, Defendants have violated Section 1 of the Sherman Act..

9.   Absent a conspiracy, Commercial Payers would fiercely compete to provide the best coverage, including for OON healthcare services, at the best price.  Instead, Zelis and Commercial Payers chose collusion over competition and thereby have paid and continue to pay heavily discounted—and illegal—rates to OON Providers, to the OON Providers' detriment.

10. The tools, technologies, and methodologies agreed to by Zelis and Commercial Payers specifically allow Commercial Payers to supplant their competitive negotiations with Providers for OON payments with Zelis's algorithmic or A.I.-based pricing determinations as to percentages,

specific amounts, or price ceilings of payments to OON Providers.  Defendants' use of collusively-determined percentages, payment amounts, or price ceilings is *per se* price-fixing in violation of Section 1 of the Sherman Act.

11. Before the Zelis Conspiracy, an investigation by the New York Attorney General ("NYAG") revealed that a UnitedHealthcare subsidiary, Ingenix, Inc. and its associated database, Ingenix, were established to gather competitors' claims and pricing data (subsequently determined to be biased, improperly pooled, and including downward-based payment incentives), for the benefit of all subscribing Commercial Payers and to the detriment of OON Providers.[9]  After an investigation, the NYAG determined that Commercial Payers used Ingenix to work together with other Commercial Payers to suppress OON payments.[10]  The Commercial Payers entered into settlements with the NYAG and others that required, in part, UnitedHealthcare to cease operating Ingenix and for all settlors to stop using Ingenix and pay millions of dollars toward the creation of an unbiased source of payment data based on the "usual, customary, and reasonable" (or "UCR") payment approach.  It also required such Commercial Payers to use what became known as the

---

[9] January 13, 2009 State of New York Office of The Attorney General, Health Care Report: The Consumer Reimbursement System Is Code Blue, at 2, https://static01.nyt.com/newsgraphics/documenttools/ce0ef77f5483731b/6f2b99cb-full.pdf (last visited May 12, 2025).

[10] *Id.*

"FAIR Health" database exclusively for a five-year period, approximately from 2010 through the end of 2015, or possibly by as late as 2016.[11]

12. After Ingenix, Commercial Payers based their payment of OON claims on FAIR Health until the exclusive use terms expired in 2015 or 2016. Zelis was ready for the Commercial Payers' exodus from FAIR Health, issuing a press release on June 13, 2016 announcing a merger of four healthcare payment related entities, its "rebranding" to "Zelis," and—knowing that its success depended on industry buy-in—explaining that it "provides a comprehensive array of network management, claims integrity, payment remittance solutions and analytical services for medical, dental and workers' compensation claims to ***over 500 payor clients***."[12] Commercial Payers, eager to drop UCR pricing in favor of more aggressive approaches, signed on with Zelis. Its clients now include "over 770 payers," with an "average client tenure" of "13 years," including the "top 5 national health plans."[13]

13. Armed with the knowledge of significant industry participation, Commercial Payers were enthusiastic about benefiting from Zelis's repricing services and joining the conspiracy. This

---

[11] *Insurance Giants to pay millions following probe into rigged database,* Healthcare Finance News (Jan. 16, 2009), https://www.healthcarefinancenews.com/news/insurance-giants-pay-millions (last visited May 12, 2025); *UnitedHealth settles New York reimbursement probe,* Reuters (Jan. 13, 2009), https://www.reuters.com/article/markets/stocks/unitedhealth-settles-new-york-reimbursement-probe-idUSTRE50C5V8/ (last visited May 12, 2025); State of New York Office of the Attorney General (Jan. 2009), Assurance of Discontinuance Under Executive Law § 63(15), https://ur.ag.ny.gov/sites/default/files/settlements-agreements/AOD_signed_by__Ind_Health.pdf (last visited May 12, 2025); *see also* https://static01.nyt.com/newsgraphics/documenttools/5d3c216164fe8ebd/0d3f6139-full.pdf (last visited May 12, 2025).

[12] *Northlake Chiropractic, Inc. v. Zelis Healthcare Corp.*, No. 1:19-cv-08087 (JZL) (N.D. Ill. Feb. 29, 2020), at ECF No. 1-2 (Ex. B) (emphasis added).

[13] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies*, Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited Mar. 21, 2025).

unlawful conspiracy concerns agreements between Zelis and other Commercial Payers to share claims, pricing, and contractual information and, based on this information, to agree to fix and/or suppress the amount of payments issued to Providers for OON healthcare services. This conspiracy further concerns the agreement to delegate pricing responsibility from Commercial Payers to Zelis and an agreement to unlawfully conceal and/or supplant previously-independent centers of pricing-related decision making.

14. Zelis, the Commercial Payer Defendants, and their Co-Conspirators secretly agreed to suppress OON Payments by limiting their OON Payments to specific amounts, ranges, percentages, or below certain thresholds, as determined by concealed and "proprietary" analytical tools, databases, and methodologies owned and operated by Zelis, including Zelis's "Established Reimbursement Schedule" or "Established Reimbursement Solution" ("ERS") and its "Reference-Based Pricing" ("RBP") services.[14]

15. Zelis repriced OON claims by feeding its analytical tools not only its own pricing and claims data, but also otherwise confidential, "proprietary," and competitively-sensitive claims, pricing, and contractual data from directly-competing Commercial Payers, in accordance with written agreements (on information and belief), and via information-sharing-enabling technologies

---

[14] *Market-based Pricing with Zelis,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited May 9, 2025); *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 9, 2025).

and relationships.[15]  As "inten[ded]," the "repriced" OON payment amounts generated by Zelis were "effective" at "stabiliz[ing]" payment amounts for OON healthcare services, steeply discounted from the original amounts claimed, and priced significantly and excessively below what Commercial Payers would pay OON Providers absent the Zelis Conspiracy.[16]

16. Commercial Payers have abandoned their independent pricing roles to their collusion-facilitating repricing agent, Zelis.  The Commercial Payers remain liable for the efforts of its pricing agent, Zelis:  "[A]n entity can incur antitrust liability for the acts of its . . . agents, when acting within the scope of their apparent authority, despite the agent's desire to benefit only him or herself."[17]  Zelis acts within the scope of its apparent authority and as an agent for Commercial Payers when it reprices submitted claims, making Commercial Payers and their Co-Conspirators liable for the acts of Zelis in downwardly adjusting payments to OON Providers for OON healthcare services.  A *per se* violation of the Sherman Act occurs in part when a Commercial Payer enters into an agreement with Zelis to provide its commercially sensitive data, knowing

---

[15] *In re EthiCare Advisors, Inc.,* No. 20-1886 (WJM), 2020 WL 4670914, at *4, n.4 (D.N.J. Aug 12, 2020); *Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050-SPW-TJC, ECF No. 118-11 at 10:3-8; *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 9, 2025); *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 9, 2025); Press Release: *Zelis and Availity® Announce Strategic Alliance to Streamline Administrative Workflows and Advance Healthcare Payments for Shared Clients,* Zelis (March 21, 2024), https://www.zelis.com/news/zelis-and-availity-announce-strategic-alliance-to-streamline-administrative-workflows/ (last visited June 5, 2025); Press Release:  *Zelis® and Availity® Announce Strategic Alliance,* Availity (March 21, 2024), https://www.availity.com/news/zelis-and-availity-announce-strategic-alliance/ (last visited June 5, 2025).

[16] Kaitlin Howard, *Reference-Based Pricing (RBP): An overview,* Zelis (Apr. 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited May 9, 2025).

[17] *County of Stanislaus v. Pacific Gas & Elec. Co.*, No. CV-F-93-5866-OWW, 1994 WL 706711, at *31 (E.D. Cal. Aug. 25, 1994) (citing *American Soc'y of Mech Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1992) and *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1369-70 (9th Cir. 1992)).

Zelis was collecting similar data from that Commercial Payer's competitors, which Zelis used to generate out-of-network payment rate recommendations that resulted in artificially low payments.

17. To remedy the economic harm caused by the illegal and anticompetitive conduct of Zelis, the Commercial Payer Defendants, and the Co-Conspirators, Plaintiffs—on behalf of themselves and a class of all other similarly situated OON Providers—bring this Section 1 Sherman Act action for damages and injunctive relief.

## II. Jurisdiction, Venue, and Interstate Commerce

18. This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 16 of the Clayton Act (15 U.S.C. § 26). Plaintiffs' Sherman Act claim seeks monetary damages, injunctive relief, costs of suit, and reasonable attorneys' fees.

19. This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

20. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26; and 28 U.S.C. § 1391(b), (c), and (d), as one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and as a substantial portion of the affected interstate commerce was carried out in this District.

21. This Court has personal jurisdiction over all Defendants under Section 12 of the Clayton Act, 15. U.S.C. § 22 and 28 U.S.C. § 1391 because each Defendant: (a) transacted business throughout the United States, including in this District; (b) paid healthcare providers throughout the United States, including from this District, to those who provided healthcare services on an out-of-network basis (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and

intended effect of causing injury to the business or property of persons residing in, located in, or doing business in this District.

22. The activities of Defendants and all Co-Conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

23. This conduct includes the OON Providers' performance and sale of healthcare services and products; the receipt of claims for OON healthcare services by the Commercial Payer Defendants and the Non-Defendant Commercial Payers; agreements reached between Commercial Payers and Zelis; the processing of such claims by repricers like Zelis; and the payment of claims to the OON Providers. Further, the claims submitted by Plaintiffs and other OON Providers include charges for services, products, and facilities supplied to persons who reside in states other than those where Zelis or the Commercial Payer Defendants reside. In addition, Zelis itself owns, manages, or operates competing PPO Networks in states other than the ones where either Zelis resides (or is headquartered) or where its PPO Networks operate. Further, Zelis, with headquarters in Boston, Massachusetts, also has offices in Morristown (and possibly Bedminster), New Jersey, and maintains offices located in various states within the United States.[18] Zelis thus often engages in interstate commerce simply by conducting claims-processing, pricing, repricing, and other related services, as such efforts involve a Zelis office located in one state, an additional party residing in another state, and, on occasion, yet another Zelis office located in a different state. Further, with

---

[18] *Connect with Zelis®,* Zelis, https://www.zelis.com/connect-with-zelis/ (last visited May 9, 2025); Jessica Perry, *Zelis adds Schick as president and chief revenue officer*, NJBIZ (April 5, 2023), https://njbiz.com/zelis-adds-schick-as-president-and-chief-revenue-officer/ (last visited May 9, 2025); *Working at Zelis Healthcare: Browse Zelis Healthcare office locations: Zelis Healthcare locations by state,* indeed, https://www.indeed.com/cmp/Zelis-Healthcare/locations (last visited May 9, 2025); *Zelis Healthcare Headquarters and Office Locations,* craft.co, https://craft.co/zelis/locations (last visited May 9, 2025).

respect to patients who receive OON healthcare services from Plaintiffs or from other OON Providers for which the Providers submit a claim to Zelis or any of the Commercial Payer Defendants or Co-Conspirators, and where the Providers' claim is then paid, the process of receiving a claim and then providing fractional payment thereof to Providers involves money flowing from a state outside of that where the OON Providers reside and into the states where the OON Providers reside, causing Plaintiffs and other Providers economic detriment, harm, and damages on an interstate basis.[19]

24. Zelis and other Commercial Payer Defendants and co-conspirators sell and market PPO Networks, PPO Plans, insurance products and services, repricing products and services, and other related products and services to persons who reside in states other than those where Zelis or the Commercial Payer Defendants reside. In addition, Zelis itself owns, manages, and/or operates PPO Networks throughout the United States.[20]   Finally, the Commercial Payer Defendants own, manage, and/or operate PPO Networks throughout the United States, D.C., and U.S. territories.

## III. Parties

### A. Plaintiffs

25. Plaintiff Pacific Inpatient Medical Group, Inc. ("PIMG"), is a California corporation with its principal place of business in San Francisco, California.  PIMG is a team of some 100 doctors

---

[19]    *Contact        Aetna®,*        Aetna,        https://www.aetna.com/about-us/contact-aetna.html#tab_content_section_responsivegrid_202619046_responsivegrid_tabs_link_tabs_5 (last visited May 9, 2025); *Contact Us*, The Cigna Group, https://www.thecignagroup.com/about-us/contact-us  (last  visited  May  9,  2025);  *Contact  Us,*  Elevance  Health, https://www.elevancehealth.com/contact-us  (last  visited  May  9,  2025);  *Contact  Humana,* Humana,  https://www.humana.com/contact-us  (last  visited  May  9,  2025);  *Pacific  Inpatient Medical Group*, https://www.pacificmedicalgroup.org (last visited May 9, 2025).

[20]    *Medical    and    Dental    Provider    Networks    by    Zelis®,*    Zelis, https://www.zelis.com/providers/provider-networks/ (last visited May 9, 2025).

and healthcare professionals who practice medicine in hospitals, skilled nursing homes, and an ambulatory clinic. PIMG's practices include general medical care, specialty consultation, surgical co-management and related services in internal medicine, geriatrics, palliative care, and infectious diseases. During the Class Period, PIMG's healthcare professionals have provided OON healthcare services to patients and have submitted claims to Commercial Payers for payment. These claims were repriced by one or more of the Zelis Defendants. PIMG received one or more payments for its OON healthcare services, which were repriced by one or more of the Zelis Defendants. PIMG suffered harm, including antitrust injury, in the form of receiving collusively-suppressed payments in amounts below that which PIMG would have received absent the conspiracy and in amounts below competitive levels resulting from the repricing efforts by Zelis, one or more of the Commercial Payer Defendants, and their Co-Conspirators.

26. Plaintiff Dennis C. Ayer, DDS, LLC ("Ayer") is a Kansas limited liability company with its principal place of business in Leawood, Kansas. Ayer provides general dentistry services, emergency dentistry, and a comprehensive suite of oral healthcare services. During the Class Period, Ayer provided OON dental services to patients and has submitted claims to Commercial Payers for payment. These claims were repriced by one or more of the Zelis Defendants. Ayer received one or more payments for its OON healthcare services, which were repriced by one or more of the Zelis Defendants. Ayer suffered harm, including antitrust injury, in the form of receiving collusively-suppressed payments in amounts below that which Ayer would have received absent the conspiracy and in amounts below competitive levels resulting from the repricing efforts by Zelis, one or more of the Commercial Payer Defendants, and their Co-Conspirators.

27. Plaintiff Frank J. Scaccia, M.D., F.A.C.S., L.L.C. ("Dr. Scaccia"), is a New Jersey limited liability company with its principal place of business in Red Bank, New Jersey. Dr. Scaccia is a solo otolaryngologist, whose practice includes medical and surgical management of conditions affecting the ears, nose, throat, and sinuses. During the Class Period, Dr. Scaccia provided OON healthcare services to patients and has submitted claims to Commercial Payers for payment. These claims were repriced by one or more of the Zelis Defendants. Dr. Scaccia received one or more payments for its OON healthcare services, which were repriced by one or more of the Zelis Defendants. Dr. Scaccia suffered harm, including antitrust injury, in the form of receiving collusively-suppressed payments in amounts below that which Dr. Scaccia would have received absent the conspiracy and in amounts below competitive levels resulting from the repricing efforts by Zelis, one or more of the Commercial Payer Defendants, and their Co-Conspirators.

28. Plaintiff James Paul Allen DDS d/b/a/ Allen Dental ("Allen") is a Wisconsin corporation with its principal place of business in West Salem, Wisconsin. Throughout the Class Period, Plaintiff provided OON healthcare services and received repriced payments in amounts established by Zelis below competitive rates because of the violations alleged herein.

29. Plaintiff Danny Bouchoua Chiropractic, APC ("DBC") is a California professional corporation with its principal place of business in San Diego, California. DBC provides a wide range of chiropractic treatment to patients, including DTS spinal therapy, traction therapy, trigger point therapy, PNF stretching and myofascial release. These treatments address a variety of issues from neck and back pain, headaches and migraines, digestive problems and more. During the Class Period, DBC performed OON healthcare services and submitted claims to Commercial Payers for payment. These claims were repriced by one or more of the Zelis Defendants. DBC received one or more payments for its OON healthcare services, which were repriced by one or more of the

Zelis Defendants. DBC suffered harm, including antitrust injury, in the form of receiving collusively-suppressed payments in amounts below that which DBC would have received absent the conspiracy and in amounts below competitive levels resulting from the repricing efforts by Zelis, one or more of the Commercial Payer Defendants, and their Co-Conspirators.

**B. Defendants**

**1. Zelis Defendants**

30. Defendant Zelis Healthcare, LLC is a limited liability company with its "State of Formation" in Delaware and a "Business Address" at 149 Newbury St., Fifth Floor, Boston, Massachusetts 02116. On information and belief, Zelis Healthcare, LLC took over the responsibilities of the now apparently inactive, terminated, or withdrawn entity, Zelis Healthcare Corporation (including "Zelis Healthcare Corp." and "Zelis Healthcare, Inc.").

31. Defendant Zelis Claims Integrity, LLC is a Delaware limited liability company with its principal place of business at 149 Newbury St., Fifth Floor, Boston, Massachusetts 02116. Zelis Claims Integrity interacts directly with OON Providers, including Plaintiffs, to convey the "repriced" reimbursement rates determined by Zelis and its Co-Conspirators.

32. Defendant Zelis Network Solutions, LLC is a Georgia "Domestic Limited Liability Company," whose principal place of business is located at 149 Newbury St., Boston, Massachusetts 02116, and whose "Principal Office Address" is the same.

33. Additionally, there are more than a dozen other Zelis-related legal entities that have engaged in the conduct described herein but whose structures and roles are hidden from view through the disregard of corporate formalities. The Zelis website draws little to no distinction between entities. Regardless of the referenced product, service, or activity, the Zelis website

(occasionally referred to in the footer as "© Zelis Healthcare")[21] makes very few, if any, distinctions for which Zelis-related entity is responsible for which tasks or for which category of clients.  Further blurring and deleting any distinction between or among Zelis-related legal entities, a "Zelis Payments representative[]" responded to a comment describing how Zelis (apparently improperly) repriced an "ambulance ride," noting that "Zelis Network Solutions, LLC ('Zelis') is a health information technology company that offers a range of services, including repricing and payment recommendations on out-of-network claims . . . ."[22]  According to a ***Zelis Payments*** representative, ***Zelis Networks, LLC*** can be considered "Zelis," which engages in "repricing and payment recommendations on out-of-network claims[.]"  The various entities that collectively comprise "Zelis" make little to no effort to distinguish publicly the specific roles assigned to one subsidiary versus another.

## 2.  Commercial Payer Defendants

34. Aetna, Inc. ("Aetna") is a Delaware Corporation headquartered in Hartford, Connecticut. Aetna is a subsidiary of CVS Health Corporation. One of the largest commercial health insurance payors in the U.S., Aetna has a commercial insurance network that pays both in-network and OON claims from healthcare providers in the District of Columbia and all 50 states. Aetna is the parent company to, or is otherwise affiliated with or related to numerous commercial health insurance plans and prescription drug plans that operate and serve patients and healthcare providers in the U.S. Aetna-related plans issue insurance and/or provide administrative services concerning healthcare claims under fully insured commercial health insurance plans, self-funded

---

[21] *See, e.g., Bringing flow to the healthcare financial system,* Zelis, https://www.zelis.com (last visited June 11, 2025) ("© Zelis Healthcare").

[22] *Zelis Payments Reviews and Complaints,* Complaints Board (Dec. 4, 2024), https://www.complaintsboard.com/zelis-payments-b134194 (last visited June 5, 2025).

administrative service only health plans, including PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.  On a consolidated basis, CVS Health Corporation publicly disclosed that its "Net income" for the year ended December 31, 2024 was $4.586 billion; that it has "Total Assets" worth $235.215 billion; that it has "Total liabilities" worth $177.485 billion; that it maintains $8.586 billion in "Cash and cash equivalents"; and that it has $20.085 billion in "Estimated statutory capital and surplus."[23]

35. The Cigna Group ("Cigna") is a Delaware corporation with its principal place of business located in Bloomfield, Connecticut.  Cigna is a parent company to or is otherwise related to various commercial health insurance plans and prescription drug plans that operate in the United States.  Cigna's plans issue insurance or provide administrative services for both in-network and OON claims from healthcare providers through fully insured commercial health insurance plans, self-funded administrative service only health plans, including PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans.  On a consolidated basis, Cigna publicly disclosed that its "Net income" for the year ended December 31, 2024 was $3.778 billion; that it has "Total Assets" worth $155.881 billion; that it has "Total liabilities" worth $114.638 billion; that it maintains $7.550 billion in "Cash and cash equivalents"; and that it has $16.0 billion in "Surplus."[24]

36. The Elevance Health Companies, Inc. ("Elevance"), formerly Anthem, Inc., is an Indiana Corporation having its principal place of business located in Indianapolis, Indiana.  Elevance is a

---

[23] CVS Health Corporation Form 10-K for the fiscal year ended December 31, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000064803/69ae70d3-3fe0-44a0-b601-f21026f8a49a.pdf, at 104-106, 174.

[24] The Cigna Group Form 10-K for the fiscal year ended December 31, 2024, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001739940/64c4c39f-1b4e-4979-8b4a-bfc403377665.pdf, at 59, 61, 100.

member of the Blue Cross and Blue Shield Association, which is a joint venture of insurance companies that, together, offer members access to a nationwide network of healthcare providers. As part of its member relationship, Elevance licenses certain trademarks and service marks from the Blue Cross and Blue Shield Association for use in 14 states. Elevance is the parent company or is otherwise affiliated with or related to various commercial health insurance plans and prescription drug plans that operate in the United States. Elevance's plans issue insurance or provide administrative services for both in-network and OON claims from healthcare providers through fully insured commercial health insurance plans, self-funded administrative service only health plans, including PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans. On a consolidated basis, Elevance publicly disclosed that its "Net income" for the year ended December 31, 2024 was $5.971 billion; that it has "Total assets" worth $116.889 billion; that it has "Total liabilities" worth $75.463 billion; that it maintains $8.288 billion in "Cash and cash equivalents"; and that it has $18.668 billion in "Statutory-basis capital and surplus of our insurance and HMO subsidiaries and capital and surplus of our other regulated subsidiaries, excluding the [California Department of Managed Health Care] DMHC regulated entities."[25]

37. Humana Inc. ("Humana") is a Delaware corporation having its principal place of business located in Louisville, Kentucky. Humana is the parent company of or is otherwise affiliated with or related to several commercial health insurance plans and prescription drug plans that operate in the United States. On information and belief, through the end of 2024, Humana's plans issued health and dental insurance or provide administrative services for both in-network and OON claims from healthcare providers through fully insured commercial health insurance plans, including

---

[25] Elevance Health, Inc. Form 10-K for the fiscal year ended December 31, 2024, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001156039/000115603925000010/elv-20241231.htm#fact-identifier-3207, at 52, 70, 134.

PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans. Although Humana apparently ceased issuing health insurance plans as of the end of 2024, it continues to issue dental plans. On a consolidated basis, Humana publicly disclosed that its "Net income" for the year ended December 31, 2024 was $1.214 billion; that it has "Total Assets" worth $46.479 billion; that it has "Total liabilities" worth $30.034 billion; that it maintains $2.221 billion in "Cash and cash equivalents"; and that it has $13.2 billion in "aggregate statutory capital and surplus."[26]

38. Defendant UnitedHealth Group, Inc. ("UnitedHealth") is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota. UnitedHealth is the largest healthcare insurance company in the United States with a network of providers in all 50 states, operating through various health insurance plans. UnitedHealth's plans issue insurance or provide administrative services for both in-network and OON claims from healthcare providers through fully insured commercial health insurance plans, including PPOs, hybrid-funded health plans, Medicare Advantage plans, and Medicaid plans. On a consolidated basis, UnitedHealth publicly disclosed that its "Net earnings" for the year ended December 31, 2024 were $15.242 billion; that it has "Total Assets" worth $298.278 billion; that it has "Total liabilities, redeemable noncontrolling interest and equity" worth $298.278 billion; that it maintains $25.312 billion in "Cash and cash equivalents"; and that it has $37.8 billion in "estimated aggregate statutory capital and surplus."[27]

---

[26] Humana Inc. Form 10-K for the fiscal year ended December 31, 2024, https://humana.gcs-web.com/static-files/6184966b-97e1-46c5-b40e-788b5261a44c, at 46, 66, 106.

[27] UnitedHealth Group Form 10-K for the fiscal year ended December 31, 2024, https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2024/UNH-Q4-2024-Form-10-K.pdf, at 27, 40, 66.

39. Aetna, Cigna, Elevance, Humana, UnitedHealth, and other PPO insurers have each entered into one or more OON repricing agreements with Zelis, issued one or more OON payments to Providers performing out-of-network healthcare services at payment levels below competitive amounts, and participated in the conspiracy, committed or omitted acts, and/or made statements in furtherance of, and is a member of, the Zelis Conspiracy.

## C. Non-Party Majority Owner Investors

### 1. Commercial Payer Defendants

40. Non-party Bain Capital Private Equity is a Massachusetts Limited Partnership, having its principal place of business in Boston, Massachusetts. Bain Capital Ventures is a Massachusetts Limited Partnership, having its principal place of business in Boston, Massachusetts. Together, these entities are referred to herein as ("Bain" or "Bain Capital").

41. Founded in 1984, Bain is a private equity firm with approximately $185 billion in assets under management.[28] Companies in which Bain acquires an ownership stake, including Zelis, are referred to as "portfolio companies."[29] Far from being a passive capital investor, Bain pioneered a "consulting-based approach" to private equity investing, partnering closely with management teams of its portfolio companies, including but not limited to active involvement in the day-to-day operations and decision making of its portfolio companies. Bain totes that "A spirit of partnership informs Bain Capital's entire approach to healthcare investing—that means tight integration and collaboration both internally and across our portfolio." [30] Along with Parthenon Capital (further

---

[28] *Bain Capital About Us*, Bain Capital, https://www.baincapitalprivateequity.com/about-us (last visited Jun. 11, 2025).

[29] *Zelis Portfolio Investment*, Bain Capital, https://www.baincapitalprivateequity.com/portfolio#getTop937 (last visited Jun. 11, 2025).

[30] *Bain Capital Healthcare Partnership*, Bain Capital, https://www.baincapital.com/healthcare/ (last visited Jun. 11, 2025).

described, *infra*), Bain Capital is a majority owner of Zelis. Bain Capital became an investor "in Zelis through a merger with Parthenon-backed RedCard Systems in 2019, combining the two healthcare payment technology companies into a unified platform."[31] Moreover, Bain did not simply invest in a standalone company, but instead "invest[ed] in Parthenon's $5.7 billion Zelis-RedCard merger."[32] It appears that Bain Capital's decision to invest in the "Zelis-RedCard merger" was based in an intent "to help fuel growth in the newly created healthcare-fintech platform . . . ."[33]

42. Bain describes itself as a "partner" in Zelis, not just an investor. "With a long track record in healthcare, technology and payments, Bain Capital Private Equity and Bain Capital Ventures were able to develop a differentiated view of Zelis's advantages in diligence with more conviction and speed than other potential acquirers. Bain Capital rapidly delivered a high-certainty proposal to catalyze the combination of Zelis and RedCard, along with a credible and comprehensive plan to help the combined company as a long-term, value-added partner."[34] Bain stated it also decided how Zelis's leadership would look and act through appointment of its own as key officers. "Through the journey, Bain Capital has tapped several key executives in its network to play key roles transforming Zelis—including Amanda Eisel (CEO) and Brian Gladden (CFO)—two former leaders in the Bain Capital Portfolio Group. The new CEO, Amanda Eisel, had significant

---

[31] *Bain and Parthenon mull selling stake in healthtech Zelis at $17bn valuation,* Private Equity Wire (Sept. 11, 2024), https://www.privateequitywire.co.uk/bain-and-parthenon-mull-selling-stake-in-healthtech-zelis-at-17bn-valuation/ (last visited Jun. 10, 2025).

[32] *Bain invests in Parthenon's $5.7 bln Zelis-RedCard merger,* PE Hub (Jul 23, 2019), https://www.pehub.com/bain-invests-in-parthenons-5-7-bln-zelis-redcard-merger/ (last visited June 10, 2025).

[33] *Id.*

[34] *Ventures and Private Equity team up to build a leader in healthcare payments.* https://www.baincapital.com/technology/case-studies/zelis.html (last visited June 11, 2025).

experience with Bain Capital's technology and healthcare investments. She transitioned seamlessly from Bain Capital to the CEO role at Zelis, en route to delivering Zelis's best bookings and growth year in its history.[35]  Zelis also announced in a press release that "Bain Capital brings deep experience across the healthcare, technology and B2B payments landscape and significant growth resources to its partner companies."[36]

## 2.  Parthenon Capital

43. Non-party Parthenon Capital Partners Fund III, LP ("Parthenon" or "Parthenon Capital") is a limited partnership formed in and under the laws of the State of Delaware on or about August 17, 2017.  Although there are several "Parthenon Capital Partners Fund[s]" (Parthenon Capital Partners Fund, Parthenon Capital Partners Fund II, Parthenon Capital Partners Fund III, and Parthenon Capital Partners Fund IV), it appears that, based on the date of the entity's formation and on information and belief, Parthenon Capital Partners Fund III, LP is the entity that invested in RedCard Holdings, which was subsequently acquired by or merged into Zelis.  Parthenon Capital announced its investment in RedCard Holdings on February 26, 2018.[37]  Parthenon Capital invested in RedCard, and subsequently held onto its investment in whole or in part following the merger with or acquisition by Zelis.  Parthenon Capital invested in RedCard in order to take advantage of RedCard's healthcare fintech business model.  Moreover, based on Bain Capital's

---

[35] *Id.*

[36] *Zelis® and RedCard to Combine in Landmark Healthcare Transaction*, Zelis, https://www.zelis.com/news/zelis-acquires-redcard/ (last visited Jun. 10, 2025).

[37] *News:  Parthenon Capital Announces Investment in RedCard,* Parthenon Capital (Feb. 26, 2018), https://www.parthenoncapital.com/news/parthenon-capital-announces-investment-in-redcard/ (last visited Jun. 10, 2025).

investment in the "Zelis-RedCard merger," it appears that Parthenon Capital and Bain Capital worked together to "help fuel growth in the newly-created healthcare-fintech platform . . . ."[38]

44. Zelis has been valued as of fall 2024 "at about $17 billion," and its owners include "Bain Capital and Parthenon Capital[.]"[39]  According to a September 27, 2023 piece authored by Zelis's CEO, Amanda Eisel, "[p]rior to Zelis, Amanda was an Operating Partner at Bain Capital focused on technology and healthcare IT companies."[40]  Collectively, at least as of December 5, 2024, Bain Capital and Parthenon Capital remain the majority owners of Zelis.[41]

45. Bain and Parthenon both maintain positions strongly suggestive of significant influence over Zelis.  For example, as part of Ms. Eisel's introduction as Zelis CEO, the August 18, 2021 press release specified "'[a]fter working very closely with the Company [Zelis] during the last two years, we are excited Amanda is now officially joining the Zelis family as its new Chief Executive Officer,' said Devin O'Reilly, Managing Director, Bain Capital Private Equity."[42]  Mr. O'Reilly went on to say: "'Amanda is a growth-oriented leader who is exceptionally well-positioned to

---

[38] *Bain invests in Parthenon's $5.7 bln Zelis-RedCard merger,* PE Hub (Jul. 23, 2019), https://www.pehub.com/bain-invests-in-parthenons-5-7-bln-zelis-redcard-merger/ (last visited Jun. 10, 2025).

[39] Michelle F. Davis *et al.*, *Mubadala Nears Deal to Buy Stake in Health Tech Firm Zelis*, BNN Bloomberg (Oct. 21, 2024), https://www.bnnbloomberg.ca/business/company-news/2024/10/21/mubadala-near-a-deal-to-buy-stake-in-health-tech-firm-zelis/ (last visited Mar. 19, 2025).

[40] Amanda Eisel, *Amenda Eisel, CEO: Why I joined Zelis,* Zelis (Dec. 1, 2021), https://www.zelis.com/blog/amanda-eisel-why-i-joined-zelis/ (last visited Mar. 19, 2025).

[41] *Mubadala Announces Strategic Investment in Zelis,* Mubadala Press Release (December 5, 2024), https://www.mubadala.com/en/news/mubadala-announces-strategic-investment-in-zelis (last visited May 13, 2025).

[42] *Zelis Announces Amanda Eisel, Strategic Management and Investment Veteran, as New Chief Executive Officer*, Zelis (Aug. 18, 2021), https://www.zelis.com/news/zelis-announces-new-ceo-amanda-eisel/ (last visited May 1, 2025).

accelerate Zelis's plans for growth and innovation.'"[43]  Bain Capital's influence is not limited to Zelis's CEO. As announced on August 16, 2022, Zelis appointed Wayne S. DeVeydt to its Board of Directors, noting that "Wayne is also a board Member of Centene Corporation and an Operating Partner at Bain Capital."[44]  Further, Brian Gladden, Zelis's Chief Administrative and Financial Officer, was also an Operating Partner at Bain Capital before joining Zelis.[45]

46. Not to be left out, Parthenon Capital positioned two of its own with current or former access to members of the Zelis board.  Co-CEO and Managing Partner of Parthenon Capital, David J. Ament "has been involved in a number of portfolio company Board of Directors, including . . . Zelis."[46]  Further, Parthenon Capital Vice President, Gabe Moynihan, serves as a "Board Observer" to Zelis's Board of Directors.[47]  Zach Sadek, a Senior Partner at Parthenon Capital serves or has served on the Board of Directors of Zelis.[48]  Further, Kurt Brumme, a Partner at

---

[43] *Id*.

[44] *Zelis Announces the Appointment of Wayne S. DeVeydt to its Board of Directors*, Zelis (Aug. 16, 2022), https://www.zelis.com/news/wayne-deveydt-joins-zelis-board-of-directors/ (last visited May 1, 2025).

[45] *Brian Gladden*, LinkedIn, https://www.linkedin.com/in/brian-gladden-6a16697/ (last visited Jun. 10, 2025).

[46] *Co-CEO, Managing Partner, David J. Ament*, Parthenon Capital, https://www.parthenoncapitalpartners.com/team/david-j-ament/ (last visited May 1, 2025).

[47] *Vice President, Gabe Moynihan*, Parthenon Capital, https://www.parthenoncapital.com/team/gabe-moynihan/ (last visited May 1, 2025); Gabe Moynihan, crunchbase, https://www.crunchbase.com/person/gabe-moynihan (last visited May 7, 2025).

[48] *Zachary Sadek*, Parthenon Capital, parthenoncapitalpartners.com/team/zachary-f-sadek/ (last visited Jun. 10, 2025).

Parthenon and Tom Hough, a Principal, were said to have played a significant role in Parthenon's investment in Zelis.[49]

47. In 2024, Zelis agreed to sell a minority stake in the company to investors led by Mubadala Investment Company, including Northwest and HarbourVest. Parthenon and Bain Capital remain the majority owners.[50]

## IV. Co-Conspirators, Agents, Authority, Reciprocal Agency, and Common Corporate Interest

### A. Co-Conspirators

48. Various persons and/or firms, whether currently known or not, not named as Defendants, have participated as co-conspirators in the violations alleged herein and performed acts, made statements, or avoided acts in furtherance thereof.

49. Defendants are jointly and severally liable for the acts of their co-conspirators, whether those co-conspirators are named as Defendants or not.

### B. Agents

50. The anticompetitive and unlawful acts alleged against Defendants were authorized, ordered, permitted, or performed by Defendants' respective officers, agents, employees, or representatives, while actively engaged in the control, direction, operation, or management of the Defendants' businesses and affairs. Defendants are also liable for actions conducted or avoided in

---

[49] *Parthenon Capital promotes Kurt Brumme to Partner and Tom Hough to Principal,* Parthenon Capital, Parthenon Capital (Jan. 6, 2021), https://www.parthenoncapital.com/news/parthenon-capital-promotes-kurt-brumme-to-partner-and-tom-hough-to-principal/ (last visited Jun. 10, 2025).

[50] *Zelis Adds Investors, Reflecting Strong Market Confidence in Mission*, Zelis (Dec. 4, 2024), https://www.zelis.com/news/zelis-adds-investors-reflecting-strong-market-confidence-in-mission/ (last visited May 1, 2025).

furtherance of the conspiracy alleged herein by companies acquired or transformed into Defendants through mergers and/or acquisitions.

51. Each Defendant, through any and all of its respective subsidiaries, affiliates, and/or agents, operated as a single unified entity.

52. To the extent Zelis engaged in efforts relating to repricing of out-of-network healthcare services or that otherwise established, furthered, preserved, or maintained the conspiracy to the benefit of the Commercial Payers, Zelis acted as an agent for the Commercial Payers as part of, but not limited to, the Commercial Payers' decision to delegate pricing responsibility to Zelis.

**C. Authority**

53. Each and every agent associated with a particular Defendant acted and operated or avoided action in furtherance of the conspiracy under the authority and apparent authority of its respective principals, including of that particular Defendant.

54. To the extent any agent acted or avoided action in representation or in agency as to more than one Defendant, such agent acted or avoided action in furtherance of the conspiracy under the authority and apparent authority of all associated principals, including of multiple Defendants.

**D. Reciprocal Agency of Defendants and Co-Conspirators**

55. Each Defendant and Co-Conspirator acted by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

56. Each Defendant and Co-Conspirator acted as the principal, agent, or joint-venturer of the other Defendants and Co-Conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

### E. Common Corporate Interest of Each Defendant's Related Entities

57. Several of the Defendants include parent, subsidiary, or other related entities. When Plaintiffs refer to a corporate family by a single name concerning the participation within, furtherance of, or concealment of a conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in such conspiratorial acts or meetings on behalf of all companies included within that Defendant's corporate family.  Because nearly all Defendants organize, market, and promote themselves as corporate families, individual participants in such conspiratorial acts did not always know or realize the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within such a corporate family.  All the Defendant entities included within the corporate families were active, knowing participants in the conspiracy to suppress payments made to Providers for OON healthcare services.

58. For the reasons set forth above, Plaintiffs allege joint and several liability to the greatest extent authorized by law among each of the Defendants for the conduct of their Co-Conspirators, and each of their respective agents.

## V. Factual Allegations

### A. A Brief History of Conspiratorial OON Payment Suppression Within the Healthcare Industry and Possible Competitive Baseline Periods

#### 1. The Ingenix Conspiracy Period: 1997-2009

59. Prior to the OON healthcare pricing conspiracy alleged in this Amended and Consolidated Class Action Complaint ("Complaint"), a previous conspiracy alleged to have impacted payments for OON healthcare services.

60. From approximately 1997 to 2009, several Commercial Payers avoided competition and worked together to avoid competing with one another by fixing payment rates through a UnitedHealth Group subsidiary, known as Ingenix, Inc.

61. Before 1997, insurers paid OON healthcare service providers based on UCR rates as established by two independent databases: Prevailing Healthcare Charges System ("PHCS") and Medical Data Research ("MDR").[51]

62. Realizing that health insurers stood to gain dramatically from underpaying OON Providers, in the 1997-1998 period, UnitedHealth Group's subsidiary, Ingenix, Inc., purchased both PHCS and MDR, and then consolidated them around 2001 into a new database called "Ingenix."[52]

63. Vertically integrated with the insurer UnitedHealth Group, the Ingenix database was, according to the NYAG "tainted by a serious conflict of interest."[53]  UnitedHealth Group itself acknowledged on January 13, 2009 "that there was an 'inherent conflict of interest' in its business relationship with Ingenix . . . ."[54]  The United States Senate Committee on Commerce, Science, and Transportation's Office of Oversight and Investigations, described the Ingenix data as "fatally

---

[51] United States Senate Comm. on Commerce, Science, and Transportation, Office of Oversight and Investigations, *Underpayments to Consumers by the Health Insurance Industry* (June 24, 2009), at 3-5, 7-9, 13, 16-17, https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54 (last visited May 12, 2025).

[52] *Id.*

[53] State of New York Office of The Attorney General, Health Care Report: The Consumer Reimbursement System Is Code Blue (Jan. 13, 2009), at 22, https://static01.nyt.com/newsgraphics/documenttools/ce0ef77f5483731b/6f2b99cb-full.pdf (last visited May 12, 2025).

[54] United States Senate Comm. on Commerce, Science, and Transportation, Office of Oversight and Investigations, *Underpayments to Consumers by the Health Insurance Industry* (June 24, 2009), at 8, https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54 (last visited May 12, 2025).

undermined by faulty statistical methods and [having] a fundamental conflict of interest."[55] Further, the Ingenix database improperly and systematically removed certain otherwise valid, but higher, medical payment amounts. The NYAG conducted an investigation, as reiterated by the United States Senate's Office of Oversight and Investigations, which further revealed that participating insurers "scrubbed" or would "pre-scrub" data to eliminate higher payment amounts prior to submitting the data to Ingenix.[56]  Moreover, Ingenix's data was used by Ingenix "to calculate its benchmark products came from the very same health insurers that purchased Ingenix's products, forming a 'closed loop' of information between Ingenix and the insurance industry. Confidentiality agreements between Ingenix and its customers prohibited the disclosure of information about the database products to patients or doctors."[57]  In addition, strongly suggesting if not confirming that Ingenix data was based on lower in-network rates, the NYAG's investigation revealed in part that "[a]fter twenty minutes of questioning of in-house counsel . . . , it emerged that [one national insurer's] plan *pays the same rates for in-network and out-of-network care.*"[58] As a result, it appeared that the Ingenix database was populated with biased and unreliable, if not

---

[55] *Id.* at i.

[56] *The Consumer Reimbursement System is Code Blue*, New York Attorney General, (Jan. 13, 2009),  https://www.leg.state.nv.us/App/InterimCommittee/REL/Document/19460  (last visited May 1, 2025); United States Senate Comm. on Commerce, Science, and Transportation, Office of Oversight and Investigations, *Underpayments to Consumers by the Health Insurance Industry* (June 24, 2009)*,* at ii, iii, 6, 11, 17, https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54 (last visited May 12, 2025).

[57] United States Senate Committee on Commerce, Science, and Transportation, Office of Oversight and Investigations, *Underpayments to Consumers by the Health Insurance Industry* (June 24, 2009)*,* at ii,  https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54 (last visited May 12, 2025).

[58] State of New York Office of The Attorney General, Health Care Report: The Consumer Reimbursement System Is Code Blue (Jan. 13, 2009), at 17, https://static01.nyt.com/newsgraphics/documenttools/ce0ef77f5483731b/6f2b99cb-full.pdf  (last visited May 12, 2025) (emphasis in original).

improperly pooled, data, which functioned to help health insurers pay OON Providers at artificially suppressed payment amounts.  The Senate's Office of Oversight and Investigations noted that "these questionable statistical methods" resulted in charges that "consistently skewed reimbursement rates downwards—in a direction that allowed insurers to reduce their claims payments"—in amounts "as much as 30% lower than the actual market rates for these services."[59] An Ingenix employee testified that "Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low median or 80th percentile . . . rates charged by health care providers in any given area."[60]  The insurers' use of Ingenix helped to eliminate or minimize the importance of independent, UCR-based payment amounts.

64. As part of this healthcare service payment suppression conspiracy, Ingenix used claims and payment information submitted by otherwise competing Commercial Payers to calculate OON healthcare service payment amounts.[61]

65. Following an investigation into Ingenix by NYAG, Ingenix was revealed to have "gather[ed] billing data from the largest health insurers in the country, including UnitedHealth Group Incorporated . . . , Aetna, CIGNA and WellPoint," and to "then send[] back schedules to those health insurers and others, based on the pooled data, which the insurers use as a benchmark

---

[59] United States Senate Comm. on Commerce, Science, and Transportation, Office of Oversight and Investigations, *Underpayments to Consumers by the Health Insurance Industry* (June 24, 2009)*, at ii,* https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54 (last visited May 12, 2025).

[60] *Michael Davekos, P.C. v. Liberty Mutual*, 2008 Mass.App. Div. 32, 36, 2008 WL 241613, at *4 (Jan. 24, 2008).

[61] United States Senate Comm. on Commerce, Science, and Transportation, Office of Oversight and Investigations, *Underpayments to Consumers by the Health Insurance Industry* (June 24, 2009)*, at ii,* https://www.commerce.senate.gov/services/files/3498904d-6994-4e7d-a353-159261240d54 (last visited May 12, 2025).

to set their reimbursement rates."[62]    As a result, the Ingenix databases were consistently understating payment rates for OON healthcare services "by up to 28 percent across the state [of New York]."[63]  According to the NYAG, these efforts "translate[d] to at least hundreds of millions of dollars in losses for consumers over the past ten years across the country."[64]

66. Physicians and patients filed numerous lawsuits against health insurers that used Ingenix. Further, in 2000, the American Medical Association and multiple state-based medical associations filed a class action lawsuit against UnitedHealth alleging violations of various antitrust laws and the Racketeer Influenced and Corrupt Organizations Act.  UnitedHealthcare Corp. and affiliates settled this class action in 2009, agreeing to pay $350 million to compensate class members.[65]

## 2. The FAIR Health Database Period: 2010-2015

67. In 2009, following the NYAG investigation and associated litigation, 12 healthcare insurance companies settled with the Attorney General.[66]  Part of the settlements with the NYAG required the settling insurers to devote substantial funds toward the creation of an unbiased and independent database designed to replace Ingenix.[67]  This new database became known as "FAIR

---

[62] State of New York Office of The Attorney General, Health Care Report: The Consumer Reimbursement System Is Code Blue (Jan. 13, 2009), at 2, https://static01.nyt.com/newsgraphics/documenttools/ce0ef77f5483731b/6f2b99cb-full.pdf (last visited May 12, 2025).

[63] *Id.*

[64] *Id.* at 2, 6 (emphasis in original).

[65] *See Am. Med. Ass'n v. United Healthcare Corp.*, No. 00 Civ. 2800 (LMM), 2009 WL 1437819, at *1-*2 (S.D.N.Y. May 19, 2009).

[66] Alison Leigh Cowan, *Mixed Views on Cuomo as Attorney General, The New York Times* (Oct. 26, 2010)  https://www.nytimes.com/2010/10/27/nyregion/27cuomo.html (last visited May 12, 2025) ("Over the next two years, Mr. Cuomo and his staff built cases against 12 companies and won settlements from them totaling $100 million.").

[67] Martha Graybow, *UnitedHealth settles New York Reimbursement probe*, Reuters, (Jan. 13, 2009) https://www.reuters.com/article/markets/stocks/unitedhealth-settles-new-york-reimbursement-probe-idUSTRE50C5V8/ (last visited Mar. 19, 2025).

Health," and its owning/managing company became known as FAIR Health, Inc.[68]  The terms of the settlement required the settling insurers to use FAIR Health exclusively for a five-year period.[69]

68. As part of UnitedHealth Group's settlement with NYAG, UnitedHealth Group agreed to cease operations of its Ingenix, Inc. subsidiary, including its Ingenix database.[70]  As a result, insurers could no longer use Ingenix.  As part of their respective settlements, insurers turned to the source of data from which to base OON payment amounts: FAIR Health.  However, in accordance with the five-year exclusive-use settlement terms, reliance on FAIR Health was short-lived.

69. FAIR Health, Inc. was established in 2009, with the expectation that the FAIR Health database would "be operational by fall of 2010 . . . ."[71]

70. As part of the NYAG settlement, the settling insurers agreed not to use or develop any alternative healthcare payment database for a five-year period.[72]  As FAIR Health was available sometime between the middle of 2010 or the beginning of 2011, this five-year exclusive-use period began approximately in mid-2010 to early 2011 and extinguished from approximately 2015 to 2016.

---

[68]  *Committed to Transparency, Driven by Innovation: About Us,* FAIR Health, https://www.fairhealth.org/about-us (last visited May 12, 2025).

[69]  *See, e.g.,* State of New York Office of the Attorney General, *In re UnitedHealth Group Incorporated,* Investigation No. 2008-161, Assurance of Discontinuance Under Executive Law § 63(15), at 11 (¶28).

[70]  *Id*.

[71]  *Mission and Origins: A Unique History and Defining Mandate,* FAIR Health, https://www.fairhealth.org/mission-origin (last visited May 12, 2025); *Knowledge Center: New Out-of-Network Physician Pay Dbase is FAIR* AAPC (Nov. 13, 2009), https://www.aapc.com/blog/2782-new-out-of-network-physician-pay-dbase-is-fair/?srsltid=AfmBOoqtWnzPoLkNmrKlZJTtRqGd_oQ52crIKrf8KC3zWFHYa-2rOEre (last visited May 12, 2025).

[72]  *See, e.g.,* State of New York Office of the Attorney General, *In re UnitedHealth Group Incorporated,* Investigation No. 2008-161, Assurance of Discontinuance Under Executive Law § 63(15), at 11 (¶28).

71. In contrast to Ingenix, Inc. and Zelis, FAIR Health, Inc., is a non-profit or not-for-profit entity whose database was designed to provide an unbiased view of OON healthcare service payment amounts in order for "users" of FAIR Health to "render their own recommendations or determinations regarding UCR or valuation."[73]  Such claims data used in part to help "render" UCR rates were and are based in part on the performance of a particular medical service as conducted in a particular geographic market.[74]  Also, in contrast to tying commissions to the amounts "saved" by Commercial Payers, subscribers paid FAIR Health a flat fee to access this data.[75]

72. Incorporating rules designed to prevent bias and other safeguards, the adoption and use of FAIR Health's database began to cause payment levels to course-correct.  With respect to the New York State Health Insurance Program, use of FAIR Health resulted in an approximate 26% increase in OON Payments.[76]  While half of that increase was apparently based on cost-of-living

---

[73] *About Us: Committed to Transparency, Driven by Innovation,* FAIR Health, https://www.fairhealth.org/about-us (last visited May 12, 2025);

*Knowledge Center: New Out-of-Network Physician Pay Dbase is FAIR,* AAPC (Nov. 13, 2009), https://www.aapc.com/blog/2782-new-out-of-network-physician-pay-dbase-is-fair/?srsltid=AfmBOoqtWnzPoLkNmrKlZJTtRqGd_oQ52crIKrf8KC3zWFHYa-2rOEre (last visited May 12, 2025);

*FAQs: FAIR Health Products And Solutions: Does FAIR Health set "usual and customary rates" or UCR?*, FAIR Health, https://www.fairhealth.org/faqs (last visited May 13, 2025).

[74] *Methodologies: Benchmarks That Mirror the Market,* FAIR Health, https://www.fairhealth.org/methodologies (last visited May 13, 2025).

[75] Chris Hamby, *Insurance Companies Reap Hidden Fees as Patients Get Unexpected Bills,* The New York Times (Apr. 7, 2024) https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (last visited May 7, 2025).

[76] Thomas P. DiNapoli, *An Analysis of Reasonable and Customary Out-of-Network Reimbursement Rates for Medical/Surgical Services in the New York State Health Insurance Program,* Office of The New York State Comptroller (April 2020), at 2, 6, 6 n.3, 7, https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2020-18d2.pdf (last visited May 13, 2025).

increases, the other half of the gains in OON payments represented a departure from Ingenix's downwardly biased data.[77]  However, the OON Providers' receipt of FAIR Health's more accurately determined payments was only temporary.

### 3. Development and Implementation of Private, For-Profit, Proprietary Zelis Repricing System: 2016 to Present

73. Participating insurers despised FAIR Health's impact on OON Payment levels and on insurers' profits and profit margins.

74. As the exclusive-use periods expired and Commercial Payers became free to develop or use other pricing databases, Commercial Payers replaced their reliance on both the concept of applying unbiased UCR payment amounts, in general, and their reliance on the FAIR Health database, in particular.  On June 13, 2016, at around the expiration of the various NYAG settlements' exclusive use terms, Zelis issued a press release explaining that it "provides a comprehensive array of network management, claims integrity, payment remittance solutions and analytical services for medical, dental and workers' compensation claims to over 500 payor clients."[78]

75. The return to private, for-profit, proprietary repricing systems has been a runaway success for increasing the profits of Zelis and the Commercial Payers.  By August 13, 2024, Zelis boasted that its "platform serves more than 750 payers, including the top 5 national health plans, BCBS

---

[77] *Id.* at 7.

[78] *Northlake Chiropractic, Inc. v. Zelis Healthcare*, No. 1:19-cv-08087 (N.D. Ill. Dec. 12, 2019), at ECF No. 1-2 (Ex. B).

insurers, regional health plans, TPAs and self-insured employers . . . ."[79]  Zelis currently asserts

that it "[p]artner[s] with over 770 health insurance companies."[80]

## B. Zelis Directly Competes with Commercial Payers and Other Repricers, and Provides Anticompetitive "Repricing" Services

### 1. Zelis's Business and Repricing Incentives

76. Zelis provides Commercial Payers with technology-enabled services that allow for the

downward adjustment of payments made to OON Providers.[81]  For example, Zelis touts its use of

artificial intelligence to help its clients reduce payments on submitted claims: Zelis "[l]everage[s]

[an] AI-powered dynamic optimization engine to find quality recommended savings on every

claim [and] [o]ur AI-powered optimization engine uses dynamic routing to examine every

available saving channel to drive valued savings."[82]

77. Such downward adjustments to Providers' submitted OON claims are described by Zelis

as "repricing."[83]  There is no pre-pricing negotiation as between Zelis and the OON Provider who

---

[79] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies*, Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited Mar. 21, 2025).

[80] *Leading the way forward in modernizing your business*, Zelis, https://www.zelis.com/built-for-payers/health-plans/ (last visited Mar. 19, 2025).

[81] *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 13, 2025) ("Improve accuracy and reduce frustration with a technology-enabled way to load and mange contracts, apply real-time edits and regulatory updates, and reprice medical healthcare claims"; "Give control back to your members by setting maximum reimbursement amounts using pre-defined prices to provide a controlled savings reference-based pricing plan").

[82] *Gain control of out-of-network costs with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited Mar. 19, 2025).

[83] *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 13, 2025) ("API, EDI or portal integration to make repricing claims easier").

receives Zelis's repriced payment amount.  Also, although neutral sounding, Zelis's "repricing" of payment amounts for OON healthcare services goes only one direction: down.

78. In addition, the "connected platform" that Zelis uses to downwardly adjust OON payments does not actually "align[]" the "interests across payers" and "providers," but, instead, submerges the interests of the healthcare service "providers" under those of the "payers."[84]

79. Whether building technology or buying it, Zelis has worked to bolster its "core payments business" relating, at least in part, to the repricing of OON healthcare services.[85]  The following timeline reflects the expansion of Zelis's empire:

- <u>2003</u>: While still named "Stratose®," Zelis's predecessor acquired a company called "PHX," thus "integrating claims cost management strategies" into its "innovative wrap network solution" offering.

- <u>2012</u>: Stratose® acquired "Pay-Plus Solutions," thus "bringing payment innovations to our growing platform."

- <u>2015</u>: Stratose® re-branded itself as Zelis, "promising a single-source solution to lower costs."

- <u>2017</u>: Zelis acquired a series of companies, including Truven, EthiCare, Strenuus and the Maverest Dental Network.

- <u>2018</u>: Zelis acquired NetMinder.

- <u>2019</u>: Zelis acquired RedCard.

- <u>2021</u>:  Zelis acquired Sapphire Digital.

---

[84] *Zelis Adds Investors, Reflecting Strong Market Confidence in Mission*, Zelis (Dec. 4, 2024), https://www.zelis.com/news/zelis-adds-investors-reflecting-strong-market-confidence-in-mission/ (last visited May 1, 2025).

[85] *Zelis warms to large-scale M&A*, Axios (Nov. 15, 2022), https://www.axios.com/pro/health-tech-deals/2022/11/15/zelis-warms-to-large-scale-ma (last visited Mar. 19, 2025).

- <u>2022</u>: Zelis acquired two entities. *First*, it "[e]xpanded Medicare capabilities, reference-based pricing, and payment integrity with acquisition of PayerCompass." *Second*, it "[e]xpand[ed] payments network and capabilities with acquisition of PaySpan."[86]

- <u>2025</u>: Zelis acquired the assets of Medxoom in order to provide "a mobile-first member experience . . . from Allied Benefit Systems, LLC, the largest independent third-party administrator in the United States."[87]

80. As reported by *AxiosPro* on November 15, 2022, "[t]he acquisition of Payspan gives Zelis capabilities around managing insurance premium payouts, says Yusuf Qasim, president of Payments Optimization at Zelis."[88]

81. This same *AxiosPro* article reported that "Zelis generates around $450 million in EBITDA . . . ."[89] Data compiled by Growjo, which cites articles dating from late April 2022 in its "Zelis News" section, estimates Zelis's annual revenue as "429.5M[.]"[90] Growjo also estimates Zelis's annual revenue as $549.8 million per year.[91] However, Data compiled by "leadiQ" indicates that "[a]s of June 2025, Zelis's annual revenue reached $750M."[92]

82. Many of Zelis's key executives previously held leadership roles at top-five health plans before coming to Zelis. For example, Heather Cox, Zelis's President, Insights & Empowerment,

---

[86] *A Legacy of Impact Milestones*, Zelis, https://www.zelis.com/company/ (last visited Mar. 19, 2025) (cited for entire timeline).

[87] *Zelis Acquires Assets of Medxoom to Deliver a Mobile-First Member Experience Platform,* BusinessWire (June 3, 2025), https://www.businesswire.com/news/home/20250602228008/en/Zelis-Acquires-Assets-of-Medxoom-to-Deliver-a-Mobile-First-Member-Experience-Platform (last visited June 5, 2025).

[88] *Zelis warms to large-scale M&A*, Axios (Nov. 15, 2022), https://www.axios.com/pro/health-tech-deals/2022/11/15/zelis-warms-to-large-scale-ma (last visited Mar. 19, 2025).

[89] *Id.*

[90] *Zelis Revenue and Competitors*, Growjo, https://growjo.com/company/Zelis#google_vignette (last visited May 2, 2025).

[91] *Zelis Revenue,* Growjo, https://growjo.com/company/Zelis (last visited June 10, 2025).

[92] *Zelis Revenue*, leadiQ, https://leadiq.com/c/zelis/5a1d8aad240000240064a2b3 (last visited June 10, 2025).

was Chief Digital Health and Analytics Officer for Humana. Heather Valteris, Zelis's Chief Marketing Officer, previously served as Cigna's Chief Marketing Officer for Cigna's International Markets. Sue Schick, Zelis's President and Chief Revenue Officer, spent 16 years in a range of senior leadership roles at UnitedHealth in its Medicaid and Commercial businesses, and she held executive sales leadership roles at Cigna. Ms. Schick also previously served as President, Group & Military at Humana.[93]

83. In exchange for its downward adjustment of Providers' OON claims, Zelis receives a percentage of the amount that the Payer saves.

84. As noted in a March 6, 2020 order, "'Under Cigna's Cost Savings Program, Zelis and CHP are incentivized to drastically reduce claims amounts payable to providers because the commission they receive is calculated as a percentage of savings.'"[94]

85. Zelis does not deny that its repricing services are compensated by receipt of percentage of savings-based commission. Rather, it just denies that its commission-based compensation structure creates a conflict: "Defendants [including Zelis] contend that the administrative record and discovery already produced indicate that while Zelis received a commission and fee for conducting a bill review [of] the BMC claim, that does not necessarily give rise to a conflict of interest."[95]

86. Zelis's repricing incentive scheme is designed such that the less money that is paid to OON Providers from an originally submitted claim, the more money Zelis receives.

---

[93] *Leading the way forward*, Zelis, https://www.zelis.com/company/leadership/ (last visited May 2, 2025) (cited for entire paragraph).

[94] *IJKG Opco LLC v. Gen'l Trad. Co.*, No. 17-6131 (KM) (JBC), 2020 WL 1074905, at *5 (D.N.J. Mar. 6, 2020) (quoting complaint).

[95] *IJKG Opco LLC v. Gen'l Trad. Co.*, No. 17-6131 (KM), 2019 WL 8164381, at *5 (D.N.J. Apr. 29, 2019) (internal citations omitted).

### 2. Zelis Directly Competes with the Repricing Services of Other OON Claims Repricers

87. Zelis's business operations, incentives, and priorities are similar to those of other repricers. Zelis is identified as a competitor by another repricer in its corporate SEC filings in the areas of "Analytics-Based Services" and "Network-Based Services."[96]

88. Zelis, in addition to providing certain "Network-Based Services," sells and provides "repricing" services to other Commercial Payers.[97] In providing such "repricing" services to other Commercial Payers, Zelis directly competes with other healthcare "repricers."

89. To the extent that Zelis incorporated or incorporates anti-competitive conduct by competing repricers into its systems, repricing "recommendations," and related services, Zelis has furthered its own conspiracy with a horizontal competitor.

### 3. As An Owner, Operator, and/or Manager of PPO Networks, Zelis Directly Competes with Other Commercial Payers

90. Zelis not only performs repricing services for other Commercial Payers, but it competes directly against them as an owner, operator, and/or manager of medical and dental networks.[98] As Zelis explains, "[b]y working with Zelis, providers get access to our networks and gain exposure to more than 100 million patients nationwide, [and] placement in provider directories of more than 700 healthcare payers and third-party administrators . . . ."[99] Further, as Zelis boasts, "Zelis represents one of the nation's largest combined member networks in the country, processing more

---

[96] MultiPlan Corp. Form 10-K for the fiscal year ended December 31, 2023 (filed on Feb. 22, 2024), https://www.sec.gov/Archives/edgar/data/1793229/000179322924000012/mpln-20231231.htm (last visited May 13, 2025).

[97] *Id.*; *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 13, 2025).

[98] *Medical and Dental Provider Networks by Zelis®,* Zelis, https://www.zelis.com/providers/provider-networks/ (last visited May 13, 2025).

[99] *Id.*

than 13,000 patient encounters every hour."[100]  As an owner, operator, and/or manager of its own medical and dental networks, Zelis directly competes with other health insurance companies, PPOs, managed care organizations ("MCOs"), self-funded plans, third-party administrators ("TPAs"), and self-insured entities (collectively, "Commercial Payers").  Zelis admits its status as a payer.  Like the other Commercial Payer Defendants and Commercial Payer Co-Conspirators, Zelis is a payer.

91. Zelis's status as a payer or Commercial Payer is legally significant as Zelis and its Commercial Payer Co-Conspirators engaged in improper sharing of competitively-sensitive claims, pricing, and contractual information between direct competitors.

92. Zelis not only serves as a payer (as further described below), but also as a healthcare network architect.  Zelis boasts that it can "[m]odel and build primary, secondary, wrap and specialty networks."[101]

93. Zelis's network-related expertise applies to "any type of network program," which even encompasses workers' compensation-related health networks.[102]  Zelis's network business also includes dental networks:  "Zelis takes an integrated approach to reduce the cost and complexity of managing your dental network . . . ."[103]  Zelis also confirms that it has its own "national dental

---

[100] *Id.*

[101] *Zelis for Third Party Administrators*, Zelis, https://www.zelis.com/built-for/payers/third-party-administrators/ (last visited May 2, 2025).

[102] *Zelis for Property & Casualty*, Zelis, https://www.zelis.com/built-for/payers/property-and-casualty-plans/ (last visited Mar. 19, 2025).

[103] *Zelis for Dental Payers,* Zelis, https://www.zelis.com/built-for/payers/dental-payer/ (last visited May 13, 2025).

provider network": "Leveraging our national dental provider network increases network access and savings for your practice."[104]

94. Further, with respect to dental networks, Zelis describes itself as "the market leader" in dental network services: "Join the market leader in partnering with dental payers to help build and optimize networks and payment strategies."[105] Zelis notes that it has "the full suite of solutions for dental payers: Network Analytics, Network Design, Network Access and Savings, Payments and Communications."[106]

95. In addition to Zelis's descriptions of its network, Zelis, has repeatedly described itself as a payer. For example, Zelis claims, "As a leading payments company in healthcare, we guide, price, explain, **and _pay_ for care on behalf of insurers and their members.**"[107]

96. Zelis publicly announced in its network business capabilities (included as an exhibit to a legal filing) that Zelis "provides a **comprehensive array of network management**, claims integrity, payment remittance solutions and analytical services for medical, dental and workers' compensation claims to over 500 payor clients."[108]

97. New Jersey's Department of Banking & Insurance includes "Zelis Network Solutions, LLC" among its "Organized Delivery Systems," explaining that an:

---

[104] *Zelis for Dental Payers*, Zelis, https://www.zelis.com/built-for/payers/dental-payer/(last visited Mar. 19, 2025).

[105] *Id.*

[106] *Id*.

[107] Thuy-An Wilkins, *Zelis to Acquire Healthcare Cost Control Innovator Payer Compass; Combined Assets to Deliver Advanced Claims Management Solutions*, Business Wire (Aug. 1, 2022), https://www.businesswire.com/news/home/20220801005598/en/Zelis-to-Acquire-Healthcare-Cost-Control-Innovator-Payer-Compass-Combined-Assets-to-Deliver-Advanced-Claims-Management-Solutions (last visited May 1, 2025) (emphasis added).

[108] *Northlake Chiropractic, Inc. v. Zelis Healthcare Corp.*, No. 1:19-cv-08087 (JZL) (N.D. Ill. Feb. 29, 2020), at ECF No. 1-2 (Ex. B) (Jun. 13, 2016 BusinessWire Press Release) (emphasis added).

> Organized Delivery System (ODS) is a legal entity that contracts with a carrier for the purpose of providing or arranging for the provision of health care services to those persons covered under a carrier's health benefits plan, but which is not a licensed health care facility or other health care provider. [¶] Examples of the types of entities that are an ODS include preferred provider organizations (PPOs), Physician Hospital Organizations (PHOs) and Independent Practice Associations (IPAs).[109]

By New Jersey's definition and determination (a state where Zelis maintains significant operations), Zelis is a type of Commercial Payer.

98. Change Healthcare also lists Zelis as a "Payer," assigning the Payer Name[d]" Zelis certain CPID numbers and a Payer ID.[110]

99. Further, in a "Petition Commencing Assignment for Benefit of Creditors," filed on March 14, 2019 in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida Civil Division in *In re Laser Spine Surgery Center of Cincinnati, LLC*, Zelis Health Solutions PMB 404, 15560 N Frank Lloyd Wright Blvd, Scottsdale, AZ 85260, is listed as one of a number of "Third Party Insurance Payers."

100.    As a fellow "payer," Zelis competes directly with the Commercial Payer Defendants and Commercial Payer co-conspirators.

101.    As part of its direct competition with "payers," including Commercial Payer Defendants, Zelis participates in the PPO Network industry.

---

[109] *Organized Delivery Systems*, State of New Jersey Department of Banking & Insurance, https://www.nj.gov/dobi/division_insurance/managedcare/mcods.htm (last visited May 1, 2025).

[110]    *MBPractice,    Change    Healthcare    Payers,* https://qa.mbpractice.com/insurance/ChangeHealthcarePayers (last visited May 13, 2025).

102.     In its Provider-directed marketing, Zelis confirms its participation in the network business as it requests Providers to "[j]oin one or more of *our* networks, where you'll gain access to healthcare consumers in your area who are shopping for care . . . ."[111]

103.     Zelis is not only listed as and has described itself as a payer, but it also competes in the PPO Network industry. Zelis acts both as an owner, operator, and manager of PPO Networks, and as a purchaser of out-of-network healthcare services through one or more of its PPO Networks. That is, Zelis purchases out-of-network healthcare services through one or more of its PPO Network subsidiaries. Accordingly, even though Zelis also maintains a repricing business, Zelis is a horizontally-positioned competitor that participates in the market for out-of-network healthcare services by purchasing such services from OON Providers.

104.     Zelis's foundational history is tied directly to participating in the PPO Network industry. As Zelis recounts, "[f]ounded as Stratose® in 1995, we first focused on expanding access and delivering an innovative wrap network solution to small and mid-market players."[112]

105.     Zelis's participation in the PPO Network industry is not limited to Stratose; rather, "Zelis offers PPO network products to support the unique requirements of clients of all sizes looking for Group Health, Dental, or Workers' Compensation coverage."[113]

106.     Zelis's various PPO Networks include:

---

[111] *Zelis for Providers*, Zelis, https://www.zelis.com/built-for/built-for-providers/ (last visited May 2, 2025) (emphasis added).

[112] *A Legacy of Impact Milestones*, Zelis, https://www.zelis.com/company/ (last visited Mar. 19, 2025) (Stratose®).

[113] *Zelis Dental Dentist,* Reading Dental Associates, https://www.readingdentalma.com/zelis-dentist (last visited June 5, 2025).

- 4Comp[114];

- 4Most Dental[115];

- 4Most Health[116];

- HFN, LLC[117]

- Maverest Dental Network[118];

---

[114] *Zelis®,* Zelis, https://apd.stratose.com/ProviderSearch/ (last visited Jun. 5, 2025) ("It is possible that the provider you plan to select is not currently participating in the PPO network"; "These networks are now part of Zelis Healthcare.  Please accept the User Agreement and select your network: . . .  4Comp").

[115] *Zelis®,* Zelis, https://apd.stratose.com/ProviderSearch/ (last visited Jun. 5, 2025) ("It is possible that the provider you plan to select is not currently participating in the PPO network"; "These networks are now part of Zelis Healthcare.  Please accept the User Agreement and select your network: . . .  4Most Dental . . .").

[116] *Zelis®,* Zelis, https://apd.stratose.com/ProviderSearch/ (last visited Jun. 5, 2025) ("It is possible that the provider you plan to select is not currently participating in the PPO network"; "These networks are now part of Zelis Healthcare.  Please accept the User Agreement and select your network: . . .  4Most Health . . .").

[117] *Zelis®,* Zelis, https://apd.stratose.com/ProviderSearch/ (last visited Jun. 5, 2025) ("It is possible that the provider you plan to select is not currently participating in the PPO network"; "These networks are now part of Zelis Healthcare.  Please accept the User Agreement and select your network: . . .  HFN . . .");

*Group Health PPO Networks,* HFN, https://hfnllc.com/products-group.htm (last visited June 5, 2025);

*Insurance Coverage,* Ann & Robert H. Lurie Children's Hospital of Chicago, https://www.luriechildrens.org/en/specialties-conditions/town-and-country-pediatrics/billing-and-insurance/ (last visited Jun. 5, 2025) ("HFN LLC (Zelis) – PPO, EPO");

*Member Spotlight:  Zelis Healthcare Making Strides in Illinois,* Illinois Chamber of Commerce, https://ilchamber.org/Resources/57fb0962-3c3e-4d30-a99a-5751d2111ff4/ZelisHealthcareMemberSpotlight.pdf (last visited Jun. 5, 2025) ("HFN, LLC . . . has grown into one of the midwest's leading Preferred Provider Organizations (PPO). . . . [¶][¶] In 2016 through additional mergers, HFN became part of the rebranded company, Zelis Healthcare.").

[118] *Zelis Dental Dentist,* Reading Dental Associates, https://www.readingdentalma.com/zelis-dentist (last visited Jun. 5, 2025) ("In 2017, Zelis Healthcare acquired Maverest Dental Network, one of the largest independent dental PPO networks in the country.").

- PPOPlus[119];

- Qualident[120];

- Zelis (Stratose)[121].

107.    Zelis serves as an owner, operator, and manager of various PPO Networks, while also participating in the market for OON healthcare services as a purchaser.  For example, HFN, LLC "has grown into one of the midwest's leading Preferred Provider Organizations (PPO), offering both **standard** and innovative health care and comprehensive program management solutions for employers, third party administrators, and mid-range insurance companies."[122]  HFN, LLC specifies that it offers various "Group Health PPO Networks," including its "HFN20 Network" and its "HFN CHC, Elite, Premiere Networks."[123]   HFN, LLC describes its "HFN20 Network" as its "largest network with a full range of medical, hospital, and ancillary services," also noting its status as an out-of-network purchaser:  "To qualify for HFN 20 , a plan **must** have

---

[119] *Zelis®,* Zelis,  https://apd.stratose.com/ProviderSearch/ (last visited June 5, 2025) ("It is possible that the provider you plan to select is not currently participating in the PPO network"; "These networks are now part of Zelis Healthcare.  Please accept the User Agreement and select your network: . . .  PPOPlus . . .").

[120] *Zelis®,* Zelis, https://apd.stratose.com/ProviderSearch/ (last visited Jun. 5, 2025) ("It is possible that the provider you plan to select is not currently participating in the PPO network"; "These networks are now part of Zelis Healthcare.  Please accept the User Agreement and select your network: . . .  Qualident . . .").

[121] *Zelis®,* Zelis, https://apd.stratose.com/ProviderSearch/ (last visited Jun. 5, 2025) ("It is possible that the provider you plan to select is not currently participating in the PPO network"; "These networks are now part of Zelis Healthcare.  Please accept the User Agreement and select your network: Zelis (Stratose) . . .").

[122] *Member Spotlight:  Zelis Healthcare Making Strides in Illinois,* Illinois Chamber of Commerce, https://ilchamber.org/Resources/57fb0962-3c3e-4d30-a99a-5751d2111ff4/ZelisHealthcareMemberSpotlight.pdf (last visited Jun. 5, 2025) (emphasis added).

[123] *Group Health PPO Networks,* HFN, https://hfnllc.com/products-group.htm (last visited Jun. 5, 2025).

at least a 20% difference between in-network and out-of-network benefits."[124]    HFN, LLC describes its "HFN CHC, Elite, Premier Networks" as "community-based" and "provid[ing] high quality medical care and significant increased savings for local employers and their employees," similarly noting that "[t]o qualify for access, a plan *must* have at least a 20% differential between in-network and out-of-network benefits."[125]

108.    By specifying the percent "differential between in-network and out-of-network benefits," Zelis, through its PPO Network subsidiary, HFN, LLC, acknowledges that it participates as a purchaser of out-of-network healthcare services performed by OON Providers, so long as those "benefits" amount to at least 20% less than those provided in-network.

109.    Zelis purchases out-of-network healthcare services performed by OON Providers.

110.    Zelis is a horizontally-positioned competitor to other Commercial Payers and participates in the OON Commercial Payer market; that is, Zelis participates in the market for out-of-network healthcare services.

## C. The "Repricing" Services Offered by Zelis

### 1. Zelis's Repricing Services, Generally

111.    Zelis provides "repricing" services for Commercial Payers.[126] Zelis's "repricing" services are designed to help Commercial Payers ignore Providers' claims submitted for OON

---

[124] *HFN20 Network,* HFN, https://hfnllc.com/products-group-hfn20.htm (last visited June 5, 2025) (emphasis added).

[125] *HFN CHC, Elite, Premiere Networks:    Community Health Connect*, HFN, https://hfnllc.com/products-group-regional.htm (last visited June 5, 2025) (emphasis added).

[126] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies* (August 13, 2024), Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited June 10, 2025) ("This platform serves more than 750 payers, including the top 5 national health plans, BCBS insurers, regional health plans, TPAs and self-insured employers . . . .").

healthcare services, and to replace those amounts with substantially smaller and excessively low payment amounts.[127]

112. Zelis describes its services in glowing, pious, and self-serving terms, characterizing itself as the source for pricing accuracy, and integrity. For example, it claims that its tools and methodologies "[e]nsure the accuracy and integrity of claims—before you pay. Pre-pay payment integrity solutions . . . reduce billing inaccuracies for your members."[128]

113. On a simplified basis, for illustrative purposes, the following summarizes how Zelis's "repricing" tools function.

114. <u>Emergency Context</u>: With respect to emergencies, a patient that is insured by one of Zelis's Commercial Payer clients/competitors receives healthcare services from a Provider (for example, Plaintiffs). If that Provider does not have a pre-existing contract governing the payment associated with providing emergency healthcare services with that insurer, the patient's insurer remains obligated to pay for the emergency healthcare services rendered to the insured individual. The Provider then treats the patient on that emergency basis, and the Provider submits a claim to the insurer reflecting its charges. According to the ACA and its implementing regulation at 75 FR 37188-01, at Section 2590.715-2719A at (b)(3)(i)(A)-(C), the Commercial Payer is obligated to pay the OON Provider according to the "Greatest of Three" (or "GOT") under the Interim Final Rule: "'(1) The amount negotiated with in-network providers for the emergency service furnished; (2) The amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the usual, customary, and

---

[127] *See, e.g., Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050 (D. Mont. Oct. 18, 2018), ECF No. 146-2 at 3 (Robert Jackson Depo. at 19:17-19:23).

[128] *Ensure accurate payments with Zelis*, Zelis, https://www.zelis.com/solutions/payment-integrity/ (last visited May 1, 2025).

reasonable charges) but substituting the in-network cost-sharing provisions for the out-of-network cost-sharing provisions; or (3) The amount that would be paid under Medicare for the emergency service.'"[129]  However, instead of paying the Provider's submitted claim directly, the insurer sends the Provider's claim to Zelis.  Zelis then applies its "analytics" tools (which are informed by horizontal competitors' confidential, propriety, and/or competitively-sensitive data) to "reprice" (that is, downwardly adjust) the Provider's submitted claim pursuant to Zelis's repricing agreement that it maintains with the insurer.  Zelis then presents the Provider's now-repriced (downwardly adjusted) claim on a take-it-or-leave-it basis.  If the Provider does not "accept" Zelis's "repriced" payment amount for such emergency healthcare services, the Provider may file "an appeal" of the repriced amount, which results in further delay in payment of the originally submitted OON healthcare services claim, possibly at an even further decreased amount only after significant administrative burden and expense.

115.  <u>Non-Emergency Context</u>: A similar sequence exists for payment of non-emergency OON healthcare service claims.  In this hypothetical circumstance, the patient is a subscriber to a particular health insurance plan, but seeks healthcare services from a Provider that is not among those listed as providing in-network healthcare services as part of the insurer's PPO Network, or from a Provider that is in-network, but who has administered out-of-network services. That is, in this example, the patient seeks and receives OON, non-emergency healthcare services from the Provider.  In this non-emergency setting (unlike the emergency context), the OON Provider has no obligation to provide OON services to the patient. However, such OON care routinely occurs, at least partly based on the understanding that the patient has some kind of health insurance and

---

[129] *American College of Emergency Physicians v. Price*, 264 F. Supp. 3d 89, 92 (D.D.C. 2017) (quoting 75 FR 37188-01 at AR008).

the Provider will be able to recoup at least some of the costs of that healthcare from that insurer

on an OON basis based on the governing agreement.  Further, traditionally, Providers were able

to charge more for OON healthcare services in accordance with the competitive dynamic of trading

the security of increased patient volume and ease and speed of payment when providing healthcare

services on an in-network basis for the possibility of obtaining greater earnings per procedure when

working out-of-network. In addition, unless anti-balance billing laws are in effect, the Provider

also had the option of recouping the balance for OON services from the patient (so-called "balance

billing").  However, there is no downside protection for a Provider performing non-emergency

out-of-network healthcare services.  In this example, the OON Provider performs the healthcare

services and the Provider bills the patient's health insurance company.  Similar to the emergency

context discussed above, rather than processing and then paying the amount included in the

Provider's submitted claim, the insurance company sends the Provider's non-emergency claim to

Zelis.  Zelis then applies one or more repricing services, technologies, methodologies, and/or

overrides, which results in the "repricing" of the Provider's submitted non-emergency claim.

Finally, Zelis presents the downwardly-adjusted "offer" to the OON Provider on behalf of the

patient's insurer for payment to the OON Provider.  Again, the OON Provider is forced either to

accept the severely downwardly adjusted ("repriced") amount as payment; to engage in time-

pressured and one-sided "negotiations" with Zelis; or to file an "appeal" of the downwardly-

adjusted claim with Zelis.  But these options rarely, if ever, result in an increase in the payment

and ultimately result in the incursion of an expense in the form of delay, if not a further decrease

in payment of the Provider's originally submitted claim.

**2. Zelis's Established Reimbursement Solution® ("ERS"), so-called "Market-Based Pricing" Unfairly Uses Lower In-Network Pricing and Is Not "Market-Based"**

116. Zelis has compiled a "proprietary fee schedule," designated as its "Established Reimbursement Schedule (ERS)."[130] Zelis also calls this service its "Established Reimbursement Solution®."[131] Misleadingly, and fraudulently concealing the Zelis Conspiracy, Zelis refers to ERS as "Market-based Pricing."[132]

117. As explained by David Scanlan, Director of Claims at Allied National, Inc., a Commercial Payer:

> ERS is a Zelis fee schedule representing the market payment rates that providers typically accept as payment for services. ERS is a fee schedule product that has been in place since 2008. It is compiled using a combination of commercially available data sets, CMS/Medicare data, aggregated carrier based PPO rates, and known provider PPO contract rates. Commercial data used in the compilation of ERS include Truven and Milliman.[133]

But what Scanlon fails to disclose is that, similar to downward pricing bias issues in Ingenix, Zelis's ERS offering is partly made up of in-network "aggregated carrier based PPO rates, and known provider PPO contract rates," which, when used to pay ***out-of-***

---

[130] Scanlan Report, *Butler v. Unified Life Ins. Co*, No. 1:17-cv-00050 (D. Mont. Aug. 16, 2018), ECF No. 88-9 at 7.

[131] *Market-Based Pricing with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited May 16, 2025). Whether the service is called the "Established Reimbursement Schedule" or the "Established Reimbursement Solution®," the repriced amounts communicated to and amounts paid to Providers at issue in this matter here are not "reimbursements," but are payments for services performed by Providers. The use of "reimbursement" to characterize the payments at issue is a misleading and self-preserving misnomer. In any event, the assertion that a "reimbursement" for performance of OON healthcare services cannot be price-fixed is false.

[132] *Market-based Pricing with Zelis,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited May 16, 2025) ("At Zelis, we take a different approach to market-based pricing.").

[133] *Butler v. Unified Life Ins. Co*, No. 1:17-cv-00050 (D. Mont. Aug. 16, 2018), ECF No. 88-9 at 7-8.

*network* healthcare providers, make an improperly-pooled and downwardly-biased payment data set.[134] ERS is not a "market-based" pricing service, as Zelis misleadingly claims. Instead, it utilizes in-network rates to compensate for OON care. Use of the phrase "aggregated carrier" suggests that payment rates come from more than one Commercial Payer, which is consistent with (but does not reveal the existence of) the conspiracy alleged herein.

118. Scanlan also described what Zelis's ERS rates are used for and how often they are used:

> ERS is currently used by Zelis and its clients to price out-of-network/non-PPO claims at market-based rates to represent the reasonable and customary payment for services. Zelis prices more than 1 million claims per year using the ERS fee schedule and experiences more than 90% provider acceptance rate of the amounts allowed.[135]

Scanlan confirms that Zelis's "ERS is currently used . . . to price out-of-network/non-PPO claims," but fails to explain that ERS's use of "known provider PPO *contract* rates" means that its data set consists of improperly-pooled in-network-based data.[136]

119. Scanlan then described how CMS/Medicare payment rates are used and how ERS payment rates compare to those rates:

> Traditionally Medicare is not representative of a commercial plan's usual and customary payment. However, commercial plans often use a markup of Medicare (*i.e.*, Medicare plus 25% or 50%) as its rate. ERS on average yields a payment range as a percent of Medicare between 150% - 225%.[137]

By referencing Medicare prices in setting payment levels, Scanlan confirms that OON healthcare services can be discretely priced at lower in-network levels through use of ERS.

---

[134] *Id.*

[135] *Id.* at 8.

[136] *Id.* at 7-8 (emphasis added).

[137] *Id.* at 9.

120. Zelis's own Robert Jackson testified that "ERS is a proprietary fee schedule product offered by Zelis," which "uses—some of this is proprietary. It uses commercially available data sets that we purchase. It uses CMS or Medicare rate tables. We use our own claims data and PPO contracting data to build [a] market base[d] reimbursement schedule."[138] Zelis's Jackson testified that "[f]or clients that use the ERS product, we receive claims from those clients. And we will apply the fee schedule pricing contained within the ERS fee schedule to typically out-of-network claims."[139]  In addition, Mr. Jackson testified at deposition that ERS is made up of "PPO contracting data," which he confirms as the "typical[]" use of ERS for "out-of-network claims."[140]

121. Mr. Jackson further explained that Zelis's ERS product does not even "factor in" what healthcare providers charge for their services:

> Q:    Now, does Zelis' ERS fee schedule is based [sic] upon what providers agree to accept as opposed to what providers charge; is that accurate?
> A:    That is correct.
> Q:    Does the Zelis' ERS fee schedule even factor in what providers actually charge for the services?
> A:    No.[141]

In summary, ERS is not market-based, uses in-network contract pricing, and does not even consider the amounts charged by Providers.  If a "market" is comprised of both buyers and sellers, Zelis's description of its ERS repricing service as "market-based" is misleading, and provides further support for fraudulent concealment.

---

[138] *Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050 (D. Mont. Oct. 5, 2018), ECF 118-11, at 3 (Jackson Depo. at 9:25-10: 8).

[139] *Id.* (Jackson Depo. at 10:9-17).

[140] *Id.*

[141] *Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050 (D. Mont. Oct. 18, 2018), ECF 146-2 at 3 (Jackson Depo. at 19:17-19:23).

### 3. Zelis's RBP Service Is Collusively Determined

122. Beyond ERS, Zelis uses an"RBP" solution for repricing, which allows the Commercial Payer to base repricing amounts off of a reference, like Medicare prices.[142]

123. Zelis markets its RBP service offering as "[g]iv[ing] control back to your members by setting maximum reimbursement amounts using pre-defined prices to provide a controlled savings model."[143] Zelis further explains that its "Zelis Open Access Pricing®, a reference-based pricing (RBP) solution, sets maximum reimbursement amounts using pre-defined prices."[144] What Zelis doesn't disclose is that its RBP repricing service can set a collusively-determined payment ceiling for its horizontally competing members, which, when implemented, is a naked price fixing agreement, and one that need not use Zelis's algorithms or A.I. technologies to remain an unreasonable restraint of trade.

124. Zelis's Kaitlin Howard on April 27, 2023 explained that "[r]eference-based pricing sets a price limit on certain medical services based on a reference point, such as the Medicare reimbursement rate or the average cost of the service in a particular geographic area."[145] Zelis's Howard then provided a specific example of how RBP functions: "For example, the cost variance of an MRI might range between $800 - $4,000 (or more). But one could argue that the quality of the procedure and care provided is essentially the same. RBP eliminates the price variance with a

---

[142] *Unlock Savings with Member-Centric Reference Based Pricing*, Zelis https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited June 5, 2025).

[143] *Id.*

[144] *Id.*

[145] Kaitlin Howard, *Reference-Based Pricing (RBP): An overview*, Zelis (Apr. 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited June 5, 2025).

set amount . . . .”[146] “Bottom line: RBP gives the control back to members ***by setting maximum***
***reimbursement amounts using pre-defined prices*** to provide a controlled saving model.”[147] Ms.
Howard then observed that RBP's pre-defined pricing feature allows Zelis's "clients [to] save up
to 28% more than a traditional network plan and realize roughly 73% of savings on individual
health care claims."[148] What Howard doesn't disclose is that Zelis's repricing services
accommodate collusively-set and specifically-determined downwardly-adjusted pricing.

125. Citing a Rand Corporation report, Ms. Howard further bragged that "RBP could potentially
reduce healthcare spending by up to $9.4 billion per year **if it were widely adopted**."[149]

126. Even though no state of mind is required for violating Section 1 of the Sherman Act
(possibly other than the requisite state of mind for reaching an agreement), Zelis is crystal clear
about its "intent" concerning its involvement in working with others to set prices or price levels:
"***The intent is to provide an effective tool to help stabilize the healthcare claims costs.***"[150] Zelis
further hoped that implementation of its intent through its "effective tool to help stabilize the
healthcare claims costs" will "have a far reaching, ripple effect throughout the entire healthcare
industry."[151]

127. Zelis confirms the "inten[ded]" "effective[ness]" of its RBP repricing service, noting as
part of its "Key Points" that "2MM+ RBP claims [are] repriced annually"; that its RBP repricing
service has resulted in "97% retained savings"; and that it has "<4% member and provider inquiry

---

[146] *Id.*

[147] *Id.* (Emphasis added.)

[148] *Id.*

[149] *Id.* (Emphasis added.)

[150] *Id.* (Emphasis added.)

[151] *Id.*

rate."[152] Zelis further asserts its long-term experience in providing RBP services: "15 years providing RBP solutions."[153]

128. Whether using ERS or RBP, it appears that a specified percentage, amount, or ceiling included, for example, in the pertinent health insurance policy, can be accommodated and govern Zelis's repricing analysis. For example, no matter what Zelis calculates as the repriced payment amount via its ERS or RBP methodologies, such methodologies can accommodate and yield to an insurance policy's "Maximum Allowable Charge," or "MAC"—including a collusively-determined MAC amount.[154]

### 4. Even if Marketed Separately, Zelis Acknowledges That Its Pricing Services Operate or Can Be Operated Cohesively

129. Whether called "ERS," "Market-based," "Reference-Based Pricing," "RBP," "Zelis Open Access Pricing," "Maximum Allowable Charge," "MAC," "pre-defined," "price limit[ed]," "default," or "override" pricing, Zelis's repricing services function or can function electronically and automatically as a single service.

130. Zelis explains how its tools allow Commercial Payers to "[g]ain control over the rising cost of Out-of-Network (OON) claims with a dynamic optimization engine with customizable rules to *automatically route claims to recommended quality savings channels.*"[155] Within its

---

[152] *Unlock Savings with Member-Centric Reference Based Pricing*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 1, 2025).

[153] *Id*.

[154] *See, e.g., Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050 (D. Mont.), ECF Nos. 94-6, 100, 101-2, 155, 166.

[155] *Gain control of out-of-network costs with Zelis,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited Mar. 19, 2025) (emphasis added).

OON solutions discussion, Zelis explains that "[o]ur AI-powered optimization engine uses dynamic routing to examine every available saving channel to drive valued savings."[156]

131. Zelis's routing procedures confirm that its various repricing offerings actually or potentially operate as a single and "automatic[]" repricing service.[157]

## 5. Zelis's Communicated Repricing Amounts Are Not Mere Proposals, Recommendations, or Suggestions

132. Zelis's "repriced" payment amounts, whether communicated to the OON Provider by Zelis, communicated to the OON Provider directly by the Commercial Payer, or communicated to the OON Provider through a third-party information-sharing service, Zelis's repricing amounts are not mere proposals, recommendations, or suggestions.

133. The downwardly-adjusted payments, as repriced by Zelis, are the amounts that Zelis has determined should be paid to OON Providers and has determined to be owed by Commercial Payers, notwithstanding the amounts actually billed by Providers.

134. Zelis's downwardly adjusted payment amounts are based in a delegation of authority by Commercial Payers to their repricing agent, Zelis.  In derogation of Section 1 of the Sherman Act, Zelis's Commercial Payer customers abdicated their independent pricing roles and responsibilities, and delegated their pricing roles and responsibilities to Zelis.  For example, a director of Allied National, Inc. (a Commercial Payer) filed a "Rebuttal Report" with the District of Montana confirming that Zelis determines the repricing amount: "Zelis matches the claim to an eligibility

---

[156] *Id.*

[157] *Id.*

file provided by Allied. If a match is found, ***Zelis determines the reasonable and customary (R&C) charge for the medical service at issue.***"[158]

135. Commercial Payers delegate pricing authority for OON claims to Zelis and, accordingly, relinquish discretion over Zelis's OON repricing amounts as part of their repricing contracts with Zelis.[159]  Because Zelis's Commercial Payer customers have delegated pricing authority to Zelis, the repricing "recommendations" generated by Zelis's repricing tools are routinely offered to OON Providers without alteration by those Commercial Payers.  In the vast majority of repricings, the Commercial Payer authorizes Zelis to determine and present (or have the Commercial Payer or another third-party present) the repriced claim, and, if necessary, for Zelis to one-sidedly negotiate the OON claim on the Commercial Payer's behalf—automatically and in complete abdication of the Commercial Payer's pricing authority to Zelis (a horizontally-positioned competitor in the PPO Network space). Accordingly, even if a Commercial Payer deviates from the direction provided by Zelis or if Zelis characterizes its repricing amounts as mere "recommendations," "proposals," or "suggestions," a conspirator's retention of some discretion does not eliminate the possibility of a conspiracy.  However, abdication of pricing authority by horizontal competitors ***to another horizontal competitor*** itself violates Section 1 of the Sherman Act.  Moreover, as further discussed below, this agreement to abdicate its authority and responsibility over pricing to Zelis deprives Providers of the benefits of having multiple independent centers of decision-making available in additional violation of the Sherman Act.[160]

---

[158] *Butler v. Unified Life Ins. Co.*, 1:17-cv-00050 (D. Mont. Sept. 5, 2018), ECF 101-5 (Scanlan Rebuttal Report), at 1 (emphasis added).

[159] *Id.*

[160] *See American Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 195 (2010); *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984).

136. Zelis boasts on its website that Commercial Payers retain Zelis's "repricing" amounts approximately "97%" of the time for its ERS product by Providers.[161] These high, so-called "retention" or "acceptance" rates do not constitute Provider satisfaction with the repriced amounts; rather, these rates result from both the widespread participation (including by some 770 health insurers) in the Zelis Conspiracy and the reality that Providers would have to spend significant administrative time and expense to challenge the repriced amount with no likely improvement in the amount offered by the Payer and only further delay in payment.

137. Of particular importance in this matter is Zelis's capacity to deny OON Providers their ability and their right under the Sherman Act to compare the independently-determined competitive OON payment rates of various Commercial Payers. As Judge Lasnick explained in *Duffy v. Yardi Sys., Inc.*, No. 2:23-cv-01391 (W.D. Wash. Dec. 4, 2024), at ECF 187:

> The fact that lessor defendants did not meet as a group but rather used an intermediary . . . , to compile their commercially sensitive data and calculate [in that case] the supracompetitive rental rate each participant would utilize does not preclude the existence of an agreement or change its unlawful nature. As former Federal Trade Commission chair Maureen Ohlhausen explained, a "group of competitors subcontracting their pricing decisions to a common, outside agent that provides algorithmic pricing services" amounts to a "hub-and-spoke conspiracy." Dkt. #113 at ¶ 29. This is so "because the same outside vendor now has confidential price strategy information from multiple competitors, [and] it can program its algorithm to maximize [or minimize as is issue in Zelis] industry-wide pricing" even if "the firms themselves don't directly share their pricing strategies" with each other. *Id.* Competitors act in concert for purposes of a Section 1 claim when their conduct "joins together separate decisionmakers," such that their agreement "deprives the market place of independent centers of decisionmaking." *Am*[erican] *Needle,* [*Inc. v. Nat'l Football League*], 560 U.S. [183,] at 195 [(2010)]. That is exactly what plaintiffs allege here.

---

[161] *Unlock Savings with Member-Centric Reference Based Pricing*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 1, 2025).

*Id.* at 9-10. Consequently, Judge Lasnick "f[ou]nd[] that plaintiffs have plausibly alleged a conspiracy in violation of § 1 of the Sherman Act." *Id*. at 10.  This same deprivation of independent decision-making centers is at issue in the Zelis Conspiracy alleged here. A communicated repricing of an OON Provider's submitted claim – even if ostensibly characterized as an "attached proposal" – does not immunize from antitrust liability the Commercial Payers who have "'join[ed] together separate decisionmakers.'"  *Id.* at 9 (citation omitted). Rather, because of the Commercial Payers' widespread delegation of their otherwise independent pricing authority and responsibility and the widespread adoption of Zelis's tools, technologies, and methodologies, Providers have no reasonably available or practical alternatives and virtually no negotiation leverage from which to improve payments for repriced claims.

### 6.   Zelis's Post-Repricing Claims Negotiation and Appeals Process Is Effectively Non-Existent

138.  While Zelis touts a Provider's ability to appeal the amount of Zelis's repriced OON service invoice, the reality is that the amount offered is essentially a "take-it-or-leave-it" proposition for the Provider.

139.  With respect to its "Out-of-Network claims" solutions, Zelis claims to provide "Expert Negotiations," which it characterizes as the ability to "[b]lend human expertise and advanced technology to deliver high quality savings by identifying the right claims for negotiation after services have been rendered."[162] Zelis also claims to have "25 years' experience with provider negotiation, contracting and settlement."[163]

---

[162]  *Claims Negotiations with Zelis*, Zelis,  https://www.zelis.com/solutions/out-of-network-solutions/out-of-network-claims/ (last visited Mar. 19, 2025).

[163]  *Unlock Savings with Member-Centric Reference Based Pricing*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 1, 2025).

140. Zelis shows that its "Claims Negotiations" result in even greater "savings" for the payer-client: "We use advanced technology to identify eligible claims, averaging 60+% savings *from negotiations*."[164]  Zelis's negotiations generate additional downward pricing for the benefit of Commercial Payers and against the interests of OON Providers.

141. To the extent that a Provider objects to the Commercial Payers about the repriced payment amounts, otherwise responsible Commercial Payers enforce Zelis's pricing determinations and evade upward adjustments by referring objecting Providers back to Zelis, who, just like the Commercial Payers themselves, has a financial incentive to keep payments owed to Providers low.[165]

### D.  The Relevant Geographic and Service Markets at Issue

#### 1.  Relevant Market Definition, Generally

142. Price-fixing under Section 1 of the Sherman Act requires no demonstration of market, monopoly, or monopsony power.  However, to the extent that a viable price-fixing violation depends in part on a demonstration of a market in which the goods or services at issue are bought or sold, Plaintiffs here present a market definition upon which to base suitable and plausible allegations of a price-fixing conspiracy.  Plaintiffs define the applicable product and geographic market, as follows.

---

[164] *Claims Negotiations with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/out-of-network-claims/ (last visited Mar. 19, 2025) (emphasis added).

[165] *Id.* ("Our team of highly skilled negotiators work collaboratively in a pre- and post-payment scenario . . . ."; "While some claims may be negotiated automatically, others are routed to our skilled and tenured team.").

## 2. Relevant Geographic Market

143. As the Zelis Conspiracy is a nationwide scheme, the relevant geographic market here is composed of all fifty States of the United States, the District of Columbia, and all U.S. territories where Providers are paid for OON healthcare services by Commercial Payers.

144. A nationwide market is particularly appropriate here, as the market at issue concerns the performance of out-of-network healthcare services. As Preferred Provider Organizations ("PPOs"), which are specifically at issue in this litigation, routinely allow for "coverage" of out-of-network healthcare services, such PPO policies are especially beneficial for members/patients who regularly travel for work, education, or leisure. As such members/patients can be expected to be outside of any specific PPO network based on travel, PPOs make for an apt healthcare choice.

145. According to the benefits manager, Thatch, "[a] PPO offers greater flexibility, allowing you to see both in-network and out-of-network providers without referrals – ideal for those who travel frequently or need access to specialists outside their network."[166]

146. A nationwide market is also appropriate in this matter as at least one of the named plaintiffs "render[s] care across the continuum, including in acute care hospitals, skilled nursing facilities, and clinics," involving at least 22 locations.[167] Such locations include significant regional hospitals, including California Pacific Medical Center, Van Ness (San Francisco, California), California Pacific Medical Center, Davies (San Francisco, California), California Pacific Medical Center, Mission Bernal (San Francisco, California), Novato Community Hospital (Novato,

---

[166] *EPO vs. PPO: Which health plan is right for your business?,* Thatch (March 27, 2025), https://thatch.ai/blog/epo-vs-ppo (last visited June 6, 2025) (And: "PPO plans are best suited for individuals who: travel often and need access to providers across different locations").

[167] *Delivering high quality and integrated care across Northern California,* Pacific Inpatient Medical Group, https://www.pacificmedicalgroup.org (last visited June 5, 2025).

California), and Santa Rosa Regional Hospital (San Francisco, California).[168]  It can be expected that PIMG health practitioners, including its team of hospitalists, have treated and will treat in the future patients who reside out-of-state who subscribe to a PPO, but where PIMG is not part of that patient's PPO's provider network.

147. Finally, as discussed in relation to interstate commerce above, the very nature of the relationship between and among the Commercial Payers, Zelis as a repricer, and patients receiving out-of-network healthcare is highly likely to involve finances and care traveling across state lines.

148. Accordingly, a market defined on a nationwide basis, including as to all fifty states, the District of Columbia, and U.S. territories, is appropriate in this matter.

### 3. Relevant Service Market

149.  The relevant service market at issue is the market for OON healthcare services as sold by out-of-network Providers and as purchased by Commercial Payers, including those available for purchase by health insurance companies, managed care organizations, third-party administrators, self-funded plans, and self-insured entities.

150. A relevant product market under the Sherman Act is composed of commodities, including services, that are reasonably interchangeable by consumers for the same purposes. A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are not likely to shift promptly to offer a defendant's customers a suitably proximate (in both product and geographic terms) alternative. Boundaries of that product or service market are determined by the reasonable interchangeability of use or cross-elasticity of demand between the product and substitutes for it.

---

[168] *Where We Are:  Services and Locations:  Hospital Medicine*, Pacific Inpatient Medical Group, https://www.pacificmedicalgroup.org (last visited June 5, 2025).

151. A "relevant product market" can consist of services (a "service market"), as alleged herein. The market at issue in this matter is made up of healthcare-related services performed on an out-of-network basis for purchase by Commercial Payers.

152. A market based on a "cluster" or "bundle" of services is also appropriate here. The market at issue in this matter is made up of a "cluster" or "bundle" of healthcare-related services performed on an out-of-network basis for purchase by Commercial Payers.

153. In the context of Clayton Act enforcement, the Supreme Court determined that a "cluster" of services can support a product or service market definition:

> We have no difficulty in determining the "line of commerce'" (relevant product or services market) and "section of the country" (relevant geographical market) in which to appraise probable competitive effects of appellees' proposed merger. We agree with the District Court that the cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term "commercial banking," *see* note 5, *supra*, composes a distinct line of commerce…. In sum, it is clear that commercial banking is a market "sufficiently inclusive to be meaningful in terms of trade realities.[169]

Or course, "even if not separately interchangeable," healthcare-related services "can be 'clustered' [or bundled] together" as part of a relevant service market, so long as the "'cluster' [or bundle] is itself an object of consumer demand,'" which is the situation in the medical and dental services context here.[170]

---

[169] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 356 (1963) (footnotes and internal quotation citation); *See also United States v. Phillipsburg Nat'l Bank & Trust Co.*, 399 U.S. 350, 361 (1970) ("the cluster of products and services termed commercial banking has economic significance well beyond the various products and services involved.") (footnote omitted).

[170] *See In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-CV-06795 (N.D. Ill. June 3, 2025), ECF 428, at 21-22 (citing *FTC v. Adoc, Health Care Network*, 841 F. 3d 460, 467-468 (7th Cir. 2016); *Green Country Food Mkt., Inc. v. Bottling Grp.*, 371 F. 3d 1275, 1284-85 (10th Cir. 2004)); *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC,* 950 F. 3d 911, 918 (7th Cir. 2020); *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 640 (N.D. Ill. 2020)).

154. The market at issue is a market for out-of-network healthcare services as sold by Providers and as purchased by Commercial Payers (defined herein), sometimes referred to herein as the "OON Commercial Payer Market."  As previously demonstrated with respect to Zelis, both Zelis and its Commercial Payer clients, including Commercial Payer Defendants and Commercial Payer co-conspirators, participate in this market (the OON Commercial Payer Market) by purchasing out-of-network healthcare services as sold by Providers.

155. Moreover, the Defendants' use of the term "reimbursement" is self-serving and inaccurate. As previously discussed, the Providers performing out-of-network healthcare services have ***not*** paid something out of their own pocket and are seeking to receive "reimbursement" for their out-of-pocket expense.  Rather, just like the normal context of charging a fee for a service, Providers are waiting for payment from the Commercial Payers ***in the first instance.***  Defendants, including the Commercial Payer Defendants and Zelis through one or more of its PPOs, ***pay*** for Providers' OON healthcare services.

156. Zelis and other industry participants have treated the market for OON healthcare services as sold by Providers and as purchased by Commercial Payers as a distinguishable and supportable market for purposes of defining a relevant product or relevant service market.

157. The OON Commercial Payer Market is a market involving private, commercial insurers and other types of private Commercial Payers, including managed care organizations, third party administrators, self-funded entities, and self-insured entities. It is distinguishable from the general OON healthcare services market, which includes governmental and charitable institution payers who pay for out-of-network services. The OON Commercial Payer market is also distinguishable from the in-network Commercial Payer market, where the services at issue are performed based on agreements entered into between the Commercial Payer and the healthcare service Provider.

158. The OON Commercial Payer Market is also a separate, distinguishable market from the general private commercial insurance market, which includes both OON healthcare services and the payment of in-network healthcare services. Such private, in-network healthcare services are often paid by Commercial Payers as part of health insurance plans with a designated provider network, often referred to herein as a "PPO Network" or "PPO."

159. The OON Commercial Payer Market at issue here is comprised of a "bundle" or a "cluster" of healthcare products and services. Once a patient is admitted into a hospital, but also when receiving treatment in an office or clinic setting or when visiting the dentist or oral surgeon, that patient might undergo a variety of tests and procedures, sometimes in combination, which would not be practical or reasonable to negotiate on a test-by-test, on a procedure-by-procedure, or on an in-combination basis. Further, such diagnostic-steps and/or treatments might need to be applied serially, in a specific sequence, or within a specific timeframe, rendering it virtually or actually impossible for a patient to "negotiate" such tests and/or procedures on a service-by-service basis. Moreover, the member/patient is often in a compromised position (especially, but not limited to, the emergency context), and likely has little to no ability to engage in a considered negotiation over the price of healthcare services. Accordingly, a cluster or bundle-based product or service market is appropriate in this matter.

160. Practical indicia support the OON Commercial Payer Market, as defined herein, including indicia based on peculiar characteristics and uses of the services at issue, the services' distinct prices, and industry or public recognition of the services as a distinct market.

161. With respect to the practical indicia of the relevant services' peculiar characteristics and uses, in support of the defined relevant service market at issue, in-network healthcare services are not reasonably interchangeable with OON healthcare services. For a particular healthcare service

rendered by a particular healthcare practitioner, in order to convert from an out-of-network service to an in-network service, at least the following would have to occur: (1) that healthcare practitioner providing a specific OON healthcare service must agree to perform the same healthcare service for a particular PPO network; (2) that PPO Network must agree to accept that Provider into its network of accepted healthcare practitioners; (3) that PPO Network must cover the test or procedure at issue; and (4) there must be a patient who is a subscriber to that PPO Network willing to undergo that procedure (emergencies notwithstanding) within the confines and constraints associated with the Commercial Payer's network. Three separate parties must agree to have that healthcare service performed under the constraints required by the PPO Network.

162. Also supporting the separate and distinct nature of the OON Commercial Payer Market, a patient's decision to use OON healthcare services is often based on the ***unavailability*** of the procedure within that patient's (previously-subscribed-to) PPO Network. As patients are usually better off financially when using in-network healthcare services, a patient deciding to "go out-of-network" is often basing this decision on her or his PPO Network ***not providing*** network-based access to a particular Provider or a particular healthcare service at issue.

163. As discussed in a March 31, 2024 MedCentral nationwide survey of 713 commercial plan enrollees, for "General Health care" patients (as opposed to "Mental Health Care" patients), 24% of patients cited the reason that "Providers were not taking new patients," and 22% of patients cited the reason of "Inaccurate in-network provider directories" for why they sought out-of-

network healthcare services.[171]  "General Health Care" patients simply could not access services or Providers through their PPO Network—*even when they wanted to do so*.[172]

164. As listed by the Patient Advocate Foundation ("PAF"), there are various circumstances where a patient might seek OON healthcare services, including for "Emergencies," "Distance Issues," "Specialist Care," and "Out-of-Town Care."[173] PAF noted specifically that "[i]f you have a rare condition, specialists can be limited, so out-of-network care may be your only option.  Or if your treating specialist leaves your insurance network, you may choose to continue that care by going out-of-network."[174]

165.  As access to a certain Provider or medical procedure is often simply unavailable within a particular PPO Network, in-network healthcare services and OON healthcare services cannot be considered to be reasonably interchangeable.

166. Distinct pricing is also a practical indicator supportive of the asserted market here.  With respect to distinct pricing at issue in the relevant market, prices for out-of-network healthcare services are often significantly different from in-network prices.   That is, they are often significantly more expensive than comparable in-network healthcare services.  As noted by Aetna,

---

[171] *See Top Reasons Patients Go Out of Network*, Med Central (Mar. 31, 2024), https://www.medcentral.com/biz-policy/top-reasons-patients-go-out-of-network (last visited Aug. 23, 2024).

[172] *Id.*

[173] *The Ins and Outs of Seeking Out-of-Network Care*, Patient Advocate Foundation, https://www.patientadvocate.org/wp-content/uploads/EP-Seeking-Out-of-Network-Care.pdf#:~:text=Going%20out%2Dof%2Dnetwork%20means%20you're%20visiting%20a%20provider,coverage%20at%20all%20from%20your%20insurance%20provider (last visited Mar. 19, 2025).

[174] *Id.*

"Out-of-network rates are higher:  An out-of-network doctor sets the rate to charge you.  It's usually higher than the amount your Aetna plan 'recognizes' or 'allows.'"[175]

167. Even if the services at issue are the same whether provided on an in-network or out-of-network basis, as the Defendants themselves regard them as distinct markets (discussed *infra*) and as the services are distinctly-priced and subject to different benefit levels, out-of-network healthcare services are not reasonably interchangeable with in-network services "due to their substantially different rates."[176]  Zelis, through its PPO Network, the HFN, LLC "HFN20 Network," specifically segregates the markets on this very basis:  "To qualify for HFN 20, a plan must have at least a 20% difference between in-network and out-of-network benefits."[177]

168. The Defendants' and other industry participants' treatment of the asserted market as a separate market provides additional practical indicia supportive of the view that out-of-network healthcare services reside in a market distinct from in-network healthcare services.  Zelis treats the OON Commercial Payer Market as a separate, distinguishable market. For example, within its website under "Solutions," Zelis specifically separates out its "In-Network Pricing" offerings from its "Out-of-Network Solutions" as distinct areas concerning Zelis's "purpose-built solutions."[178]

169. Moreover, others, including David C. Lewis, Principal of Milliman (at least previously one of the suppliers of healthcare-related data to Zelis), have recognized the relationship between

---

[175] *Network and out-of-network care*, Aetna, https://www.aetna.com/individuals-families/using-your-aetna-benefits/network-out-of-network-care.html (last visited Jun. 6, 2025).

[176] *In re MultiPlan Health Ins. Provider Litig.,* No. 1:24-cv-06795 (N.D. Ill. Jun. 3, 2025), ECF 428, at 25; *see also id,* generally, at 24-26.

[177] *See, e.g., HFN20 Network,* HFN, https://hfnllc.com/products-group-hfn20.htm (last visited June 6, 2025).

[178] *Bringing flow to the healthcare financial system,* Zelis, https://www.zelis.com (drop-down menu for "Solutions") (last visited May 14, 2025) ("One partner to address the most abrasive aspects of the healthcare financial experience with purpose-built solutions.").

Commercial Payers and OON healthcare service Providers to be a "market."[179]  For example, Milliman's Lewis authored a "white paper," titled, "The changing landscape of out-of-network reimbursement."[180]  This "Milliman White Paper" repeatedly described the relationship between Commercial Payers and OON Providers as a "market."[181]

170. For example, confirming the control of OON costs as an overall component of a Commercial Payer's overall insurance venture, Mr. Lewis noted that:

> "Commercial out-of-network (OON) provider reimbursement is a topic of great debate in healthcare. Changes on both the payer and provider sides have produced a large disparity **in the OON payment levels** pursued by each. Payers seek ways to limit growth in OON costs while providers look to maintain revenue **in a market** with increasing pressure to accept lower payments."[182]

171. Milliman's Mr. Lewis noted that there are various perspectives with which Commercial Payers pay OON healthcare service Providers.  Mr. Lewis referred repeatedly to the OON Commercial Payer Market as a separate and distinct "market."  For example, Lewis lists the "U&C Market Standard," explaining that "[f]or many years, **the market standard for OON provider reimbursement** was to determine a usual and custom[ary] (U&C) level to pay based on the market."[183]  Milliman's Lewis also lists the "Pay At A Percentage of Medicare" market standard, explaining that with respect to the "Pay At A Percentage of Medicare[,] **[m]any payers are redefining OON reimbursement** as a multiple of Medicare allowable reimbursement.[184]  This

---

[179] David C. Lewis, *The changing landscape of out-of-network reimbursement*, Milliman (Sept. 2018),                  https://edge.sitecorecloud.io/millimaninc5660-milliman6442-prod27d5-0001/media/Milliman/importedfiles/uploadedFiles/insight/2018/changing-landscape-oon-reimbursement.pdf at 1 (last visited Mar. 19, 2025).

[180] *Id*.

[181] *Id*.

[182] *Id*. (emphases added).

[183] *Id*. (Emphasis added.)

[184] *Id*. (Emphases added.)

practice is already common in commercial contracting and benchmarking, and has the advantages of . . . ***setting the reimbursement relationship between services more consistently with the market*** . . . ."[185]  Lewis further lists the "Pay At In-Network Levels" market standard, explaining the use of In-Network payment levels to reference payments made in the OON Commercial Payer Market: "<u>**Pay At In-Network Levels**</u>: This approach sets ***OON reimbursement*** at a payer's in-network reimbursement levels ***for a market***, where the in-network levels may be determined as an average for providers ***in the market***, or as a standard base schedule."[186]  And: "Whatever form of ***OON reimbursement*** approach is used, it is recommended that a payer benchmark its reimbursement levels ***to the market*** to assess its position . . . ."[187]  As treated by a major healthcare data supplier used by Zelis, "OON reimbursement" is a distinct market from the in-network "reimbursement" market.

172. Zelis, Commercial Payers, and at least one of Zelis's data brokers have treated the OON Commercial Payer Market as a separate, distinguishable market from the in-network market.  The OON Commercial Payer Market is a plausibly and sufficiently distinct market, in which Defendants violated Section 1 of the Sherman Act .

**E. Through Its Agreements and Relationships with Commercial Payers, Zelis Has Market Power and Monopsony Power in The Relevant Market**

173.  There is no requirement that a plaintiff assert that Defendants possess market, monopoly, or monopsony power in order to adequately and properly allege a violation of Section 1 of the Sherman Act.  However, Zelis and the Commercial Payer Defendants jointly possess market power and monopsony power, as follows.

---

[185] *Id*. (Emphasis added.)

[186] *Id*. (Emphases added.)

[187] *Id*. (Emphases added.)

174. Zelis asserts that it "works for 770 health insurance companies, ranging from national carriers and dental plans, to BCBS and regional plans, to third-party administrators."[188] Zelis further emphasizes that "Zelis is built for all payers" and lists as part of its "Key Points" that it participates in "$220B annual payment volume."[189]

175. According to the National Association of Insurance Commissioners ("NAIC") U.S. Health Insurance Industry 2023 Annual Results, "[t]he number of health insurers filing the health statement type with the NAIC increased to 1,176 from 1,165 in 2022."[190]

176. Based on 1,176 entities who "fil[e] the health statement type with the NAIC," Zelis participates in at least 65.5% of the OON Commercial Payer Market on a number-of-entities basis.[191] However, based on asymmetrical financial strength and size among Commercial Payers, as well as significant consolidation in the health insurance company industry, Zelis is likely to have a substantially larger market share percentage.

177. According to an August 13, 2024 press release ("Zelis Named to Inc. 5000 List of Fastest-Growing Companies"), Zelis maintains a "platform [that] serves more than 750 payers, ***including the top 5 national health plans***, BCBS insurers, regional health plans, TPAs and self-insured employers."[192]

---

[188] *Your success is our succes*s, Zelis, https://www.zelis.com/built for/ (last visited Mar. 19, 2025).

[189] *Zelis for Property & Casualty*, Zelis, https://www.zelis.com/built-for/payers/property-and-casualty-plans/ (last visited May 1, 2025).

[190] *U.S. Health Insurance Industry Analysis Report*, NAIC (Dec. 2023), https://content.naic.org/sites/default/files/topics-industry-snapshot-analysis-reports-2023-annual-report-health.pdf at 1 (last visited Mar. 19, 2025).

[191] *Id.*

[192] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited Mar. 21, 2025) (emphasis added).

178.  Correspondingly, according to a May 1, 2024 AAMC [American Association of Medical Colleges] Research and Action Institute analysis, there continues to be significant insurer consolidation, giving rise to "concern among policymakers about increasing consolidation in the U.S. health care system."[193]  According to the AAMC, ***"[o]verall, our data show that . . . the top three large-group insurers hold an average of 82.2% of the market share in each state.***" (emphasis in original).[194]  As interpreted by the American Hospital Association, this study indicates that "[t]he top three large-group insurers control an average of 82.2% of the market share in each state . . . ."[195]

179. Based on its business relationships with "the top 5 national health plans" and Zelis's available transaction-related data, it is reasonable to conclude that Defendants' market share in the OON Commercial Payer Market is significantly above 65.5%, and likely above 82.2%.[196]

180.  On a transaction basis, Zelis explains on its website that its payments platform, "ZAPP," which stands for "Zelis Advanced Payments Platform," "supports all payment modalities . . . and communications," and which "delivers payments to 850k+ providers," "delivers more than $285B in payments to providers" and "processes 225M payment transactions annually."[197]  Zelis notes

---

[193] *See* Atul Grover, MD, PhD, *et al.*, *Why Market Power Matters for Patients, Insurers, and Hospitals,* AAMC (May 1, 2024), https://www.aamcresearchinstitute.org/our-work/data-snapshot/why-market-power-matters (last visited Mar. 19, 2025).

[194] *Id*.

[195] *AAMC study examines the impact of health care consolidation in state,* American Hospital Association (May 1, 2024), https://www.aha.org/news/headline/2024-05-01-aamc-study-examines-impact-health-care-consolidation-states (last visited Mar. 19, 2025).

[196] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies*, Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited May 7, 2025).

[197] *Modernize your healthcare payments & communications*, Zelis, https://www.zelis.com/solutions/payments-optimization/ (last visited May 2, 2025);

that it is responsible for "$100B claims priced annually," "$220B payments processed annually," resulting in $27B claims cost savings."[198] Zelis has also asserted that it "delivered" "800 million claims communications . . . ."[199]

### F. OON Payments Made by Commercial Payers to Providers Can Be Price-Fixed and Collusively Suppressed

181. With respect to the OON Commercial Payer Market, the Commercial Payers purchase healthcare services from OON Providers. On the sales side of the transaction, Providers are healthcare practitioners who sell their performance of OON healthcare services to those Commercial Payers.

182. The private commercial health insurance market, in general, encompasses three sets of transactions: The first set of transactions concerns individuals or employers who enter into subscription agreements with Commercial Payers, including health insurers. The second set of transactions concerns individuals (patients) entering into healthcare service-related agreements with Providers, including hospitals, doctor's offices, and clinics, dentists, and oral surgeons, among others. The third set of transactions concerns partial or full payments made by Commercial Payers to those healthcare service Providers for insureds' claims. There is no dispute that Commercial Payers have a legal obligation to pay for the Providers' delivery of OON healthcare services to the Payers' insureds based on the "Greatest of Three" rule in the emergency context or

---

*Reduce payment complexity with ZAPP for Member Disbursements*, Zelis, https://www.zelis.com/solutions/payments-optimization/member-disbursements/ (last visited May 2, 2025).

[198] *Zelis for Property & Casualty*, Zelis, https://www.zelis.com/built-for/payers/property-and-casualty-plans/ (last visited May 1, 2025).

[199] *Zelis Launches Platform for Healthcare Payments, Communications*, PYMNTS, https://www.pymnts.com/healthcare/2024/zelis-launches-platform-for-healthcare-payments-communications/ (last visited May 2, 2025).

in accordance with the terms of the policyholder's health insurance policy in the non-emergency context.    The third set of transactions (payments to Providers) is a necessary part of the Commercial Payers' overall insurance-business venture.

183. As part of this third set of transactions, doctors enter into the practice of medicine after years of extensive and expensive training to, at least in part, obtain a delayed, but professionally incentivizing, financial reward.  That is, doctors and other medical practitioners devote years of study, training, and significant incursion of both real and opportunity costs to enter a possibly lucrative market that concerns the provision of healthcare services *for payment*, as often purchased by Commercial Payers.

184. This third set of transactions can be further broken down, as follows: payments paid to Providers for "in-network" healthcare services; and payments paid to Providers for OON healthcare services.

185. Commercial Payers seek to maximize the number and amount of premiums and other fees paid to them by insureds, while minimizing the OON obligations they have to pay their insureds' OON Providers. Based on its compensation structure, Zelis also seeks to minimize payments made to healthcare Providers performing OON healthcare services.

186. Even if part of a broader health insurance scheme or series of transactions, OON healthcare services can be considered to be stand-alone products or services and thus the amount of payments for such services constitute a "price" in any relevant product or services market for purposes of antitrust law. OON services can be price-fixed or collusively suppressed.  However, they remain a properly-defined relevant market even if not considered to be "stand-alone."

187. Moreover, it is of no importance that the Commercial Payer does not directly use or directly benefit from the healthcare service at issue.  Defendants' position is similar to the parent  where

"parents who buy a chocolate bar for a child" remain "in the market for chocolate bars"—even though "only the child consumes the chocolate."[200]  From an antitrust perspective, there is no requirement "that a purchaser must use the product being purchased to be in the market for that product."[201]

188. In any event, by providing coverage for OON healthcare services, for which the Commercial Payer charges premiums and possibly other fees, the Commercial Payer *does* benefit financially from paying for such OON healthcare services.  Even if a corporate entity does not enjoy improved physical health from the OON healthcare services at issue, it derives financial benefits from providing such OON coverage.

189. Commercial Payers participate in the OON Commercial Payer market every time they make a payment to a Provider for performing OON healthcare services.  It makes no difference when the service was provided or when the payment was made.  Even if the Commercial Payers did not negotiate with the Providers prior to the rendering of their services, the timing or chronology of the performance of the OON healthcare services in comparison to when payment is received does not insulate the Commercial Payers from participating in the OON Commercial Payer Market.  For example, should a Commercial Payer decide to pay more generously for OON healthcare services compared to its competition, then it is likely that Providers would readily seek to supply services to that payer's members, which would correspondingly likely allow that payer

---

[200] *See In re MultiPlan health Ins. Provider Litig.*, No. 1:24-cv-06795 (N.D. Ill. June 3, 2025), ECF 428 at 19 (discussing how an argument trying to deny the Commercial Payers' participation in the market is an "absurdity" that "simply highlights the recognized 'reality of the health services financing market' that third-party payors are the purchasers for out-of-network healthcare services, whether or not the payor is considered the recipient of those services.") (citation omitted).

[201] *In re MultiPlan health Ins. Provider Litig.*, No. 1:24-cv-06795 (N.D. Ill. June 3, 2025), ECF 428 at 19.

to gain additional customers or charge more for servicing those customers (or both).  On the other hand, "if providers realize that a third-party payor pays too-low, noncompetitive rates for out-of-network services, providers will stop accepting patients who utilize that payor."[202]  Irrespective of the timing of the Providers' service (or the characterization of payments made to Providers), "third-party payors compete with other third-party payors for out-of-network services . . .  even if providers cannot choose between payors once a patient/subscriber receives treatment."[203]

190. Zelis's repriced amounts are applied by the Commercial Payers through Zelis to all or nearly all medical and dental services performed on an OON basis, regardless of the specific test or procedure involved.  Zelis's algorithmic, artificial intelligence, machine learning, and other repricing methodologies and services calculate repriced amounts in a similar manner, including using all of Zelis's available repricing services cohesively.[204]  Moreover, the Commercial Payers purchase on a broad basis a variety of OON healthcare services, specifically so that their respective PPOs or other offerings can market themselves as providing OON healthcare coverage.

191. The performance of OON healthcare services for payment is a discrete product or service, which certainly be price fixed.  For example, Zelis's repricing communications specify "repriced" OON payment *amounts* and include prohibitions against balance billing for the unpaid difference for specific tests and treatments.  Also, the repricing communications specify, for example, the "Patient ID," the "Patient Name," the "Date(s) of Service," the "Claim ID," the "Provider," and

---

[202] *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-06795 (N.D. Ill. June 3, 2025), ECF 428 at 20.

[203] *Id.*

[204] *See, e.g., Gain control of out-of-network costs with Zelis®,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited Jun. 6, 2025) ("Gain control over the rising cost of Out-of-Network (OON) claims with a dynamic optimization engine with customizable rules to automatically route claims to recommended quality savings channels.").

the "Total Billed Amount."  Also, through Zelis's repricing calculations and pricing services, including its "ERS" and "RBP" repricing methodologies, Zelis clearly determines and applies discrete price amounts, percentages, and ceilings for payments to Providers performing specific OON healthcare services.

192. Second, the U.S. government demonstrates that such services can be "discrete[ly]" priced. As part of its "RBP" service, Zelis relies on the U.S. government's Centers for Medicare & Medicaid Services ("CMS") for prices Zelis in turn uses as references to then reprice OON claims.[205] Confirming the ability to price healthcare services discretely, the CMS establishes Medicare prices for healthcare services, as listed within its "Physician Fee Schedule."[206]

193. CMS/Medicare payment amounts, which are presumptively owed to healthcare practitioners serving Medicare patients, are determined by the federal government's CMS , based on rate recommendations by the American Medical Association/Specialty Society Relative Value Scale Update Committee ("AMA/RUC"), and are not determined through the usual operation of a competitive or market-driven process.  Instead of letting market forces set prices, CMS uses the "Resource-Based Relative Value Scale," which establishes relative values based on resource costs. Further, CMS assigns a Current Procedural Terminology ("CPT") code for over 10,000 healthcare services.  The CPT coding system was created in 1966 by the AMA, who owns copyright to the CPT coding guidelines.  The CPT coding system was developed to be "a standardized way to describe healthcare services in medical records, insurance claims, and research."  In addition, these

---

[205] *Unlock Savings with Member-Centric Reference Based Pricing*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 2, 2025).

[206] *Physician Fee Schedule,* CMS.gov, https://www.cms.gov/medicare/payment/fee-schedules/physician (last visited May 14, 2025).

Medicare amounts are not necessarily paid by the patients themselves. Rather, as Medicare makes full or partial payment, in either situation Medicare pays the majority share of the cost of healthcare for Medicare patients.[207]  In other words, the paramount financial relationship at issue is between the federal government as purchaser and the healthcare practitioner as seller.

194. The U.S. government establishes, in part through the use of the AMA's CPT coding system, discrete, procedure-based pricing for over 10,000 procedures where the U.S. government is the "payer" and the Provider is the "seller."[208]  Such pricing is then often used as a "reference" by repricers, including by Zelis.[209] The notion that OON healthcare procedures cannot be price-fixed, when repricers and Commercial Payers specifically rely on CMS's discretely-determined pricing (through use of the AMA's CPT coding system) to then "reprice" these very same procedures based on some percentage or multiple of CMS's procedure-based prices, is untenable.

195. Commercial Payers, not *patients,* are the purchasers of health services from the patients' OON Providers and have the obligation to pay for them.  Anti-balance billing laws and contractual prohibitions (as mandated by Defendants' own repricing communications) reject the notion that "patients . . . have the obligation to pay for" the Providers' healthcare services.  Also, in the private, commercial health insurance context here, the Commercial Payer is the first one to decide how much of the claim it will pay of the charge issued by the OON Provider (in comparison to other

---

[207] John O'Shea, Elise Amez-Droz, Kofi Ampaabeng, *The Medicare Physician Fee Schedule: Overview, Influence on Healthcare Spending, and Policy Options to Fix the Current Payment System,* Mercatus Center: George Mason University (May 24, 2023), https://www.mercatus.org/research/policy-briefs/medicare-physician-fee-schedule-overview-influence-healthcare-spending-and (last visited May 14, 2025).

[208] *Id.*

[209] Kaitlin Howard, *Debunking Common Reference-Based Pricing (RBP) Misconceptions,* Zelis (May 30, 2023), https://www.zelis.com/blog/debunking-common-rbp-misconceptions/ ("Providers are paid using the fair and transparent RBP reimbursement model, which is based on Medicare.") (last visited May 14, 2025).

potential payers). Just like in the Medicare payment context, the paramount relationship at issue is the practical and obvious one existing between the Commercial Payer as purchaser and the OON Provider as seller.

196. Prices for OON healthcare services can be discretely determined and are subject to price-fixing and collusive suppression efforts and are within the reach of the Sherman Act.

### G. Anti-Competitive Acts and The Contours of The Zelis Conspiracy

#### 1. Zelis, the Commercial Payer Defendants, and Their Co-Conspirators Have Formed, Executed, and Enforced an Information Sharing, Price Fixing, OON Payment Suppression, and Payer-Camouflaging Conspiracy

197. Zelis and the other Commercial Payers are direct competitors that have agreed to join, establish, enable, operate, further, preserve, and conceal the Zelis Conspiracy based in part on commonly-applied methodologies and technologies for the suppression of payments for claims submitted for OON healthcare services, which has unreasonably restrained trade relating to payments made to Providers for OON healthcare services.[210]

198. On information and belief, Zelis has entered into numerous written agreements with hundreds of its horizontally-positioned Commercial Payer competitors in order to, at least in part, exchange confidential, "proprietary," and competitively-sensitive claims, payment, repricing, and contractual data so as to collusively suppress payments and payment thresholds for claims

---

[210] As a reminder, in addition to providing repricing services, Zelis builds, owns, operates, and/or manages PPO Networks, making it a direct and horizontally-positioned competitor to Commercial Payers who also own, operate, and/or manage PPO Network businesses.

submitted for OON healthcare services and to fix the payment amounts for claims submitted for payment by Commercial Payers for OON healthcare services.[211]

199. On information and belief, the agreements at issue require these horizontally-positioned competitors to agree to share their claims, payment, repricing, and/or contractual data with Zelis in return for the Commercial Payer to be able to use Zelis's repricing algorithms, tools, and/or methodologies to suppress payments for OON healthcare services.

200. The use of such third-party or agent-based pricing algorithms and/or methodologies is price-fixing, especially when a competitor knows or can readily access information that confirms that the algorithms, tools, and/or methodologies at issue are based on claims, pricing, or contractual information submitted by competitors as is the case here.[212] Further, when such conduct deprives the seller from being able to distinguish one Commercial Payer from another, the Defendants have violated Section 1 of the Sherman Act. Defendants' concerted action violates Section 1 of the Sherman Act because they jointly delegate key aspects of their decision-making to a common algorithm, which joins together separate decisionmakers and thus deprives the marketplace of independent centers of decision making.

---

[211] *In re EthiCare Advisors, Inc.,* No. 20-1886 (WJM), 2020 WL 4670914, at *4, n.4 (D.N.J. Aug. 12, 2020); *Butler,* 1:17-cv-00050 (D. Mont. Oct. 5, 2018), ECF 118-11, at 3 (Jackson Depo. at 10:3-8); *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ ("Improve accuracy and reduce frustration with a technology-enabled way to load and manage contracts . . . and reprice medical healthcare claims.") (last visited May 14, 2025).

[212] *See, e.g., Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ ("This platform serves more than 750 payers, including the top 5 national health plans, BCBS insurers, regional health plans, TPAs, and self-insured employers") (last visited May 14, 2025);

*Zelis® for Health Plans & National Carriers,* Zelis, https://www.zelis.com/built-for/payers/health-plans/ ("Zelis is built for all payers. Partnering with over 770 health insurance companies.") (last visited May 14, 2025).

201. Members of the Zelis Conspiracy harmed competition by delegating to Zelis industry-wide pricing and negotiation authority concerning the payment of claims submitted for OON healthcare services.  Independent, individualized negotiations between Providers and Commercial Payers were thus made impossible (or a hopeless exercise).  This delegation of pricing authority allows Zelis, the Commercial Payer Defendants, and other Co-Conspirators to suppress payments for OON healthcare services far below what they otherwise would have paid.  In addition, such delegation of pricing authority to Zelis deprives the OON Provider of its ability and its right under the Sherman Act to distinguish pricing levels offered by one Commercial Payer from another so that the OON Provider can best position itself for success in the Commercial Payer Market.

202. Defendants were able to effectuate the Zelis Conspiracy by basing OON payments on information shared between and among each other, and through Zelis, and by interfering with the ability of Providers to associate specific Commercial Payers with payment of specific OON healthcare services.

### 2. Agreements to Conspire and Share Competitively-Sensitive Information Between Zelis and Commercial Payers

#### a. Agreements to Conspire to Suppress OON Payments and to Share Information, Generally

203. Zelis claims that it seeks to "align[] the interests of payers, providers, and healthcare consumers."[213]  However, it appears that Zelis's interest in "aligning" the interests of Providers

---

[213] *About Us,* Zelis, https://www.zelis.com/company/ (last visited Jun. 6, 2025).

and policyholders gives ways to its interest in "aligning" or "benchmark[ing]" Commercial Payers.[214]

204. The conspirators can be broken out into the following categories: Repricing Defendant Zelis; Commercial Payer Defendants; and non-defendant Co-Conspirators. Defendants improperly shared claims, pricing, and other commercially and competitively-sensitive business information ("CSI") in at least the following ways: (1) Commercial Payers directly shared CSI between and among each other; (2) Commercial Payers shared CSI with Zelis; (3) Zelis shared CSI with Commercial Payers; and (4) Commercial Payers shared CSI *through Zelis* to other Commercial Payers.

205. On information and belief, this conspiracy functioned and functions in at least two ways. First, Commercial Payers agree that, in exchange for obtaining "repricing" services from Zelis, the Commercial Payers provide claims, pricing data, and contractual information to Zelis.[215] As Zelis obtains such private, confidential, hidden-to-the-public, CSI from approximately 770 Commercial Payers involving over $240 billion in payments to Providers, it obtains knowledge about claims and pricing of OON healthcare services from a substantial portion of the OON Commercial Payer Market.[216] Accordingly, Zelis's Commercial Payer customers are able to pay OON Providers an

---

[214] *Create innovative and competitive network structures,* Zelis, https://www.zelis.com/solutions/network-solutions/ (last visited Jun. 6, 2025) ("Benchmark against competition to underscore your strengths and proactively mitigate weaknesses."; "Competitive Benchmarking – See how your network compares to your competitors. – Gain market intelligence to better position yourself against competitors with side-by-side comparisons that show overlap and exclusivity by geography and top specialties.").

[215] *See, e.g., Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ ("Improve accuracy and reduce frustration with a technology-enabled way to load and manage contracts . . . and reprice medical healthcare claims.") (last visited May 14, 2025).

[216] Zelis, https://www.zelis.com/built-for/payers/health-plans/ (last visited May 8, 2025).

artificially and collusively-suppressed price for OON healthcare services as there are no or virtually no non-collusive payment sources for OON Providers to which to turn as all or nearly all Commercial Payers are also participants in the Zelis Conspiracy. Secondly, as discussed in greater detail in Section V.G.5., below, Commercial Payers use repricing in order to avoid identification with below-market pricing levels for out-of-network healthcare services. Through the delegation of pricing authority to Zelis by a substantial portion of the Commercial Payer Market, Providers cannot associate poor pricing levels with any particular Commercial Payer.

206. With respect to sharing competitively-sensitive business information, by way of agreements and facilitated data access, Commercial Payers share claims, pricing, and contract-related information with and through Zelis.[217].

207. Zelis engages in verbal, written, and electronic-based sharing of information, including claims, pricing, and contract-related information, with its healthcare Commercial Payer clients.

### b. Verbal Information Sharing

208. Among other events and meetings, Zelis hosts an "annual client conference" where health insurer personnel are invited to discuss the industry and Zelis's offerings with other existing and potential health insurer clients. These verbal communications have been captured on film.[218] *See also* Section VII.C., *infra* (explaining the extravagant "Zelis Forum").

---

[217] *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 8, 2025); *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 8, 2025).

[218] *Building a Healthcare Technology Brand Experience Online,* DeSantis Breindel (May 26, 2017), https://web.archive.org/web/20240725184204/https://www.desantisbreindel.com/insights/building-healthcare-technology-brand-experience-online/ (captured Jul. 25, 2024).

### c. Written and Contract Based Information Sharing

209. Further, Zelis engages in written agreements that contemplate the sharing of and access to CSI, including claims, pricing, and contractual information.[219]

210. Zelis boasts that its RBP pricing product can "[i]mprove accuracy and reduce frustration with *a technology-enabled way to load and manage contracts*, apply real-time edits and regulatory updates, and process pricing."[220]

211. Zelis also maintains a "Payment Harmonization Index," developed from a quantitative survey of 214 healthcare payer executives, 75% of whom worked at health plans, and the remainder at TPAs.[221] According to Zelis, the index "highlights findings from payment accuracy executives to offer an outline for the next wave of payment integrity and cost containment."[222]

---

[219] *See, e.g., Part III: Rate Proposal – Question and Answer Section,* lccef.org, https://lccef.org/wp-content/uploads/2016/04/03-Questionnaire.pdf ("PacificSource has an agreement with Zelis for high-dollar out-of-network negotiations") (last visited May 14, 2025); *Summary of Material Modifications,* WinCo Foods Employee Benefit Plan, https://benefits.wincofoods.com/wp-content/uploads/Summary-of-Material-Modifications-2020.pdf ("Dialysis Cost Containment Program Administrator: (Repricing, Pre-authorization & Network) Zelis Healthcare") (last visited May 14, 2025); *Winco Holdings, Inc. Employee Benefit Plan: Serving as the Plan Document and Summary Plan Description,* Winco Holdings, Inc. (Effective Jan. 1, 2021), https://benefits.wincofoods.com/wp-content/uploads/Winco-SPD-2021.pdf ("Dialysis Cost Containment Program Administrator: (Repricing, Pre-authorization & Network) Zelis Healthcare") (last visited May 14, 2025); *Teton County Board of County Commissioners – Clerk Report,* Teton County Wyoming, https://www.tetoncountywy.gov/DocumentCenter/View/28962/0409-02-Allegiance-Benefit-Plan-Management-Agreement ("Adds language for Zelis pass through fee. Claims editing and payment integrity") (last visited May 14, 2025).

[220] *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 1, 2025) (emphasis added).

[221] *Payment Harmonization Index,* Zelis, https://www.zelis.com/white-papers/payment-harmonization-report-2022/(last visited Mar. 19, 2025).

[222] Kaitlin Howard, *Payment Integrity and Cost Containment in Healthcare: A Payment Harmonization Benchmark,* Zelis (Jan. 5, 2023), https://www.zelis.com/blog/payment-integrity-and-cost-containment-in-healthcare-a-benchmark/ (last visited Mar. 19, 2025).

212. Also, as discussed *infra*, there is direct evidence of Commercial Payers entering into repricing agreements with Zelis.  On information and belief, these agreements include information sharing obligations.

### d.  Electronic Information Sharing

213. Finally, Zelis and its healthcare insurance company payer clients have technological relationships, which enable immediate electronic sharing of claims, pricing, and contract-related information.

214. Zelis provides a forum for insurers to participate in the anticompetitive sharing of CSI. Each insurer submits real-time, non-public pricing information to its database, including: (1) claims (both in- and out-of-network) received from providers; (2) compensation paid to those providers, whether in-network or out-of-network; and (3) and proprietary pricing preferences and strategies.

215. For example, Zelis boasts that payers can "accelerate healthcare efficiency with Zelis APIs-"Healthcare platforms struggle with managing complex data, improving efficiency, and ensuring compliance. Zelis APIs streamline data access, automate processes, and enhance security, helping you optimize workflows, reduce costs, and stay compliant." Zelis says that when using its system, it takes "<1 second to reprice a claim".[223]

216. On this same website, Zelis describes its rapidly available data for Commercial Payers as follows:

> Whether outside forces like legislative changes, provider and consumer expectations, or internal pressures for strategy and growth goals, business demands are hitting you from every side, causing

---

[223] *Gain claims pricing accuracy and transparency with Zelis*, Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited June 2, 2025); *Accelerate Healthcare Efficiency with Zelis APIs*, Zelis, https://marketplace.zelis.com/ (last visited Jun. 10, 2025)

resource strains and slowing down development. You feel like you're always one step behind. Is there a solution? The API economy is a growing trend towards real-time data management and scale.

It is a technology-driven model that exposes service and data through APIs and allows you to integrate and activate data and application intelligence from outside systems in a standardized, real-time, and secure fashion. Zealous' APIs streamline your internal development demands, increase your speed to market, and simplify your stakeholder experiences, giving you the freedom to focus on the strategy and growth of your business. In other words, with Zealous' API marketplace, business leaders and developers now have the technological innovation they need to turn obstacles into opportunities.

The API marketplace is the gateway to discover Zelis's rich library of APIs and SDKs, offering flexibility where you need to extend your services, and deliver new seamless experiences within your environment. With it, we deliver robust functionalities and support that drive your success, including secure and compliant API orchestration, comprehensive management and a developer portal, sample code and sandbox environments, standardized development and analytics capabilities, and inbound and outbound API connectivity. ***Whether you need pricing insights, payment details, network visibility, or solutions to drive member digital adoption, we  got you.***

At Zelis our goal is to help clients create solutions that align interests across payers, providers, and healthcare consumers by modernizing the healthcare financial experience for all.[224]

217. Zelis subscribers have access to pricing and payment data in real time.  Indeed, Zelis calls it's pricing program  "QuickReprice" for OON repricing:

Achieve swift claims adjudication in your system with the QuickReprice API. Zelis designed this tool to capture all savings opportunities. Enjoy fully automated and accurate claims editing, Out-of-network pricing, NSA/State pricing, and expert claim review. Which can be enhanced for specific client needs and customization. Zelis merges innovative technologies with a team of healthcare professionals to ensure precise claim review. Utilize the seamless integration of post-adjudication with a pre-payment

---

[224] *See/listen* https://marketplace.zelis.com/ (Video transcription) (last visited May 22, 2025) (emphasis added).

interface built with Facets and QNXT, supported by Cognizant, along with multiple adjudication systems such as HealthEdge, Beacon/Spyglass, WLT, VBA, and Illumifin, ensuring smooth workflows.[225]

218. Zelis also provides information for pricing strategies: "QuickReprice reviews all claim lines against patient and provider histories. Plus, Zelis's post-adjudication, pre-payment interface utilizes Ebix Health support, is built with LuminX, and *is backed up by Zelis's latest industry data and trend analytics.*"[226] Zelis clients *can adjust networks in real-time, integrating competitive and cost analysis to gain instant feedback on network viability before going to market.*[227]

219. Supporting the existence of its electronic platform for sharing such claims and pricing information, Zelis boasts that it has a "99% auto adjudication rate" and uses "API, EDI, or portal integration to make repricing claims easier."[228] As a result, Zelis boasts that it repriced "82M+ claims . . . in 2023," alone.[229] Further, its capabilities allow Commercial Payers to "[a]utomate claims pricing & strengthen provider contracting negotiations[.]"[230]

---

[225] https://marketplace.zelis.com/product/quickreprice/ (last visited Jun.. 2, 2025.)

[226] *Simple Claims Adjudication*, Zelis, https://marketplace.zelis.com/payments-communication/ccs-quickreprice/ (last visited Jun. 9, 2025).

[227] *Zelis and HealthCorum Partner to Advance Provider Network Optimization for Insurers*, EINPRESSWIRE, https://www.einpresswire.com/article/536859933/zelis-and-healthcorum-partner-to-advance-provider-network-optimization-for-insurers (last visited Jun. 2, 2025).

[228] *Track the path of every claim with a fully transparent process trail*, Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited Mar. 19, 2025).

[229] *Id.*

[230] *Id.*

220. Zelis claims that its information system works with a variety of other claims systems. As explained by Zelis, Zelis's systems "[i]ntegrate with numerous claims systems, including FACETS,[231] to enables [sic] more efficient implementations and workflows[.]"[232]

221. Further, its platform allows for the sharing of contractual information. For example, Zelis notes that its platform includes the "[a]bility to load contracts on your behalf" and provides "[r]obust reporting & in-depth contract analysis."[233] Zelis further notes that Commercial Payers can "[l]everage **our source pricers for all direct agreements, including** Medicare, Medicaid, **commercial**, and other government programs. We'll load and maintain client contracts & fees schedules, manage the contract inventory, **and price claims against them for all plan types.**"[234] As repeatedly emphasized by Zelis, "[w]e'll even load contracts for you."[235] Zelis's electronic capabilities allow for the analysis and sharing of "load[ed]" contracts.[236]

222. Zelis admits that its electronic sharing capability "layer[s]" the data from one PPO Network operator with that from other competing, PPO Network operators: "Our proven data

---

[231] FACETS is a core administration solution for health plans, developed by TriZetto®. It automates common healthcare administrative tasks, including claims processing, billing, care management, and network management workflow. https://www.amazinghealthcareconsultants.com/what-is-facets-healthcare/ (last visited June 10, 2025).

[232] *Gain control of out-of-network costs with Zelis,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited Mar. 19, 2025).

[233] *Track the path of every claim with a fully transparent process trail,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 14, 2025).

[234] *Gain claims pricing accuracy and transparency with Zelis: Advanced claim pricing methodologies*, Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 14, 2025) (emphases added).

[235] *Id*.

[236] *Id*.

analytics platform leverages provider and competitor data with the ability to layer in additional

data elements from your organization or our partners . . . ."[237]

223. Further, Zelis explicitly describes how its improperly pooled information can be used:

"Disruption—Gain a competitive edge in the sales process ***with integrated competitor data*** within

your disruption analysis—***benchmark against competition*** to underscore your strengths and

proactively mitigate weaknesses."[238]

224. Virtually, if not actually, admitting that its data sets are based on collecting competing

Commercial Payers' information, Zelis describes how "Zelis collects data ***from hundreds of plans***

***and thousands of networks****. . . .* Zelis specializes in organizing and managing this data to support

network analytics that you can rely on."[239] According to Zelis, this process, dubbed "The Zelis

Provider Network Data Process," occurs as follows:



240

---

[237]    *Create    innovative    and    competitive    network    structures*,    Zelis,
https://www.zelis.com/solutions/network-solutions/ (last visited Mar. 19, 2025).

[238] *Id*. (Emphases added.)

[239] *Id*. (Emphasis added.)

[240] *Id*.

225. Competitor data is then funneled into Zelis's software, Network360®, which generates comparative reports.[241] For example, on information and belief, Zelis uses this Network360 software to sell reports of payment rates of insurers for dental providers to competitor insurance companies, who then use them to set anti-competitive reimbursement rates. Commercial Payers know that their data is being sold to competitor Commercial Payers since these reports are marketed to and are available for sale to any Commercial Payer who wishes to enter into a particular dental market.

226. For its RBP service, Zelis acknowledges that it can "[i]mprove accuracy and reduce friction with a technology-enabled way to load and manage contracts, apply real-time edits and regulatory updates, and process pricing."[242]

227. Zelis's CEO, Amanda Eisel, explained that Zelis is "aggregating and analyzing data and putting it back into the hands of payers, providers, and consumers. More specifically, Zelis is optimizing data to help payers easily assess, benchmark and create high-performing networks based on costs, access and quality."[243] Also, "at Zelis, we download and process about 27 terabytes of MRF [machine-readable file] data each month for just the top four payers."[244]

228. Zelis shares information back to Commercial Payers. David Scanlan, a director at Allied National, Inc., a Commercial Payer, confirmed that "Claims of insureds are submitted by the

---

[241] *Network360® brings intelligence to action.,* Zelis, https://www.zelis.com/solutions/network-solutions/network360/ (last visited May 15, 2025).

[242] *Discover new savings strategies while empowering members*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited Mar. 19, 2025).

[243] Amanda Eisel, *The Data Revolution: Coming to a Healthcare Industry Near You*, Zelis (Sept. 27, 2023), https://www.zelis.com/blog/the-data-revolution-coming-to-a-healthcare-industry-near-you/ (last visited Mar. 19, 2025).

[244] *Id.*

provider, either a hospital, doctor, or ancillary provider, to Zelis . . . . Zelis matches the claim to

an eligibility file provided by Allied.  If a match is found, Zelis determines the reasonable and

customary (R&C) charge . . . . ***Zelis then includes that information in a file that is delivered to***

***Allied electronically.***"[245]

### 3.    Commercial Payers Share CSI and Other Related Information

229. Commercial Payers shared and continue to share confidential, proprietary, and CSI

directly with each other, including sharing information related to Zelis's ability to assist particular

Commercial Payer "organization[s]" with other Commercial Payer "organization[s]."[246]

230. For example, Zelis's "B2B Marketing" advisor, DeSantis Breindel, not only noted that

"fanatics" of Zelis shared information between and among each other, but that they did so on film:

> [A]s we knew from our external interviews, there were a lot of Zelis fanatics eager
> to talk about their exceptional experiences with the company. Many were already
> sharing their stories as referrals for prospective clients, and we heard things like:
>
> "I'm one of their greatest referrals just because I'll go out there and sell them all
> day long and I don't even get paid for it."
>
> "I can't tell you how many references I've done for them but it's not a chore. I'm
> happy to talk about them and how much they do for our organization and what they
> can do for other people that are thinking about using them."
>
> These referrals were important, but their impact remained limited to individual
> interactions. To leverage these on a larger scale, we turned to the power of film.
> During Zelis's annual client conference, we filmed a dozen clients sharing stories
> about their experience with Zelis. Their passion was evident, and it translated
> beautifully and genuinely into testimonials for the website. It's one thing for Zelis

---

[245] Scanlan Rebuttal Report, *Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050 (D. Mont. Sept. 5, 2018), ECF 101-5, at 1 (emphasis added).

[246] *Building a Healthcare Technology Brand Experience Online,* DeSantis Breindel (May 26, 2017), https://web.archive.org/web/20240725184204/https://www.desantisbreindel.com/insights/building-healthcare-technology-brand-experience-online/ (archived on Jul. 25, 2024).

to say it offers a great experience, and quite another to hear it directly from the clients who have lived it.[247]

As explained by Zelis's B2B Marketing Advisor, DeSantis Breindel, potential Zelis customers "hear[d] it directly from the [existing] clients who have lived it."[248]  Such direct exchanges of experiences as facilitated by Zelis, are examples of information exchanged by direct competitors.

231.  What incentive did competing Commercial Payers have to promote Zelis to each other?  Commercial Payers knew that the success of their Zelis Conspiracy depended on wide-spread adoption of Zelis's repricing among the Commercial Payers.  Otherwise, Providers would not accept patients from the one or few insurance companies that utilized Zelis's repricing models because they would receive higher payments from the other Payers that did not reprice their services as dramatically or as uniformly as Zelis.  Absent the Zelis Conspiracy, Commercial Payers had no legitimate self interest in encouraging their horizontal competitors to adopt a program that would help make those other Commercial Payers money by downwardly adjusting payments to Providers.

232.  In March, 2024, Zelis announced that it had entered into a vaguely-termed "strategic alliance" with Availity ("Zelis, a leading provider of healthcare financial solutions, and Availity, the nation's largest real-time health information network, announced today a strategic alliance to streamline the end-to-end process between healthcare payers and providers, from administrative workflows through payments . . . .  The strategic alliance between Zelis and Availity holds the potential to unlock *both front-end and back-end value*, such as turnkey enrollment and onboarding, *a single source of access for payment and remit information, real-time analytics*

---

[247] *Id.*

[248] *Id.*

***and dashboard capabilities, and multi-modal disbursement configurations in an omni-channel experience.***") (Emphasis added.)[249]

233. Availity has described itself as "the largest real-time information network in healthcare, connecting two million providers, health plans, and their technology partners.  We work collaboratively with health plans and providers to create a more efficient and person-centered health system.  Availity works to solve communication challenges in healthcare by creating a richer, more transparent exchange of information among health plans, providers, and technology partners.  As one of the nation's largest health information networks, Availity facilitates billions of clinical, administrative, and financial transactions annually.  Our suite of dynamic products, built on a powerful, intelligent platform, enables real-time collaboration for success in a competitive, value-based care environment."[250]

234.    Availity was founded in 2001 by Humana and Blue Cross and Blue Shield of Florida, in the city of Jacksonville.  Other owner health plans include Health Care Service Corp., Elevance (formerly Anthem), Francisco Partners and Novo Holdings.  It reached one million transactions during 2002 and then a hundred million transactions by 2005.  Availity was described by Information Week as "an electronic clearinghouse that specializes in Web-based, real-time

---

[249]  Zelis® and Availity® Announce Strategic Alliance, Availity   (Mar. 21, 2024), https://www.availity.com/news/zelis-and-availity-announce-strategic-alliance/ (last visited Jun. 2, 2025).

[250] The Availity story, Availity, https://www.availity.com/history/ (last visited Jun. 2, 2025).

healthcare transactions," focusing on information exchanges between healthcare providers, insurers, and other parties.[251]

235.    Availity "works in partnership with several major insurance companies in order to provide its clients with secure data exchange capabilities across multiple networks. These partners include defendants Aetna, Cigna, Humana and United Healthcare."[252] "Availity, a company that offers free access to real-time information and instant responses for healthcare professionals, has several key shareholders or owners who play a significant role in the company's operations and decision-making processes. Some of the key shareholders or owners of Availity include:

> Blue Cross Blue Shield Association:
>
> Blue Cross Blue Shield Association is a major shareholder in Availity, providing support and resources to help the company grow and expand its services in the healthcare industry.
>
> UnitedHealth Group: UnitedHealth Group is another key shareholder in Availity, bringing valuable expertise and industry knowledge to the company's operations.
>
> Humana: Humana is also a significant shareholder in Availity, contributing to the company's success and growth in the healthcare market.
>
> Health Care Service Corporation (HCSC): HCSC is a key owner of Availity, playing a crucial role in shaping the company's strategic direction and future growth. These key shareholders and

---

[251] *Availity*, Everipedia, https://everipedia.org/wiki/lang_en/Availity (last visited June 2, 2025). *See also Availity Celebrates 20 Years of Innovation*, PR Newswire (Sept. 15, 2021), https://www.prnewswire.com/news-releases/availity-celebrates-20-years-of-innovation-301377301.html (last visited May 30, 2025) ("Launched in Jacksonville in 2001, as a joint venture between Florida Blue and Humana, Availity's original mission was to reduce administrative abrasion between payers and providers in Florida by digitizing manual, inefficient, and time-consuming processes. Today, Availity's investor base includes the original founders, HCSC, Anthem, and Novo Holdings, Inc.").

[252] Which insurance companies use Ability, YourInsurance.info, https://yourinsurance.info/which-insurance-companies-use-availity/ (last visited Jun. 10, 2025).

owners of Availity have a vested interest in the company's success and are actively involved in guiding its operations, ensuring that it continues to provide valuable services to healthcare professionals and patients alike."[253]

Now these defendants are in a "strategic alliance" with Zelis. This symbiotic relationship, which includes confidential information sharing and most likely profit sharing among Zelis, Availity and these Defendants, could not be more anticompetitive.

### 4. Commercial Payers' Sharing CSI with Zelis, Using Zelis To Suppress Prices, and Using Zelis To Conceal Responsibility for Payment Determinations, While Knowing That Their Competitors Are Doing The Same, Is Price-Fixing

236.    To the extent that Zelis has shared CSI with other Commercial Payers, including pricing and other business or contract-related details, direct and horizontally-positioned competitors have shared private, confidential, "proprietary," and/or competitively-sensitive information in violation of the Sherman Act.

237.    Moreover, to the extent that the Commercial Payers use Zelis's algorithms and/or "A.I." for setting prices or delegate pricing responsibilities to Zelis, such efforts are price-fixing and, as applicable here, coordinated price suppression.[254]

238.    Commercial Payers know or can readily learn that their competitors are similarly transmitting information to Zelis to obtain repricing information. This determination as to the existence of price-fixing is readily reachable as Zelis publicizes on its website that the "top 5"

---

[253] *Who Owns Availity*, CANVAS https://canvasbusinessmodel.com/blogs/owners/availity-who-owns (last visited Jun. 2, 2025).

[254] Kaitlin Howard, *Revolutionizing Provider Payments with AI,* Zelis (Jan. 30, 2024), https://www.zelis.com/blog/revolutionizing-provider-payments-with-ai/ (last visited May 15, 2025); *How Human and Artificial Intelligence Can Streamline Claims Reviews,* Zelis (Apr. 15, 2024), https://www.zelis.com/blog/how-human-and-artificial-intelligence-can-streamline-claims-reviews/ (last visited May 15, 2025); *Gain control of out-of-network costs with Zelis®,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited May 15, 2025).

national health insurers and approximately 770 of the nation's health insurers are Zelis customers.[255]

239.    Zelis's reference to its "platform serv[ing] . . . the top 5 national health plans" is incredibly specific.[256]  According to Value Penguin, based on 2023 data pulled in June 2024, "the 5 largest health insurance companies" are United, Anthem, Kaiser, Ambetter, and Humana.[257] Value Penguin further specifies the biggest health insurance companies by "Market %" and "by revenue" (in order, large to small):  UnitedHealth Group (15.7%, $215 billion), Elevance (Anthem) (9.7%, $133 billion), Kaiser Permanente (9.2%, $126 billion), Centene (Ambetter) (8.6%, $116 billion), Humana (7.3%, $100 billion), HCSC (Blue Cross) (4.0%, $55 billion), CVS Health (Aetna) (3.5%, $48 billion), Molina (2.3%, $31 billion), GuideWell (Florida Blue) (2.1%, $29 billion), and Independence Health Group (Blue Cross) (2.1%, $28 billion).[258]  Value Penguin also notes that "[*t*]*he five biggest health insurance companies make up half of the health insurance market*."[259]  Even if a hypothetical Commercial Payer knows only that the "top 5" national health insurance companies use Zelis and that those top 5 "make up half of the health insurance market,"

---

[255] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/    (last visited May 15, 2025); Amanda Eisel, *The Data Revolution: Coming to a Healthcare Industry Near You,* Zelis (Sept. 27, 2023), https://www.zelis.com/blog/the-data-revolution-coming-to-a-healthcare-industry-near-you/ (last visited May 15, 2025); *Zelis® for Health Plans & National Carriers,* Zelis, https://www.zelis.com/built-for/payers/health-plans/ (last visited May 15, 2025).

[256] *See, e.g., Press Release: Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (August 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited Jun. 6, 2025).

[257]    *Largest    Health    Insurance    Companies,*    ValuePenguin    by    lendingtree, https://www.valuepenguin.com/largest-health-insurance-companies (last visited Jun. 6, 2025) (also explaining that "Data on market share, revenue and enrollment is from S&P Capial IQ, pulled in June 2024 based on the most recent annual data available – for the calendar year of 2023").

[258] *Id.*

[259] *Id.* (Emphasis added.)

if the payer also considers that the Zelis "platform serves more than 750 payers" (now over 770), that Commercial Payer almost certainly knows that its competition is using Zelis to reprice out-of-network healthcare services.

240.     If a Commercial Payer is not using Zelis's repricing services, it would appear to be among the few who are not.

### 5. Widespread Adoption and Application of Zelis's Repricing Services by Commercial Payers Has Precluded Meaningful Competitive Alternatives and Harmed Competition

241.     The harm to competition in the OON Commercial Payer Market has already occurred as Zelis itself has estimated that, for its "ERS" product, Providers accept Zelis's payment amounts for OON healthcare services approximately "97%" of the time (described as a "savings retention" rate) with an "inquiry rate" below 10%.[260]  Zelis similarly reports that its rate of "retained savings" for its Reference-Based Pricing" product ("RBP") is "97%,"[261] and that its "member and provider inquiry rate" is less than "4%."[262]

242.     The pervasive adoption and application of Zelis's tools, technologies, and methodologies is astonishing. By 2025, Zelis counts approximately 770 health insurers, including the nation's "top 5" national health insurers, among its repricing customers.[263]  Zelis also explains that its "ZAPP" repricing platform "processes 1B payment transactions annually," or 2.74 million

---

[260] *Market-based Pricing with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited May 1, 2025).

[261] *Unlock Savings with Member-Centric Reference Based Pricing*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 1, 2025).

[262] *Id.*

[263] *Zelis® for Health Plans & National Carriers,* Zelis, https://www.zelis.com/built-for-payers/health-plans/ (last visited May 15, 2025); *Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited May 15, 2025).

per day, and "delivers 800M+ claims communications as well as 800M payment transaction to members annually," or 2.19 million claims communications and payment transactions per day.[264]

243.    With such widespread adoption and application, Defendants have harmed competition and have left OON Providers with actually or virtually no available alternatives from which to seek better pricing.

### 6. Any Possible Procompetitive Justifications Are Legal Nullities Because Zelis's and The Commercial Payers' Conduct Is a Per Se Antitrust Violation

244.    This Zelis matter concerns *per se* violations of Section 1 of the Sherman Act.  As a *per se* violation, the liability concerns conduct that is inherently wrong, for which the law tolerates no procompetitive excuse, rendering procompetitive justifications legal nullities.

245.    As a *per se* Sherman Act violation, collusively-based repricing resulting in artificially suppressed OON payment amounts does not qualify as just another healthcare services payment option.

### 7. Providers Suffered Antitrust Injury As a Result of the Zelis Conspiracy

246.    The Zelis Conspiracy resulted in Providers receiving less for the OON healthcare services they performed than they would have otherwise been paid absent collusive conduct.

247.     Low payments from Zelis's repricing squeeze small medical practices.  Some Providers saw their pay cut in half or more for multiple patients as a result of repricing.

248.    Repricing efforts instituted by the Commercial Payers have reduced Providers' salaries and forced private practitioners to consider other business arrangements or to close entirely.  Defendants' repricing efforts have slashed pay for Providers.  Some smaller Providers

---

[264] *Modernize    your    healthcare    payments    &    communications*,    Zelis, https://www.zelis.com/solutions/payments-optimization/ (last visited Mar. 20, 2025).

have been forced to consider joining a large hospital system or private-equity-backed group due

to the drastic reduction in payments by Defendants as a result of the Zelis Conspiracy. Providers'

payments were slashed after Commercial Payers started routing the Providers' claims and invoices

through Zelis and/or its repricing tool. Some Providers' payments were cut so dramatically they

had to close their business, requiring patients to travel several hours to find treatment elsewhere.

249.    Defendants reap hidden fees by slashing payments to Providers.

250.    Since at least the outset of the alleged conspiracy, U.S. health insurance costs for

consumers and businesses have risen and continue to rise (while OON payment amounts have

plummeted).[265]

251.    According to U.S. health insurance industry data compiled by the National

Association of Insurance Commissioners ("NAIC"), the costs of health insurance premiums have

increased in a drum-beat and seemingly uninhibited fashion.

252.    For example, according to the NAIC's "2023 Annual Results" (currently, the most

recent year where annualized results are available), "Comprehensive Hospital & Medical"

---

[265] *Zelis for Third Party Administrators*, Zelis, (last visited Jun. 10, 2025)
https://www.zelis.com/built-for/payers/third-party-administrators/ ("$27B in claims cost
reduction"); https://www.zelis.com/blog/rbp-an-overview/ ("RBP can be an effective cost
containment strategy for employers and insurers, particularly in industries with high healthcare
costs such as manufacturing and construction" and "The intent is to provide an effective tool to
help stabilize the healthcare claims costs. The benefits, however, have a far reaching, ripple effect
throughout the entire healthcare industry."); *Zelis Named "Best Overall Digital Health Company"
in 2022 MedTech Breakthrough Awards Program*, Zelis (May 5, 2022),
https://www.zelis.com/news/zelis-named-medtech-breakthrough-best-digital-health-company/
(last visited Jun 10, 2025); *Claims Negotiations with Zelis*, Zelis,
https://www.zelis.com/solutions/out-of-network-solutions/out-of-network-claims/ (last visited
Jun. 10, 2025); *Market-based Pricing with Zelis.*, Zelis, https://www.zelis.com/solutions/out-of-
network-solutions/market-based-pricing/ (last visited Jun. 10, 2025); *Next Generation Technology
Optimizes Out-of-Network Claim Savings*, Zelis Healthcare (Oct. 12, 2020),
https://www.fiercehealthcare.com/sponsored/next-generation-technology-optimizes-out-network-
claim-savings (last visited Jun. 10, 2025).

premiums per member per month ("PMPM") have jumped from $347.49 in 2014 to $524.24 in 2023.[266]



253.      More recent information, included in the NAIC's 2024 mid-year report indicates that the U.S. health insurance industry's "Group Comprehensive Hospital & Medical" line of business, "Net Premium PMPM" increased from $470 as of June 30, 2020 to $574 as of June 30, 2024.[267]  With respect to the industry's "Individual Comprehensive Hospital & Medical" line of business "Net Premium PMPM" increased from $498 as of June 30, 2020 to $548 as of June 30, 2024.[268]

---

[266] *U.S. Health Insurance Industry Analysis Report*, 2023 Annual Results, NAIC, https://content.naic.org/sites/default/files/topics-industry-snapshot-analysis-reports-2023-annual-report-health.pdf (last visited May 2, 2025).

[267] *Id.*

[268] *Id.*



254.    The U.S. health insurers have offered no relief for their consumers.  The idea that the Defendants' repricing scheme has provided "savings" to health insurance policyholders is not supported by NAIC data.

255.    Commercial Payers, including the Defendant health insurers here, can afford to pay Providers' OON invoiced amounts, according to financial data compiled by the NAIC.

256.    NAIC's "U.S. Health Insurance Industry | 2023 Annual Results" reported the health insurance industry increased its profit margin by billions of dollars in 2023.[269]  In addition, the U.S. health insurance industry benefited from an "8% ($80 billion) increase in net earned premium to over $1.1 trillion."[270]  Further, according to NAIC, "[t]he industry reported a 75% ($5 billion) increase in net investment income earned."[271]  As demonstrated by the chart below, the health insurers' net income has dramatically increased since the start of the conspiracy period in mid-2016.

---

[269] *Id.*

[270] *Id.*

[271] *Id.*



For example, as reported to the NAIC, "health entities who file annual health statements with the NAIC" reported $3.672 billion in net income in 2015.[272]  This amount nearly doubled to $7.194 billion in 2016.[273]  Then this amount more than doubled again to $16.060 billion in 2017.[274] From 2017 until the last reported period in 2023, the NAIC reported that net income increased yet another $8 billion to $24.8 billion in net income.[275]  As shown by the above chart, the net income of U.S. Commercial Payers, as reported to and by the NAIC, dramatically increased toward the expiry of the FAIR Health exclusive use period and right around the beginning of the Class Period (June 13, 2016).

257.    With respect to 2023 annual reporting, and even when the analysis is limited to only the "Comprehensive Hospital & Medical" segment, the numbers remain astonishingly large.  For

---

[272] *Id.*

[273] *Id.*

[274] *Id.*

[275] *Id.*

example, for 2023 alone, the annual "Net Earned Premium" for this segment was listed at $272.26 billion, resulting in a $6.265 billion "Net Underwriting Gain."[276]

258.      Zelis's repricing services do not save patients money.  Since 2014, "Group Comprehensive" premiums have increased from $166.375 billion to $171.757 billion in 2023.[277] On the individual side, the growth in premium income for the U.S. health insurance industry has been obscene.  "Individual Comprehensive" related premiums have increased over two and a half times since 2014; starting at $43.388 billion in 2014 and growing to $113.620 billion in 2023.[278]

259.      As reported in NAIC's "2024 Mid-Year Results," earnings resulting from the U.S. health insurance industry's "Direct Written Premium" amounts increased from approximately $411 billion as reported on June 30, 2020 to approximately $590 billion as reported on June 30, 2024, representing an increase of 43.55% over five years.[279]  In comparison, the annual U.S. inflation rate over this same period ranged from a high of 7.00% in 2021 to a low of 2.9% in 2024.[280]  Such a dramatic increase in "Direct Written Premium[s]" cannot be fully explained by overarching economic trends.

260.      Defendants' profitability has not been squeezed by any increase in Providers' claim amounts. On an annual basis, NAIC reports that health insurer entities "reported a 6.5% (over $13 billion) increase in capital and surplus to nearly $215 billion [in 2023] from $202 billion at Dec.

---

[276] *Id.*

[277] *Id.*

[278] *Id.*

[279] *U.S. Health Insurance Industry Analysis Report*, 2024 Mid-Year Results, NAIC, https://content.naic.org/sites/default/files/health-2024mid-year-industry-report.pdf  (last visited May 2, 2025).

[280] *U.S. Health Insurance Industry Analysis Report*, 2023 Annual Results, NAIC, https://content.naic.org/sites/default/files/topics-industry-snapshot-analysis-reports-2023-annual-report-health.pdf (last visited May 2, 2025).

31, 2022 . . . . The increase is due primarily to net income of approximately $25 billion, paid in surplus of $6 billion, and $3 billion increase in unrealized capital gains."[281]

261.    Defendants are foreclosed from offering procompetitive justifications as Plaintiffs have sufficiently alleged a *per se* violation of the antitrust laws. However, even if Defendants were permitted to offer such excuses, the financial data compiled by NAIC shows that Defendants have neither saved policyholders money, nor are they somehow compromised in their ability to pay OON invoices in full, especially with their cash surpluses rising to $215 billion in 2023. Rather, Defendant Commercial Payers are well-positioned to pay in full the Providers' originally invoiced amounts for their performance of out-of-network healthcare services.

### 8.    The Zelis Conspiracy's Existence Is Supported by Direct Evidence of Written Agreements Entered into Between Conspirators

262.    Direct evidence establishes that Commercial Payers entered into repricing agreements and have "established business relationships" with Zelis. Zelis entered into repricing agreements with its direct competitors, including other Commercial Payers. In addition to providing repricing services, Zelis directly competes with other Commercial Payers.

263.    Teton County's healthcare benefit plan manager, Allegiance Benefit Plan Mgmt., Inc., contracted with Zelis for repricing services. As noted in an April 9, 2024 Board of County Commissioners—Clerk Report, the commissioners considered "[a] pass through fee to Zelis based on Allegiance's contract with Zelis for services related to claims editing and payment integrity."[282]

---

[281] *Id.*

[282] *Board of Cnty. Comm'rs – Clerk Report,* Teton Cnty., Wyoming (Apr. 9, 2024), https://www.tetoncountywy.gov/DocumentCenter/View/28962/0409-02-Allegiance-Benefit-Plan-Management-Agreement#:~:text=Zelis:%20A%20pass%20through%20of%20fees%20to,age%20residing%20in%20the%20state%20of%20Massachusetts\ (last visited Mar. 19, 2025).

264.     PacificSource Health Plans, a "health plan serving the Northwest since 1933," acknowledges that it "has an agreement with Zelis for high-dollar out-of-network negotiations[.]"[283]

265.     Winco Holdings, Inc. Employee Benefit Plan, lists Zelis Healthcare as Winco's "Dialysis Cost Containment Program Administrator," providing "Repricing, Pre-authorization & Network" services.[284] Winco acknowledges that its "Plan has entered into an agreement with a third-party Dialysis Cost Containment Program Administrator for purposes of repricing, prior authorization, utilization review, and case management . . . ."[285]

266.     In *California Spine & Neurosurgery Inst. V. Agilent Techs., Inc.*, No. 5:24-cv-05248-EJD (N.D. Cal.), ECF No. 1-11 (Ex. 11), Zelis sent "San Jose Neurospine" a "Settlement Proposal," listing "Anthem Blue Cross & Blue Shield" as the "Payor," in addition to the repricing amount. In a reference to the Commercial Payor, the fax includes the following footer: "This facsimile has been sent by Zelis Healthcare, LLC ("Zelis") to those with an interest in the services provided by Zelis under our ***established business relationship.***" *Id.* (Emphasis added.)

---

[283]     *Rate Proposal—Question and Answer Section*, https://lccef.org/wp-content/uploads/2016/04/03-Questionnaire.pdf (last visited May 2, 2025).

[284]     *Employee Benefit Plan*, Winco Holdings, Inc. (Jan. 1, 2021), https://benefits.wincofoods.com/wp-content/uploads/Winco-SPD-2021.pdf at 4 (last visited Mar. 19, 2025).

[285]     *Id*.

### 9. In Addition to Direct Evidence, Abundant Indirect and Circumstantial Evidence Supports the Existence of the Zelis Conspiracy

#### a. Indirect Evidence and "Plus Factors" Supporting Existence of Zelis Conspiracy

267.    In addition to the direct evidence of repricing agreements, there also exists extensive and compelling indirect or circumstantial evidence that supports the existence of the Zelis Conspiracy.

268.    As discussed in greater detail below, the OON Commercial Payer Market is characterized by at least the following "plus factors": (1) the collectively high market concentration of conspiracy members; (2) high barriers to entry; (3) sufficient motives to conspire; (4) a history of prior collusion; (5) numerous opportunities to collude; (6) actions taken against self-interest; (7) conspiracy enforcement mechanisms; (8) pervasive, systematic, and contract-based requirements to exchange competitively-sensitive information; and (9) the existence of customary patterns and courses of dealing. Assessed holistically, when considered along with repricing agreement evidence, these "plus factors" support the existence of a horizontal price-fixing and price suppression agreement.

#### b. Collectively High Market Concentration of Conspiracy Members

269.    Defendant Zelis's market share, market power, and monopsony power was previously analyzed and alleged in Section V.E., *supra*.

270.    The applicable geographic market includes all fifty States of the United States of America, the District of Columbia, and all U.S. territories.  The relevant product/service market is the "OON Commercial Payer Market," described above.  On a number of Commercial Payers basis, where Zelis counts 770 Commercial Payer customers (out of approximately 1,176 insurer entities), Zelis has a market share of approximately 65.5%.  However, when considering the unequal size and financial strength of these Commercial Payers, that Zelis counts the "top 5

national plans" among its customers, and that studies show that industry consolidation has left the nation's top three insurers with an average of 82.2% market share in each State of the United States, Zelis's joint market share with Commercial Payers on a transaction basis is likely much higher than 65.5% and possibly higher than 82.2%.

271.    This market power has enabled the Zelis Conspiracy to flourish, its members to impose anticompetitive effects in the relevant market, and is circumstantial evidence of a conspiracy.

### c.  The Market's High Barriers to Entry

272.    Entrance into the OON Commercial Payer Market is hindered by high barriers. New market entrants must be able to bear large expenditures of both time and money necessary to develop a network of healthcare Providers large enough to compete against other health insurers and other categories of Commercial Payers (like other managed care organizations, TPAs and self-insured entities). Even without developing a corresponding PPO Network (or similarly functioning entity), there are significant capital outlays required to operate as a Commercial Payer.  Entrants then face the challenge of contending with staggering economies of scale that large, incumbent, nationwide health insurers possess. Obtaining name recognition in an industry occupied by longstanding and well-recognized players presents an additional major hurdle.

273.    There is also an actuarial risk for new health insurance-related networks. Participating health insurers need a stable of healthy premium-paying subscribers to counteract the costs associated with those subscribers needing healthcare services.

274.    As a result of such barriers, the established players in this industry, including members of the Zelis Conspiracy, are further entrenched and protected by participation in the Zelis Conspiracy.  Also, a new entrant who might decide against participating in the Zelis Conspiracy places itself at a significant competitive disadvantage and its impact on the market would likely be

so small that it would not be able to undermine the Zelis Conspiracy members' collective ability to impose repriced payment amounts for OON healthcare services.

275.     Moreover, for those seeking to replicate the repricing services provided by Zelis, such a hopeful repricing market entrant would have to have access to significant funds in order to make the cash outlays necessary to purchase or develop source code, algorithms, and software to manage and make accessible such information to the user; to have funds and staff available to make updates to the new entrant's technology; and to hire and train a staff that can, in turn, provide training and support to customers seeking repricing services such that the new technology could effectively reprice OON claims and sufficiently displace existing repricing incumbents—all without infringing, for example, patents, copyrights, trademarks, and other protectible intellectual property as owned, possessed, or controlled by existing repricers.

### d.  Motives To Conspire

276.     Compounding financial and public relations bases incentivize and motivate existing and would-be cartel participants to conspire.

277.     First, Zelis has an exceptionally strong financial incentive to conspire: Zelis receives a percentage of the difference between the amount billed by the Providers and the amount ultimately paid by the Commercial Payers. Zelis has a substantial financial incentive to have Providers receive as low a payment (off of the original invoice) as possible.

278.     For example, Auxiant's Administrative Services Health Care Proposal "includes claims surveillance technology which seeks to achieve additional cost savings for the plan . . .

(Zelis Fee 25% of Savings).[286] Proposal also includes . . . non-Network Usual Reasonable Customary Reference Based Pricing (RBP) program. ***The fee for this service is 18% of savings.***" (Emphasis added.)[287]

279.    Also, third-party administrators ("TPAs") (a category of Commercial Payer) often pay themselves—just like the repricers—a percentage-of-savings-based "shared savings fee" or "processing fee." Such "savings fees" can result in significant revenue for TPAs. As reported by the *New York Times,* "legal testimony" indicates that UnitedHealthcare "has reaped about $1 billion in fees annually" from such shared saving fees.[288] Savings fees have also been known to exceed amounts paid to Providers.[289]

280.    The Commercial Payers are just as financially motivated to minimize payments made to OON Providers. From a straight profitability perspective, the smaller amount that health insurance companies, self-funded plans, and self-insured entities pay Providers, the better return on their overall insurance business venture.

281.    The Commercial Payers' interest in avoiding legal scrutiny for developing their own repricing efforts provides another motive to conspire. In an internal email Cigna's Chief Risk

---

[286]    *Health Care Proposal,* Auxiant (Jan. 1, 2025), https://mccmeetingspublic.blob.core.usgovcloudapi.net/jacksonmo-meet 14d63987732c418594f89293ddf69c11/ITEM-Attachment-001-e973084e45804526bc402c0fb382af2b.pdf at 2 (last visited Mar. 19, 2025).

[287]    *Id.*

[288]    *Health Insurers' Lucrative, Little-Known Alliance,* The New York Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills-takeaways.html (last visited May 7, 2025); *Insurance Companies Reap Hidden Fees as Patients Get Unexpected Bills,* The New York Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (last visited May 7, 2025). Also, as FAIR Health charges a flat fee, such "savings fees" and "processing fees" can be mostly or entirely avoided by self-insured entities and self-funded plans. No wonder Commercial Payers have strongly encouraged employers to abandon their previous reliance on FAIR Health.

[289]    *Id.*

Officer, Eva Borden, explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements) . . . ."[290]

### e.  Previous Participation in Collusive Efforts

282.     Their corporate ancestors, if not some of the exact same Defendants, have a shared history pertaining to the same issue as the subject of this Complaint—the price-fixing and collusive suppression of payments made to Providers for OON healthcare services.  *See* discussion of Ingenix, NYAG Investigation, and FAIR Health, at Section V.A., *supra.*

### f.  Opportunities To Conspire

283.     Zelis and its Commercial Payer co-Defendants participated in and had numerous opportunities to share information and engage in coordinated efforts to establish, further, preserve, or conceal the Zelis Conspiracy, including Zelis's own facilitation of communications among competitors, where they are able to share conspiracy-related information.

284.     For example, Zelis hosts "annual client conference[s]" where, according to Zelis's "B2B Marketing" advisor, DeSantis Breindel, "fanatics" of Zelis not only shared information between and among each other, but that they did so on "film."[291]

285.     Also, otherwise competing Commercial Payers repeatedly have "individual interactions" where they communicate with each other "'about how much [Zelis does] for our

---

[290] Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, New York Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (last visited Mar. 20, 2025).

[291] *Building a Healthcare Technology Brand Experience Online,* DeSantis Breindel (May 26, 2017), https://web.archive.org/web/20240725184204/https://www.desantisbreindel.com/insights/building-healthcare-technology-brand-experience-online/ (captured by Wayback Machine on Jul. 25, 2024).

organization . . . .'"[292]  Further, at these "annual client conferences," potential Zelis customers "hear[d]" about existing customers' experiences "directly from the clients who have lived it."[293]

286.     Zelis participated in a variety of healthcare conferences organized by others.[294]

287.     In addition, Zelis hosts an extravagant, annual "Zelis Forum," most recently held on May 13-15, 2024 at the Hyatt Regency Lost Pines Resort and Spa in Austin, Texas, featuring a comedy performance by Jason Sudeikis.[295]  Zelis Forum 2024 brought together "500 Zelis clients and partners."[296]  According to Zelis's Erin Brophy, "[e]ach year, we strive to dream up the unexpected, transforming every event into an experience our customers eagerly anticipate and remember long after[.]"[297]

288.     With respect to opportunities to collude as exploited by the Commercial Payer Defendants and Commercial Payer Co-Conspirators, several Commercial Payers, including (but not limited to) Aetna, Centene, Cigna, Elevance, HCSC, and Humana, are members of AHIP (formerly, America's Health Insurance Plans).  AHIP represents that it "plays an important role in

---

[292] *Id.*

[293] *Id.*

[294] These conferences include the SIIA (Self-Insurance Industry Association Spring) Forum, Mar. 25-27, 2024 at the JW Marriott Hill Country Resort & Spa in San Antonio, Texas; the SIIA Connect National Conference in Phoenix on Oct. 8-10, 2023; and the 2024 National Medicare Advantage Conference, Nov. 4-5, 2024 at the Loews Vanderbilt Hotel in Nashville, Tennessee. Zelis also participated as an "Exhibitor" for the 2024 Annual Healthcare Financial Management Association ("HFMA").

[295] Claire Hoffman, *Most Innovative Meetings 2024: Zelis Forum*, BizBash (Nov. 18, 2024), https://www.bizbash.com/bizbash-lists/meetings-conferences/article/22925945/most-innovative-meetings-2024-zelis-forum#:~:text=The%20basics%3A%20Zelis%20Forum%202024,from%20its%20cutting%2Dedge%20technology (last visited Mar. 19, 2025).

[296] *Id.*

[297] *Id.*

bringing together member companies and facilitating dialogues to advocate on shared interests."[298] Of course, a "shared interest" among AHIP members is controlling costs, and, correspondingly, minimizing OON payments to Providers. AHIP hosts conferences, committee meetings, and board meeting multiple times a year, including meetings where members participate in non-public, closed-door meetings.

289.    Numerous executives of Commercial Payers hold positions on AHIP's Board of Directors, including Gail K. Boudreaux, President and CEO of Elevance; David Cordani, Chairman and CEO of Cigna; and Maurice Smith, President, CEO, and Vice Chair of HCSC.[299]

### g. Acts Against Corporate Self Interest

290.    Members of the Zelis Conspiracy have taken numerous actions against their own respective corporate interests.  Agreements entered into between Commercial Payers and Zelis would, absent a conspiracy, be counter to the Commercial Payers' own independent economic interests.  For example, in a world where no other Commercial Payer had entered into such a repricing agreement with Zelis, no OON Provider would perform services (possibly except for emergency treatment) for the one Commercial Payer that had decided to enter into a repricing agreement with Zelis.  The result would be a single Commercial Payer offering repriced OON Payments at a comparatively underpriced and non-competitive basis—to its own destruction.

291.    However, so long as there is an active conspiracy where most or all Commercial Payers use or apply Zelis's repricing services, such self-defeating effects are eliminated.

---

[298]    *Overview Brochure 2022*, AHIP (Jan. 2022), https://ahiporg-production.s3.amazonaws.com/documents/AHIP-Overview-Brochure-2022.pdf#:~:text=AHIP%20plays%20an%20important%20role%20bringing%20together,ahead%20to%20identify%20opportunities%20and%20challenges%20on at 3 (last visited Mar. 19, 2025).

[299] *Board of Directors,* ahip.org (appears to have been removed from internet).

292.     In addition, the Commercial Payers have, on information and belief, entered into agreements which require sharing with Zelis claims, pricing, or contractual information.  Absent a conspiracy, a single Commercial Payer would **never** elect, on its own, to share such competitively-sensitive business information with anyone, much less a horizontally-positioned payer.[300]

### h. Conspiracy-Enforcement Mechanisms

293.     One mechanism used to preserve participation by Co-Conspirators was to "film" participants, thus minimizing conspiracy defectors.[301]  As noted on Zelis's PR/Marketing firm, DeSantis Breindel's now-removed webpage, "[t]o leverage [Zelis referrals] on a larger scale, we turned to the power of film. During Zelis's annual client conference, we filmed dozens of clients

---

[300] MultiPlan Corp. Form 10-K for the fiscal year ended December 31, 2023 (filed on Feb. 22, 2024), https://www.sec.gov/Archives/edgar/data/1793229/000179322924000012/mpln-20231231.htm (last visited May 13, 2025); *In re Laser Spine Institute, LLC, Assignor, to Kapila, Assignee,* Petition Commencing Assignment for Benefit of Creditors, Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County, Florida, Civil Division, listing Zelis as a "Third Party Insurance Payer[]"; *November Payer Processing Issues,* RXNT (Nov. 2024), https://www.rxnt.com/chc-updates-nov24/?srsltid=AfmBOoqss6TZjCk2qRGBiqY2L622ybVsRhexTplH2zUCEb6kM8FbQWY4 (listing Zelis as a "Payer"); *Change Healthcare,* MB, https://qa.mbpractice.com/insurance/ChangeHealthcarePayers (listing "Payer Name" Zelis at CPID Nos. 6630 and 6731, and Payer ID No. 88057); *Organized Delivery Systems,* State of New Jersey Department of Banking & Insurance, https://www.nj.gov/dobi/division_insurance/managedcare/mcods.htm (listing Zelis Network Solutions, LLC as among the "Approved Organized Delivery Systems") (last visited May 15, 2025); *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 15, 2025); *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 15, 2025).

[301] *Building a Healthcare Technology Brand Experience Online,* DeSantis Breindel (May 26, 2017), https://web.archive.org/web/20240725184204/https://www.desantisbreindel.com/insights/building-healthcare-technology-brand-experience-online/ (captured by the Wayback Machine on Jul. 25, 2024) (last visited May 14, 2025).

sharing stories about their experience with Zelis . . . ."[302]  Of course, retaining "film" of Zelis "clients sharing stories about their experience with Zelis," is helpful to keep Zelis Conspiracy members in line.

294.    Enforcement mechanisms are not necessarily negative—carrots often work better than sticks.  Zelis-hosted conferences have taken place at luxury resorts and hotels.[303]

295.    Conspiracy members, including Zelis, have been successful in enforcing and preserving the Zelis Conspiracy.  With respect to "Zelis Open Access Pricing" (RBP), Zelis boasts that it has a "120% client retention rate," suggesting that no client has stopped using it (or possibly that Zelis has gained 1/5 more clients than they have lost, overall) and that clients are recruiting other divisions of their respective companies to start.[304]

### i.    Exchange of Private, Confidential, Proprietary, and Competitively-Sensitive Information by Conspiracy Members

296.    As discussed above, members of the Zelis Conspiracy agreed to share and have shared private, confidential, proprietary, and CSI, including claims, pricing, and contractual data,

---

[302] *Id.*

[303] Clare Hoffman, *Most Innovative Meetings 2024: Zelis Forum,* bizbash.com (Nov. 18, 2024), https://www.bizbash.com/bizbash-lists/meetings-conferences/article/22925945/most-innovative-meetings-2024-zelis-forum (last visited May 15, 2025); Amanda Eisel, *The Courage to Help Care Flow: A Fix for the Financial Experience,* Zelis (Jun. 5, 2024), https://www.zelis.com/blog/the-courage-to-help-care-flow-a-fix-for-the-financial-experience/ (last visited May 15, 2025).

[304] *Elevate member experience with Zelis®,* Zelis, (Reference-Based Pricing for Network Replacement by Zelis) (last visited Apr. 14, 2025) (appears to have been subsequently removed from internet); *Zelis adds Schick as president and chief revenue officer by Jessica Perry,* NJBiz (Apr. 5, 2023), https://njbiz.com/zelis-adds-schick-as-president-and-chief-revenue-officer/ (last visited May 12, 2025).

which would otherwise be against the interest of the sharing entity to do so.[305] *See supra*.  The conspiracy members' willingness to share such important business information is based on the knowledge or analysis of readily accessible information that indicates that their direct competitors have agreed to do the same.[306]

297.    This type of information exchange has anticompetitive consequences.

---

[305] *In re EthiCare Advisors, Inc.*, No. 20-1886 (WJM), 2020 WL 4670914, at *4 n.4 (D.N.J. Aug. 12, 2020); *Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050 (D. Mont.), ECF No. 118-11 at 9:25-10:8); *see also, e.g., Part III: Rate Proposal – Question and Answer Section,* lccef.org, https://lccef.org/wp-content/uploads/2016/04/03-Questionnaire.pdf ("PacificSource has an agreement with Zelis for high-dollar out-of-network negotiations") (last visited May 14, 2025); *Summary of Material Modifications,* WinCo Foods Employee Benefit Plan, https://benefits.wincofoods.com/wp-content/uploads/Summary-of-Material-Modifications-2020.pdf ("Dialysis Cost Containment Program Administrator: (Repricing, Pre-authorization & Network) Zelis Healthcare") (last visited May 14, 2025); *Winco Holdings, Inc. Employee Benefit Plan: Serving as the Plan Document and Summary Plan Description,* Winco Holdings, Inc. (Effective Jan. 1, 2021), https://benefits.wincofoods.com/wp-content/uploads/Winco-SPD-2021.pdf ("Dialysis Cost Containment Program Administrator: (Repricing, Pre-authorization & Network) Zelis Healthcare") (last visited May 14, 2025); *Teton County Board of County Commissioners – Clerk Report,* Teton County Wyoming, https://www.tetoncountywy.gov/DocumentCenter/View/28962/0409-02-Allegiance-Benefit-Plan-Management-Agreement ("Adds language for Zelis pass through fee. Claims editing and payment integrity") (last visited May 14, 2025); *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ (last visited May 15, 2025).

[306] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited May 14, 2025); *Zelis® for Health Plans & National Carriers,* Zelis, https://www.zelis.com/built-for/payers/health-plans/ (last visited May 15, 2025).

298.      Defendants' information sharing occurred pursuant to written repricing contracts and other written and unwritten agreements.[307] Zelis is using these claims, pricing, and contractual data to share confidential pricing information between members of the Zelis Conspiracy to fix and collusively suppress OON Payments.

### j.   Pattern and Course of Dealing Engaged in by Conspirators

299.      The Commercial Payers have an established history of forming, maintaining, and preserving a similar OON payment suppression cartel. *See supra*.

300.      Zelis stood at the ready to form, maintain, preserve, enforce, and conceal its conspiracy upon the expiry of the FAIR Health exclusive use period.[308]  Accordingly, Zelis proudly emphasizes the long-term nature of its relationships with Commercial Payers, including with "national health plans, BCBS insurers, regional health plans, TPAs, and self-insured

---

[307] *See, e.g., Part III: Rate Proposal – Question and Answer Section,* lccef.org, https://lccef.org/wp-content/uploads/2016/04/03-Questionnaire.pdf ("PacificSource has an agreement with Zelis for high-dollar out-of-network negotiations") (last visited May 14, 2025); *Summary of Material Modifications,* WinCo Foods Employee Benefit Plan, https://benefits.wincofoods.com/wp-content/uploads/Summary-of-Material-Modifications-2020.pdf ("Dialysis Cost Containment Program Administrator: (Repricing, Pre-authorization & Network) Zelis Healthcare") (last visited May 14, 2025); *Winco Holdings, Inc. Employee Benefit Plan: Serving as the Plan Document and Summary Plan Description,* Winco Holdings, Inc. (Effective Jan. 1, 2021), https://benefits.wincofoods.com/wp-content/uploads/Winco-SPD-2021.pdf ("Dialysis Cost Containment Program Administrator: (Repricing, Pre-authorization & Network) Zelis Healthcare") (last visited May 14, 2025); *Teton County Board of County Commissioners – Clerk Report,* Teton County Wyoming, https://www.tetoncountywy.gov/DocumentCenter/View/28962/0409-02-Allegiance-Benefit-Plan-Management-Agreement ("Adds language for Zelis pass through fee. Claims editing and payment integrity") (last visited May 14, 2025).

[308] *Northlake Chiropractic Inc. v. Zelis Healthcare Corp.,* No. 1:19-cv-08087 (N.D. Ill.), ECF No. 1-2 (Ex. B) (June 13, 2016 BusinessWire Press Release: "Newly Named Zelis Healthcare Introduced to Healthcare Community, Offers Integrated Suite of Claims Cost Containment and Payments Technology")).

employers . . . ."[309]  Zelis boasts that it "has been with you at the forefront of modernizing the business of healthcare for 20 years."[310]

### 10. Timing of Anti-Competitive Acts

301.    Defendants' collusive efforts to artificially suppress payments to healthcare providers performing OON services begun as early as June 13, 2016 and continue to the present.

302.    Well within any applicable statute of limitations, Zelis repriced San Jose Neurospine's back surgery services to $567.58—approximately 1.455% of the initially billed amount ($39,000.00) on July 11, 2023.

### H. Defendants' Efforts to Suppress Payments for OON Healthcare Services Have Been Enormously Successful and Destroyed Competition in The OON Commercial Payer Market

303.    Payment amounts to providers performing OON healthcare services have cratered following the expiry of the FAIR Health five-year, exclusive-use period.

304.    Moreover, the harm to competition is revealed when non-conspiratorial periods are compared to the current state of affairs.

305.    Payments to Providers for OON healthcare services began to increase during the period when insurers were required to use the FAIR Health database.

306.    The FAIR Health period contrasts starkly to the current situation where OON invoiced amounts might be cut by 88% or even by over 98%. In the context of Zelis's relationships with "over 770 health insurance companies," including the "top 5 national health plans," normal

---

[309] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited May 16, 2025).

[310] *Zelis for Health Plans & National Carriers*, Zelis, https://www.zelis.com/built-for/payers/health-plans/ (last visited Mar. 19, 2025).

supply-and-demand competitive forces are no longer at play.[311]  Defendants' coordinated efforts

to "contain[]" OON-related "costs" destroyed competition within the OON Commercial Payer

Market.[312]

### VI.  Each New Act By  Defendants To Further Or Preserve the Conspiracy Has Resulted In a Newly-Started Violation Period and Efforts To Conceal the Conspiracy Have Tolled Any Applicable Statute of Limitations

#### A.  Zelis and the Other Commercial Payers Are Engaging in a Continuing Antitrust Violation by Renewing Their Conspiracy with New and Independent Acts

307.      A continuing violation of the Sherman Act restarts the statute of limitations period

each time a defendant commits a new, overt act.  Here, during the Class Period, Zelis and the other

Commercial Payers continue to underpay Plaintiffs and members of the Class, adjusting price-

fixing agreements to reflect fluctuating economic and market conditions.  Each meeting (whether

bilateral or multi-lateral), communication, episode of information sharing, and individual effort to

"reprice" OON healthcare service claims is an overt act that begins a new statute of limitations as

each newly-transpired event advances the objectives of the Defendants' and non-defendant Co-

Conspirators' Zelis Conspiracy, but which involves different facts at the time.

308.      Every statement made to establish, further, preserve, enforce, or conceal the

conspiracy, and, as related to, each time Zelis, a Commercial Payer Defendant, or a Commercial

Payer non-defendant shared private, confidential, proprietary, or competitively-sensitive claims,

pricing, and/or contractual information, such a statement or act sprang from the same collusive

goal to artificially suppress OON payment levels, but which involved different facts at the time.

---

[311]  *Zelis® for Health Plans & National Carriers*, Zelis, https://www.zelis.com/built-for/payers/health-plans/ (last visited May 7, 2025); *Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited May 7, 2025).

[312]  *Reference-Based Pricing (RBP): An overview,* Zelis (Apr. 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited May 7, 2025).

**B. Fraudulent Concealment**

309.     The efforts, conduct, statements, and omissions taken to establish, further, and enforce the Zelis Conspiracy were performed in secret and Plaintiffs had no knowledge of the conspiracy, whether actual, constructive, or otherwise.  Zelis's repricing efforts, as indicative of antitrust violations, as far as investigatory work has revealed so far, have not been reported in the press and, until now, have evaded antitrust-based litigation.  As far as investigatory work has revealed and on information and belief, there is no date, so far, that has begun to run as to any applicable statute of limitations.

310.     Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed the conspiracy from Plaintiffs and the other members of the Class.

311.     Because the Zelis Conspiracy was expansive, encompassing, and secret, there was no practical alternative to which Plaintiffs or members of the Class could turn to obtain fair payment for OON healthcare services. Because Commercial Payers had insight into the repricing efforts of at least one of Zelis's repricing rivals through the Commercial Payers' relationships with Zelis, Plaintiffs and members of the Class could not avoid the impact of the Zelis Conspiracy even if they turned to those Commercial Payers that exclusively used a competing repricer.[313]

312.     There are several examples and occurrences that indicate or suggest that Defendants attempted to conceal the Zelis Conspiracy.

313.     In a letter to the Antitrust Division of the DOJ and the FTC concerning possible algorithmic-based antitrust violations, Senator Klobuchar wrote: "The result is that—instead of

---

[313] *Butler v. Unified Life Ins. Co.*, No. 17-50-BLG-SPW, 2019 WL 5302491, at *6 (D. Mont. Aug. 9, 2019) (Magistrate Judge's Findings and Recommendations); *Butler v. Unified Life Ins. Co.*, No. 17-50-BLG-SPW, 2019 WL 4745065, at *2 (D. Mont. Sept. 30, 2019) (District Judge adopting Magistrate Judge's findings and recommendations "in full"); *Butler v. Unified Life Ins. Co.*, No. 17-50-BLG-SPW, ECF Nos. 88-7, 88-9, 96-4, 101-2, 111-3, 117, 146-2, 155.

competing with each other—*insurance companies* are pushing additional *hidden costs* on to employees and patients."[314]

314.    Facilitating concealment, while claiming its services as "defensible" (Zelis claims that its "Established Reimbursement Solution®" tool for "Out-of-Network claims" helps to "[m]aximize acceptance and minimize appeals with a pricing solution that delivers *defensible*, geographically and adjusted pricing recommendations")[315], Zelis has sought to avoid compliance with a subpoena in other litigation, asserting that its "pricing and repricing reports [are] confidential business information."[316]

315.    Claiming that its tools are "defensible," while simultaneously thwarting disclosure by asserting that its methodologies are confidential and "proprietary," is an attempt to legitimize and fraudulently conceal the illicit nature of the Zelis Conspiracy.

316.    Furthering concealment of the Zelis Conspiracy, according to *The New York Times*, health insurers resist providing information about their repricing methods to employer-customers.[317]  For example, "employers have also questioned increased fees and complained about being kept in the dark," leaving Commercial Payers scrambling for ways to respond to objecting

---

[314] Apr. 29, 2024 Sen. Klobuchar Letter to Assistant Attorney General Kanter of Antitrust Division of the Department of Justice and Federal Trade Commission Chair Lina M. Khan, at 1 (emphases added).

[315] *Gain control of out-of-network costs with Zelis®,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (emphasis added) (last visited May 16, 2025).

[316] *In re EthiCare Advisors, Inc.*, No. 20-1886 (WJM), 2020 WL 4670914, at *4, n.4 (D.N.J. Aug. 12, 2020) (citing and analyzing *Peterson v. Cigna Health and Life Ins. Co.*, BER-1-518-18, N.J. Super. Ct. (Law Division) [ECF No. 24]).

[317] Chris Hamby, *Insurers Reap Hidden Fees by Slashing Payments. You May Get the Bill*, New York Times (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/health-insurance-medical-bills.html (last visited Mar. 20, 2025).

customers.[318]  "A UnitedHealthcare account executive emailed colleagues for help explaining the $50,650 fee charged to New England Motor Freight, [which] grew out of $152,594 bill, of which just $7,879 was covered."[319]  When pressed for the basis of such a fee, as reported by the *New York Times*, "UnitedHealthcare initially refused to provide the trucking company with the full underlying data," and "Cigna refused a similar request from auditors for Arlington County, Va., which it had charged $261,000 in one year."[320]

317.    The legitimacy of such "secretive arrangements" between repricers and Commercial Payers has been publicly questioned.  In an April 9, 2024 letter from the American Hospital Association ("AHA") to Acting Secretary Su of the U.S. Department of Labor, the AHA wrote: "Health care providers are forced to endure these below-cost reimbursements [payments], and employers with self-funded plans report that insurance companies are charging them unpredictable and frequently large processing fees ***without transparency*** about claims practices or data analytics, making it difficult for them to police or understand these inappropriate practices."[321]

318.    In a letter dated May 21, 2025 to the Anticompetitive Regulations Task Force Antitrust Division, U.S. Department of Justice 950 Pennsylvania Avenue NW Washington, DC 20530, the American Dental Association Issued a "Public Comment on Lack of Competition in

---

[318] *Id.*

[319] *Id.*

[320] *Id.*

[321] April 9, 2024 American Hospital Association Letter to Acting Secretary of the U.S. Department of Labor, Julie A. Su, https://www.aha.org/system/files/media/file/2024/04/Following-NYT-Investigation-AHA-Urges-DOL-to-Investigate-Actions-of-MultiPlan-and-Commercial-Insurers-letter.pdf (last visited May 16, 2025) (emphasis added).

the U.S. Dental Insurance Market" requesting that the DOJ investigate potential anticompetitive practices of dental insurers.[322]

319.    Zelis and the Commercial Payers have exerted substantial and prolonged efforts to keep the specifics of their relationships, the repricing calculation methods, and the conspiracy to artificially suppress payments for OON healthcare services out of view of patients and Providers.

320.    Zelis' "RBP" product, which in part uses "Medicare" pricing as a reference point, which, in turn, is regarded by health plans to result in payments so low as to be "misleading":

> The] Medicare-based reference point is misleading. The average consumer doesn't understand how low Medicare rates are. On its surface, a policy to reimburse at a level well above what Medicare pays sounds fair, even generous when compared to the traditional methodology that reimburses at a percentage below U&C. However, when a provider anticipating low reimbursements from payers increases the charges to compensate, the gap between an elevated charge and the bare-bones Medicare reimbursement can be significant.[323]

Zelis uses or enables the use of the same "misleading" Medicare pricing as "reference" for its "RBP" service.

321.    Zelis's Establishment Reimbursement Solution ("ERS") is similarly misleading. According to part of the Zelis website that addresses "out-of-network solutions" ("Gain control of out-of-network costs with Zelis®), Zelis lists its "Established Reimbursement Solution® as part

---

[322] *Public Comment on Lack of Competition in the U.S. Dental Insurance Market*, American Dental Association (May 21, 2025), https://www.ada.org/-/media/project/ada-organization/ada/ada-org/files/advocacy/dental-insurance-reform/public_comment_on_lack_of_competition_in_the.pdf?rev=745a2a112b14422e8d27659a278e49e9&hash=1E9ADB52949210DCB7054B058CE19069 (last visited Jun. 10, 2025).

[323] *A Better Reference for Reference-Based Pricing, MultiPlan Data iSight,* Health Plan Alliance (Mar. 21, 2018), https://www.healthplanalliance.org/News/1662/A-Better-Reference-for-Reference-Based-Pricing--MultiPlan-Data-iSight (last visited May 16, 2025).

of its "**OON** Solution Suite[.]"[324]   Yet, when clicking through the "Explore solution" link, Zelis indicates that "[o]ur Established Reimbursement Solution® is enhanced with median in-network rates to address requirements of the No Surprises Act."[325]   Although Zelis attempts to cover this data bias and improper pooling issue under the "requirements of the No Surprises Act," there is no need to include "median in-network rates" within a data set that is being used to reprice **out-of-network** healthcare service claims.  To the extent that "median in-network rates" are needed under the NSA, they do not appear to need to be included within ERS.  In any event, as the ERS data is improperly pooled with "in-network rates," which are of course subject to contractual negotiations as between Commercial Payers and in-network Providers, it is entirely inappropriate and misleading to label this repricing service "Market-based."

322.    Further, the contents behind the "No Suprises Act" link Zelis uses to justify the inclusion of in-network rates on data sets used to reprice out-of-network claims provides little to no explanatory value.[326]   ERS data used to reprice out-of-network claims based on in-network rates

---

[324] *Gain control of out-of-network costs with Zelis®,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited Jun. 6, 2025) (emphasis added).

[325] *Market-based Pricing with Zelis.,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited Jun. 6, 2025).

[326] *See Sponsored:  Zelis helps address new NSA and TiC regulations,* Healthcare Dive (October 18, 2021), https://www.healthcaredive.com/spons/zelis-helps-address-new-nsa-and-tic-regulations/608081/ (last visited June 6, 2025) (With respect to the "requirements" to include in-network rates "under the No Surprises Act," this "[s]ponsored" article notes only "[w]e will also offer in-network (INN) MRF data with median INN rates **for clients whose primary networks are owned or managed by Zelis**" and "Out-of-Network Claims Pricing with Median In-Network Rates:  Zelis Market-Based Pricing Offers payers a fully outsourced solution that meets No Surprises Act (NSA) compliance immediately upon implementation.  Moreover, we provide the Qualifying Payment Amount (QPA), provider payment amount, provider settlement and support in an Independent Dispute Resolution (IDR.)  Market-Based Pricing calculates reasonable and acceptable reimbursements benchmarked by procedure, provider and geography."  Even after analyzing the contents of the "No Surprises Act" link, it remains unclear why ERS data "must" be pooled with in-network data when repricing out-of-network claims.).

cannot be considered "market-based" even if the data is, in part, "benchmarked by procedure, provider and geography."[327]

323.    Further, based on the "proprietary" nature of Zelis's claims repricing tools, technologies, and methodologies, Zelis does not share with Providers which particular repricing tool, technology, or methodology was applied.[328]  As Zelis does not inform OON Providers as to which of its various tools, including but not limited to its ERS , its RBP  or its "pre-defined prices" methodologies it applied for the repricing of a particular claim, and as Zelis's "AI-powered dynamic optimization engine" "automatically route[s] claims to recommended quality savings channels," OON Providers have no way of knowing if Zelis's calculation was accurate or appropriate.[329]

324.    The conspiracy, by its very nature, was and is self-concealing.  Payments for OON healthcare services are not exempt from antitrust regulation, and thus, before recent events, Plaintiffs and other Providers considered the OON Commercial Payer Market to be competitive. A reasonable person under the circumstances would not have been previously alerted to investigate the legitimacy of Defendants' unlawful conduct.

325.    Zelis has continued to fraudulently conceal the Zelis Repricing Conspiracy.  On or around April 1, 2025, A spokesperson for Zelis provided the following statement to *Becker's*:

---

[327] *Id.*

[328] *Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050-SPW, ECF No. 118-11 at 9:25-10:8.

[329] *Market-Based Pricing with Zelis.,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited May 16, 2025); *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 16, 2025); Kaitlin Howard, *Reference-Based Pricing (RBP): An overview,* Zelis (Apr. 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited May 16, 2025); *Gain control of out-of-network costs with Zelis®,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/ (last visited May 16, 2025).

The complaints filed against Zelis are without merit. They are mistaken about the identity of Zelis' clients, the operation of Zelis' solutions, and the benefits Zelis provides to patients, providers and health plans. Zelis provides highly customizable solutions that our clients leverage independently. Nothing about any of Zelis' solutions is unlawful.

The plaintiffs' lawyers failed to conduct a diligent investigation before filing their claims. They copied allegations against another firm and concocted a 'conspiracy' among Zelis and health plans that is without any foundation in fact or law. Zelis looks forward to prevailing in court.[330]

Zelis's un-caveated statement reflects a continuation of its nothing-to-see-here approach.

## VII. Anticompetitive Effects of Each Defendants' Conduct, Article III Damages, Antitrust Injury, And Antitrust Standing

### A. Summary of Defendants' Anticompetitive Effects

326.    Defendants' anticompetitive conduct had the following effects, among others:

   a.  Price competition has been restrained or eliminated with respect to paying Providers for OON healthcare services;

   b.  Payments for OON healthcare services rendered to patients have been fixed, suppressed, stabilized, or maintained at artificially deflated levels;

   c.  Plaintiffs and members of the Class have been deprived of free and open competition; and

   d.  Plaintiffs and members of the Class have received payments at artificially suppressed price levels for OON healthcare services.

327.    The purpose and actual resulting impact of the conspiratorial conduct of Defendants and their co-conspirators was to decrease, fix, stabilize, and/or maintain at suppressed payment levels, the payments to Providers for performance of OON healthcare services.  As a direct and

---

[330] *Kansas dentist filed antitrust lawsuit against Zelis, insurers*, Becker's Dental + DSO Review (Apr. 1, 2025), https://www.beckersdental.com/revenue-cycle-management/kansas-dentist-files-antitrust-lawsuit-against-zelis-insurers/ (last visited Jun. 10, 2025).

foreseeable result, Plaintiffs and members of the Class were damaged by receiving payment for OON healthcare services at artificially suppressed prices during the Class Period.

## B.  Article III Damages

### 1.  Collusively-Suppressed OON Payment Amounts

328.     The price effects of Defendants' conduct have damaged Plaintiffs and Class Members through receipt of payments at suppressed price levels for the performance of OON healthcare services during the Class Period, causing both Article III and antitrust injuries.

329.     The Defendants' conspiratorial conduct, along with that of the other Co-Conspirators, caused Plaintiffs and members of the Class direct and proximate harm.

330.     When the Commercial Payer applies Zelis-enabled repricing, there remains a difference, often including a substantial difference, between what the OON Provider is paid and the amount billed.

331.     As David Scanlan testified, "we [Allied National, Inc., a healthcare insurance company Commercial Payer] usually pay something less than what that billed amount is."[331]

332.     A representative from Zelis confirmed its role in paying OON Providers at amounts less than what was billed.  When asked, "[w]hen you say accept the ERS rates, does that mean the ERS rates might be something less than [what] the provider billed?," Zelis's Robert Jackson responded: "Yes."[332]

---

[331] *Butler v. Unified Life Ins. Co.,* No. 1:17-cv-17-00050 (D. Mont. Aug. 30, 2018), at ECF 94-4, at 2 (92:11-17).

[332] *Butler v. Unified Life Ins. Co.,* No. 1:17-cv-00050 (D. Mont. Oct. 5, 2018), at ECF 118-11, at 3 (11:16-25).

333.    Zelis repeatedly asserts that its repricing tools are highly effective, and are intended to be so.[333] With respect to the effectiveness, which is to say, the "retention" of the "savings" or "acceptance" by Providers, Zelis's Robert Jackson testified that "90 percent of the providers who receive claims priced by ERS accept the ERS rate."[334] Zelis admits that its services are effective in downwardly adjusting payment amounts for Providers providing OON services. According to its press release, "Zelis sees across the system to identify, optimize, and solve problems holistically with technology built by healthcare experts – ***driving real, measurable results for clients***."[335]

334.    By reason of the alleged violations of the antitrust laws described herein, Plaintiffs and the Class have sustained injury to their businesses or property, having received lower payments for performing OON healthcare services than they would have been paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages. The pervasive use and application of Zelis's technologies and methodologies have caused widespread and substantial harm to Providers. As included on Zelis's webpage, "Craig, COO of TPA" apparently said: "'We're the nation's largest Taft Hartley TPA and have been working with our partner Zelis for the past several years. Our clients have enjoyed average savings of 42%.'"[336] Zelis has also indicated that it "delivers more than $240B in payments to providers"—payments which deposition testimony confirms is substantially less than the amount that was originally and

---

[333] Kaitlin Howard, *Reference-Based Pricing (RBP): An overview,* Zelis (Apr. 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited May 16, 2025) ("The intent is to provide an effective tool to help stabilize the healthcare claims costs.").

[334] *Butler v. Unified Life Ins. Co.,* No. 1:17-cv-00050 (D. Mont. Oct. 5, 2018), at ECF 118-11, at 3 (11:16-21).

[335] *Zelis Named to Inc. 5000 List of Fastest-Growing Companies,* Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited Mar. 21, 2025)(emphasis added.)

[336] *Market Based Pricing with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (emphasis added) (last visited Mar. 19, 2025).

collectively billed.[337] In one example, Plaintiff Pacific Inpatient Medical Group's submitted a claim, which was repriced by Zelis and the associated Commercial Payer at a discount of over 88%:



| Proposal Expires: 01/17/2023 |
| --- |

The attached proposal is being submitted to you for consideration and remittance of payment on the below detailed claim in accordance with the terms and conditions contained herein.

| **Details** | Patient ID: | | Contact: | Pam |
| --- | --- | --- | --- | --- |
| | Patient Name: | ███████████ | Phone: | ███████ |
| | Date(s) of Service: | 10/30/22 - 10/30/22 | Fax: | |
| | Payor: | Anthem Blue Cross & Blue Shield | | |
| | Claim ID: | ██████████ | | |
| | Provider: | PACIFIC INPATIENT MEDICAL | | |
| | Total Billed Amount: | $1,234.08 | | |
| | Repriced Amount: | $143.24 | | |

**Terms**    This Agreement outlines Provider's willingness to accept the following terms on the above claim:

1. The Repriced Amount will be agreed to on this claim.

2. Any interest or penalties relating to the claims processed by the Payor will be waived by Provider.

3. In consideration, Provider will receive payment within 10-15 working days from the date this document is received in the Zelis office. The EOB/EOP remark will designate that the discount is through Zelis or PHX.

4. Payment from the Payor will be subject to any benefit plan terms such as deductibles, co-insurance, co-pays, exclusions and code edit reductions per the plan guidelines. Provider agrees not to balance bill the Payor, administrator and/or patient for the difference between the Total Billed Amount and the Repriced Amount in accordance with the terms of this Agreement.

$143.24 divided by $1,234.08 is 0.116, or 11.6%, or approximately an 88.39% discount off of Plaintiff's claim.

335.    An even greater discount was applied by Zelis and the associated Commercial Payer in *California Spine & Neurosurgery Inst. v. Agilent Techs., Inc.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024).  As illustrated in Ex. 11, Zelis repriced the back surgery services performed by the Provider from an initially-billed amount of $39,000.00 to $567.58:

---

[337] *Modernize your healthcare payments & communications*, Zelis, https://www.zelis.com/solutions/payments-optimization/ (last visited Mar. 20, 2025).



| | | Proposal Expires: 07/12/2023 |

The attached proposal is being submitted to you for consideration and remittance of payment on the below detailed claim in accordance with the terms and conditions contained herein.

**Details**

| | | | |
|---|---|---|---|
| Patient ID: | | Contact: | LIZ |
| Patient Name: | ████████ | Phone: | 213-355-3900 |
| Date(s) of Service: | 02/16/23 - 02/16/23 | Fax: | 213-355-3999 |
| Payor: | Anthem Blue Cross & Blue Shield | | |
| Claim ID: | ████████ | | **We are willing to accept a reduced |
| Provider: | SAN JOSE NEUROSPINE | | payment of $33,150.00** |
| Total Billed Amount: | $39,000.00 | | |
| Repriced Amount: | ~~$567.58~~  $33,150.00 | | |

**Terms**    This Agreement outlines Provider's willingness to accept the following terms on the above claim:

1. The Repriced Amount will be agreed to on this claim.
2. Any interest or penalties relating to the claims processed by the Payor will be waived by Provider.
3. In consideration, Provider will receive payment within 12-15 working days from the date this document is received in the Zelis office. The EOB/EOP remark will designate that the discount is through Zelis or PHX.
4. Payment from the Payor will be subject to any benefit plan terms such as deductibles, co-insurance, co-pays, exclusions and code edit reductions per the plan guidelines. Provider agrees not to balance bill the Payor, administrator and/or patient for the difference between the Total Billed Amount and the Repriced Amount in accordance with the terms of this Agreement.

Zelis's proposal is a mere 1.712% of the price of Provider's services, representing a 98.288% discount.[338]

336.    Zelis, the Commercial Payer Defendants, and other Co-Conspirators have directly and proximately caused Plaintiffs and members of the Class harm and damages resulting from the Zelis Conspiracy.  By receiving collusively-determined and suppressed payments in amounts less than what they would have received for competitively-priced OON healthcare services, Plaintiffs and members of the Class have suffered Article III damages.

337.    The repricing communications are addressed to Providers performing OON services, and include an "Agreement, [which] outlines Provider's willingness to accept . . . The Repriced Amount . . . ."[339]  This "Agreement" also includes a prohibition against "balance bill[ing]," which specifies the "Provider" as the target of repricing resulting from Zelis Conspiracy

---

[338] *California Spine & Neurosurgery Inst. v. Agilent Techs., Inc.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024), ECF 1-11 (Ex. 11).

[339] *Id.*

members' collusive conduct, re-confirms the damages experienced by the target of the collusion, and prevents their target from mitigating damages or becoming "whole" again from a damages perspective.[340]    Plaintiffs and members of the Class have been harmed precisely in the ways Congress anticipated and intended the federal antitrust laws to be used so as to prohibit and remedy such harm. Plaintiffs and members of the Class have suffered antitrust damages and possess antitrust standing.

### 2. Artificially Limiting Professional Choice

338.    The ***overall*** private, commercial payer market (as encompassing the OON Commercial Payer Market) includes both payments made to in-network Providers and payments made to OON Providers.  Although this matter primarily concerns out-of-network payments, the Zelis Conspiracy touches on the market relating to payments made to in-network Providers, as follows.

339.    In-network and OON healthcare services are often regarded, including by Zelis, as providing basically or exactly the same services.[341]    Yet, traditionally, prices paid to in-network Providers for the same services as performed by OON Providers differ.[342]    The difference in price is due, in part, to the economic decision in which the in-network Provider forgoes a higher price for providing specific healthcare services in return for stability, ease or speed of payment, and/or

---

[340] *Id.*

[341] Kaitlin Howard, *Reference-Based Pricing (RBP): An overview,* Zelis (Apr. 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ ("For example, the cost variance of an MRI might range between $800 - $4,000 (or more). But one could argue that the quality of the procedure and car provided is essentially the same.") (last visited May 16, 2025).

[342] *Network and out-of-network care,* Aetna, https://www.aetna.com/individuals-families/using-your-aetna-benefits/network-out-of-network-care.html ("Out-of-network rates are higher") (last visited May 16, 2025).

a higher volume of patients for the Provider's services. Providers who remain or decide to go out-of-network often do so, at least in part, precisely in order to charge a higher fee for a given service.

340.      By artificially suppressing OON payment levels so that they match or come close to in-network payment levels, there is comparatively greater incentive for a Provider to join a PPO Network or go "in-network," but without the PPO needing to increase in-network payments or to improve in-network services.  Without needing to expend any additional costs to improve pay or conditions for Providers, the PPO Network then can charge subscribers more for having a comparatively larger practitioner directory.

341.      There is a direct economic and competitive tension between the benefits involved with choosing to practice within a particular PPO plan and the benefits associated with practicing on an out-of-network basis.

342.      Prior to the Zelis Conspiracy and prior to Ingenix, there was a proper, competitive dynamic available to Providers deciding whether to opt to go in-network or remain OON.  The collusive efforts of Zelis, the Commercial Payer Defendants, and the Co-Conspirators also operate to deny Providers the economic advantages associated with this competitive dynamic.  For example, Milliman's David Lewis specifically noted how repricers and Commercial Payers can use an "In-Network" pricing "reference."[343]   By using this pricing comparator, the Zelis

---

[343] David C. Lewis, *The changing landscape of out-of-network reimbursement*, Milliman (Sept. 2018),          https://edge.sitecorecloud.io/millimaninc5660-milliman6442-prod27d5-0001/media/Milliman/importedfiles/uploadedFiles/insight/2018/changing-landscape-oon-reimbursement.pdf at 1 (last visited Mar. 19, 2025).

Conspiracy operates explicitly to help eradicate the economic value associated with providing OON healthcare services.[344]

343.    By collusively suppressing OON payment levels to come close to or match in-network payment levels, the Commercial Payer Defendants and the non-defendant Co-Conspirators harm competition in yet another way: by making in-network participation artificially more attractive to Providers, but without needing to increase payment levels or improve service levels for Providers.

### C. Antitrust Injury

344.     In addition to sustaining Article III harm, as discussed above, Plaintiffs PIMG, Frank Scaccia, Plaintiff Ayer, Plaintiff Allen, Plaintiff Dr. Scaccia, and Plaintiff DBC, and other members of the Class have also suffered antitrust injury.

345.    Plaintiff Providers have antitrust standing to bring this lawsuit because they are the ones directly injured by the Zelis conspiracy OON underpayments, not the patients:

a.  Providers are the ones underpaid and injured as a result of the anticompetitive repricing conspiracy. Injury occurs at the time of payment (or when it is clear the Provider will not be paid for rendered service). Any injury to a patient is derivative and may not occur at all if there is a balance billing prohibition. Even if there is no such a prohibition by contract or by governmental regulation, a patient's injury depends on whether the provider is willing or able to force the patient to pay the remainder.

b.  Providers' only real and guaranteed option for payment is direct payment from Commercial Payers after providing the service. Whether Providers can get all or part of the remainder of their fee from sources beyond the Commercial Payers is a speculative, secondary issue.

c.  The patient's injury is dependent on what a Provider does after it is underpaid. Any purported injury is indirect and an irrelevant pass-on issue.

---

[344] Use of any reference (or none) can still eradicate the difference in economic value between practicing in-network and out-of-network. The key factor is the resultant price. So long as this price is set at or near in-network payment levels, Defendants thwart the availability of this competitive dynamic.

d.  Patients are not motivated to sue third party payors when such patients are not required to pay the Provider in full for the services.  Balance billing prohibitions torpedo any motivation that patients might otherwise have to pursue receipt of additional policy benefits.

e.  Patients' injuries are speculative:  To the extent that a patient never pays the balance owed to Providers for the  services at issue, patients suffer no injury.

In the real world, Providers don't feel they have the option to go after patients for the full amount, whether due to a patient's lack of resources or patient  relationship concerns.  Going after a patient means the Provider suffers additional injury as far as the lost time value of money, expended effort, opportunity costs of use of limited resources, additional internal office expense to recover payment, loss of goodwill with customers, tarnish to reputation in the community, cost for a collections agent or attorney (which will take a cut of the total payment), and the distraction from the ability to maintain or improve quality of services.

346.    In any event, the Commercial Payers are in a far better position to pay for the Providers' healthcare services than customers.  In comparison to the assets of policyholders, the billions of dollars of readily-available "Surplus" and "Cash and cash equivalents" held by the Commercial Payers (*see* Parties, *supra*) means that the Commercial Payers are in a far better position to pay the OON Providers than the patients themselves.  Of course, the whole idea behind insurance is that the Commercial Payers will pay the lion's share when healthcare services are needed.  If patients are the actual, responsible party, the entire value proposition of insurance is at risk.

347.    As for antitrust injury, ***first***, the injury suffered by Plaintiffs and members of the Class is precisely the type of harm antitrust laws are meant to prevent.  As alleged above, Plaintiffs and members of the Class were paid at amounts or levels less than what they would have been paid for their OON healthcare services that would [have] prevail[ed] in a market free of the unlawful

trade restraint. Had the Defendants and other conspirators abided by the nation's antitrust laws, including Section 1 of the Sherman Act, Plaintiffs and members of the Class would not have been harmed by way of a conspiracy designed to be, which was intended to be, and which was effective in suppressing prices on a collusive basis for payments made to Providers performing OON healthcare services.

348.    **Second**, Plaintiffs and members of the Class were injured as a direct result of Defendants' violation of Section 1 of the Sherman Act. Plaintiffs and members of the Class were harmed by receiving excessively low and anticompetitive below-market payments for OON healthcare services, which were directly related to the efforts to establish, maintain, preserve, further, and conceal the Zelis Conspiracy at issue in this matter.  For example, by examining Zelis's repricing communications issued to Plaintiffs and other Providers, it is clear that the injury at issue concerns the amounts by which submitted claims were repriced.  To the extent that there is any question about from where the injury "flow[ed]," these repricing communications are addressed to specific healthcare service Providers performing OON healthcare services, and which list the "Total billed Amount," as well as the "Repriced Amount" to be paid to that specifically-addressed Provider. Further, the repricing communications note that "1. The Repriced Amount will be agreed to on this claim," and, preventing the ability to mitigate such conspiracy-derived damages, the repricing communication specifies that the "Provider agrees not to balance bill the Payor, administrator and/or patient ***for the difference between the Total Billed Amount and the Repriced Amount*** in accordance with the terms of this Agreement."[345] To the extent there is any question from where Plaintiff's injury "flowed," the repricing communications include details that support,

---

[345] *See, e.g., California Spine & Neurosurgery Inst. v. Agilent Techs., Inc.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024), ECF 1-11 (Ex. 11) (emphasis added).

if not outright confirm, that the Plaintiffs and members of the Class were harmed by that which flowed from the efforts of Defendants participating in the Section 1 Sherman Act-violating Zelis Conspiracy.

349.     **Third**, Plaintiffs can show not only the existence of their own injuries stemming from violations of Section 1 of the Sherman Act, but that Defendants' conduct resulted in an antitrust injury, which also harmed competition.  Zelis admits that it has issued "$240B" worth of payments and even the repricing communications found by Plaintiffs and included and discussed herein demonstrate that others beside the Plaintiffs were injured a result of the Defendants' and their Co-Conspirators' collusive efforts.[346]  Further, however, because "over 770 health insurance companies" have joined the Zelis Conspiracy, including the "top 5" nationwide insurers, there is actually, virtually, or practicably nowhere for Providers to turn in order to obtain market-based and non-collusively-determined OON payments.[347] Through the Defendants' and their Co-Conspirators' use of the conspiracy device, Plaintiffs and members of the Class are deprived of the ability to benefit from competition between and among non-conspiring and rival Commercial Payers. This harm to competition is further discussed in the paragraph below.

350.     **Fourth**, competition was harmed by Defendants' and their Co-Conspirators' collusive efforts, which affected the prices, quantity, or quality of OON healthcare services nationwide.  More specifically, as reflected by the Zelis website touting the "effective[ness]" of

---

[346] *Zelis® for Health Plans & National Carriers*, Zelis, https://www.zelis.com/built-for/payers/health-plans/ (last visited May 7, 2025).

[347] *Id.*

Zelis Named to Inc. 5000 List of Fastest-Growing Companies, Zelis (Aug. 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited May 7, 2025).

its repricing tools and technologies[348]; as reflected by the website's inclusion of customer testimonials, noting, for example, that repricing efforts have given a certain "Taft Hartley TPA" an "average savings of 42%"; and as reflected on the repricing communications not provided by Plaintiff, which concern discounts ranging, for example, from 40% to over 98% of the Providers' originally invoiced amounts, "***prices***" of the OON healthcare services have been suppressed by this buyers' side conspiracy collusively suppressing OON payments.[349]  Moreover, on information and belief, the Zelis Conspiracy has caused the "***quantity***" of sources providing non-collusively-determined OON payments to be severely limited or fully eliminated, further harming competition. Because "over 770 payers," including the "top 5 national health plans" are customers of Zelis and, presumably, members of the conspiracy, Plaintiffs and members of the OON Provider Class have virtually or actually nowhere to turn to obtain non-collusively-suppressed payments for their respective OON healthcare services.[350]  As reflected in the prices paid not just to Plaintiff, but to many other OON Providers, Defendants have harmed competition.

351.    ***Fifth***, price-fixing efforts are sufficient to support a finding of the correct "type" of injury for purposes of showing antitrust injury.  As alleged, collusively-suppressed payments resulting from a price-fixing conspiracy as caused by Zelis's ERS, RBP, and other tools,

---

[348] February 24, 2025 *Effective Strategies to Navigate Provider Out-of-Network Billing Challenges,* Zelis, https://www.zelis.com/blog/effective-strategies-to-navigate-provider-out-of-network-billing-challenges/ (last visited May 7, 2025).

*See also* Kaitlin Howard, *Reference-Based Pricing (RBP): An overview*, Zelis (April 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited May 7, 2025).

[349] *Market-based Pricing with Zelis*., Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited May 7, 2025).

[350] *Zelis® for Health Plans & National Carriers*, Zelis, https://www.zelis.com/built-for-payers/health-plans/ (last visited May 7, 2025); *Zelis Named to Inc. 5000 List of Fastest-Growing Companies*, Zelis (August 13, 2024), https://www.zelis.com/news/zelis-named-to-inc-5000-list-of-fastest-growing-companies/ (last visited May 7, 2025).

technologies, and methodologies, including their respective ability to allow collusively and specifically-determined OON pricing amounts, percentages, thresholds, or ceilings, including "Maximum Allowable Charges," overrides, "pre-defined prices," or price limits, as used and applied by Zelis and the Commercial Payer Defendants, support a "type" of injury constituting antitrust injury.[351]

352.     **Sixth**, when a buyers' cartel is alleged, injury to sellers like Plaintiffs and members of the Class, inflicted through a horizontal price-fixing conspiracy of buyers, constitutes an antitrust injury, which is actionable by the seller.  Sellers, as alleged herein, are the Providers performing OON healthcare services.  As alleged, this action is one concerning a buyers' cartel or buyers' conspiracy.  Such a conspiracy, just as the one alleged herein, often concerns artificially suppressed prices by coordination from fellow buyer-conspirators.  A "mirror" of a sellers' conspiracy, which is designed to prop up or maintain prices, antitrust injury can be properly alleged in the context of a buyers' cartel as supported by allegations of collusive efforts, which have suppressed prices below that which would have existed absent the conspiracy at issue. Commercial Payers have coordinated and engaged in efforts, including the sharing of confidential, proprietary, and CSI and the use of and application of Zelis's tools and technologies to determine on a collusive basis payment level for OON healthcare services and to conceal Commercial Payer responsibility for payment determinations. In disregard of the amounts originally invoiced by the Providers and the pricing responsibility and decision making authority of the Commercial Payers, Defendant

---

[351] *Market-based Pricing with Zelis.,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited May 16, 2025); *Unlock Savings with Member-Centric Reference Based Pricing,* Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 16, 2025); Kaitlin Howard, *Reference-Based Pricing (RBP): An overview,* Zelis (April 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited May 16, 2025).

Zelis then communicates such repriced amounts to the Providers, which are then paid by the Commercial Payers to the Providers at anticompetitive levels to the Providers' detriment. Absent the alleged buyers' side conspiracy, Providers performing OON healthcare services would have received higher payments.

353.    **Seventh**, Plaintiffs and members of the Class received payment for their OON services from members of the buyers' cartel in  amounts less than what they would have been paid absent the conspiracy.  Receipt of such prices or payment levels are established by allegations, including that use of Zelis's repricing tools and technologies resulted in a "Taft Hartley TPA" obtaining an "average savings of 42%" off of OON healthcare service costs and that Anthem Blue Cross used Zelis to reprice back surgery services at more than a 98% discount (repriced from an initially-provided invoice of $39,000 to $567.58).[352]  Further, Zelis asserts the "effective[ness]" of its tools and services, including that its and its Co-Conspirators' efforts have resulted in "$27B" in "claims cost reduction."[353]  Such savings reflect enormous discounts, including discounts as much as over 88% or over 98%, which can readily be recognized as "excessively low" or "significantly below-market," and which such low prices paid to Providers for OON healthcare services would not have existed absent the Zelis Conspiracy.

354.    **Eighth**, harm to competition can readily be shown even if healthcare costs have decreased for patient-consumers (which they have not—*see* analysis, *supra*) as the conspiracy at

---

[352] *Market-Based Pricing with Zelis,* Zelis, https://www.zelis.com/solutions/out-of-network-solutions/market-based-pricing/ (last visited May 16, 2025); *California Spine & Neurosurgery Inst. v. Agilent Techs., Inc.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024), ECF 1-11 (Ex. 11).

[353] *Effective Strategies to Navigate Provider Out-of-Network Billing Challenges,* Zelis (February 24, 2025), https://www.zelis.com/blog/effective-strategies-to-navigate-provider-out-of-network-billing-challenges/ (last visited May 16, 2025); *Zelis for Property & Casualty*, Zelis, https://www.zelis.com/built-for/payers/property-and-casualty-plans/ (last visited May 1, 2025).

issue is a horizontal one; that is, one occurring between and among otherwise competing Commercial Payers, including private health insurance companies.[354]  Further, this group of Commercial Payers includes Defendant Zelis, as well as other architects, owners, operators, and/or managers of PPO Networks. Although Defendant Zelis operates in and competes with other PPO Networks in the PPO Network space, it also performs repricing services.[355]  However, as a repricer, Zelis does not perform at a different commercial plane than the other Commercial Payers, but operates as a way to coordinate pricing information, apply uniform pricing strategies, and share private, confidential, and competitively-sensitive business information between and among Commercial Payers.  In this way, as Zelis acts as a conductor, conduit, and hub in service of the greater Zelis Conspiracy, any verticality in the relationship between Zelis and other Commercial

---

[354]  NAIC U.S. Health Insurance Industry | 2023 Annual Results, https://content.naic.org/sites/default/files/topics-industry-snapshot-analysis-reports-2023-annual-report-health.pdf (last visited May 16, 2025); NAIC U.S. Health Insurance Industry | 2024 Mid-Year Results, https://content.naic.org/sites/default/files/health-2024mid-year-industry-report.pdf (last visited May 16, 2025); MultiPlan Corp. Form 10-K for the fiscal year ended December 31, 2023 (filed on Feb. 22, 2024), https://www.sec.gov/Archives/edgar/data/1793229/000179322924000012/mpln-20231231.htm (last visited May 13, 2025); *In re Laser Spine Institute, LLC, Assignor, to Kapila, Assignee,* Petition Commencing Assignment for Benefit of Creditors, Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, Civil Division, listing Zelis as a "Third Party Insurance Payer[]"; *November Payer Processing Issues,* RXNT (November 2024), https://www.rxnt.com/chc-updates-nov24/?srsltid=AfmBOoqss6TZjCk2qRGBiqY2L622ybVsRhexTplH2zUCEb6kM8FbQWY4 (listing Zelis as a "Payer"); *Change Healthcare,* MB, https://qa.mbpractice.com/insurance/ChangeHealthcarePayers (listing "Payer Name" Zelis at CPID Nos. 6630 and 6731, and Payer ID No. 88057); *Organized Delivery Systems,* State of New Jersey Department of Banking & Insurance, https://www.nj.gov/dobi/division_insurance/managedcare/mcods.htm (listing Zelis Network Solutions, LLC as among the "Approved Organized Delivery Systems") (last visited May 15, 2025).

[355]  *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ ("API, EDI or portal integration to make repricing claims easier" and "82M+ claims repriced in 2023") (last visited May 16, 2025).

Payers does not immunize Zelis and any such verticality is overwhelmed by its role in facilitating collusive efforts on behalf of itself and other Commercial Payers to the detriment of OON Providers. In this circumstance, any "low prices" that might be argued as benefiting consumer-policyholders do not immunize Zelis or any of the Commercial Payer Defendants as (to the extent any such "low [health insurance premium] prices" actually exist in the real world) they result from a horizontal, buyers' side, price-fixing cartel.

355.    Plaintiffs have alleged details sufficient to establish that competition has been harmed and that Plaintiffs and members of the Class have suffered antitrust injury.

### D. Antitrust Standing

356.    The following allegations, among others herein alleged, support Plaintiffs' antitrust standing, including:

357.    *First*, with respect to the causal connection between the antitrust violation and the harm to the plaintiff, the collusive repricing efforts caused OON Providers, including Plaintiffs and members of the Class, to receive payments at artificially suppressed amounts, as described by Zelis's repricing communications. With respect to whether that harm impacted Plaintiffs, analyzing just a single repricing communication received by PIMG on or around January 17, 2023, showing the repriced amount was significantly lower than the original invoiced amount, and the discounted amount or some portion of it was anticompetitive. This discounted payment was determined by Defendants by an agreed-upon anticompetitive rate and is but a single expression

of harm suffered by one Plaintiff, which was caused by the Sherman Act violation committed by Defendants.[356]

358.      **Second,** with respect to pleading an improper motive, other than possibly any requisite intent associated with committing to an agreement, there is no need to prove any other specific state of mind to support a violation of Section 1 of the Sherman Act.   Nevertheless, Plaintiffs have alleged Defendant Zelis's intent to use its technology, tools, and agreements Zelis has with other Commercial Payers to collusively—and effectively—suppress payments to an anticompetitive level for Providers performing OON healthcare services.   As Zelis's Kaitlyn Howard stated in an April 27, 2023 description of its "Referenced-Based Product" repricing tool, "[t]he intent is to provide an effective tool to help stabilize the healthcare claims costs." (Emphasis added.)[357]   Zelis is clear as to the focus of the RBP tool's "effective[ness]": "RBP could potentially reduce healthcare spending by up to $9.4 billion per year if it were widely adopted."[358]   With respect to "Key Points" regarding its "RBP" repricing service: "2MM+ reference-based pricing claims [are] repriced annually"; that its RBP repricing service has resulted in "97% retained savings"; and that it has "<4% member and provider inquiry rate."[359]   In other words, Zelis expressed its "intent" to "stabilize" OON healthcare claims costs, and its website further confirmed

---

[356] As to be further explored and determined by one or more experts, it is likely that all or some component of the difference between the amount billed and the post-repricing amount paid represents the amount that an OON Provider has been injured.   Although this amount or associated percentage has not been determined at this time, the existence of this difference demonstrates, at the pleading stage where all well-pled factual allegations support Plaintiffs' inferences, Article III injury and antitrust injury.

[357] Kaitlin Howard, *Reference-Based Pricing (RBP): An overview*, Zelis (Apr. 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited Mar. 19, 2025).

[358] *Id.*

[359] *Unlock Savings with Member-Centric Reference Based Pricing*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/ (last visited May 2, 2025).

that it did so.  Although controlling or minimizing costs might be appropriate in the abstract, it is not appropriate, and is "improper" when accomplishing such a goal in a collusive manner involving horizontal competitors engaging in price-fixing.

359.     **Third**, Plaintiffs have previously and satisfactorily alleged the existence of antitrust injury, or the nature of the plaintiff's alleged injury and whether the injury is of a type that Congress sought to redress with the antitrust laws.  As thoroughly discussed *supra*, Plaintiffs have fully satisfied this "antitrust injury" test.  Further, allegations concerning price-fixing occurring through a buyers' cartel suffice for pleading antitrust injury.

360.     **Fourth**, Plaintiffs have sufficiently pleaded the directness with which the alleged market restraint caused the asserted injury.  Plaintiffs have alleged a direct connection between the collusive repricing scheme at issue and its resulting harm to Plaintiffs.  Plaintiffs have alleged that the Commercial Payers have reached agreements with Zelis, and have at least exchanged CSI between and among other Commercial Payers (if not also reached associated agreements).  Further, on information and belief, at least prior to July 1, 2022, these agreements concern an agreement to share confidential, proprietary, and competitively-sensitive business information in exchange for the permission to use Zelis's repricing tools, technologies, and methodologies.  Also, these agreements specifically concern the repricing of payments owed to Providers performing OON healthcare services.  Finally, such repricing is often reflected in Zelis's repricing communications, which include details concerning the amount billed, the identification of the patient and associated claim, and the amount ultimately paid at the repriced (downwardly adjusted) amount.  There is no intervening event or occurrence that separates the agreements at issue entered into by the Defendants, the application of the repricing, which was enabled by those agreements, and the financial impact suffered by the Providers performing OON healthcare services.  As shown by the

Zelis repricing communications, this injury was not remote, but is as direct as an impact resulting from a buyers' cartel can be.

361.    ***Fifth***, the damages here are not speculative.[360] Plaintiffs and their fellow class-member OON Providers were the intended victims of the repricing scheme at issue. The repricing communications were not only addressed directly to the Provider (and not, for example, a patient), and not only include the downwardly adjusted amounts (the amounts which were actually paid to the Providers), but also include a prohibition on balance billing and other terms. The balance billing prohibition, among other effects, conditions the ***Provider's*** receipt of payment on an agreement not to "balance bill." As such, the focus of the repricing is not on some other individual or entity, but on the Provider performing OON healthcare services. Specifically, Zelis conditioned "[p]ayment" on Plaintiff's "agree[ment] not to balance bill the Payor, administrator and/or patient for the difference between the Total Billed Amount and the Repriced Amount in accordance with the terms of this Agreement." Moreover, there is no indication that any other individual or entity has suffered greater or more directly-applied harm by the Defendants resulting from this scheme, or otherwise holds positions in greater danger from the effects of the collusive repricing scheme than the OON Providers. Just as Zelis's Ms. Howard communicated, the Providers (the source of such "healthcare claims costs") are the "intend[ed]" victims of the collusive repricing scheme and were and are the most direct victims of the repricing scheme at issue; there are no other "more direct victims." The damages cannot be deemed to be "speculative," as in those cases where repricing communications accompany a repriced claim, Zelis specifies the exact amounts at issue

---

[360] *Sullivan v. Tagliabue,* 25 F. 3d 43, 46 (1st Cir. 1994) (citing *Associated Gen'l Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537-545 (1983)) (factor (5) "the speculative nature of the damages").

362.    **Sixth,** there is very little, if any, risk of duplicative recovery or complex apportionment of damages.  With respect to the payment for OON healthcare services at issue, Providers perform healthcare services for patients where that Provider is not a member of the patient's PPO Network.  Based on the terms of that patient's health insurance policy with that particular Commercial Payer, the Commercial Payer remains obligated to pay the Provider for such care, even though the Provider is "out-of-network." After such healthcare services are performed, the Provider issues a claim to the patient's insurer.  At this point, the insurer could simply pay the Provider the amount invoiced by the Provider.  However, this is not what occurs. Instead, the Commercial Payer sends the Provider's claim to the Commercial Payer's repricer; here, Zelis.  Zelis then applies its downwards pricing adjustment via its tools, technologies, and/or methodologies to produce a reduced payment amount.  As the Commercial Payer has previously delegated such pricing authority to Zelis, Zelis then issues the Provider a repricing communication reflecting various details, which include the date the healthcare service was rendered, the identification of the patient, the claim ID, the procedure at issue, the Provider performing the procedure, the amount originally billed, and the repriced amount.[361]  As occurs most of the time (by far), there is no objection by the Provider and within a particularly specified amount of time, the Commercial Payer pays the Provider at the repriced amount.

363.    Subject to expert analysis and refinement, the damages at issue here are represented by at least part, if not all, of the difference between the amounts originally invoiced and the amounts paid at the repriced level.  There is no potential for "duplicative recovery;" rather, there is only any recovery if the repriced amount is less than the amount originally billed.  Moreover, as

---

[361] *Butler v. Unified Life Ins. Co.*, No. 1:17-cv-00050 (D. Mont. Sept. 5, 2018), ECF 101-5 (Scanlan Rebuttal Report), at 1; *Cal. Spine Inst. v. Agilent Techs.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024), ECF No. 1-11 (Ex. 11).

these amounts are specifically tied to particularized procedures and patients, as performed on a particular day by a particular Provider (as indicated on Zelis's repricing communications), there is no risk of multiple payments paid for the same service. Additionally, allocation of damages is straightforward, as often specified by Zelis's repricing communications. Zelis, as delegated by the respective Commercial Payer, specifies that the repriced amount as included in the repricing communication is tied to a particular procedure performed by a particular Provider on a particular patient on a particular day. Further, that repriced amount is tied to the Provider's specific, invoiced amount. Subject to expert analysis and refinement, the OON Provider's damages are captured, at least in part, by the difference between the amount originally invoiced and the repriced payment. The repricing communications themselves minimize or eliminate entirely the possibility of duplicative recovery or complex apportionment. Further, Defendant Zelis and the Commercial Payer responsible for the payment at issue are both likely to have detailed ledgers and databases, which similarly record and connect the originally invoiced amount and the repriced amount with the Provider performing the OON healthcare service.[362]

364.     The harm and damages suffered by Plaintiffs and members of the Class constitute an antitrust injury of the type that Congress, through the enactment of the antitrust laws including Section 1 of the Sherman Act, meant to dissuade, prevent, and redress.

---

[362] Amanda Eisel, *The Data Revolution: Coming to a Healthcare Industry Near You*, Zelis (Sept. 27, 2023), https://www.zelis.com/blog/the-data-revolution-coming-to-a-healthcare-industry-near-you/ ("We're aggregating and analyzing data and putting it back into the hands of payers, providers, and consumers. More specifically, Zelis is optimizing data to help payers easily assess, benchmark and create high-performing networks based on costs, access and quality.") (last visited May 16, 2025); *Gain claims pricing accuracy and transparency with Zelis,* Zelis, https://www.zelis.com/solutions/in-network-pricing/ ("API, EDI or portal integration . . . make[s] repricing claims easier") (last visited May 16, 2025).

365.     In addition to the analysis above, confirming Plaintiffs' and the Class Members' antitrust injury, their antitrust standing, and their inability to mitigate damages, the repricing communications at issue specifically prevent and prohibit Providers from recovering the difference between the amount invoiced by the Providers and the amount paid by the Commercial Payers, through the repricing efforts of Zelis.[363]

366.     Zelis, as an agent of the Commercial Payers and acting within its scope of delegated authority, conditions receipt of payment on the healthcare service Provider's agreement not to balance bill others in order to obtain full satisfaction of the amount invoiced for performance of OON healthcare services.[364]

367.     In the event that a healthcare service Provider seeks to avoid the balance billing restriction, that Provider receives no payment from Commercial Payers for the performance of the OON healthcare services.  Accordingly, the Provider performing associated OON healthcare services is either damaged through receipt of an underpayment or through receipt of no payment whatsoever.

368.     As communicated by Zelis to the "Provider": "Provider agrees not to balance bill the Payor, administrator, and/or patient for the difference between the Total Allowed Amount and the Repriced Amount in accordance with the terms of this Agreement."[365]

369.     Due in part to OON underpayments as communicated at repriced amounts and Zelis's inclusion of prohibitions on "balance billing," which are specifically directed to

---

[363] *See, e.g., Cal. Spine Inst. v. Agilent Techs.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024), ECF No. 1-11 (Ex. 11).

[364] *See Id.*

[365] *Cal. Spine Inst. v. Agilent Techs.*, No. 5:24-cv-05248-EJD (N.D. Cal. Aug. 16, 2024), ECF No. 1-11 (Ex. 11).

"Provider[s]," there is no question that the "intend[ed]" victims of this antitrust conspiracy, as the source of "healthcare claims costs," are the Plaintiffs and Class members; that such Providers have suffered damages; that such Providers have sustained antitrust injury of the type that Congress, through enactment of the Sherman Act, sought to dissuade, prevent, and redress; and, as such, that Plaintiffs and members of the Class of OON Providers possess antitrust standing.[366]

## VIII.   Class Action Allegations

### A.  Plaintiffs Seek to Represent and Are Members of the Following Defined Class

370.        Plaintiffs satisfy Federal Rule of Civil Procedure 23 and all other pertinent federal class certification requirements to represent the Class described herein.

371. Plaintiffs invoke Rule 23(a), (b)(2), and (b)(3) on behalf of the following Class:

> All persons and entities who received one or more payments from either Zelis or from Commercial Payers (as defined herein) for out-of-network healthcare services in the United States, including in any of its States, the District of Columbia, or U.S. territories  that were repriced directly or indirectly by Zelis, from June 13, 2016 to the present (the "Class Period").

Excluded from the Class are Zelis, any of its subsidiaries; any of its officers, directors and employees; any entity in which Zelis has a controlling interest; and any affiliate, legal representative, heir, or assign of Zelis.  Also excluded from the Class are the Commercial Payer Defendants and any other commercial payers that made payments pursuant to Zelis' repricing conspiracy any of their subsidiaries; any of their officers, directors, and employees; any entity in which a Commercial Payer Defendants has a controlling interest; and any affiliate, legal representative, heir, or assign of any Commercial Payer. Also excluded are any federal, state, or

---

[366] Kaitlin Howard, *Reference-Based Pricing (RBP): An overview,* Zelis (Apr. 27, 2023), https://www.zelis.com/blog/rbp-an-overview/ (last visited May 16, 2025).

local governmental entity; any judicial officer presiding over this action; the members of the judicial officer's immediate family and staff; and any juror assigned to this action.

372.    Plaintiffs provided OON healthcare services to patients who maintained insurance, but whose insurance did not include Plaintiffs among the policy's, the plan's, or the network's in-network Providers. Plaintiffs are members of the Class they seek to represent.

## B. Plaintiffs Satisfy All Rule 23(a) Requirements

### 1. The Class Is Ascertainable

373.    The defined Class is readily identifiable and one for which sufficient and adequate electronic records exist because Class members received payments from Defendants.

### 2. The Number of Members of the Class Is Sufficiently Numerous

374.    Due to the nature of the trade and commerce involved, Plaintiffs believe thousands of Class Members exist. Defendants know or have records sufficient to determine the exact number of Class members and their identities.

### 3. Plaintiffs' Claims Are Typical of Those Members of the Class

375.    Plaintiffs' claims are typical of Class members' claims as the members' claims invoke the same theories of liability, arise from the same course of unlawful conduct, and show that injury of healthcare Providers has occurred in the same way involving the same or similar mechanisms. Plaintiffs Will Adequately Protect the Interests of the Class.

376.    Plaintiffs will fairly and adequately protect the interests of the members of the Class as Plaintiffs' interests are aligned with, and not antagonistic to, the interests of Class members.

377.    Plaintiffs have retained counsel competent and experienced in prosecuting class actions, litigating antitrust matters, and both in combination.

**4. An Action Brought Individually on Behalf of Plaintiffs Share Common Legal and Factual Questions and Answers with an Action Brought on Behalf of the Class**

378.     As discussed further with respect to Rule 23(b)(3), in the event that Plaintiffs were to bring individual antitrust actions against Zelis and the Commercial Payer Defendants, such actions would share many if not all of the same legal and factual inquiries and related resolutions as would a similar action brought on behalf of a proposed Class.

**C. Common Legal and Factual Questions Predominate Over Individual Questions and Answers**

379.     Common legal and factual questions, along with their corresponding resolutions, predominate over individual or individualized questions. These predominating common legal questions, which resolve to common answers, include the following:

- Whether Zelis, the Commercial Payer Defendants, and their Co-Conspirators engaged in an agreement, combination, or conspiracy to suppress, maintain, or stabilize payments made to Providers for their OON healthcare services and/or products as part of interstate commerce between and among the States, the District of Columbia, and U.S. territories, and in the United States;

- The identity of the conspiracy's participants;

- The conspiracy's duration;

- The acts performed by Zelis, the Commercial Payer Defendants, and their Co-Conspirators in furtherance, maintenance, enforcement, preservation, or concealment of the conspiracy;

- Whether the conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

- The effect of the conspiracy on the price of OON healthcare services and products in the United States, the District of Columbia, and U.S. territories during the Class Period;

- Whether Plaintiffs and members of the proposed Class suffered antitrust injury as a result of the Zelis Conspiracy;

- The appropriate method for measuring damages for injury suffered by Plaintiffs and members of the Proposed Class; and

Whether Plaintiffs and members of the Class are entitled to injunctive relief, and the form, nature, and extent thereof.

380.    Many, if not all of the above inquiries resolve to an answer shared between Plaintiffs and members of the proposed Class.

381.    To the extent there might be differences between those experiences of Plaintiffs and Class members, such differences relate to considerations regarding the extent, amount, or timing of the injuries at issue and do not defeat class certification.

**D.  Use of the Class Action Mechanism Here is Superior to Other Methods of Dispute Resolution**

382.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons: (1) individual joinder of all class members is impractical; (2) prosecution as a class action will eliminate the possibility of duplicative litigation; (3) prosecution of separate actions by individual members of the proposed Class would create the risk of inconsistent or varying decisions and adjudications, creating uncertain and potentially incompatible standards for adjudicating the claims and defenses asserted in this action; (4) the relatively small amount of damages suffered by individual members of the proposed Class, when compared to the expense and burden of individual prosecution of their individual claims, preclude feasible and practical individual actions to seek redress for the violations alleged; and (5) individual litigation would greatly magnify the delay and expense to all parties and to the court system. For these reasons, a class action will reduce case management difficulties and provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

383.    Also supporting the superiority of use of the class action mechanism over other methods, the Zelis members have acted on grounds generally applicable to the Class, making final

injunctive relief appropriate as applied to the Defendants and as of benefit to the members of the proposed Class as a whole.

## IX.  Cause of Action

### Count 1: Horizontal Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

384.      Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint as if set forth herein.

385.      Beginning no later than June 13, 2016, Zelis, the Commercial Payer Defendants, and their Co-Conspirators created and executed a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce.

386.      The contract, combination, or conspiracy alleged herein has consisted of a continuing horizontal agreement between and among Zelis, the Commercial Payer Defendants, and all of their Co-Conspirators to knowingly and collectively use Zelis's repricing tools to collusively fix payment amounts for OON healthcare services performed by OON Providers in the United States.  This conspiracy has caused Plaintiffs to be paid at artificially suppressed payment levels for performance of OON healthcare services during the Class Period.

387.      The contract, combination, or conspiracy alleged herein constitutes a horizontal conspiracy between and among direct competitors participating in the OON Commercial Payer Market.

388.      In the alternative, the contract, combination, or conspiracy to unreasonably restrain trade and commerce alleged herein has taken the form of a hub-and-spoke conspiracy in which Zelis served and continues to serve as the "hub" or as a "conduit," the agreements between Zelis and Commercial Payer Defendants, and their Co-Conspirators to use Zelis's repricing tools served and continue to serve as "spokes," and the agreements between the ends of different "spokes" to

use Zelis's repricing tools to reprice payments to Providers for OON healthcare services at artificially suppressed levels served and continue to serve as the "rim."

389.     The unlawful acts and omissions of Zelis, the Commercial Payer Defendants, and their Co-Conspirators in establishing, maintaining, furthering, reinforcing, concealing and/or preserving the conspiracy and the conspiracy's objectives include, but are not limited to, the following:

- Zelis sold and operated its proprietary analytical tools to determine the amounts of payment for OON healthcare services performed by OON Providers;

- Zelis's Co-Conspirators, including other Commercial Payers, facilitated the use of Zelis's analytical pricing tools by submitting their confidential, proprietary, and competitively-sensitive claims and pricing data to Zelis;

- Zelis's Co-Conspirators, including Commercial Payers, outsourced the processing and pricing of OON claims to Zelis, knowing that Zelis would use their claims and pricing data to set payment prices for OON healthcare claims;

- Zelis and its Co-Conspirators, including the Commercial Payer Defendants, paid claims for OON healthcare services at anticompetitive rates or payment levels as determined by Zelis's pricing tools;

- Zelis, the Commercial Payer Defendants, and their Co-Conspirators, including Non-Defendant Commercial Payers, used many methods of bilateral and multilateral communication about claims, pricing, and payments of claims submitted for OON healthcare services, including their use and endorsement of Zelis's repricing tools, all having the purpose and effect of establishing, maintaining, furthering, reinforcing, concealing and/or preserving their anticompetitive scheme;

- Zelis, the Commercial Payer Defendants, and their Co-Conspirators engaged in efforts designed to and were successful in interfering with the OON Providers' ability to associate OON pricing determinations with a particular Commercial Payer; and

- Engaging in efforts to conceal the Zelis Conspiracy, the methodologies, calculations, and overrides used in determining OON payment levels, and the identities of its participants.

390.     The acts and omissions by Zelis, the Commercial Payer Defendants, and their Co-Conspirators in establishment, maintenance, furtherance, reinforcement, and concealment of their conspiracy to restrain trade were authorized, ordered, and performed by the Defendants' and their

Co-Conspirators' officers, employees, agents, or representatives while actively engaged in managing their interstate operations.

391.     Zelis, the Commercial Payer Defendants, and their Co-Conspirators jointly possess market power in the relevant antitrust market, the market for payments made to OON Providers by Commercial Payers made up of private health insurers, PPO Networks, PPO Plans, managed care organizations, self-funded plans, and self-insured entities (the OON Commercial Payer Market).

392.     The relevant geographic market is the United States, including all fifty states, the District of Columbia, and U.S. territories.

393.     The Zelis Conspiracy has caused past and continuing anticompetitive effects in the form of artificially suppressed payment of claims.

394.     As a direct and proximate result of past and continuing violations of Section 1 of the Sherman Act by members of the Zelis Conspiracy, Plaintiffs and members of the Class have been injured in their business or property and will continue to be similarly injured by receiving lower payments for OON healthcare claims than they would have received, absent the conspiracy.

395.     The Zelis Conspiracy is a *per se* violation of Section 1 of the Sherman Act.

396.     As the violations at issue include *per se* violations of Section 1 of the Sherman Act, no delving into procompetitive justifications or excuses is needed or permitted.

397.     In the event that a presiding Court determines that the violations at issue are not *per se*-based, there are no procompetitive justifications or excuses for the Zelis Conspiracy.  Further, to the extent that any to-be-proffered procompetitive justifications exist, they could have been achieved through less restrictive means.

398.     In the alternative, the Zelis Conspiracy violates Section 1 of the Sherman Act under either a "quick look" or a full "rule of reason" analysis.  The combination and conspiracy alleged had these effects, among others:

- Price competition in the payment for OON healthcare services has been restrained, suppressed, and eliminated as to interstate commerce in the United States;

- Plaintiffs and members of the Class who received payments for their respective OON healthcare services from Zelis, the Commercial Payer Defendants, or their Co-Conspirators, including their respective divisions, subsidiaries, and affiliates, were deprived of the benefits of free and open competition with respect to the prices paid for those OON healthcare services.

399.     Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by suppressing and fixing payments for claims submitted for OON services throughout the United States as Defendants provide repricing and payment-related services throughout the United States, the District of Columbia, and U.S. territories.

400.     The conspiratorial acts and combinations have caused unreasonable restraints in the OON Commercial Payer Market.

401.     Plaintiffs and members of the Class have been injured and will continue to be injured in their respective businesses and properties by receiving smaller payments for their performance of OON healthcare services from Zelis, the Commercial Payer Defendants, and their Co-Conspirators than they would have been paid absent the conspiracy.

402.     Plaintiffs and members of the Class are entitled to an injunction against all members of the Zelis Conspiracy, including Zelis, the Commercial Payer Defendants, and their Co-Conspirators, to prevent and restrain their unlawful conduct.

## X.  Request for Relief

WHEREFORE, Plaintiffs, on their behalf and on behalf of absent Class members, request that the Court grant the following relief:

a.   A determination that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3); appointing Plaintiffs as Class representatives and their counsel of record as Class Counsel; and directing that notice of this class action as provided by Rule 23(c)(2) be given to members of the Class following certification;

b.   A determination that the conspiracy among Zelis, the Commercial Payer Defendants, and their Co-Conspirators, and all of their respective acts or omissions in establishing, maintaining, furthering, reinforcing, concealing and/or preserving the conspiracy, violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.   Enter judgment for Plaintiffs and members of the Class against Zelis and the Commercial Payer Defendants for treble damages sustained by Plaintiffs and the members of the Class in the form of claim underpayments, lost revenue and profits, and all other economic harm resulting from Zelis's and the Commercial Payer Defendants' violations of the Sherman Act;

d.   An award to Plaintiffs and the members of the Class of all available damages, including the trebling of all antitrust-based damages as allowed under the federal antitrust statutes for Defendants' wrongful conduct as alleged herein;

e.   An award to Plaintiffs and the members of the Class all pre-judgment and post-judgment interest covering the fullest extent of time and calculated at the largest interest rate allowed by law, beginning no later than the commencement of this action;

f.   Permanent injunctive relief enjoining Zelis, the Commercial Payer Defendants, and their Co-Conspirators, affiliates, successors, transferees, assignees, officers, directors, partners, agents, employees, and all other persons acting or claiming to act on their behalf or in concert with them, from continuing, maintaining, furthering, reinforcing, concealing, preserving, and/or renewing the conduct, conspiracy, or combination and from entering into any other contract, conspiracy, or

combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device from having a similar purpose or effect, and/or from adopting or following any practice, plan, program, or device having a similar purpose or effect caused by any further violation of the Sherman Act or any other federal antitrust law;

g. An award of Plaintiffs' and the Class members' costs and expenses of prosecuting this action, including all reasonable attorneys' fees as permitted by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26;

h. Such other and further relief as the Court may deem just and proper.

## XI. Demand for Jury Trial

Plaintiffs demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), of all issues so triable.

Dated: June 11, 2025                    Respectfully submitted,


                                        *s/Maureen Forsyth*

Richard M. Paul III, *pro hac vice*      Maureen Forsyth (MA Bar No. 642390)
Ashlea G. Schwarz, *pro hac vice forthcoming*   Jason S. Hartley, *pro hac vice*
Mary Jane Fait, *pro hac vice forthcoming*      Jason M. Lindner, *pro hac vice forthcoming*
Haley Hawn, *pro hac vice forthcoming*          Kenneth Frost, *pro hac vice forthcoming*
**PAUL LLP**                              **HARTLEY LLP**
601 Walnut Street, Suite 300              101 W. Broadway, Ste 820
Kansas City, Missouri 64106              San Diego, CA 92101
Telephone: (816) 984-8100               Telephone: (619) 400-5822
Rick@PaulLLP.com                        forsyth@hartleyllp.com
Ashlea@PaulLLP.com                      hartley@hartleyllp.com
MaryJane@PaulLLP.com                    lindner@hartleyllp.com
Haley@PaulLLP.com                       frost@hartleyllp.com

                                        *Co-Lead Counsel for Plaintiffs and the Putative Class*

Amanda F. Lawrence
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: (860) 531-2606
alawrence@scott-scott.com

Patrick Coughlin, *pro hac forthcoming*
Fatima Brizuela, *pro hac forthcoming*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 798-5308
pcoughlin@scott-scott.com
fbrizuela@scott-scott.com

John Landay (*pro hac vice forthcoming*)
**LANDAY ROBERTS LLP**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 648-4811
jlanday@landayroberts.com

Daniel J. Mogin (*pro hac vice forthcoming*)
MOGIN LAW LLP
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone: (619) 687-6611
dmogin@moginlawllp.com

Daniel R. Karon (*pro hac vice forthcoming*)
KARON LLC
631 W. St. Clair Ave.
Cleveland, OH 44113
Telephone: (216) 622-1851
dkaron@karonllc.com

Katrina Carroll
Kyle A. Shamberg
CARROLL SHAMBERG LLC
111 W. Washington Street
Suite 1240
Chicago, IL 60602
Telephone: 872-215-6205
katrina@csclassactions.com
kyle@csclassactions.com

Adam J. Zapala (245748)
Elizabeth T. Castillo (280502)
Christian S. Ruano (352012)
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com

David M. Cialkowski
(*pro hac vice application forthcoming*)
Ian F. McFarland
(*pro hac vice application forthcoming*)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
(612) 341-0400
david.cialkowski@zimmreed.com
ian.mcfarland@zimmreed.com

Garrett D. Blanchfield
Brant D. Penney
Roberta A. Yard
**REINHARDT WENDORF &
BLANCHFIELD**
80 South 8th Street, Suite 900
Minneapolis, MN  55402
Telephone:  (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have caused the above papers to be filed through the Court's ECF system, which will serve the papers electronically to all counsel of record.

Dated: Jun 11, 2025                             /s/*Maureen E. Forsyth*
                                                        Maureen E. Forsyth