## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: ZELIS REPRICING ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>All Actions | Lead Action Case No.: 1:25-cv-10734-BEM<br><br>*Consolidated with Case Nos.:*<br>*1:25-CV-11092-BEM*<br>*1:25-CV-11167-BEM*<br>*1:25-CV-11537-BEM*<br><br>Leave to file granted on July 31, 2025 |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT</u>

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 5

    A.  Healthcare System Dynamics ................................................................................ 5

    B.  Zelis Services and the MCOs .............................................................................. 8

    C.  Plaintiffs' Allegations ......................................................................................... 9

LEGAL STANDARDS ........................................................................................................ 12

ARGUMENT ........................................................................................................................ 13

I.   PLAINTIFFS LACK ARTICLE III STANDING BECAUSE THEIR PURPORTED
     INJURIES ARE INDIRECT AND DERIVATIVE ................................................... 13

    A.  Plaintiffs Lack Article III Standing Because They Fail to Allege an Injury-in-
        Fact that Is Traceable to Defendants' Use of Zelis's Repricing Solution ................. 13

    B.  Plaintiffs Have No Antitrust Standing Because Their Purported Injuries Are
        Indirect and Derivative. ..................................................................................... 15

II.  PLAINTIFFS DO NOT ALLEGE ANTITRUST INJURY. .................................... 18

III. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A CONSPIRACY. .................................. 21

    A.  Plaintiffs Do Not Plead a Horizontal Conspiracy. ....................................................... 22

    B.  Plaintiffs Do Not Plead a Hub-and-Spoke Conspiracy. ................................................ 24

        1.  *Plaintiffs Do Not Plead Any Direct Evidence of a Conspiracy.* ........................... 25

        2.  *Plaintiffs Also Fail to Plead Circumstantial Evidence of a Conspiracy.* ............. 26

IV. PLAINTIFFS FAIL TO PLEAD A RELEVANT ANTITRUST MARKET. ........................ 37

CONCLUSION ..................................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) (per curiam) ............................................................................31

*Advanced Tech. Corp. v. Instron, Inc.*,
925 F. Supp. 2d 170 (D. Mass. 2013) ...................................................................................12

*In re Aetna UCR Litig.*,
2015 WL 3970168 (D.N.J. June 30, 2015) ................................................................2, 30, 31

*Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
267 F.3d 30 (1st Cir. 2001) .....................................................................................................5

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*,
374 F.3d 23 (1st Cir. 2004) ...................................................................................................35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................12, 22, 30, 40

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983) ..........................................................................................................15, 18

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ...............................................................................................................14

*In re BCBS Antitrust Litig.*,
2017 WL 2797267 (N.D. Ala. June 28, 2017) ......................................................................39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................... *passim*

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999) ..................................................................................................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) .....................................................................................................16, 17, 18

*Bryan v. Ascend Learning*,
2024 WL 5170211 (D. Mass. Dec. 19, 2024) ........................................................................37

*Chapman v. New York State Div. of Youth*,
546 F. 3d 230 (2d Cir. 2008) .................................................................................................37

*In re Concrete and Cement Additives Antitrust Litig.*,
    2025 WL 1755193 (S.D.N.Y. June 25, 2025) ........................................................27

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
    2024 WL 4356188 (D.N.J. Sept. 30, 2024) ...................................................28, 29

*Dai v. SAS Inst. Inc.*,
    2025 WL 2078835 (N.D. Cal. July 18, 2025)................................................28, 29

*In re Delta Dental Antitrust Litig.*,
    484 F. Supp. 3d 627 (N.D. Ill. 2020) ............................................................39, 40

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ...............................................................................25

*DM Rsch., Inc. v. Coll. of Am. Pathologists*,
    2 F. Supp. 2d 226 (D.R.I. 1998), *aff'd*, 170 F.3d 53 (1st Cir. 1999) .....................13

*United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
    579 F.3d 13 (1st Cir. 2009)....................................................................................12

*Eastern Food Servs., Inc. v Pontifical Catholic Univ. Servs. Ass'n*,
    357 F.3d 1 (1st Cir. 2004)..............................................................................37, 39

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    720 F.3d 33 (1st Cir. 2013)...................................................................................27

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    832 F.3d 1 (1st Cir. 2016).....................................................................................34

*Franco v. Conn. Gen. Life Ins. Co.*,
    818 F. Supp. 2d 792 (D.N.J. 2011), *aff'd in relevant part*, 647 F. App'x 76 (3d
    Cir. 2016) ...................................................................................................2, 30, 31

*FTC v. Advocate Health Care Network*,
    841 F.3d 460 (7th Cir. 2016) ...............................................................................38

*FTC v. Staples, Inc.*,
    190 F. Supp. 3d 100 (D.D.C. 2016)......................................................................38

*Gibson v. Cendyn Grp.*,
    2024 WL 2060260 (D. Nev. May 8, 2024)...........................................................29

*Gibson v. MGM Resorts Int'l*,
    2023 WL 7025996 (D. Nev. Oct. 24, 2023) ...................................................27, 32

*Hochendoner v. Genzyme Corp.*,
    823 F.3d 724 (1st Cir. 2016)................................................................................14

*Hostar Marine Transp. Sys., Inc. v. United States*,
   592 F.3d 202 (1st Cir. 2010) ...........................................................................12

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ........................................................................25, 26

*InterGen N.V. v. Grina*,
   344 F.3d 134 (1st Cir. 2003) ...........................................................................35

*Kartell v. Blue Shield of Mass., Inc.*,
   749 F.2d 922 (1st Cir. 1984), *cert. denied*, 471 U.S. 1029 (1985) .........................................19

*Kleen Prods. LLC v. Ga-Pac. LLC*,
   910 F.3d 927 (7th Cir. 2018) ...........................................................................34

*Little Rock Cardiology Clinic PA v. Baptist Health*,
   591 F.3d 591 (8th Cir. 2009) ...........................................................................38

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*,
   2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023)................................................................2, 19, 24

*Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*,
   2025 WL 1031093 (E.D.N.Y. Apr. 7, 2025) ..................................................................2

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
   952 F.3d 832 (7th Cir. 2020) ........................................................................25, 26

*Martindell v. News Grp. Publications, Inc.*,
   580 F. Supp. 330 (E.D.N.Y. 1984) ......................................................................29

*In re MultiPlan Health Ins. Provider Litig.*,
   2025 WL 1567835 (N.D. Ill. June 3, 2025) ........................................................ *passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ...................................................................24, 27, 29, 31

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   42 F. Supp. 3d 231 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st Cir. 2016)................................25

*In re Nexium (Esomeprazole) Antitrust Litig.*,
   842 F.3d 34 (1st Cir. 2016)..........................................................................24, 25, 28

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
   997 F. Supp. 2d 526 (N.D. Tex. 2014) ..................................................................28

*Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*,
   2021 WL 1176677 (N.D. Cal. Mar. 29, 2021)............................................................2, 16, 18

*Pac. Recovery Sols v. United Behav. Health*,
  481 F. Supp. 3d 1011 (N.D. Cal. 2020) ....................................................2, 16, 17

*Pagan v. Calderon*,
  448 F.3d 16 (1st Cir. 2006)................................................................................14

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
  767 F. Supp. 3d 681 (N.D. Ohio 2025)..............................................................32

*PKS, Inc. v. Leegin Creative Leather Prod., Inc.*,
  615 F.3d 412 (5th Cir. 2010) .............................................................................25

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)...............................................................................37

*Rodi v. S. New England Sch. Of L.*,
  389 F.3d 5 (1st Cir. 2004)..................................................................................35

*RSA Media, Inc. v. AK Media Grp., Inc.*,
  260 F.3d 10 (1st Cir. 2001)...............................................................15, 16, 17, 18

*Smugglers Notch Homeowner's Ass'n Inc. v. Smugglers Notch Mgmt. Co*,
  414 F. App'x 372 (2d Cir. 2011) ........................................................................37

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).....................................................................................13, 15

*Sterling Merch., Inc. v. Nestle, S.A.*,
  656 F.3d 112 (1st Cir. 2011)...........................................................18, 19, 20, 21

*Stop and Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,
  373 F.3d 57 (1st Cir. 2004)................................................................................39

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006)...............................................................................................22

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)...........................................................................................37

*United States v. Masonite Corp.*,
  316 U.S. 265 (1942)...........................................................................................28

*VHS Liq. Trust v. MultiPlan Corp.*,
  No. CGC-21-594966 (Cal. Super. Ct. Aug. 9, 2024).........................................2

*In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*,
  903 F. Supp. 2d 880 (C.D. Cal. 2012) .............................................................2, 16

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010).........................................................................21

*Westchester Radiological Assocs. P.C. v. Empire Blue Cross & Blue Shield, Inc.*,
  707 F. Supp. 708 (S.D.N.Y. 1989) .........................................................21

*White v. R.M. Packer Co.*,
  635 F.3d 571 (1st Cir. 2011)....................................................................34

*Whitman & Co. v. Longview Partners (Guernsey) Ltd.*,
  2015 WL 4467064 (D. Mass. July 20, 2015)........................................22

**Other Authorities**

45 C.F.R. § 147 ...................................................................................10, 33

Fed. R. Civ. P. 12(b)(1).............................................................................13

Fed. R. Civ. P. 12(b)(6).............................................................................12

*In re MultiPlan Health Ins. Provider Litig.*,
  No. 1:24-CV-06795 (N.D. Ill. Sept. 23, 2024), Dkt. No. 146 ................11

*In re MultiPlan Health Ins. Provider Litig.*,
  No. 1:24-CV-06795 (N.D. Ill. Sept. 23, 2024), Dkt. No. 171 ................20

*In re MultiPlan Health Ins. Provider Litig.*,
  No. 1:24-CV-06795 (N.D. Ill. Sept. 23, 2024), Dkt. No. 172 ................20

*Pacific Inpatient Med. Grp., Inc. v. MultiPlan Health Inc.*,
  No. 1:24-CV-07825 (N.D. Ill. Aug. 28, 2024), Dkt. No. 1.........................3, 11, 35

## INTRODUCTION

Plaintiff healthcare providers allege a sprawling antitrust conspiracy between Zelis, a provider of healthcare financial solutions, and its alleged customers who are managed care organizations ("MCOs").[1]  According to Plaintiffs, this conspiracy is premised on MCOs' use of Zelis's "repricing" solutions that rely on publicly available data to recommend reimbursement amounts for certain "out-of-network" ("OON") services offered by providers.  At root, Plaintiffs' claims are premised on the idea that providers should be able to charge patients whatever dollar amount they want for OON services, and that health plans must pay those unilaterally set amounts, even though the providers chose not to negotiate a participating provider contract with those same MCOs and assumed the risk of uncertainty with respect to the amount they will be reimbursed for their services.

To state a conspiracy claim, Plaintiffs must marshal allegations that make it plausible that MCOs conspired among each other to use Zelis's repricing solutions.  Plaintiffs fall far short of this.  Plaintiffs offer no direct evidence of a conspiracy.  In fact, they offer none of the specifics that might make a conspiracy at all plausible.  Plaintiffs do not plead when or how Defendants purportedly conspired with one another, and they do not even identify the Zelis service that each Defendant purportedly agreed with one another to use.  Courts around the country have rejected substantially similar claims, which seek to convert common use of commercial services into an

---

[1] "Zelis" refers to Zelis Healthcare, LLC, Zelis Claims Integrity, LLC, and Zelis Network Solutions, LLC.  Zelis together with Aetna, Inc., The Cigna Group, Elevance Health, Inc., Humana Inc., and UnitedHealth Group, Inc. comprise the "Defendants."  The Amended and Consolidated Class Action Complaint (the "Complaint") contains contradictory and vastly overbroad definitions of "Commercial Payers" and misleadingly purports to include the non-Zelis Defendants therein, *see* Compl. ¶¶ 2, 90, despite recognizing that the entities provide services unrelated to payment for healthcare services, and some do not provide payment for healthcare services at all.  *See id.* ¶¶ 34-38. For accuracy, this Motion accordingly refers to the non-Zelis Defendants as the "other Defendants."

unlawful conspiracy based on little more than inuendo and speculation.[2]  This Court should do the same and dismiss the Complaint for failing to state a claim.

In a recent decision in coordinated proceedings against MultiPlan, Inc., a much larger provider of healthcare solutions, the court rejected some of the very same theories Plaintiffs now assert.  That court correctly held that pleading a horizontal agreement between MultiPlan and each of its users was not enough because MultiPlan does not compete for OON repricing.  And while that court, in contrast to others before it, allowed some of the plaintiffs' claims there to proceed, it did so based on factual allegations that are conspicuously absent here, while acknowledging its departure from the weight of authority rejecting these theories and its disagreement with First Circuit precedent that is binding here.  *See In re MultiPlan Health Ins. Provider Litig.*, 2025 WL 1567835, at *10, *19 n.2 (N.D. Ill. June 3, 2025) ("*MultiPlan*").  And critically, unlike in *MultiPlan*, Plaintiffs here do not allege *any* communications among the payor Defendants establishing any supposed conspiracy, and have thus alleged only a "rimless wheel" conspiracy, which is insufficient under the controlling law.

There is an additional and important way that this Complaint is worse than the one in *MultiPlan*.  The first plaintiff to file suit in this consolidated action, Pacific Inpatient Medical Group, Inc. ("PIMG"), is also a plaintiff in the MultiPlan proceedings.  In its case there, PIMG

---

[2] *See, e.g.*, *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 832 (D.N.J. 2011), *aff'd in relevant part*, 647 F. App'x 76 (3d Cir. 2016) (dismissing antitrust claim based on MCOs' common use of Ingenix to reimburse OON claims); *In re Aetna UCR Litig.*, 2015 WL 3970168, at *24 (D.N.J. June 30, 2015) (same); *In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 902 (C.D. Cal. 2012) (same); *Pac. Recovery Sols v. United Behav. Health*, 481 F. Supp. 3d 1011, 1022-23 (N.D. Cal. 2020) ("*Pac. Recovery I*") (dismissing antitrust claims based on MCOs' common use of MultiPlan to reimburse OON claims); *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*, 2021 WL 1176677, at *14 (N.D. Cal. Mar. 29, 2021) ("*Pac. Recovery II*") (same); *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, 2023 WL 8096909, at *1 (E.D.N.Y. Nov. 21, 2023) ("*Long Island Anesthesiologists I*") (same); *Long Island Anesthesiologists PLLC v. United Healthcare Ins. Co. of N.Y. Inc.*, 2025 WL 1031093, at *1 (E.D.N.Y. Apr. 7, 2025) ("*Long Island Anesthesiologists II*") (same); Ord. Sustaining Dem. at 15-17, *VHS Liq. Trust v. MultiPlan Corp.*, No. CGC-21-594966 (Cal. Super. Ct. Aug. 9, 2024) (same).

alleges that Zelis is a "small-time player[] compared to MultiPlan," *see* Complaint ¶ 334, *Pacific Inpatient Med. Grp., Inc. v. MultiPlan Health Inc.*, No. 1:24-CV-07825 (N.D. Ill. Aug. 28, 2024), Dkt. No. 1 ("PIMG Complaint"), and that Zelis reprices a tiny fraction of claims per year compared to MultiPlan, *see id.* (alleging Zelis repriced about 2 million claims in 2022, compared against MultiPlan repricing about 546 million claims in 2023). Yet in its Complaint here, PIMG reverses course and now inexplicably claims the exact opposite—asserting that it is Zelis, not MultiPlan, that has a dominant market share. Compl. ¶ 270. Plaintiffs offer no explanation for this contradiction. Nor do they explain how or why MCOs would *simultaneously* conspire around both a dominant data source (MultiPlan) and also around MultiPlan's allegedly far smaller competitor (Zelis). On the other hand, Plaintiffs allege that there are many reasons that each MCO would choose Zelis's products regardless of what others are doing, including that Zelis advertises that it is efficient, fast, and lowers costs. Compl. ¶ 215. These gaps and inconsistencies show that there is no plausible conspiracy here.

As explained in more detail below, Plaintiffs' Complaint should thus be dismissed for multiple reasons. *First*, Plaintiffs lack Article III standing to bring their claims. Plaintiffs never allege that they had *any* claims actually repriced by Zelis's repricing solutions, much less that any such repriced claims were paid by the MCOs. That omission is dispositive. Moreover, Plaintiffs' alleged injury is too indirect. To the extent Plaintiffs have chosen to be OON, they have no contractual relationship with the MCOs; rather, the patient contracts with the MCO, and the MCO's obligation, if any, is only to the patient. As a result, the MCO's offer to cover a portion of a provider's charge does not create a contract between the MCO and the provider. If a provider determines that the health plan's offer is insufficient, the provider may collect payment of the balance of its charge from the patient (and, in many circumstances, is required to do so). Any

"injury" resulting from the MCO's partial reimbursement offer is thus so indirect and derivative that Plaintiffs lack standing to pursue their claims.

*Second*, Plaintiffs fail to plead antitrust injury. Their alleged injury—*lower* healthcare costs to MCOs and consumers—is simply not the type of injury that the antitrust laws are intended to prevent. Antitrust laws protect competition, not individual market participants' profit margins, and Plaintiffs do not plausibly allege that their purported injury flowed from a reduction in competition. Instead, Plaintiffs' Complaint seeks windfall profits for themselves by attempting to unilaterally impose excessive rates on MCOs (and patients) and eliminating the tools that help MCOs protect patients from these excessive rates. That turns antitrust law principles upside down.

*Third*, the factual allegations supporting Plaintiffs' claim of conspiracy are inadequate. Plaintiffs have failed to plead a horizontal conspiracy between Zelis and the other Defendants because, just as the court held in *MultiPlan*, there are no plausible allegations that Zelis is an MCO or in any respect a horizontal competitor of the other named Defendants. Nor have Plaintiffs plausibly alleged that Zelis facilitates a "hub-and-spoke" conspiracy through its service agreements with its MCO customers. The Complaint asserts no direct evidence of such a conspiracy. And it also fails to establish the requisite parallel conduct and plus factors necessary to infer such a conspiracy because, among other reasons, the conduct that Plaintiffs allege is in each Defendant's self-interest.

*Fourth*, Plaintiffs' alleged market for OON healthcare services is not a relevant market for antitrust purposes. The "products" at issue in this case are healthcare services. OON simply refers to one method of payment for those products, and thus cannot define the contours of the relevant market. Indeed, as the Complaint concedes, healthcare services can be purchased in myriad ways.

Defendants respectfully request that the Court dismiss the Complaint with prejudice.

## BACKGROUND[3]

### A.    Healthcare System Dynamics

Healthcare costs in the United States have risen rapidly in recent years, Compl. ¶¶ 250-53, and the trend shows no signs of abating.  This case is about one solution that some MCOs use to manage a critical cause of those increasing costs—providers choosing to go OON and unilaterally imposing excessive rates for healthcare services on MCOs and patients.

Healthcare markets involve a complex set of relationships between patients, MCOs, and healthcare providers.  *Id.* ¶ 2.  When patients need healthcare services, they select a healthcare provider and purchase medical treatment from them, and in doing so agree to be financially responsible for the charges incurred.  *See id.* ¶ 4 n.4 (eHealthInsurance, *What Is a Preferred Provider Organization (PPO) Plan?*, https://www.ehealthinsurance.com/health-plans/ppo, (hereinafter "eHealthInsurance"), attached as Ex. 1 to the Decl. of Matthew McGinnis in Supp. of Defs.' Mot. to Dismiss ("McGinnis Decl.")).[4]  Patients can pay for these healthcare services directly, but often they seek "reimbursement" from their health plan, either directly, or indirectly by authorizing the provider to submit a claim to the health plan on their behalf.  Compl. ¶ 4 n.4 (eHealthInsurance, attached as McGinnis Decl. Ex. 1) (noting patients "might have to submit claims [themselves]").  Patients obtain their health insurance plans through government programs such as Medicare and Medicaid, or through private entities, including MCOs, that sell health plans directly to individuals or to their employers.  *See id.* ¶ 157.  These MCOs may cover health plan members through "fully-insured plans," or act as the administrator for a "self-funded" entity such as a large employer or union.  Notably, for self-funded plans, MCOs are not responsible for and

---

[3] Defendants accept as true the Complaint's well-pled factual allegations, as they must at this stage.

[4] Documents referenced in a complaint are considered incorporated into the pleadings and are properly considered by the Court on a motion to dismiss.  *See Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir. 2001).

do not fund reimbursement payments. *See id.* ¶¶ 34-38. In this scenario, MCOs enter into "administrative services only" agreements with the plan sponsor (likely an employer), through which the MCO administers claims for the plan's members (typically employees), based on the specific coverage and benefits elections that the plan sponsor has decided to provide to its employees. *See id.* Members of the health benefit plans can then access the provider networks established by MCOs described below for the provide r's discounted rates.

To manage the costs of healthcare, MCOs contract with healthcare providers to establish the rates at which the providers will be reimbursed for their services, as well as other terms and conditions for payment such as licensing standards, malpractice insurance requirements, and credentialing requirements. *See id.* ¶¶ 3-4. As referenced above, health plan sponsors design their benefit plans, and often incentivize patients to use these so-called "in-network" or "participating" providers by lowering the patient's deductible, copayments, or co-insurance in comparison to the cost sharing for services from OON providers. *Id.* ¶ 4 n.4 (eHealthInsurance, attached as McGinnis Decl. Ex. 1). Because in-network providers agree to negotiated rates as a condition for participating in a network (rather than the provider insisting that they be paid whatever they choose to bill), networks allow health insurance plans to reduce healthcare costs and thereby lower the premiums and cost-sharing requirements for patients and employers. Compl. ¶ 4. Some participating providers may agree to accept rates lower than their published charges generally so that they can benefit from in-network status, including by the health plans incentivizing members to use in-network providers. *Id.*

The terms of the health plans administered by MCOs often vary widely. The premiums they charge, the relative breadth or narrowness of the provider network where patients can obtain in-network coverage, and the patient cost-sharing they require are just some of the ways health

plans differ, in many cases at the direction of self-funded plan sponsors.  Notably, some health plans do not provide *any* reimbursement for elective services from OON providers.  *See id.* ¶ 3 (describing health maintenance organization ("HMO") plans).  In contrast, preferred provider organization ("PPO") health plans may offer partial reimbursement for services rendered by OON providers, but may have higher premiums or cost sharing.  *Id.* ¶ 4 ("[U]nder PPO plans, 'You can visit out-of-network providers and still receive partial coverage, thought [*sic*] at a higher cost.'"); *id.* ¶ 4 n.4 (eHealthInsurance, attached as McGinnis Decl. Ex. 1 (PPO plans "[g]enerally [have] higher premiums and costs are due to greater flexibility and broader access")).

Importantly, whenever a patient receives care from an OON provider, that provider does not have a contract or negotiated in-network rates with the MCO, and thus has not agreed to abide by the health plan's terms and conditions or quality guidelines.  *See id.* (eHealthInsurance, attached as McGinnis Decl. Ex. 1).  Moreover, if the OON provider seeks to be reimbursed at rates higher than those typically paid for in-network care, both the health plan and the patient may incur substantially greater costs for services that are provided OON.  *Id.* ¶ 4.

To manage those OON costs (assuming they are covered at all), MCOs, employers, and other plan sponsors typically design a health plan to reimburse OON coverage based on selected OON methodologies, which are generally subject to different levels of cost-sharing (deductibles, co-pays, co-insurance) than in-network claims and can vary in terms of technique or data sources. *See id.* ¶¶ 114, 171.  MCOs may issue payments directly to providers or may reimburse patients directly if they pay the provider out-of-pocket.  *Id.* ¶¶ 155, 5, 4 n.4 (eHealthInsurance, attached as McGinnis Decl. Ex. 1).  Because OON providers may charge patients more than the rate described in their health plan documents, the patients may be liable to the provider, in which case the provider

can "balance bill[]" the patients for the difference between the total charged amount and the MCO's reimbursement. *See id.* ¶ 5.

## B. Zelis Services and the MCOs

Zelis is a healthcare technology company that provides a "comprehensive array of network management, claims integrity, payment remittance solutions, and analytical services." Compl. ¶ 12. The majority of these technologies and services, however, have no bearing on this case. The Complaint nonetheless freely incorporates by reference the webpages describing these solutions, including Zelis's Network Solutions, Payment Integrity, and "In-Network Pricing" analytics, and in doing so mischaracterizes them and Zelis's business. *See, e.g.*, *id.* ¶ 222 n.237 (*Create innovative and competitive network structures*, Zelis, https://www.zelis.com/solutions/network-solutions/, attached as McGinnis Decl. Ex. 2 (describing Zelis's network solutions)); ¶ 112 n.128 (*Ensure accurate payments with Zelis*, Zelis, https://www.zelis.com/solutions/payment-integrity/, attached as McGinnis Decl. Ex. 3 (describing Zelis's "Payment Integrity" services)).

The only Zelis services at issue in this case are certain of Zelis's "out-of-network" solutions, which are tools that some MCOs may use to manage and administer OON benefits. *Id.* ¶ 14. In particular, the Complaint focuses on Zelis's Reference Based Pricing ("RBP") and "Established Reimbursement Solution" ("ERS"). *Id.* ¶¶ 116-21 (describing ERS); ¶¶ 122-27 (describing RBP). RBP calculates "maximum reimbursement amounts" using each MCO's distinct criteria, such as a multiple of the standard Medicare rate that other providers accept, to "provide a controlled savings model." *Id.* ¶ 123, 14 n.14 (*Unlock Savings with Member-Centric Reference Based Pricing*, Zelis, https://www.zelis.com/solutions/reference-based-pricing-for-network-replacement/, (hereinafter "Unlock Savings"), attached as McGinnis Decl. Ex. 4). Likewise, ERS leverages publicly available CMS and Medicare data and public data from Truven and Milliman, Compl. ¶ 117, to "derive fair and defensible reimbursements" based on "individual

plan . . . preferences." *See id.* ¶ 14 n.14 (*Market-based Pricing with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-networksolutions/market-based-pricing/, attached as McGinnis Decl. Ex. 5). MCOs can use these as benchmarks to recommend OON reimbursement at a level consistent with their obligations to plan members or as tools to negotiate with providers. *Id.* ¶¶ 115, 14 n.14 (Unlock Savings, attached as McGinnis Decl. Ex. 4). Plaintiffs allege that Zelis's repricing solutions also rely on MCOs' confidential information to recommend OON reimbursement rates for competitors, but there are no factual allegations supporting these conclusory assertions (nor could there be).

Zelis also has other solutions that clients, including MCOs, may use to process and facilitate payment of their OON claims. Compl. ¶¶ 90-108. For example, Zelis contracts with providers to form PPO or supplemental provider networks which it then re-sells to some MCO clients, who can use or not use the networks at their discretion. *See id.* ¶¶ 24 n.20, 90 n.98 (*Medical and Dental Provider Networks by Zelis*, Zelis, https://www.zelis.com/providers/provider-networks/, (hereinafter "Provider Networks"), attached as McGinnis Decl. Ex. 6); ¶ 103. Importantly, Zelis leases these provider networks to MCOs and other clients; Zelis does not sell health insurance products to employers or individuals. These Zelis networks do not themselves operate as "health plans" nor does Zelis itself pay for "out of-network benefits" at all for claims priced under these networks. Rather, they are additional tools that MCOs can opt to use to reimburse claims. *Id.* ¶¶ 24 n.20, 90 n.98 (Provider Networks, attached as McGinnis Decl. Ex. 6).

### C.    Plaintiffs' Allegations

Plaintiffs in this consolidated case—an inpatient physician group (PIMG), two dentists (Drs. Ayer & Allen), a chiropractic practice (Danny Bachoua Chiropractic, APC), and a solo otolaryngologist (Dr. Scaccia), Compl. ¶¶ 25-29—allege that Zelis and the other five named Defendants conspired to suppress OON payments to healthcare providers in violation of Section 1

of the Sherman Act by using Zelis's repricing solutions. *Id.* ¶ 1. In particular, they attempt to plead a "horizontal conspiracy" between Zelis and MCOs participating in the alleged market for OON healthcare services to fix OON payment amounts. *Id.* ¶ 387. In the alternative, Plaintiffs allege that Zelis facilitates a "hub-and-spoke" conspiracy through its separate service agreements with each of its MCO customers, allegedly including the five other named Defendants. *Id.* ¶ 388.

Despite that pronouncement, Plaintiffs' 158-page Complaint never once alleges that any OON claims submitted to the MCOs were actually "repriced" by Zelis's ERS or RBP solutions. Nor do Plaintiffs claim that Zelis through its networks—the supposed foundation for the claimed horizontal conspiracy—pays OON claims in "competition" with the MCOs (nor can they). The Complaint also never says when, where, or how the other Defendants—who are just 5 entities, and Plaintiffs allege there are at least 1,176 MCOs that compete in the United States, *id.* ¶ 175— reached an agreement to suppress OON reimbursements.

Plaintiffs' characterizations of the Zelis ERS and RBP solutions as facilitating the alleged conspiracy are belied by the very sources they quote. Plaintiffs claim that Zelis uses competitively sensitive customer data in connection with providing OON payment rates, *id.* ¶ 292, but plead *no* facts to suggest that such information is shared *with other customers* and then separately admit that ERS relies on public CMS and Medicare data, as well as "commercially available datasets" from Truven and Milliman.[5] *Id.* ¶ 117. Moreover, far from ERS or RBP "setting prices," the sources Plaintiffs cite concede that ERS only generates "recommendations" that MCOs may follow when making OON reimbursement offers. *See, e.g.*, *id.* ¶ 237 n.254 (*Gain control of out-of-network costs with Zelis*, Zelis, https://www.zelis.com/solutions/out-of-network-solutions/,

---

[5] The Complaint also ignores the fact that MCOs' OON allowed amounts (*i.e.*, the maximum amount a plan will pay for a covered item or service) are required to be made publicly available due to the Transparency in Coverage Rule, and are thus not confidential. 45 C.F.R. § 147.

(hereinafter "OON Solutions"), attached as McGinnis Decl. Ex. 7 ("Leverage AI-powered dynamic optimization engine to find quality recommended savings on every claim")). Those documents further indicate that ERS recommendations are calibrated according to "customizable rules" for individual MCOs, *see, e.g.*, *id.* ¶ 190 n.204 (OON Solutions, attached as McGinnis Decl. Ex. 7), and that RBP criteria are likewise set according to each MCO's distinct "pre-defined" strategy, *id.* ¶ 123.

The Complaint's assertions regarding Zelis's alleged share of OON repricing suffer from similar flaws and make them implausible. In order for Zelis's tools to plausibly result in market wide harm to competition, as Plaintiffs contend, Zelis would have to be responsible for at least a substantial share of repricing of OON claims. To that end, Plaintiffs claim that Zelis is responsible for some 65.5% to 82.2% of all OON repricing. *Id.* ¶ 179. But the Complaint is tellingly silent regarding Zelis's largest competitor, MultiPlan. This case is a copycat of the case against MultiPlan, a multi-district litigation in which one of the same plaintiffs, PIMG, is represented by the same counsel as lead counsel in this action.[6] In allegations in the case against MultiPlan, PIMG alleges that MultiPlan (not Zelis) processes more than 80% of OON payments. *See supra* at 3. PIMG also alleges that Zelis and other repricers were "small-time players compared to MultiPlan," with Zelis responsible for repricing approximately 2 million claims in 2022 compared to MultiPlan's repricing of 546 million claims the next year. PIMG Complaint ¶ 334.

Even setting aside those inconsistencies, Plaintiffs' alleged market share percentages are implausible. Plaintiffs arrive at these percentages simply by tallying the number of payors that purportedly use some Zelis service. But Plaintiffs critically fail to allege whether those payors use

---

[6] Plaintiffs filed this case after Hartley LLP was not appointed as lead counsel in the *MultiPlan* litigation. *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-CV-06795 (N.D. Ill. Sept. 23, 2024), Dkt. No. 146 (minute order denying docket number 119, PIMG's motion to appoint Hartley as lead counsel).

Zelis *repricing services*, as opposed to other services, or how frequently those payors use Zelis to reprice OON claims (if at all). In any event, other data included in the Complaint contradicts these market share percentages. In particular, the Complaint separately admits that Zelis is responsible for repricing at most three million out of 800 million claims annually—less than 0.5%—using RBP or ERS. Compl. ¶ 242; ¶ 118 (acknowledging that Zelis only reprices 1 million claims per year with its ERS fee schedule); ¶ 127 (acknowledging that only "2MM+ RBP claims [are] repriced annually"). If, as Plaintiffs allege, Zelis is responsible for less than 0.5% of OON claim repricing, it is facially implausible that Zelis could have any impact whatsoever on competition.

## **LEGAL STANDARDS**

Under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). At the motion to dismiss stage, courts must accept the plaintiffs' well-pled factual allegations as true, *Hostar Marine Transp. Sys., Inc. v. United States*, 592 F.3d 202, 207 (1st Cir. 2010), but are "under no obligation to credit [plaintiffs'] conclusory allegations, which simply parrot the elements of the statute," *United States ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 28 (1st Cir. 2009). Further, a complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Plaintiffs' allegations of anticompetitive conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. "The crucial question, therefore, is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170, 177-78 (D. Mass. 2013) (quoting *Twombly*, 550 U.S. at 553) (internal quotations omitted).

To state a claim under Section 1 of the Sherman Act, Plaintiffs must plead: (1) a contract, combination, or conspiracy among the Defendants (2) that unreasonably restrains trade in a relevant market, (3) affects interstate commerce, and (4) causes injury to the marketplace and to Plaintiffs—*i.e.*, antitrust standing and injury. *See DM Rsch., Inc. v. Coll. of Am. Pathologists*, 2 F. Supp. 2d 226, 228 (D.R.I. 1998), *aff'd*, 170 F.3d 53 (1st Cir. 1999); *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999) (plaintiffs must "describe the relevant market in which [the court] may presume the anticompetitive effect *would* occur" (emphasis added)).  Plaintiffs have failed to allege the first, second, and fourth elements, warranting dismissal.

## ARGUMENT

Plaintiffs' Complaint should be dismissed for at least four independent reasons: (1) Plaintiffs lack Article III standing to pursue their claim because their purported injuries are indirect and derivative; (2) Plaintiffs fail to allege antitrust injury; (3) Plaintiffs fail to plausibly allege a conspiracy to restrain trade; and (4) Plaintiffs fail to plead a relevant antitrust market.

## I.    PLAINTIFFS LACK ARTICLE III STANDING BECAUSE THEIR PURPORTED INJURIES ARE INDIRECT AND DERIVATIVE.

### A.    Plaintiffs Lack Article III Standing Because They Fail to Allege an Injury-in-Fact that Is Traceable to Defendants' Use of Zelis's Repricing Solution.

Article III standing requires each Plaintiff to allege that it: "(1) suffered an injury in fact (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs here fail to plead either injury-in-fact or traceability, warranting Rule 12(b)(1) dismissal.

Plaintiffs assert they were injured because MCOs allegedly used Zelis to reprice OON claims and allegedly paid them at less than competitive rates.  *See, e.g.*, Compl. at 1 (alleging "downwardly-adjusted, 'repriced' payments in anticompetitively suppressed amounts").  But the Complaint does not plead facts showing that: (1) any specific Defendant actually used Zelis to

reprice a specific claim from a specific Plaintiff; or (2) the payment on that claim was below a competitive market price as a result of that Zelis repricing.

The Complaint instead follows a formula, asserting generically that each Plaintiff "received one or more payments for its OON healthcare services, which were repriced by one or more of the Zelis Defendants," *id.* ¶¶ 25-29, and that each MCO "issued one or more OON payments to Providers" at "payment levels below competitive amounts," *id.* ¶ 39.  But nowhere does any Plaintiff identify any specific claims, dates of service, or claim payments for any claim paid by a named Defendant—underscoring the absence of factual allegations that plausibly tie any particular Defendant's conduct to any particular Plaintiff's allegedly underpaid claim.  Such "conclusory assertions" are not enough because they do not provide "sufficient factual matter" to plead Article III standing.  *See Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016).

Moreover, "standing is not dispensed in gross," and it must instead be shown by a "plaintiff-by-plaintiff and claim-by-claim analysis." *Id.* at 733 (internal quotation marks omitted); *see also Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006) ("the standing inquiry is both plaintiff-specific and claim-specific").  That means to allege injury-in-fact, *each* Plaintiff must plead facts showing that it *actually* "is adversely affected" by the challenged conduct, *Genzyme*, 823 F.3d at 732—not merely assert that they participate in the same general market where alleged underpricing may have occurred.  *See also id.* at 731-32 (the "particularization element" of injury-in-fact likewise requires each plaintiff to "allege that he, himself, is among the persons injured by [the challenged] conduct"); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (antitrust injury must result from a "competition-*reducing* aspect or effect of the defendant's behavior").  Plaintiffs do not meet these requirements.  They do not allege how each of them was individually harmed by any Defendant's use of Zelis, and they also do not allege how any

individual claim was allegedly paid by Defendants at less than what Plaintiffs contend was the market rate.

Plaintiffs also fall short of pleading traceability, which requires a causal link between the alleged harm and "the challenged conduct of the defendant." *Spokeo*, 578 U.S. at 338. The Complaint does not meet this requirement because it fails to connect each Plaintiff's alleged underpayment to any particular Defendant's alleged use of Zelis. At most, Plaintiffs offer a generalized theory of alleged industry harm and then repeat it in identical language for each Plaintiff. But these generalized assertions are not a substitute for identifying specific instances in which each Plaintiff alleges that they were underpaid, let alone to plausibly show that each of *these* Defendants caused those underpayments. Because Plaintiffs have not plausibly pled a particularized injury-in-fact, or that any such injury is traceable to the named Defendants, the Complaint should be dismissed for lack of Article III standing.

### B. Plaintiffs Have No Antitrust Standing Because Their Purported Injuries Are Indirect and Derivative.

In addition to Article III standing, the First Circuit has explained that "[s]tanding in an antitrust case is 'not simply a search for an injury in fact; it involves an analysis of prudential considerations aimed at preserving the effective enforcement of the antitrust laws.'" *RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 13 (1st Cir. 2001) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)). To conduct this analysis, the First Circuit applies the six-factor test from *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"), to assess antitrust standing, with special "emphasi[s] [on] the causation requirements of that test." *RSA Media*, 260 F.3d at 14. Two of those six factors—(1) "the causal connection between the alleged antitrust violation and harm to plaintiff," and (4) "the directness with which the alleged market restraint caused the asserted injury"—require a plaintiff

- 15 -

to show that the harm flowed directly from the alleged antitrust conduct.[7]  *Id.*  This emphasis on causation is critical: a plaintiff must show injury that specifically "flows from that which makes defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Courts have repeatedly dismissed on standing grounds very similar antitrust claims brought by providers who alleged industry-wide OON price-fixing conspiracies, finding that the providers' asserted injuries are not direct but rather derivative—including because the providers could seek unpaid portions by balance-billing their patients.  *See, e.g.*, *Pac. Recovery I*, 481 F. Supp. 3d at 1022-23 (dismissing Sherman Act claim that insurer conspired to underpay certain OON claims through use of MultiPlan pricing, including because plaintiff-providers "are 'injured' only to the extent that their patients fail to pay them"); *Pac. Recovery II*, 2021 WL 1176677, at *12 (similar); *WellPoint*, 903 F. Supp. 2d at 901-03 (dismissing Sherman Act claim that insurer conspired to underpay OON claims through coordinated use of Ingenix data).

Plaintiffs' antitrust claims fail for the same reason.  While they allege that they are in limited circumstances prohibited from balance-billing patients if they decide to accept Zelis's pricing, Plaintiffs do not allege that they are *required* to accept that pricing.  They are still free to negotiate with Zelis and the MCO if they feel a higher rate is appropriate.  And importantly, Plaintiffs admit that whether or not a prohibition applies, they still often do not pursue the unpaid portion of their charges from patients through balance-billing—likely because the amounts these providers bill are inflated and unreasonable and charging patients those rates would cause "patient

---

[7] The other four factors are "(2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ('antitrust injury'); . . . (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages."  *Id.*  Defendants address antitrust injury separately below.

relationship concerns" and "loss of goodwill."  Compl. ¶ 345; *see also id.* (even absent balance-billing restrictions, "[p]roviders don't feel they have the option to go after patients for the full amount"); ¶ 346 (MCOs are "in a far better position to pay" than patients because MCOs have "billions of dollars").

These allegations make clear that Plaintiffs' own choice not to balance-bill and other business choices, not Defendants' conduct, caused any asserted injury.  Plaintiffs allege a range of considerations as reasons not to balance-bill patients, including "a patient's lack of resources," "patient relationship concerns," "loss of goodwill," "tarnish to reputation in the community," and "cost for a collections agent or attorney."  *Id.* ¶ 345.  But all of these are discretionary business decisions, not legal barriers.  Plaintiffs even concede that whether a patient is billed the unpaid balance "is dependent on what a Provider does *after* it is underpaid."  *Id.* ¶ 345(c) (emphasis added).  Likewise, a particular patient's inability or unwillingness to pay a particular balance bill also is the result of that patient's independent decision, not conduct that results from the alleged price-fixing conspiracy here.  These admissions undermine any claim of direct economic harm, confirming that any injury here flows from Plaintiffs' post-reimbursement business decisions instead of the Defendants' alleged price-fixing.

These intervening decisions—by the provider, whether to balance-bill the patient; and then by the patient, whether to pay the provider's balance bill—break the causation chain.  *See RSA Media*, 260 F.3d at 14; *Brunswick Corp.*, 429 U.S. at 489.  And courts have dismissed similar claims for lack of antitrust standing precisely because the providers' asserted injury only arises if they balance-bill the patient and the patient does not pay.  *See Pac. Recovery I*, 481 F. Supp. 3d at 1022 (plaintiffs-providers "are 'injured' only to the extent that their patients fail to pay them," so "any such injury would arise directly from the patients' failure to comply with their financial

obligations to plaintiffs"); *Pac. Recovery II*, 2021 WL 1176677, at *12 (plaintiffs-providers' "injuries arise, if at all, only to the extent that their patients do not pay the amounts that Cigna does not reimburse"). Like the providers in those cases, Plaintiffs here cannot create antitrust standing because they elect not to try to collect unpaid amounts from their patients (because doing so would highlight the inflated nature of their bills).

Finally, the out-of-circuit decision in the *MultiPlan* case does not compel a different result. *See In re MultiPlan Health Ins. Provider Litig.*, 2025 WL 1567835 (N.D. Ill. June 3, 2025). For one, the First Circuit "has emphasized the causation requirements" of the six-factor *AGC* test in a way that the Seventh Circuit has not, *see RSA Media*, 260 F.3d at 14, and the *MultiPlan* decision did not address this issue from a direct causation perspective. But just as important, here, Plaintiffs *admit* that they are able to balance-bill patients in many circumstances, and that their decisions not to do so are voluntary and strategic. *See supra* at 16-17; Compl. ¶ 346 (MCOs "are in a far better position to pay the OON Providers" than patients because they have "billions of dollars"). The First Circuit's requirement of direct causation, coupled with Plaintiffs' admissions about the voluntary nature of their claimed injuries, distinguishes the *MultiPlan* decision and mandates dismissal for lack of antitrust standing.

## II.    PLAINTIFFS DO NOT ALLEGE ANTITRUST INJURY.

The Complaint must also be dismissed because Plaintiffs fail to plead facts showing antitrust injury. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489. As the First Circuit has explained, establishing antitrust injury requires that a plaintiff's alleged injury "is the type of injury the antitrust violation would cause *to competition.*" *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011). And "injury to competition" is "usually measured by a *reduction in output* and an *increase in prices* in the relevant market." *Id.*

(quoting *Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1096-97 (1st Cir. 1994)). As explained below, Plaintiffs plead *lowered* costs to MCOs and patients and they have not plausibly alleged decreased quality or output in their asserted market. As such, they have not pled antitrust injury, the absence of which will "generally defeat standing." *Sterling*, 656 F.3d at 121.

Plaintiffs' own allegations recognize that MCOs' agreements to use Zelis's repricing recommendation services result in more cost management options and lowered costs to MCOs and their patients. Compl. ¶ 280 (alleging MCOs have a purported motive to conspire to use Zelis's services to lower costs). Plaintiffs allege that higher rates for OON services—to which Plaintiffs claim they are entitled—ultimately translate to higher costs for health plans, which are eventually passed to the consumer in the form of higher premiums. *See id.* ¶ 162 (recognizing "patients are usually better of financially when using in-network healthcare services"). Plaintiffs' alleged injury in the form of lower costs of healthcare services is thus not the type of injury the antitrust laws were meant to prevent. Indeed, the very purpose of the antitrust laws is to "protect[] consumers against prices that were too *high*, not too low." *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 931 (1st Cir. 1984) (Breyer, J.), *cert. denied*, 471 U.S. 1029 (1985). As such, reduced reimbursement amounts, as Plaintiffs allege they have received here, are "generally insufficient to establish antitrust injury." *Long Island Anesthesiologists I*, 2023 WL 8096909, at *6.

Plaintiffs' other allegations in support of claimed injury fare no better. As an initial matter, the Complaint contains no allegations showing that Defendants' actions had any impact on the quality or output of OON healthcare services offered by Plaintiffs or other providers. *See Sterling*, 656 F.3d at 121. Instead, Plaintiffs allege harm to competition "on information and belief" based on a decrease in the "quantity" of OON repricing services because Zelis counts "over 770 payers" as customers. Compl. ¶ 350. Yet Plaintiffs concede that Zelis's OON solutions reprice only three

million out of 800 million claims annually—less than 0.5%—using RBP or ERS. *Id.* ¶ 242 (alleging Zelis delivers 800 million claims communications and payment transactions annually); ¶ 118 (acknowledging that Zelis only reprices 1 million claims per year with its ERS fee schedule); ¶ 127 (acknowledging that only "'2MM+ RBP claims [are] repriced annually'"). While Plaintiffs go to great lengths to avoid referencing other repricing services responsible for the remaining claims, the lead plaintiff in this case has alleged in another case that another repricing service— MultiPlan—is "the dominant force in the market, having agreements with over 700 third-party payors and processing over 80% of out-of-network service payments." *See MultiPlan*, 2025 WL 1567835, at \*7 (citing Consol. Class Action Compl. ¶ 273, *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-06795 (N.D. Ill. Nov. 18, 2024), Dkt. No. 172 ("MultiPlan Class Action Compl."); Consol. Master Direct Action Pl. Compl. ¶ 567, *In re MultiPlan Health Ins. Provider Litig.*, No. 1:24-cv-06795 (N.D. Ill. Nov. 18, 2024), Dkt. No. 171 ("MultiPlan Direct Action Compl.")). To the extent Zelis has attracted payors to its service from MultiPlan, which is much larger, that would represent an *increase* in competition—not a decrease in competition as required to support antitrust injury. Accordingly, to whatever extent Plaintiffs claim they have been harmed via lower reimbursements resulting from an increase in competition between Zelis and MultiPlan, that cannot support a plausible antitrust claim against Zelis and its customers. Regardless, an alleged decrease in OON repricing services is not a cognizable antitrust injury; as providers of healthcare services, the only possible injury Plaintiffs could even allege would have to relate to the quality or output of healthcare services they provide, rather than the repricing services that is the focus of their Complaint. *See Sterling*, 656 F.3d at 121.

With respect to the MCOs, there can be no doubt that buyers do not violate the antitrust laws by seeking a competing service that will enable them to lower their costs. *See, e.g.*,

*Westchester Radiological Assocs. P.C. v. Empire Blue Cross & Blue Shield, Inc.*, 707 F. Supp. 708, 715 (S.D.N.Y. 1989) (even a buyer with market power is not prohibited "from negotiating a good price, or from specifying what it will buy"). Indeed, an entity "is generally free to bargain aggressively when negotiating the prices it will pay for goods and services." *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010). And while the end result of those repricing services may be that Plaintiffs receive reduced reimbursement amounts, that does not constitute a cognizable antitrust injury to competition or consumers. In fact, lower reimbursement amounts may benefit consumers, especially if the consumer is not balance-billed, given that their out-of-pocket responsibility may be lower. Accordingly, at best, Plaintiffs have pled that their inability to obtain a windfall in higher reimbursement rates constituted an injury to themselves. But that is not an injury to competition or to consumers, and is thus inadequate. *See Sterling*, 656 F.3d at 121.

## III. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE A CONSPIRACY.

Plaintiffs' Complaint articulates two theories of how Defendants allegedly "conspired" to restrain trade in violation of Sherman Act Section 1. Plaintiffs first allege a "horizontal conspiracy" between Zelis and each of the MCOs to fix OON payment amounts. Compl. ¶ 387. Second, Plaintiffs allege that Zelis facilitates a "hub-and-spoke" conspiracy through its vertical bilateral service agreements with its customers, allegedly including the five other named Defendants. *Id.* ¶ 388.

As a threshold matter, the premise of Plaintiffs' claims—that the MCOs would pursue against their own self-interest a conspiracy centered around the use of Zelis's services for a comparatively small number of OON claims while separately allegedly conspiring to use MultiPlan's services for more than 80% of claims—makes no economic sense. And tellingly, Plaintiffs fail to explain how or why two such conspiracies allegedly proceeded simultaneously.

- 21 -

That alone is sufficient reason to dismiss Plaintiffs' claims. *Iqbal*, 556 U.S. at 679 (a court should "draw on its judicial experience and common sense" when determining whether a plaintiff alleges a plausible claim for relief).

Both of Plaintiffs' theories also suffer from other basic and fatal pleading deficiencies. In particular, the Complaint fails to offer factual allegations plausibly suggesting that any MCO entered into an agreement with other MCOs to reduce reimbursements through Zelis's services. That is, there are no alleged facts plausibly suggesting any agreements to use the services that Defendants purportedly conspired to use. Instead, the Complaint falls back on allegations regarding "Commercial Payers" and "Co-Conspirators," but such group pleading allegations fail to state a plausible claim against each Defendant. *See Whitman & Co. v. Longview Partners (Guernsey) Ltd.*, 2015 WL 4467064, at *10 (D. Mass. July 20, 2015).

With respect to Plaintiffs' alleged "horizontal conspiracy," Plaintiffs do not plausibly allege that Zelis is a horizontal competitor of the MCOs *in Plaintiffs' asserted market for OON reimbursement*, and therefore this claim should be dismissed, just like the nearly identical claims that were dismissed against Zelis's much larger rival MultiPlan. And with respect to Plaintiffs' "hub and spoke" conspiracy, Plaintiffs identify no direct evidence of an agreement among MCOs at the "rim" of the alleged conspiracy, nor do they offer sufficient facts from which the Court could infer such a conspiracy. These flaws are explained in more detail below.

### A.    Plaintiffs Do Not Plead a Horizontal Conspiracy.

Plaintiffs' contention that Zelis is a direct horizontal competitor of its MCO customers in the "OON Commercial Payer Market," Compl. ¶ 386, fails at the outset. Plaintiffs must allege facts showing an agreement between competitors "in the *relevant* market" for OON services. *Texaco Inc. v. Dagher*, 547 U.S. 1, 3-6 (2006) (emphasis added). They have not done so.

Instead, Plaintiffs allege that Zelis is a horizontal competitor of MCOs because it markets and operates PPO networks and "network-related expertise." Compl. ¶¶ 90, 93. The Complaint includes a single reference to a Zelis PPO network's website that refers to the cost savings the payor customer would receive by using Zelis's PPO contracts. *Id.* ¶¶ 107-08. Nothing in the Complaint alleges that Zelis through its "supplemental networks" pays OON claims, and it does not. Far from suggesting Zelis "competes" with MCOs, the very provider networks to which Plaintiffs point are examples of the services Zelis provides to MCOs as part of a *vertical* relationship. That is plainly insufficient to support Plaintiffs' claim that Zelis purchases OON healthcare services such that it should be deemed a horizontal competitor of MCOs in the market for OON healthcare services.

Notably, the *MultiPlan* court recently rejected similar allegations as insufficient to plead a horizontal conspiracy. In *MultiPlan*, the plaintiffs alleged that MultiPlan competes with MCOs but pointed only to allegations regarding MultiPlan's unrelated PPO network business, which was insufficient to support a horizontal conspiracy. *MultiPlan*, 2025 WL 1567835, at *12-13. So too here: nothing in the Complaint suggests Zelis's selling of PPO networks makes Zelis a horizontal competitor of the MCOs in the alleged market at issue in this case. As the *MultiPlan* court correctly concluded, it is not enough for Plaintiffs to allege that Zelis and the MCOs compete in the context of creating and selling PPO networks. *Id.* Just as in *MultiPlan*, Plaintiffs accordingly have not plausibly alleged a horizontal conspiracy. *See id.*

Plaintiffs also claim that Zelis "admits its status as a payer" and is therefore a horizontal competitor of the MCOs. Compl. ¶ 90. Their sole support for this assertion is a general statement on Zelis's website describing Zelis as a payments company that enables insurers to pay for care. *Id.* ¶ 95. Contrary to being an "admission" that Zelis is a commercial payor, this allegation

suggests (correctly) that Zelis provides technology services to MCOs as Zelis's *customers*—a *vertical* relationship. Moreover, the statement is unrelated to the asserted market for OON healthcare services that Plaintiffs allege is at issue in this case. *See Long Island Anesthesiologists I*, 2023 WL 8096909, at *6 (finding that the plaintiffs' complaint "support[ed] a conclusion that" MultiPlan and a subsidiary of UnitedHealth Group Incorporated were "not horizontal competitors").

The Complaint also fails to adequately allege a horizontal conspiracy because it lacks factual allegations that Zelis's ERS or RBP customers directly compete against one another in Plaintiffs' alleged market. *See, e.g.*, Compl. ¶ 15 (referring to "directly-competing Commercial Payers" without factual support); ¶ 197 (conclusory allegation that Zelis and MCOs are "direct competitors"); ¶¶ 34-39 (identifying the other named Defendants without alleging that they directly compete). Plaintiffs' failure to allege facts—as opposed to conclusory contentions— establishing an agreement *between competitors* dooms Plaintiffs' horizontal agreement theory. *See Twombly*, 550 U.S at 555, 557 (a complaint that advances "labels and conclusions," or tenders "naked assertion[s]" devoid of "further factual enhancement" will not survive a motion to dismiss).

### B.    Plaintiffs Do Not Plead a Hub-and-Spoke Conspiracy.

In the alternative, Plaintiffs attempt to allege a hub-and-spoke conspiracy between Zelis and an unspecified number of MCOs to use Zelis's repricing solutions. To plausibly allege such a conspiracy, Plaintiffs must plead (1) "a hub," (2) "spokes, such as competi[tors] . . . that enter into vertical agreements with the hub," and (3) "the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (citing *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010)); *see In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 56-57 (1st Cir. 2016) (analyzing hub-and-spoke conspiracy claim and affirming grant of judgment as

a matter of law for defendants).  Plaintiffs allege bilateral vertical agreements between Zelis (the hub) and MCOs (the spokes) but fail to allege an agreement at the "rim" of the wheel, which is fatal to their hub-and-spoke claim.

The "rim" is critical.  As the First Circuit has explained, without "a 'rim' to the wheel in the form of an agreement," there can be no such conspiracy.  *Nexium*, 842 F.3d at 56 (citation omitted); *see, e.g.*, *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) ("[T]he critical issue for establishing a *per se* violation with the hub and spoke system is how the spokes are connected to each other."); *PKS, Inc. v. Leegin Creative Leather Prod., Inc.*, 615 F.3d 412, 420 (5th Cir. 2010) ("In the absence of an assertion that [the spokes] agreed . . . among themselves, there is no wheel and therefore no hub-and-spoke conspiracy."); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002) ("[A] wheel without a rim is not a single conspiracy." (citing *Kotteakos v. United States*, 328 U.S. 750, 755 (1946))).

Here, the requirement of a rim means that Plaintiffs must plead factual allegations showing that the MCOs *actually agreed with each other* to use Zelis's repricing services to fix OON prices. As explained below, Plaintiffs have not done so.

### 1.    *Plaintiffs Do Not Plead Any Direct Evidence of a Conspiracy.*

Plaintiffs fail to plead direct evidence of a conspiracy among MCOs to buy or use Zelis's products and services, much less to form a buyers' cartel to fix OON reimbursement rates.  Direct evidence of a conspiracy must establish, on its own without any inferences, concerted action among the defendants.  *See In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 252 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st Cir. 2016) (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).  Here, the Complaint contains a section purporting to allege "direct evidence of written agreements entered into between conspirators," but that section of the

Complaint merely references *bilateral* agreements between Zelis and *non*-defendant MCOs. Compl. ¶¶ 262-66. Just as the court held in *MultiPlan*, contracts between Zelis and MCOs "are not 'smoking gun' evidence of a horizontal agreement among the [MCOs] themselves." *MultiPlan*, 2025 WL 1567835, at *14; *see Marion Healthcare*, 952 F.3d at 842 (vertical agreements with distributors insufficient to establish a horizontal agreement among competitors); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 327 ("[O]ne cannot plausibly infer a horizontal agreement among a broker's insurer-partners from the mere fact that each insurer entered into a similar contingent commission agreement with the broker.").

### 2.    *Plaintiffs Also Fail to Plead Circumstantial Evidence of a Conspiracy.*

Because Plaintiffs fail to plead direct evidence, they must allege circumstantial evidence from which their alleged price-fixing conspiracy, and in particular the "rim" of the conspiracy, may plausibly be inferred. When relying on circumstantial evidence, a Section 1 plaintiff must plead evidence of "parallel conduct" that is further "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

### (i)    Plaintiffs Do Not Adequately Allege Unlawful Parallel Conduct.

Plaintiffs' attempt to plead a conspiracy through circumstantial evidence fails at the threshold because Plaintiffs fail to even plead that MCOs acted in parallel. There are no allegations whatsoever showing parallel OON reimbursement rates or price movements among the other Defendants. Nor have Plaintiffs pled that any of the other named Defendants even use the same Zelis repricing service. To the contrary, Plaintiffs' allegations reflect that Zelis offers various separately-marketed tools that can operate independently or in combination. *See supra* at 8-9 (describing ERS and RBP); Compl. ¶ 129 ("Whether called 'ERS,' 'Market-based,' 'Reference-

Based Pricing,' 'RBP,' 'Zelis Open Access Pricing,' 'Maximum Allowable Charge,' 'MAC,' 'pre-defined,' 'price limit[ed],' 'default,' or 'override' pricing, Zelis's repricing services function or can function electronically and automatically as a single service."). But even the use of the same Zelis service or services is insufficient to suggest a conspiracy for at least two reasons.

*First*, Plaintiffs fail to plead *when* each MCO began using Zelis's services, much less that they began doing so in such close proximity that it could plausibly support an inference of conspiracy. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 (1st Cir. 2013) ("[A] complaint must at least allege the general contours of when an agreement was made, supporting those allegations with a context that tends to make said agreement plausible."). Indeed, they do not allege any facts showing when their alleged conspiracy began, much less that all MCOs began using Zelis's services in close proximity with one another. *Cf.* Compl. ¶ 385 (the alleged conspiracy began "no later than" 2016). Instead, Plaintiffs allege that Zelis developed and implemented repricing systems from 2016 to present, and that the number of insurers with which Zelis partners has grown to over 770 over that time. *Id.* ¶¶ 73-75. Those allegations do not show that any decisions of the other named Defendants, alongside hundreds of other entities, over the course of nearly a decade, were the result of a conspiracy. *See Musical Instruments*, 798 F.3d at 1196 (competitors adopting similar pricing policies "over a period of several years" insufficient to plead a conspiracy because the "slow adoption of similar policies does not raise the specter of collusion"); *In re Concrete and Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *5 (S.D.N.Y. June 25, 2025) ("[E]ven highly similar actions separated by a lengthy delay are not truly parallel.").

Indeed, numerous courts have held that such allegations are inadequate to suggest conspiracy as a matter of law. *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *1, *4 (D.

Nev. Oct. 24, 2023) (dismissing claims where plaintiffs failed to allege facts that would allow the court to "plausibly infer that all [defendants] began using particular pricing software at or around the same time"); *Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188, at *5 (D.N.J. Sept. 30, 2024) (dismissing claims regarding the same software where "the fourteen-year gap, coupled with the pricing authority the [defendants] continued to retain and exercise, ma[de] it quite implausible that [defendants] tacitly agreed to anything"); *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526, 542-43 (N.D. Tex. 2014) ("[T]his two-year period in which competitors in the online bookings market adopted similar pricing strategies is the sort of gradual pricing change rejected as unsuspicious by other courts."); *Dai v. SAS Inst. Inc.*, 2025 WL 2078835, at *3-4 (N.D. Cal. July 18, 2025) ("Plaintiffs need not allege that each Hotel Defendant acted at the exact same moment in time or at the exact same acceptance rate, but the Court concludes they must plead additional facts to render the allegations of parallel conduct plausible."). *MultiPlan* held that "concurrent adoption" is not "required" to state a claim, *MultiPlan*, 2025 WL 1567835, at *14, but that rejects the weight of authority nonetheless holding that a lack of such allegations rendered similar claims implausible. The *MultiPlan* court also expressly relied on a reading of Supreme Court law explicitly rejected by the First Circuit. *Compare id.* at *19 & 19 n.2 (relying on *United States v. Masonite Corp.*, 316 U.S. 265 (1942), to find horizontal conspiracy from defendants independently entering similar agreements with same third-party), *with Nexium*, 842 F.3d at 57 (rejecting argument that *Masonite* found a horizontal conspiracy).

 *Second*, even if Plaintiffs had plausibly alleged that the other named Defendants began using the same Zelis tools at or around the same time (they have not), Plaintiffs' own allegations reflect that each of Zelis's pricing tools is further "customizable" to the particular user's needs, Compl. ¶¶ 130, 217, and that users can adjust the parameters for the analysis those tools perform,

*id.* ¶ 128 ("Whether using ERS or RBP, it appears that a specified percentage, amount, or ceiling included, for example, in the pertinent health insurance policy, can be accommodated and govern Zelis's repricing analysis.").  Such allegations undercut any suggestion that the other named Defendants actually agreed to use the *same* tool and in the *same* way.  So too do Plaintiffs' allegations that the MCOs are able to, and do in practice, reject Zelis's repriced rates.  Plaintiffs quote a Zelis website reflecting "97% retained savings" for customers who accept Zelis's repricing recommendation, demonstrating that MCOs determine whether to accept Zelis's recommendations.  *See id.* ¶ 127.  Courts have rejected claims similarly predicated on the alleged "joint delegation" of pricing authority when customers can reject recommendations as they see fit.  *Gibson v. Cendyn Grp.*, 2024 WL 2060260, at *8 (D. Nev. May 8, 2024) (nonbinding nature of recommendations rendered it "implausible" to infer "a tacit agreement to accept . . . pricing recommendations"); *Cornish-Adebiyi*, 2024 WL 4356188, at *7 (refusing to "infer a plausible price-fixing agreement . . . from the mere fact that [certain defendants] all use the same pricing software"); *Martindell v. News Grp. Publications, Inc.*, 580 F. Supp. 330, 334 (E.D.N.Y. 1984) (rejecting resale price fixing claim where plaintiffs were free to set their own prices); *SAS Inst. Inc.*, 2025 WL 2078835, at *3 (dismissing similar case where acceptance rate allegations are "not reflective of the [defendant's] acceptance rate").

        (ii)     Plaintiffs Do Not Plausibly Allege Actions Against Self Interest.

The Complaint's threadbare allegations that the MCOs acted against their independent economic interest are likewise insufficient.  Compl. ¶¶ 290-92.  Only "extreme action against self-interest . . . may suggest prior agreement . . . where individual action would be so perilous in the absence of advance agreement that no reasonable firm would make the challenged move without such an agreement."  *Musical Instruments*, 798 F.3d at 1195.  Plaintiffs fail to allege that here, and

in fact allege a variety of reasons an MCO would use Zelis's repricing services absent a conspiracy. *See Twombly*, 550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among themselves to do what was only natural anyway.").

Indeed, Plaintiffs' own factual allegations demonstrate, contrary to their conclusory assertions, that the alleged conduct was *consistent* with each Defendant's individual economic self-interest.  In particular, a rational, independent basis for MCOs to engage a vendor like Zelis for repricing services is, as Plaintiffs allege, that MCOs seek to limit rising premiums in general and growth in OON costs in particular.  *See* Compl. ¶ 170 (recognizing MCOs' goal of limiting growth in OON costs); ¶¶ 250-52 (describing rapidly increasing health insurance premiums).  It is common sense that doing so allows them, in turn, to compete with lower prices in the sale of health insurance and health benefit plans to their benefit, not detriment.  *Iqbal*, 556 U.S. at 679 (noting that a court should "draw on its judicial experience and common sense" when determining whether a plaintiff alleges a plausible claim for relief).  Likewise, for self-funded plans, it is common sense that plan sponsors (such as large employers or unions) would choose to utilize tools that enable them to lower their OON costs, and direct plan administrators to use Zelis's services.

Plaintiffs' claims that an MCO risks OON providers refusing to provide healthcare services to its subscribers "to its own destruction" if it pays below market rates for OON services is illogical and contradicted by Plaintiffs' own allegations.  Compl. ¶ 290.  The opposite is true; MCOs may lose customers—both employers and individuals purchasing health insurance—if they pay too much to OON providers and, as a result, the medical costs are too high.  *In re Aetna UCR Litig.*, 2015 WL 3970168, at *21; *see also Franco*, 818 F. Supp. 2d at 839 (holding that health plans' "efforts to keep [OON] costs down" fulfilled an "obvious objective" for any health plan, not a conspiracy).  Plaintiffs' own allegations undermine the idea that MCOs compete for subscribers

by paying healthcare providers *more* for OON services, such that it would be against the MCOs'
self-interest to use Zelis's repricing services.  Rather, Plaintiffs allege that patients would prefer
to stay in network, but sometimes use OON services.  Compl. ¶ 163.  In other words, patients
choose a health plan based on factors such as what providers are in-network, how broad the
network is, and how low medical costs or premiums are—and MCOs compete for customers on
that basis, not on whether the MCOs pay more to OON providers.  The *MultiPlan* decision was
wrong to depart from a long line of authority consistent with that conclusion, and Plaintiffs'
copycat allegations should be rejected.  *Compare MultiPlan*, 2025 WL 1567835, at *16-17 *with*
*In re Aetna UCR Litig.*, 2015 WL 3970168, at *21 *and Franco*, 818 F. Supp. 2d at 839.

The Complaint is replete with allegations that undercut Plaintiffs' theory that partnering
with Zelis would be against the MCOs' self-interests absent a conspiracy.  For instance, Plaintiffs
allege MCOs allegedly also use *other* repricing vendors beside Zelis—conduct plainly inconsistent
with a conspiracy to use Zelis to set OON prices.  Compl. ¶¶ 87, 311.  And they allege that Zelis's
marketing efforts touted the savings available to MCOs through use of its services, *see, e.g.*, *id.*
¶¶ 76, 140, which would rationally lead other MCOs to want to use the products that were
delivering those savings.  *See AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216,
235 (2d Cir. 1999) (per curiam) (no conspiracy where conduct was consistent with unilateral
legitimate business interests).  That Defendants had independent reasons to enter agreements with
Zelis regardless of what others did forecloses an inference of conspiracy and requires dismissal.
*See Twombly*, 550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among
themselves to do what was only natural anyway."); *see also, e.g.*, *Musical Instruments*, 798 F.3d
at 1195 (affirming dismissal where "the complaint itself . . . provides ample independent business
reasons why each of the manufacturers" engaged in the challenged conduct).

> (iii)    Plaintiffs' Additional "Plus Factors" Do Not Suggest a Conspiracy.

Plaintiffs attempt to allege additional "plus factors" rendering a conspiracy more likely, but those allegations do not place the alleged conduct "in a context that raises a suggestion of a preceding agreement," and thus do not support Plaintiffs' claim. *Twombly*, 550 U.S. at 557.

***Competitively Sensitive Information Sharing.***    Plaintiffs assert that MCOs share competitively sensitive information with and through Zelis. But that assertion is not supported by, and indeed is undermined by, the Complaint's allegations. The Complaint includes generalized allegations that MCOs submit claims information and certain contracts to Zelis, but Plaintiffs plead *no* facts, as none exist, to suggest that such information is shared *with other MCOs* or is used in any manner to recommend OON reimbursement rates for competitors. *See, e.g.*, Compl. ¶¶ 205, 210, 221, 226. Courts have found similar allegations of "information sharing" via a service provider's technology insufficient to raise any inference of conspiracy. *See MGM*, 2023 WL 7025996, at *5 (dismissing Section 1 claim where plaintiffs merely alleged that confidential information was fed in—but not out—of the pricing algorithm at issue, and where plaintiffs failed to allege that "one [alleged co-conspirator] ever receive[d] confidential information belonging to another" as opposed to merely getting "their own confidential information back mixed with public information from other sources"); *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 716 (N.D. Ohio 2025) (dismissing Section 1 claim where plaintiffs failed to allege "what confidential information was or could have been exchanged").

Allegations of various other purported exchanges of data that Plaintiffs conspicuously do *not* allege to be confidential do nothing to rectify these deficiencies. *See, e.g.*, Compl. ¶¶ 218, 230. For instance, Plaintiffs allege that Zelis provides MCOs with access to *public* data, such as PPO network data, in a context unrelated to Zelis's repricing solutions. *See id.* ¶¶ 222-24 (describing

- 32 -

network benchmarking data), ¶ 227 n.244 (citing article discussing Zelis's use of "publish[ed]" data).[8]    Similarly, Plaintiffs' allegation that Zelis's partnership with Availity—which the Complaint describes as a "real-time health information network"—somehow "includes confidential information sharing" falls flat.  *Id.* ¶¶ 232, 235.  Plaintiffs do not allege *what* competitively sensitive information is purportedly transmitted among competitors through Availity.  To the contrary, Plaintiffs instead simply claim that Availity provides "secure" communication channels *between health plans and providers*.  *Id.* ¶¶ 232-35.

Plaintiffs' unsupported allegation pled "[o]n information and belief" that MCOs' repricing agreements with Zelis "include information sharing obligations" serves only to further highlight the weaknesses in Plaintiffs' allegations.  *Id.* ¶¶ 199, 212.  None of the sources on which Plaintiffs purport to rely reflect such contractual obligations—nor could they; the sources simply acknowledge the existence of services agreements between Zelis and certain insurers.  *Id.* ¶ 209 n.219.  The lack of any indication that *competitively sensitive* pricing data is shared among competitors is "critical" because "[i]t is natural—if not expected—that to compete better, competitors will monitor the publicly-available pricing practices of others."  *MultiPlan*, 2025 WL 1567835, at *17 (citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (noting "[t]he exchange of price data . . . among competitors does not invariably have anticompetitive effects" as it can "increase economic efficiency and render markets more . . . competitive.")).

*MultiPlan*'s allegations are notably different.  There, the plaintiffs alleged a purported "prominent example" of a communication between MultiPlan and an MCO "in which MultiPlan divulged enough pricing information to [the MCO] that it could glean how its competitors were

---

[8] And indeed, some of this information is required to be disclosed under the Transparency in Coverage Rule and is thus not confidential.  *See* 45 C.F.R. § 147.

calculating their out-of-network rates." *Id.* at *18. The *MultiPlan* plaintiffs further claimed that MultiPlan produced and distributed white papers that communicated the "typical" calculation settings MCOs used to other MCOs. *Id.* There are no such allegations here.

**Motive and Opportunity to Collude.** Plaintiffs' allegations that Defendants had motives and opportunities to collude are also deficient.[9] Plaintiffs allege Defendants had a financial incentive to conspire, Compl. ¶¶ 276-80, but a common motive to earn profits does not suggest an agreement. *See White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011). Plaintiffs also allege that representatives from Zelis and MCOs attended some of the same conferences, including some held by Zelis, and that certain MCOs are members of a trade association. Compl. ¶¶ 283-89. But Plaintiffs do not allege *any* communications among Defendants regarding OON claims repricing or the use of Zelis's repricing solutions at those conferences. Indeed, Plaintiffs only speculate that Defendants even communicated or exchanged information at all beyond their general "experiences" with Zelis, *id.* ¶ 285, much less that they entered an agreement while attending any particular meeting or event. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 14 (1st Cir. 2016) ("mere participation" in a trade organization does not suggest an illegal agreement (citing *Musical Instruments*, 798 F.3d at 1196)); *Kleen Prods. LLC v. Ga-Pac. LLC*, 910 F.3d 927, 938 (7th Cir. 2018) ("[H]aving the *opportunity* to conspire does not necessarily imply that wrongdoing *occurred*. Especially when companies have legitimate business reasons for their contacts, plaintiffs must offer some evidence that moves beyond speculation about the content of what was conveyed." (internal citation omitted)).

---

[9] Plaintiffs further allege conclusory statements that "conspirators" and their unspecified "corporate ancestors" have a "shared history" of price fixing and collusion related to payments for OON healthcare services. Compl. ¶¶ 299-300, 282. Bare labels and conclusions are entitled to no weight on a motion to dismiss. *Twombly*, 550 U.S. 545.

**Market Share.** Finally, Plaintiffs also claim that Zelis's alleged high market share is a "plus factor" in favor of a conspiracy. Compl. ¶ 268. But Plaintiffs' market share allegations are directly at odds with the position taken by the plaintiffs (including Plaintiff PIMG in this case) in the MultiPlan cases, and Plaintiffs should be estopped from taking a contrary position here. "[T]he doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant . . . in a prior legal proceeding." *InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003). It has two basic requirements: (1) a mutually exclusive inconsistency, and (2) a court's acceptance of the party's prior position. *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004). Both are met here.

*First*, PIMG's market allegations in the MultiPlan cases and its market allegations here are flatly contradictory. In the MultiPlan cases, PIMG alleged that MultiPlan "reached agreements with nearly every (other) significant Payor in the United States, addressing . . . payment of OON claims," and that those agreements "*required* Payors to use MultiPlan's repricing tools." PIMG Complaint ¶¶ 250, 252 (emphasis added).[10] Further, PIMG alleged that "Zelis, along with other claims repricing services, are small-time players compared to MultiPlan" and that in comparison to the "approximately 2 million claims" Zelis processed in 2022, "MultiPlan processed 546 million claims" in 2023. *Id.* ¶ 334. In other words, PIMG alleged Zelis's market share to be less than 0.5%. Those allegations were subsequently incorporated into consolidated pleadings in the multi-district litigation where PIMG's original case is proceeding. *See, e.g.*, MultiPlan Class Action Compl. ¶ 273; MultiPlan Direct Action Compl. ¶ 567. The allegations cannot be squared with

---

[10] The Court is permitted to take judicial notice of these court filings because they are directly relevant to the motion presently before the Court. *See Rodi v. S. New England Sch. Of L.*, 389 F.3d 5, 19 (1st Cir. 2004) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.").

PIMG's allegations here that it is *Zelis* that is the dominant player with market share is "likely much higher than 65.5% and possibly higher than 82.2%."  Compl. ¶ 270.

*Second*, the *MultiPlan* court directly relied on MultiPlan plaintiffs' market allegations to deny a motion to dismiss in that case.  Specifically, the court accepted as true for the purposes of the motion the plaintiffs' allegations that MultiPlan processed over 80% of OON healthcare service payments and "is the dominant force in the market."  *See MultiPlan*, 2025 WL 1567835 at *3, *7. The Court should accordingly reject Plaintiffs' tactics and disregard Plaintiffs' contradictory allegations of Zelis's purported dominance since they have elsewhere acknowledged the truth— that Zelis is a small player in the claims repricing industry.

In any event, Plaintiffs' purported market share statistics are independently flawed. Plaintiffs' allegation that Zelis's market share is "at least 65.5%" is calculated on a "number-of-entities basis," that is, they allege that there are 1,176 U.S. health insurers and that Zelis counts 770 of them as customers.  *Id.* ¶¶ 174, 176.  But Plaintiffs do not allege how many of those 770 insurers use Zelis for repricing services, as opposed to the many other technology services Zelis offers, or how many of those insurers use Zelis for repricing OON claims in particular.  Nor do the Plaintiffs allege the extent to which *any* insurer uses Zelis for repricing services relative to other repricing services offered by other vendors, including MultiPlan.  The allegation that Zelis's market share is "possibly higher than 82.2%" is equally flawed.  Compl. ¶ 270.  Plaintiffs cite data purportedly reflecting that the "top three large-group insurers hold an average of 82.2% of the market share in each state," and claim that, because Zelis has "business relationships" with those insurers, Zelis likewise has an 82.2% market share.  *Id.* ¶¶ 178-79.  But Plaintiffs do not identify the insurers or provide any facts showing that they are in fact Zelis customers, let alone for OON repricing services specifically.

IV.    **PLAINTIFFS FAIL TO PLEAD A RELEVANT ANTITRUST MARKET.**

Plaintiffs' Complaint should be dismissed for the independent reason that it fails to plead a relevant antitrust market. Plaintiffs must allege both the existence of a relevant product market and relevant geographic market to state a claim under Section 1 of the Sherman Act. *Eastern Food Servs., Inc. v Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 9 (1st Cir. 2004) (affirming dismissal in part based on failure to allege a proper geographic market); *Bryan v. Ascend Learning*, 2024 WL 5170211, *7 (D. Mass. Dec. 19, 2024) (dismissing for failure to properly define a relevant market); *Chapman v. New York State Div. of Youth*, 546 F. 3d 230, 238 (2d Cir. 2008) (affirming dismissal of antitrust claims based on failure to allege relevant market).

A properly alleged antitrust product market must encompass all products or services that are "reasonably interchangeable" for the purposes for which they are produced. *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). Failure to "allege[] a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor" renders the relevant market legally insufficient and "a motion to dismiss may be granted." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *see also Smugglers Notch Homeowner's Ass'n Inc. v. Smugglers Notch Mgmt. Co*, 414 F. App'x 372, 375 (2d Cir. 2011) (affirming dismissal of complaint on this basis). Plaintiffs' alleged "nationwide" market for "OON healthcare services as sold by out-of-network Providers and as purchased by Commercial Payors" fails as both a product market and as a geographic market. Compl. ¶¶ 148-49.

*First*, Plaintiffs' alleged product market fails because it groups countless different healthcare services offered by vastly different kinds of providers into a single alleged market. A routine dental exam is simply not "reasonably interchangeable" with a kidney transplant. *See Chapman*, 546 F. 3d at 238 ("Interchangeability implies that one product is roughly equivalent to

another for the use to which it is put." (quoting *Queen City*, 124 F.3d at 437)). While "cluster" markets can group together services that are not reasonably interchangeable, this is only permissible where, unlike here, competitive dynamics are the same across the relevant products, *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 117 (D.D.C. 2016), and "the 'cluster' is itself an object of consumer demand." *FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016) (citation omitted). For example, courts may group "inpatient general acute care services" performed at hospitals together. *Id.* at 468. The competitive dynamics across *every* healthcare service allegedly encompassed in Plaintiffs' market definition (ranging from teeth cleaning to brain surgery) are vastly different, and Plaintiffs make no effort to allege any competitive dynamics across these various services—apart from allegedly similar pricing mechanisms used to reimburse OON providers.[11]

Plaintiffs also cannot define the market around *the method or amount* of payment for those services, rather than the actual substitutability of those services, as required by the law. Specifically, Plaintiffs define the market as services "more expensive than comparable in-network healthcare services." Compl. ¶¶ 166, 167. From the perspective of providers and patients, however, the nature of the medical services patients receive does not change based on the price charged by the provider or the manner in which they are paid. *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009) ("[A]s a matter of law, in an antitrust claim brought by a seller, a product market cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller."). In-network reimbursement and OON reimbursement are merely two means by which patients pay for medical services, regardless

---

[11] Plaintiffs' allegations related to emergency care illustrate the point. Providers are legally required to render emergency care to any MCO's members, so Plaintiffs' alleged competition among MCOs in the "OON Commercial Payer Market" is inapplicable to a major segment of their alleged market. Compl. ¶ 159.

of what services they are or where they receive them. For providers, their customers are presumptively *all* patients receiving their medical services, regardless of the type of reimbursement. *See Stop and Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66, 69 (1st Cir. 2004) (affirming lower court's decision to strike market definition testimony that excluded sales of drugs that were not financed or reimbursed). Moreover, Plaintiffs' allegations that OON reimbursement is its own market because Defendants and third parties allegedly treat it as distinct from in-network reimbursement misses the point. Compl. ¶¶ 167-72. That Defendants and third parties identify OON reimbursement as distinct from in-network reimbursement for explaining rate differences and plan options does not establish that healthcare services reimbursed under either method are somehow not reasonably interchangeable.

*Second*, Plaintiffs' alleged geographic market also fails, which is also grounds for dismissal. *Eastern Food Servs.*, 357 F.3d at 9 (dismissal of Section 1 claim where complaint failed to allege a valid geographic market). Plaintiffs' alleged geographic market is "all fifty States, of the United States, the District of Columbia, and all U.S. territories *where providers are paid for OON healthcare by Commercial Payers*." Compl. ¶ 143 (emphasis added). This market definition ignores commercial realities because, as courts have recognized, "[h]ealthcare professionals and healthcare facilities usually provide services to patients living or working in relatively close proximity to their offices or other facilities." *In re BCBS Antitrust Litig.*, 2017 WL 2797267, *6 (N.D. Ala. June 28, 2017) (denying a market definition motion to dismiss where healthcare provider plaintiff class alleged geographic market limited to counties, metropolitan areas, and states). Moreover, the majority of Defendants do *not* "insure patients across the country," and are therefore not "seen by sellers as being reasonably good substitutes." *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 641 (N.D. Ill. 2020) (citation omitted). Plaintiffs allege as much,

claiming that one of their providers offers care in at least 22 locations *only in California*. Compl. ¶ 146. Plaintiffs' alleged nationwide geographic market is facially implausible.

Plaintiffs' alleged geographic market also fails because it includes healthcare services offered across the country in the same alleged "market." A routine dental visit in California is not "reasonably interchangeable" with one in Massachusetts from the perspective of patients or MCOs. Many MCOs do not operate nationwide or have the state insurance or business licenses required to do so. This Court can draw on its judicial experience and common sense to find the Complaint's proposed geographic market implausible, *Iqbal*, 556 U.S. at 679, and the Complaint's failure to plead sufficient facts supporting the proposed "nationwide" market for OON healthcare services likewise warrants dismissal. Plaintiffs' singular allegation that a "benefits manager"—which Plaintiffs do not allege administers the PPOs of any of the Defendants—defines a PPO as "ideal for those who travel frequently" is unrelated to where patients actually are insured or receive care. Compl. ¶ 145; *cf. Delta Dental*, 484 F. Supp. 3d at 641.

For the foregoing reasons, Plaintiffs' alleged "nationwide" market for "OON healthcare services as sold by out-of-network providers and as purchased by commercial payors" fails and the Complaint should be dismissed.

## CONCLUSION

For the reasons stated above, the Amended and Consolidated Class Action Complaint should be dismissed in its entirety, with prejudice.

Dated: August 11, 2025

*/s/ Matthew L. McGinnis*
Matthew L. McGinnis (BBO# 666120)
Jane E. Willis (BBO# 568024)
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199
(617) 951-7000
Jane.Willis@ropesgray.com
Matthew.McGinnis@ropesgray.com

***Attorneys for Defendants Zelis Healthcare,
LLC, Zelis Claims Integrity, LLC, and Zelis
Network Solutions, LLC***

George Borden
Katherine Anne Trefz (*pro hac vice*)
Jonathan Pitt (*pro hac vice*)
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Telephone: 202-403-5038
gborden@wc.com
ktrefz@wc.com
jpitt@wc.com

***Attorneys for Defendant Aetna, Inc.***

Brett Boskiewicz (BBO #656545)
**McDERMOTT WILL & SCHULTE LLP**
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 535-4000
Facsimile: (617) 535-3800
bboskiewicz@mwe.com

Joshua B. Simon (*pro hac vice*)
Warren Haskel (*pro hac vice*)
**McDERMOTT WILL & SCHULTE LLP**
One Vanderbilt Ave
New York, NY 10017
Telephone: 212-547-5400
Facsimile: 212-547-5444
jsimon@mwe.com
whaskel@mwe.com

- 41 -

*Attorneys for Defendant The Cigna Group*

Maria R. Durant (BBO #558906)
**HOGAN LOVELLS US LLP**
125 High Street, Ste. 2010
Boston, MA 02110
Telephone: 617-371-1024
Maria.Durant@hoganlovells.com

E. Desmond Hogan (*pro hac vice*)
Justin Bernick (*pro hac vice*)
W. David Maxwell (*pro hac vice*)
**HOGAN LOVELLS US LLP**
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
david.maxwell@hoganlovells.com

*Attorneys for Defendant Elevance Health, Inc.*

Abena Mainoo (BBO #677622)
Joseph Kay (*pro hac vice*)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006
Telephone: 212-225-2000
Telephone: 212-225-2745
amainoo@cgsh.com
jkay@cgsh.com

Heather Nyong'o (*pro hac vice*)
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
650 California Street
Suite 2400
San Francisco, CA 94108
Telephone: 415-796-4480
hnyongo@cgsh.com

Daniel P. Culley (*pro hac vice*)
**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone: 202-974-1500
dculley@cgsh.com

*Attorneys for Defendant Humana Inc.*
Rachel S. Brass (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
One Embarcadero Center Suite 2600
San Francisco, CA 94111
Telephone: 415-393-8293
rbrass@gibsondunn.com

Heather L. Richardson (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Ave., 54th Floor
Los Angeles, CA 90071
Telephone: 213-229-7409
hrichardson@gibsondunn.com

Allison O'Neil
Kara Kelleher
**TROUTMAN PEPPER LOCKE**
111 Huntington Ave., 9th Floor
Boston, MA 02199
Telephone: 617-443-3744
Allison.oneil@troutman.com
Kara.kelleher@troutman.com

*Attorney for Defendant UnitedHealth
Group, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of August, 2025, the foregoing was filed with the Court's electronic filing system, which will send electronic notice of this filing to all counsel of record.

/s/ *Matthew L. McGinnis*
Matthew L. McGinnis