**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE: ZELIS REPRICING ANTITRUST LITIGATION | Lead Action Case No.: 1:25-cv-10734-BEM |
| | *Consolidated with Case Nos.:* <br> *1:25-CV-11092-BEM* <br> *1:25-CV-11167-BEM* <br> *1:25-CV-11537-BEM* |
| This Document Relates To: <br><br> All Associated Cases | |
| | Leave to File Excess Pages Granted on July 31, 2025 (ECF Dkt. 85) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS**
**THE AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT**

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

FACTUAL ALLEGATIONS ......................................................................................... 3

APPLICABLE LEGAL STANDARD ......................................................................... 6

ARGUMENT .................................................................................................................... 6

I.      PLAINTIFFS' ALLEGATIONS ESTABLISH BOTH ARTICLE
        III AND ANTITRUST STANDING ........................................................... 6

        A.    Plaintiffs Sufficiently Allege Injury-in-Fact Traceable
              to Defendants' Conspiratorial Conduct ............................................. 6

        B.    The Injuries Plaintiffs Allege Are Neither Indirect nor Derivative ................. 8

II.     PLAINTIFFS SUFFICIENTLY ALLEGE ANTITRUST INJURY .................... 12

III.    PLAINTIFFS PLAUSIBLY ALLEGE BOTH A HORIZONTAL AND
        A HUB-AND-SPOKE CONSPIRACY .................................................. 17

        A.    Plaintiffs Plausibly Plead a Horizontal Conspiracy ...................................... 17

              1.    Defendants' Resort to "Group Pleading" Fails .......................................... 17

              2.    One or More of Zelis's PPO Networks Participate in the
                    Relevant Market ............................................................................... 18

              3.    The CAC Alleges Direct Evidence of a Conspiracy .................................. 21

              4.    The CAC Also Alleges Indirect Evidence of the Conspiracy .................... 21

                    a. Plaintiffs Plausibly Plead Defendants' Parallel Conduct ........................ 21

                    b. Plaintiffs Allege Sufficient Plus Factors .............................................. 21

        B.    Plaintiffs Also Plausibly Allege a Hub-and-Spoke Conspiracy ................... 25

              1.    Plaintiffs Allege Direct Evidence of the Hub and Spokes ........................ 21

              2.    The CAC Also Alleges Facts That Indirectly Evidence the Hub
                    and Spokes ....................................................................................... 27

              3.    The CAC Also Alleges Evidence of a Rim ............................................. 30

IV.     PLAINTIFFS ADEQUATELY PLEAD THE RELEVANT SERVICE AND GEOGRAPHIC MARKET ........................................................................... 32

     A.   The CAC Plausibly Alleges the Relevant Service Market ........................... 32

     B.   Plaintiffs Also Plausibly Plead a Relevant Georgraphic Market .................. 35

     C.   Plaintiffs Market Share Allegations are Sufficiently Plausible

         at This Stage ...................................................................................................... 37

CONCLUSION .......................................................................................................................... 39

TABLE OF AUTHORITIES

**CASES**

*Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323 (D. Vt. 2010)................................................. 39

*Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F. 3d 23 (1st Cir. 2004)). ...................................... 37

*American Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 195 (2010) ..................................... 13, 14

*American Steel Erectors v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43 (1st Cir. 2016) .................................................................. 19, 20, 26

*Anderson News, L.L.C. v. Am. Media, Inc.,* 899 F.3d 87, (2d Cir. 2018))................................................. 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................................ 6

*Associated General Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)......... 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). ............................................................... 6, 21, 27

*Brader v. Allegheny Gen'l Hosp.*, 64 F.3d 869 (3d Cir. 1995)............................................................... 12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977))................................................. 11, 12

*Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643 (1980)). ...................................................... 25

*Connectu LLC v. Zuckerberg,* 522 F.3d 82 (1st Cir. 2008) ................................................... 38

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)....................................... 13

*Desjardins v. Van Buren Community Hosp.*, 37 F.3d 21 (1st Cir. 1994); ................................... 38

*Dickson v. Microsoft Corp.*, 309 F. 3d 193 (4th Cir. 2002)..................................................... 31

*Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283 (W.D. Wash. 2024),................................... 14, 26

*Duggan v. Martorello*, No. 18-12277-JGD, 2021 WL 4295828, at *8 (D. Mass. Sept. 21, 2021))......... 38

*Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.,* 357 F.3d 1 (1st Cir. 2004) .... 36

*Eastman Kodak,* 504 U.S. at 482 ........................................................................................... 33

*Fraser v. Major League Soccer, L.L.C.,* 284 F. 3d 47 (1st Cir. 2002)) ........................................ 13, 19

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016))..................................... 33

*FTC v. Staples,* 190 F. Supp. 3d at 117 (D.D.C. 2016) ............................................................... 33

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F. 2d 547 (1st Cir. 1974) .................. 16

*Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251 (1972)............................................................... 10

*Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738 (1976). ............................................... 6

*In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775, 2010 WL 4916723, at *2 (E.D.N.Y. Nov. 24, 2010) ......................................................................................................... 10

*In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 WL 2797267 (N.D. Ala. June 28, 2017).......................................................................................................... 36

*In re Concrete and Cement Additives Antitrust Litig.*, No. 24-md-3097 (LJL), 2025 WL 1755193, at *13–*14 (S.D.N.Y. June 25, 2025). ...................................................................... 23

*In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627 (N.D. Ill. 2020)). .............................................. 33

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015)............. 7

*In re High-Tech Antitrust Employee Antirust Litig.*, 985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................ 22

*In re MultiPlan Health Ins. Provider Litig.*, Case No. MDL No. 3121, Dkt. 382, p.1.............................. 1

*In re MultiPlan Health Insurance Provider Litig.*, No. 24 C 6795, 2025 WL 1567835, --- F. Supp. 3d --- (N.D. Ill. June 3, 2025)................................................................................... passim

*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 533 F.3d 1, 5–6 (1st Cir. 2008) ................ 27

*In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 723 (N.D. Ill. 2022)................................................... 22

*In re Wellpoint, Inc. Out- of-Network* ................................................................................................. 10

*Interstate Circuit,* 306 U.S. at 226......................................................................................................... 30

*Kartell v. Blue Shield of Mass., Inc.*, 749 F. 2d 922, 931 (1st Cir. 1984), *cert. denied,* 471 U.S. 1029 (1985). ................................................................................................................... 13

*Kartell,* 749 F. 2d at 929 .......................................................................................................................... 15

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F. 3d 979, 989 (9th Cir. 2000) ....................................... 15

*Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009))......................... 34

*MacDermid Printing Sol'ns LLC v. Cortron Corp.*, 833 F. 3d 172 (2d Cir. 2016)................................. 14

*Mish Int'l Monetary Inc. v. Vega Capital London, Ltd.*, 596 F. Supp. 3d 1076 (N.D. Ill. 2022) ............. 21

*Musical Instruments & Equip. Antitrust Litig.,* 798 F. 3d 1186 (9th Cir. 2015) ..................................... 23

*New Hampshire v. Maine*, 532 U.S. 742 (2010) ...................................................................... 38

*Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700 (1969) ............................ 23

*North Jackson Pharmacy, Inc. v. Express Scripts Inc.*, 345 F. Supp. 2d 1279 (N.D. Ala. 2004) .............. 7

*Osterhaus Pharm., Inc. v. Express Scripts, Inc.*, 768 F. Supp. 3d 1186 (W.D. Wash. 2025)................... 14

*Pac. Recovery Sols v. United Behav. Health*, 481 F. Supp. 3d 1011 (N.D. Cal. 2020)............................. 9

*Pac. Recovery Sols. v. Cigna Behav. Health, Inc.* No. 5:20-cv-02251-EJD, 2021 WL 1176677, at *12 (N.D. Cal. Mar. 29, 2021). ................................................................................................... 9

*Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990)............................................................... 18

*PDFFiller,* 2018 WL 1403330, at *6.......................................................................................... 33

*ProMedica,* 749 F.3d at 568 ...................................................................................................... 33

*Remicade Antitrust Litig.*, 345 F. Supp. 3d 566 (E.D. Pa. 2018)................................................. 7

*RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10 (1st Cir. 2001))................................... 11

*Solyndra Residual Trust by and through Neilson v. Suntech Power Holdings Co., Ltd.*, 62 F. Supp. 3d 1027,  (N.D. Cal. 2014)................................................................................................. 15, 35

*Spokeo, Inc. v. Robins,* 578 U.S. 330 (2016) ........................................................................... 8

*Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 311 F.3d 468 (D.R.I. 2018). ................................................................................................................. 24

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57 (1st Cir. 2004),........... 34

*Synopsys*, 374 F.3d at 33; *United States v. Owens*, 933 F. Supp. 76 (D. Mass. 1996); ........................... 38

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,* 552 F.3d 430 (6th Cir. 2008);.............................................................................................................. 31

*United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109 (D. Mass. 2024),..................................... 14
*United States v. Levasseur,* 846 F.2d 786 (1st Cir. 1988) ........................................................ 37

*Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286 (1st Cir. 2022). ...................................................... 14

*Wellpoint,* 903 F. Supp. 2d 880 (C.D. Cal. 2012). ...................................................................... 10

*W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F. 3d 85 (3d Cir. 2010) ........................................... 15

*Whitman & Co. v. Longview Partners (Guernsey) Ltd.*, No. 14–cv–12047–ADB, 2015 WL 4467064, at *10 (D. Mass. July 20, 2015). ....................................................................................... 17

*Zond v. Fujitsu Semoconductor Ltd.*, 990 F. Supp. 2d at 50 ...................................................................... 17

## STATUTES

Clayton Act § 4 ......................................................................................................................... 10

Clayton Act § 7 ......................................................................................................................... 14

FRCP Rule 12(b)(1) ................................................................................................................ 1, 6

FRCP Rule 12(b)(6) ................................................................................................................ 1, 6

## OTHER AUTHORITY

Request for Information Regarding the Prescription Drug Machine-Readable File Requirement in the Transparency in Coverage Final Rule, 90 FR 23303-01, 2025 WL 1547404, at *23306 n.35 (June 2, 2025). ....................................................................................................................... 28

**INTRODUCTION**

This case challenges Defendants' use of a shared algorithm to reprice out-of-network ("OON") healthcare services. As the U.S. Department of Justice recently made clear: "Competitors' use of algorithmic technologies to coordinate their decision-making poses a growing threat to the free market competition on which our economic system is premised."[1] Defendants mischaracterize Plaintiffs' claims as healthcare providers ("Providers") seeking uncapped rates for OON services. But there is no dispute that managed care organizations ("MCOs") offer PPOs that provide for OON benefits on some percentage of a usual and customary rate ("UCR"). The market should dictate that UCR. Here, Defendants conspired to set a collusively-"repriced" payment amount using a shared algorithm. That is illegal.

Over the course of hundreds of remarkably detailed factual allegations, Plaintiffs allege Article III injury and standing, antitrust injury and standing, and plausibly allege that Defendants conspired to suppress OON payments to Providers by exchanging confidential claims, pricing, and contractual data through the Zelis Defendants.[2] By allowing Zelis to use their collective claims data to reprice OON claims, the other Defendants delegated to Zelis their previously independent decision-making role and responsibility over OON payments (the "Zelis Conspiracy"). Under both Rules 12(b)(1) and 12(b)(6), Defendants' motion to dismiss should be denied as these detailed factual allegations suffice to plausibly plead a violation of Section 1 of the Sherman Act.

Defendants mount four main arguments, each flawed. *First*, they challenge Plaintiffs' Article III standing on two grounds. First, Defendants falsely contend that Plaintiffs fail to plead that their injury is fairly traceable to Defendants' conduct because they do not allege that any of their claims were actually repriced by Zelis. The Amended and Consolidated Class Action Complaint ("CAC") in *Zelis* explicitly

---

[1] Statement of Interest of the United States, *In re MultiPlan Health Ins. Provider Litig.*, Case No. MDL No. 3121, Dkt. 382, p.1.

[2] "Zelis" refers collectively to Zelis Healthcare, LLC, Zelis Claims Integrity, LLC, and Zelis Network Solutions, LLC.

alleges not only that Zelis repriced OON claims submitted by each Plaintiff but describes repricing in detail and includes an illustrative example. Defendants' other ground is even shakier, contending that Plaintiffs' injuries were not directly caused by Defendants' conduct, but were indirectly caused by the Providers' failure to invoice patients for the amounts remaining after Defendants' discounted payments— so-called "balance-billing," coupled with their patients' failure to pay in full. This argument was rejected in the analogous case, *In re MultiPlan Health Insurance Provider Litig.*, No. 24 C 6795, 2025 WL 1567835, at *23, --- F. Supp. 3d --- (N.D. Ill. June 3, 2025) ("*MultiPlan*"). Defendants offer no reason to depart from that well-reasoned decision.[3]

*Second*, Defendants maintain that Plaintiffs do not plead antitrust injury because the Conspiracy lowers rather than raises healthcare costs. This argument collapses as it (1) is premised on supposed facts found nowhere in the CAC; (2) misunderstands that lower prices, not higher ones, are the way buyer cartels cause injury; (3) assumes the wrong product market: healthcare—an untenably broad, complex and nebulous sector of commerce; and (4) disregards that Plaintiffs plead a *per se* violation of Section 1, which does not consider supposed downstream repercussions.

*Third*, Defendants argue that Plaintiffs fail to allege a plausible conspiracy. But it can hardly be implausible that Defendants re-instituted their prior conspiracy following the expiration of the FAIR Health exclusive use period. And, the CAC describes in abundant detail exactly how Defendants accomplished their objective, evidenced by parallel conduct and salient "plus factors." These allegations

---

[3] Defendants make the baseless and gratuitous ad hominem accusation that this action is a "copycat" of *MultiPlan* because one of the plaintiffs, PIMG, is represented by lead counsel in this action. Not only is this accusation a gratuitous distraction, but it disregards that interim co-lead counsel in *MultiPlan* integrated details developed by Plaintiffs' counsel into their consolidated class complaint. *Compare* PIMG Application for Leadership, Case No. 1:24-cv-06795 (N.D. Ill. Sept. 9, 2024), ECF No. 119, at 2–5 *with* Consolidated Class Action Complaint, Case No. 1:24-cv-06795 (N.D. Ill. Nov. 18, 2024), ECF No. 172 ¶ 266.

evince both a horizontal conspiracy, and a hub-and-spoke conspiracy placing Zelis at the center and inter-Defendant communications around the perimeter.

*Fourth*, Defendants challenge Plaintiffs' proposed product and geographic markets. To be successful, Defendants must demonstrate that the relevant product market Plaintiffs allege—payment for OON healthcare services—*clearly* fails to encompass all interchangeable products and that the nationwide market Plaintiffs allege is facially implausible. *At most*, Defendants raise fact-intensive issues that are not appropriately resolved on a motion to dismiss. Further, Defendants conflate the type of healthcare services with the relevant market: Defendants' provision of OON payments. The real product is those OON benefits, not medical treatments. On nearly identical facts, of course, a similar relevant market was recently deemed plausible by Judge Kennelly in *MultiPlan*. *See MultiPlan,* 2025 WL 1567835, at *12.

In sum, Plaintiffs offer more detailed and supporting allegations for their claims than those found sufficient in *MultiPlan* to establish standing and a plausible antitrust conspiracy. Defendants' arguments that the Complaint is inconsistent hinge on a refusal to accept the pleaded facts as true with all inferences in Plaintiffs' favor. While this Court isn't bound to follow the decision of another district court, this Court is likely to find Judge Kennelly's recently-decided order concerning the same industry and many of the same issues helpful. Also of assistance, is the DOJ's Statement of Interest from the DOJ. For these reasons, the CAC plausibly pleads a Section 1 violation and the Court should accordingly deny Defendants' motion to dismiss in its entirety.

## **FACTUAL ALLEGATIONS**

Among Defendants are three of the nation's five largest health insurers. CAC ¶¶ 34–39, 239. In hidden consort, they delegated to Zelis their respective responsibilities to independently determine their own OON healthcare service payments. To facilitate their scheme, the MCOs shared with and by Zelis confidential and competitively sensitive information. *Id.* ¶¶ 1, 8, 13, 15, 91, 199, 202, 204, 206–207, 212–

214, 219, 221–222, 228. Feeding that data into its claim-pricing technologies, Zelis "repriced" the OON payments that the MCOs would make to Plaintiffs and other Providers. *Id.* ¶¶ 8, 15, 23, 25–29, 31, 33, 77, 88, 90, 114–115, 127, 132–134, 136, 190–191, 215, 228, 302, 333–335, 337, 348, 353–354, 357–358, 361–362, 365. The repriced payments were invariably lower than the Defendants were able to bilaterally negotiate with the Providers. Through this repricing, Defendants established an illegal price-fixing conspiracy in the form of a buyers' cartel to suppress the amount of OON healthcare service payments. *Id.* ¶¶ 350, 352–54, 359–60. More than 770 health insurers, including Defendants, have elected to ally with Zelis in the Conspiracy, making it difficult for OON Providers to find competitively priced OON payments. *Id.* ¶¶ 176, 178–179, 205, 270.

Before Zelis, various health insurers subscribed to their direct competitor UnitedHealthcare Group's service, known as Ingenix. From approximately 1997 through 2009, several health insurers, including the predecessors of some Defendants here, avoided competition by implementing UHG's "conflict[ed]" Ingenix database, which used "scrubbed" and downwardly biased data for purposes of pricing OON healthcare services. *Id.* ¶¶ 60, 63. Ingenix resulted in payments understated by up to 28% across New York state. *Id.* ¶ 65. Following an action brought by the New York Attorney General's Office, certain MCOs entered into settlements where they agreed to stop using Ingenix and to fund a new OON pricing service, "FAIR Health." *Id.* ¶ 66.

Health insurers agreed to use the FAIR Health database to price OON payments for five years beginning in 2010-2011. *Id.* ¶¶ 67, 70. Five years later, MCOs returned to private sources to "reprice" or downwardly adjust OON payment amounts. *Id.* ¶¶ 8, 60, 70, 74. Because Zelis's repricing success depended on a nearly industrywide buy-in, on June 13, 2016, Zelis announced its "re-branding" with "over 500 payor clients." *Id.* ¶¶ 8, 12. That number now exceeds 770, including "the top 5 national health plans." *Id.* ¶¶ 12, 75.

Zelis provides at least two flavors of repricing services. The first was branded as the Established Reimbursement Schedule ("ERS"), also known as the Established Reimbursement Solution. *Id*. ¶¶ 14, 116. Zelis misleadingly refers to ERS as "'Market-Based Pricing.'" *Id*. ¶¶ 14, 116–18, 120. Zelis's second flavor is Reference-Based Pricing ("RBP"). *Id*. ¶¶ 14, 122–28. Zelis asserts that its repricing services operate cohesively "to automatically route claims to recommended quality savings channels." *Id*. ¶¶ 129–131. Zelis is highly incentivized to work with the other MCOs to make OON payments as low as possible, receiving a percentage of the difference between the amount an OON charges and the amount actually paid. *Id*. ¶¶ 8, 84–85.

Zelis candidly expressed its intent: "The intent is to provide an effective tool to help stabilize the healthcare claims costs." *Id*. ¶ 126. Of course, OON Providers are the source of healthcare claims costs Zelis hopes to stabilize. Zelis boasts that its repricing services are effective: "Zelis ... driv[es] real, measurable results for clients." *Id*. ¶¶ 127, 333; *see also id.* ¶ 334.

Defendants' conspiracy suppresses OON payments far below what would be paid if competitive circumstances existed and deprives OON Providers of the benefits resulting from independent centers of decision-making. *Id*. ¶¶ 135, 137. It violates the Sherman Act by reducing the number of sources for OON payment amount determinations and by interfering with Providers' ability to distinguish the lower-paying from the higher-paying MCOs. *Id*. ¶¶ 1, 8, 202, 389.

Finally, Plaintiffs allege both a horizontal and a hub-and-spoke price-fixing conspiracy. For the horizontal conspiracy, Plaintiffs allege not only that Zelis operates Preferred Provider Organization ("PPO") networks, which is a type of MCO, but that at least one of its "standard" PPOs participated in the market for OON healthcare services. *See, e.g., id.* ¶¶ 4, 7, 103, 105–10, 197. By alleging that MCO "fanatics" communicated with each other about Zelis's repricing services on film during Zelis's annual client conferences, Plaintiffs plausibly allege a conspiracy-enabling "rim" connecting the "spokes." *Id*. ¶¶

5

220, 230, 284–86. The "rim" is further supported by the ownership structure of Availity, a software joint venture between Zelis and other MCOs, and efforts by MCO members and board participants to "bring[] together member companies and facilitate[e] dialogues." *Id.* ¶¶ 232–35, 288–89.

**APPLICABLE LEGAL STANDARD**

Because Defendants' Rule 12(b)(1) motion asserts a facial challenge, the same standard of review applies to Defendants' motion under Rule 12(b)(1) and 12(b)(6). *Murphy v. U.S.*, 45 F.3d 520, 522 (1st Cir. 1995). To meet this standard, the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This means that "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 556). The Supreme Court has admonished that "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 747 (1976).

**ARGUMENT**

I.    **PLAINTIFFS' ALLEGATIONS ESTABLISH BOTH ARTICLE III AND ANTITRUST STANDING**

A.    **Plaintiffs Sufficiently Allege Injury-in-Fact Traceable to Defendants' Conspiratorial Conduct**

Defendants argue that the CAC is inadequate because it does not plead facts showing that any specific Defendant used Zelis to reprice a specific claim from a specific Plaintiff or that a payment amount was below a competitive market price due to Zelis' repricing. Defendants' Memorandum of Law in Support of Defendants' Joint Motion To Dismiss The Amended and Consolidated Class Action Complaint ("MTD"), at 13–14. But while this level of granular detail is not required to allege an Article III injury,

6

Plaintiffs *do* plead many such details. For example, the CAC alleges that Zelis, on behalf of Defendant Elevance, named Anthem, Inc. at the time, repriced OON services by Plaintiff Pacific Inpatient Medical Group ("PIMG") rendered on October 30, 2022, discounting PIMG's services over 88% from invoice. CAC ¶ 334; *see also id.* ¶¶ 36, 234, 239, 334.

Each Plaintiff alleges that it received repriced payments for OON services in amounts below competitive rates. *See id.* ¶¶ 25–29. Those allegations suffice without supporting price data. *See, e.g., North Jackson Pharmacy, Inc. v. Express Scripts Inc.*, 345 F. Supp. 2d 1279, 1295 (N.D. Ala. 2004) (finding complaint's allegation that defendants conspired to pay plaintiffs below-market prices adequate) (citing *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 222 (1940)).[4]

Defendants next cite a personal injury case, *Hochendoner v. Genzyme Corp.*, 823 F.3d 724 (1st Cir. 2016), to argue standing must be established claim-by-claim and plaintiff-by-plaintiff. MTD at 14. The issue there was that the plaintiffs alleged different injuries and causal chains from toxic exposure. *Id*. at 733. Here, there is only one form of injury and one causal chain for all plaintiffs. *See* CAC ¶¶ 384–402 (alleging single Section 1 Count for "Plaintiffs and members of the Class").

Proposing an overly stringent standard, Defendants argue that the CAC does not satisfy Article III's traceability predicate "because it fails to connect each Plaintiff's alleged underpayment to any particular Defendant's alleged use of Zelis." MTD at 15. Defendants identify no authority for their proposition that Plaintiffs must "identify[] specific instances in which each Plaintiff alleges that they were underpaid[.]" *Id*. Alleging a causal nexus between their injuries and Defendants' collusive price restraints suffices. CAC ¶¶

---

[4] *See also In re Remicade Antitrust Litig.*, 345 F. Supp. 3d 566, 580 (E.D. Pa. 2018) ("Plaintiffs argue that competitive pricing is not a pleading requirement," and "[w]e agree with Plaintiffs that the accuracy of ASP pricing data cannot be resolved on a motion to dismiss."); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 596 (S.D.N.Y. 2015) (holding that complaint adequately pleads antitrust injury by alleging that horizontal competitors engaged in price-fixing that caused plaintiffs to pay supra-competitive prices).

328–329. *See Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016) (holding that plaintiffs need only assert causal link between alleged harm and challenged conduct).[5]

### B.    The Injuries Plaintiffs Allege Are Neither Indirect nor Derivative

Defendants focus on two of the six factors of the antitrust standing test from *Associated General Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"): (1) "the causal connection between the alleged antitrust violation and harm to plaintiff," and (4) "the directness with which the alleged market restraint caused the asserted injury." MTD at 15. Defendants effectively argue that Plaintiffs' choice not to balance-bill is an intervening cause of their harm. This argument fails for several reasons.

First, under *AGC* factor (1), the CAC alleges a causal nexus between the conspiracy and Plaintiffs' injury. Plaintiffs assert that their injuries occur upon receipt of underpayment by repricing. CAC ¶¶ 25–29. *See also id.* ¶ 357 & n.356 (addressing *AGC* factor (1)). Remaining balances to Providers' bills are legally inconsequential. By Defendants' logic, they may collude to suppress OON payments and then force Providers to go after their patients for the difference.

Moving to the fourth *AGC* factor, the directness of the injury, Plaintiffs allege this directness in detail at CAC ¶ 360. Nevertheless, Defendants errantly contend that a Provider's decision not to balance-bill an OON patient is the direct cause of its injury, not Defendants' Section 1 violation. MTD at 16. Defendants fail to mention that, in many instances, Zelis prohibits Plaintiffs from balance-billing an OON claim that it pays at a repriced (i.e., reduced) price. *See* CAC ¶¶ 191, 348. Defendants' restriction on balance billing creates a Catch-22: According to Defendants, Providers should recoup their alleged loss directly from the

---

[5] Zelis has confirmed that its repricing methodologies are effective in saving OON payers money. *See, e.g.*, CAC ¶ 333 ("Zelis sees across the system to identify, optimize, and solve problems holistically with technology built by healthcare experts—driving real, measurable results for clients."); *id.* ¶ 334 (quoting third-party administrator's boast that "'as a result of working with our partner Zelis for the past several years[,] [o]ur clients have enjoyed average savings of 42%.'").

8

patient, but the loss only materializes from Defendants' underpayment, which is conditioned on *not* recouping anything from the patient. Further, laws have been enacted that restrict balance billing. *Id.* ¶¶ 115, 195.

Defendants' conspiracy—coupled with Zelis' balance billing ban—is the obvious cause of that injury. For that reason, *MultiPlan* rejected the causation argument Defendants echo now. *MultiPlan,* 2025 WL 1567835, at *5. The *MultiPlan* court found the three cases both cited by the *MultiPlan* defendants and the Defendants here "all distinguishable," and that none of those cases does anything to "break the causation chain." First, *Pac. Recovery Sols v. United Behav. Health* is distinguishable as the plaintiffs there alleged injury "only to the extent that their patients do not pay the amounts that United does not reimburse." 481 F. Supp. 3d 1011, 1022 (N.D. Cal. 2020). In contrast, Plaintiffs allege they are injured upon receipt of the Zelis-determined underpayment. CAC ¶¶ 25–29.

Secondly, *Pac. Recovery Sols. v. Cigna Behav. Health, Inc.*, rejected antitrust standing based on the "directness of the injury" as "Plaintiff's injury . . . is derivative of their patients' injury," as the harm was "speculative," and as there was "more than theoretical risk" of duplicative injuries based on the existence of "a separate suit." No. 5:20-cv-02251-EJD, 2021 WL 1176677, at *12 (N.D. Cal. Mar. 29, 2021). Here, Providers are directly harmed, as reflected in Zelis's repricing communications, and there is no need to look "downstream." Also, recovery does not depend on patients bringing suit, especially as Judge Kennelly observed that patients are likely to be "oblivious" to underpayments and that they "have no real incentive to sue third-party payors for underpayment." *MultiPlan,* 2025 WL 1567835, at *5. In contrast, Plaintiffs are often prohibited from recovering anything from their patients by virtue of accepting repricing's associated balance billing prohibition or due to anti-balance billing laws. CAC ¶¶ 191, 195, 337, 345, 361, 369. Even if Providers could recover from patients, such recoveries are unlikely to make

9

Providers whole, but are likely to entail further costs, and are inconsequential as to eliminating antitrust injury or antitrust standing. *Id.* ¶¶ 5 & n.7, 343.

With respect to *In re Wellpoint, Inc. Out- of-Network "UCR" Rates Litig.*, in distinction to the multiple plaintiff groups at issue (with likely diverging interests) and an insufficient assignment of ERISA claims to the "Provider Plaintiffs" for purposes of standing, the Court found no "'direct link' between the harm the Provider Plaintiffs suffered and Defendants' alleged misconduct," that "Subscribers" were also pursuing claims against the payers, and that the Subscribers' but-for behavior was based on "speculation." 903 F. Supp. 2d 880, 893, 897–898, 902–903 (C.D. Cal. 2012). In contrast, Plaintiffs here suffered injury independent of anything suffered by a subscribing member, and those members are often entirely unaffected by repricing's underpayment of Providers. Here, Providers suffer at the moment of receipt of repricing-based underpayment for OON healthcare services. As discussed above, the likelihood of double recovery is remote and speculative risks about patient behavior depend on unmotivated and oblivious patients/members. Also, balance billing restrictions make risk of duplicative recovery too remote to interfere with antitrust injury or antitrust standing.

Downstream activity is generally beyond antitrust considerations for purposes of determining the existence of injury. According to the Supreme Court, with respect to the Clayton Act, "[u]nder § 4, courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss in some other way[.]" *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 n.14 (1972); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775, 2010 WL 4916723, at *2 (E.D.N.Y. Nov. 24, 2010) ("for the most part courts have found information about such 'downstream' matters to be irrelevant[.]").

Defendants try to make something of the First Circuit's "special 'emphasi[s] [on] the causation requirements of [the *AGC*] test.'" MTD at 15 (quoting *RSA Media, Inc. v. AK Media Group, Inc.*, 260

F.3d 10, 14 (1st Cir. 2001)). This simply reflects that "[b]oth the first and fourth factors expressly require causation between the alleged violation and the alleged harm." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Yet, there appears to be no basis to find different applications of *AGC* by the First and Seventh Circuits.[6] Based on this supposed differing standard, Defendants give short shrift to *MultiPlan*. First listing all *AGC* factors, the *MultiPlan* court carefully applied *AGC*'s fourth and sixth standing factors, finding neither to interfere the *MultiPlan* plaintiffs' antitrust standing. *MultiPlan,* 2025 WL 1567835, at *4–*6. The First Circuit's approach to antitrust injury appears consonant with *MultiPlan*.

The rationale for granting standing in *MultiPlan* extends a fortiori to causation of the injury to those Providers whom Defendants contractually precluded from balance-billing. Any Providers that are contractually allowed to balance bill face formidable obstacles to full collection, leaving them, on average, seriously short of the amounts they invoiced. *See* CAC ¶ 5 & n.7 (alleging that hospitals, health systems, and medical practices collect only 69 cents on the dollar for unpaid bills up to $100 and progressively less as the uncollected amounts increase); ¶ 345 ("Provider suffers additional injury [,for example,] . . . cost for a collections agent or attorney . . . ."). Also, state and federal laws prohibit balance billing. CAC ¶ 195.

The practical effect of a balance billing prohibition is that a Provider faced with a choice of accepting partial payment from a third-party payor or pursuing "the mere possibility of full payment from a patient will likely choose the guaranteed payment even if it is below the market rate." *MultiPlan,* 2025 WL 1567835, at *5. Also, "there is little doubt that commercial third-party payors have greater resources than the average patient," and "[a] court need not ignore this reality when ruling on a motion to dismiss." *Id.* (rejecting *MultiPlan* defendants' argument that "there are no specific allegations that third-party payors

---

[6] To the contrary, at least one decision from N.D. Ill. relied on *RSA Media* to inform its antitrust causation analysis. *See In re Dealer Management Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 1007 (N.D. Ill. 2023) (citing *RSA Media* in refusing to find causation where the state, not the defendant, prevented plaintiff's market entry).

are more capable of paying for healthcare services than patients"). *See* CAC ¶ 346 ("Commercial Payers are in a far better position to pay for the Providers' healthcare services than customers"); ¶¶ 34–38 (listing MCO Defendants' net earnings, total assets, cash and cash equivalents, and statutory capital and surplus amounts); ¶ 345 (collection success "depends on whether the provider is . . . able to force the patient to pay the remainder").

Judge Kennelly rejected Defendants' implicit argument at MTD 18 that patients, not Providers, are those directly injured: "Because the alleged balance billing prohibition prevents providers from seeking the remaining payment from patients and shields patients from the consequences of the alleged third-party payor price-fixing agreement, the providers have alleged a direct injury." *MultiPlan*, 2025 WL 1567835, at *5. "Providers are thus the only private parties under this scenario that have an incentive to enforce antitrust law." *Id.*

## II.    PLAINTIFFS SUFFICIENTLY ALLEGE ANTITRUST INJURY

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." MTD at 18 (citing  *Brunswick Corp.*, 429 U.S. at 489). However, the question of antitrust injury is generally not resolved at the pleadings stage. *Brader v. Allegheny Gen'l Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995).

Defendants' argument that antitrust injury is "usually measured by a *reduction in output and an increase in prices* in the relevant market," MTD at 18, is a red herring. Those indicia may apply when a *seller*'s cartel (oligopoly) is alleged, but Plaintiffs allege a *buyers'* cartel (oligopsony). Any effect of lowering prices for health insurers or their subscribers is irrelevant to the analysis of *per se* illegal conduct

that harms sellers—here, Providers. The relevant effect is that the conspiracy artificially lowered payments

for the direct target of the conspiracy: the OON Providers.[7]

In any event, for this buyer's cartel, Plaintiffs **have** alleged just such a "reduction." Here, the reduction

at issue is the decrease in the number of sources from which OON Providers can turn to obtain

independently-determined OON payments for their OON healthcare services.

As explained in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984):

> Concerted activity is fraught with anticompetitive risk. It deprives the marketplace of
> independent centers of decisionmaking that competition assumes and demands. In any
> conspiracy, two or more entities that previously pursued their own interests separately are
> combining to act as one for their common benefit. This not only reduces the diverse
> directions in which economic power is aimed but suddenly increases the economic power
> moving in one particular direction.

*Id.* at 768-69. *See also American Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 195 (2010) ("The

relevant inquiry . . . is whether there is a 'contract, combination . . . , or conspiracy' amongst 'separate

economic actors pursuing separate economic interests,' . . . such that the agreement 'deprives the

marketplace of independent centers of decisionmaking,' and therefore of 'diversity of entrepreneurial

interests,' . . . and thus of actual or potential competition[.]") (citing, in part, *Fraser v. Major League

Soccer, L.L.C.,* 284 F. 3d 47, 57 (1st Cir. 2002)) (other citations omitted).

The First Circuit in *Fraser* similarly explained that "if the operator/investors [defendants] are viewed

instead more as individual potential competitors . . . it is not difficult to see how an agreement among

them not to compete . . . might . . . eliminate competition among them." *Id.* at 61. Also, in a market

foreclosure action, the First Circuit determined that provider-plaintiffs, "[h]aving been directly harmed by

---

[7] Defendants stray far from antitrust law and economic policy by proposing that Plaintiffs' alleged injury is not the type that Section 1 is designed to prevent. Again conflating buyer and seller cartels, Defendants rely on then-Circuit Judge Breyer's remark that "the very purpose of the antitrust laws is to "protect[] consumers against prices that were too *high*, not too low." *Kartell v. Blue Shield of Mass., Inc.*, 749 F. 2d 922, 931 (1st Cir. 1984), *cert. denied,* 471 U.S. 1029 (1985). Pertinent here is the distinction supporting Judge Breyer's concern for high prices: " 'payments for doctors' services [that are] 'too low'" when "a single firm sets a price . . . are very different from those associated with agreements by competitors to limit independent decision-making." *Id.* at 930.

the alleged elimination of competition in [the] alleged market, they have plainly suffered an antitrust injury . . . ." *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 294 (1st Cir. 2022). As recognized in *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 153 (D. Mass. 2024), *appeal dismissed in* 2024 WL 3491184 (1st Cir. Mar. 5, 2024), a Clayton Act §7 merger matter, "the removal of [a competitor] as an option for consumers . . . would constitute a cognizable harm." (citing, among others, *MacDermid Printing Sol'ns LLC v. Cortron Corp.*, 833 F. 3d 172, 183 (2d Cir. 2016) ("We have suggested that actions that reduce consumer choice are inherently anticompetitive.") (footnote and citations therein omitted)).

In *Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283 (W.D. Wash. 2024), the Court determined that "[c]ompetitors act in concert for purposes of a Section 1 claim when their conduct 'joins together separate decisionmakers,' such that their agreement 'deprives the marketplace of independent centers of decisionmaking.'" *Id.* at 1293 (quoting *American Needle*, 560 U.S. at 195). *See also Osterhaus Pharm., Inc. v. Express Scripts, Inc.*, 768 F. Supp. 3d 1186, 1195 (W.D. Wash. 2025) (antitrust injury plausibly alleged as "these agreements between ESI and Co-Conspirators, to share the large firm's market power, allowed Co-Conspirators to receive more favorable rates and reimbursements at the expense of [pharmacies]"). Reducing the number of available sources for OON payment thus constitutes harm to competition.

Defendants' other arguments are also unavailing, accomplishing nothing more than raising intricate fact issues that preclude dismissal of the CAC. For example, they assert that Plaintiffs cannot show antitrust injury because the CAC recognizes that Defendants' use of Zelis's repricing creates more cost management options. MTD at 19. Plaintiffs contend the opposite. *See* CAC ¶ 200 (the Conspiracy "joins together separate decisionmakers and thus deprives the marketplace of independent centers of decision making."). Whether Defendants' conduct facilitates a new pricing option for them, and if so, whether that option abrogates a Section 1 claim, are factual disputes that cannot be resolved on a motion to dismiss.

*MultiPlan*, 2025 WL 1567825, at *7. The injury to Plaintiffs is real and sometimes severe. *See, e.g.,* CAC ¶¶ 246–48 (Defendants' collusion has "squeeze[d] small medical practices" and cut some providers' OON revenue by half or more, forcing some practitioners to consider other business arrangements or to close entirely."). At the same time, Defendants were making billions in profits. *See* CAC at ¶¶34-38, 256-260. In any event, adding a cost management option would not justify a *per se* violation of Section 1.

The same goes for Defendants' insistence that by abdicating OON pricing roles and responsibilities to Zelis (CAC ¶¶ 7, 134), the Conspiracy actually increased competition among Defendants. MTD at 19–20. This dubious proposition also defies basic economics. *See, e.g., Solyndra Residual Trust by and through Neilson v. Suntech Power Holdings Co., Ltd.*, 62 F. Supp. 3d 1027, 1041 n.7 (N.D. Cal. 2014) (explaining that concerted action by competitors "deprives the marketplace of the independent centers of decisionmaking that competition assumes" and "reduces the diverse directions in which economic power is aimed").

Defendants spawn yet another factual dispute by urging that the Conspiracy has reduced their own and patients' costs. MTD at 20–21. The CAC directly contradicts this supposition. *See* CAC ¶ 254 (purported "savings" for health insurance policyholders is belied by National Association of Insurance Commissioners ("NAIC") data); *see also* CAC ¶¶ 251–53 (presenting health insurance premium data). Regardless, lower healthcare costs for insurers or patients cannot be achieved through horizontal price fixing. *Kartell,* 749 F. 2d at 929; *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F. 3d 979, 989 (9th Cir. 2000) ("Clearly mistaken is the occasional court that considers low buying prices pro-competitive or that thinks sellers receiving illegally low prices do not suffer antitrust injury.") "Every precedent in the field makes clear that the interaction of competitive forces, not price-rigging, is what will benefit consumers." *W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F. 3d 85, 105 (3d Cir. 2010) (quoting *Knevelbaard*

*Dairies.*, 232 F. 3d at 988); *see also MultiPlan,* 2025 WL 1567835, at *7 ("Nor can the defendants justify an alleged price-fixing agreement by touting lower prices for its members and patients.").

As discussed above, Plaintiffs allege adverse impacts "to the quality or output of healthcare services they provide[.]" *See, e.g.,* CAC ¶¶ 246–48. Contrary to Defendants' argument, Plaintiffs do *not* allege that there has been any "increase in competition between Zelis and MultiPlan. . . ." MTD at 20. *See* CAC ¶¶ 8, 89, 311 ("Because Commercial Payers had insight into the repricing efforts of at least one of Zelis's repricing rivals through the Commercial Payers' relationships with Zelis, Plaintiffs and members of the Class could not avoid the impact of the Zelis Conspiracy even if they turned to those Commercial Payers that exclusively used a competing repricer.").

Defendants grasp at another straw by observing that Plaintiffs allege that Zelis processes a relatively small number of OON claims annually and that the lead plaintiff in this case alleges in *MultiPlan* that MultiPlan is the dominant player in the OON payer market. *See* MTD at 3, 20, 36. This is yet another misunderstanding of basic antitrust law: market share is irrelevant to pleading a *per se* price-fixing conspiracy. The First Circuit has clearly held that "analysis of market power as opposed to effect is required for most per se violations **although not for price fixing**[.]" *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F. 2d 547, 559 (1st Cir. 1974) (footnotes omitted) (emphasis added). Regardless of whether Zelis's position is or is not dominant, the CAC alleges that Zelis is a significant player in the repricing industry. *See, e.g.,* CAC ¶ 334 ("Zelis ... delivers more than $240B in payments to providers," payments which are "substantially less than the amount that was originally and collectively billed."); ¶ 180 (Zelis "is responsible for '$100B claims priced annually," "resulting in $27B claims cost savings."). See also Sec. IV(C) infra.

16

## III. PLAINTIFFS PLAUSIBLY ALLEGE BOTH A HORIZONTAL AND A HUB-AND-SPOKE CONSPIRACY

### A.    Plaintiffs Plausibly Plead a Horizontal Conspiracy

#### 1.    Defendants' Resort to "Group Pleading" Fails

Defendants mistakenly contend that Plaintiffs improperly rely on "group pleading." MTD at 22. To begin with, they misplace their reliance on *Whitman & Co. v. Longview Partners (Guernsey) Ltd.*, which acknowledges that group pleading "is not prohibited *per se,*" especially "when the specific factual allegations . . . support a reasonable inference that all of the Defendants were involved in the alleged conduct." No. 14–cv–12047–ADB, 2015 WL 4467064, at *10 (D. Mass. July 20, 2015). Moreover, *Zond v. Fujitsu Semiconductor Ltd.*, the case relied on in *Whitman* for its group pleading decision, stressed that "[a]t the motion to dismiss stage a complaint generally will only be dismissed where it is 'entirely implausible' or impossible for the grouped defendants to have acted as alleged." 990 F. Supp. 2d 50, 53 (D. Mass. 2014).

It is far from implausible that Defendants have colluded just as Plaintiffs allege. The CAC identifies each Defendant individually, and plausibly alleges that each has acted similarly in organizing and implementing the conspiracy. CAC ¶¶ 30–38. The CAC alleges that Zelis and, as explained in the CAC's introductory paragraph, MCO Defendants, all make OON payments to Providers in factually identical ways for factually identical purposes. The CAC specifies that "Aetna, Cigna, Elevance, Humana, and UnitedHealth . . . have each entered into one or more OON repricing agreements with Zelis, issued one or more OON payments to Providers performing out-of-network healthcare eservices at payment levels below competitive amounts, and participated in the conspiracy, committed or omitted acts, and/or made statements in furtherance of, and is a member of, the Zelis Conspiracy." CAC ¶ 30–39. These allegations give each Defendant "fair notice of the claims against it." *See Zond*, 990 F. Supp. 2d at 53.

17

2.   One or More of Zelis's PPO Networks Participate in the Relevant Market

Defendants argue that Plaintiffs do not adequately allege that Zelis is a horizontal competitor of the MCO Defendants in the proposed relevant "OON Commercial Payer Market." MTD at 22–24; *cf.* CAC ¶ 110. Defendants are wrong. To begin with, Defendants acknowledge that Zelis operates PPOs (even if on a "supplemental" basis) (MTD at 9, 23) and that PPOs cover OON services, but at less generous rates (CAC ¶ 4). A reasonable inference is that Zelis participates in the OON Commercial Payer market by purchasing OON healthcare services. *See id*. ¶¶ 107 & nn.124–25, 108 (alleging that HFN, LLC, one of the Midwest's leading PPOs, operates one of Zelis's PPO networks as part of Zelis Healthcare).

Defendants' argument that Zelis is not a horizontal competitor is refuted by four reasons explained in the CAC. First, Zelis horizontally competes directly with MCOs by owning and operating HFN, LLC, "one of the Midwest's leading Preferred Provider Organizations." *Id*. ¶¶105–110. As a "standard" PPO, Zelis—through HFN—purchases OON healthcare services. *Id.* ¶¶ 4, 109. Zelis acknowledges that it "offers PPO network products to support the unique requirements of clients of all sizes looking for Group Health, Dental, or Workers' Compensation coverage." *Id*. ¶ 105. Plaintiffs identify eight of these networks that are part of Zelis Healthcare." *Id*. ¶106 nn.114–121.

Second, even if the Court credits the assertion that Zelis's PPOs are merely "'supplemental networks'" that do not currently issue OON payments (MTD at 23), as alleged, Zelis previously competed in the relevant market. Section 1 applies to those who "previously competed" in a particular market, even if they currently do not. *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49–50 (1990) (*per curiam*) (market allocation by former competitors was "unlawful on its face.") Zelis's "foundational history is tied directly to participating in the PPO Network industry." CAC ¶ 104.

Third, even assuming Zelis does not and did not compete with MCOs, Section 1 applies to "***potential*** competitors." *American Needle,* 560 U.S. at 200 (emphasis added). The First Circuit has recognized the

18

possibility that "individual ***potential*** competitors . . . might . . . eliminate competition among them." *Fraser,* 284 F.3d at 61. HFN, LLC "has grown into one of the Midwest's leading . . . PPOs." CAC ¶ 107. According to Zelis: "Zelis contracts with providers to form PPO or supplemental provider networks which it then re-sells to some MCO clients, who can use or not use the networks at their discretion . . . ." MTD at 9. Even if currently considered "supplemental" or "*vertical*," Zelis can "re-sell[]" its networks to "MCOs and other clients," or it can convert these networks for its own direct participation in the OON payment market. Zelis discusses no barrier to its direct participation in that market. Rather, Plaintiffs allege that "HFN, LLC describes its 'HFN CHC, Elite, Premier Networks' as 'community-based' and 'provid[ing] high quality medical care and significant increased savings for local employers and their employees[.]'" CAC ¶ 107.

Finally, Plaintiffs sufficiently plead that Zelis and MCO Defendants operate at the same level of the market under the First Circuit's decision in *American Steel Erectors v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 815 F.3d 43 (1st Cir. 2016), which extended horizontal competition for purposes of Section 1 liability to "vertical relationships" that "intersect with or give rise to an unlawful horizontal relationship." *Id.* at 64. The CAC alleges just such an intersection: "As Zelis obtains such private, confidential, hidden-to-the-public, CSI from approximately 770 Commercial Payers . . . , it obtains knowledge of the OON Commercial Payer Market." CAC ¶ 205. Defendants' repricing agreements function as an intersection that places Zelis's PPO business at a distinct competitive advantage over rival PPO networks. MTD at 23 (emphasis in original).

In sum, Plaintiffs' allegations that Zelis occupies a horizontal position with the other MCOs suffice, whether Zelis is considered a previous, current or potential participant in the relevant market. Further, Zelis's repricing business operates at the "intersect[ion]" of a vertical and horizontal relationship, unfairly benefiting its PPO business. Also, "offering both standard and innovative . . . program management

solutions," HFN separately lists that it offers solutions "'for employers, third party administrators, and mid-range insurance companies.'" *Id*. ¶ 107. If HFN is merely a provider of "supplemental" PPO networks, there would be no need to mention its available "solutions" for "employers" at all (as there would be no such "solutions").

Defendants rely on *MultiPlan*, MTD at 23, but the relevant facts in this respect are materially different between the two cases. There, the court distinguished between an entity—like MultiPlan—that simply sells its "own curated network of providers" from one that—like Zelis—actually, previously, or potentially "purchases out-of-network services through one or more of its PPO networks." *MultiPlan Order,* 2025 WL 1567835, at *13. This factual distinction was dispositive there, as it should be here. As alleged, Zelis participates in the relevant market by previously, actually, or potentially purchasing OON healthcare services. CAC ¶¶ 107–10.

Defendants also maintain that it makes no economic sense for MCOs to simultaneously conspire with both Zelis and MultiPlan. MTD at 21–22. This proposition gets immediately tangled within a mare's nest of industrial and economic questions of fact. There is no factual record or expert testimony to inform the Court's ruling on this issue. The CAC's allegations also refute, or at a minimum should defer, a ruling on the merits of Defendants' charge that Zelis does not reprice enough claims for them to bother conspiring. *See* CAC ¶¶ 81, 277–278 (describing strong economic incentives to collude with Zelis). MCOs have a history of moving from one conspiracy to another to the detriment of OON Providers. *See id.* ¶¶ 59–66.

With respect to Defendants' implication that a "single reference" of allegations concerning a directly competing participant is insufficient at the pleading, MTD at 23, one representative example suffices. In any event, Plaintiffs' allegations concern how Zelis through this PPO previously, currently, or potentially competes in the OON Commercial Payer Market, or, at minimum, how its repricing services serves as an "intersection" under *Am. Steel Erectors.*

### 3. The CAC Alleges Direct Evidence of a Conspiracy

Plaintiffs allege both direct and indirect evidence of the Zelis Conspiracy. The direct evidence is of two types: evidence of written agreements or a repricing relationship between Zelis and MCOs, (CAC ¶¶ 262–265) and related probative documents that discuss how Zelis has provided its pricing communications "to those with an interest in the services provided by Zelis under our established business relationship." *Id.* ¶ 266. As shown by a pricing communication fax, Zelis confirms its "established business relationship" with the participating MCO. Defendants advance a series of reasons they believe Plaintiffs don't plead a plausible conspiracy. MTD at 25–26. None has merit. They variously rely on facts outside the four corners of the CAC, posit a standard that demands excessive specificity, refuse to draw any inferences in Plaintiffs' favor, or a combination of these flaws. At most, the arguments raise factual issues to be resolved later.

### 4. The CAC Also Alleges Indirect Evidence of the Conspiracy

#### a. Plaintiffs Plausibly Plead Defendants' Parallel Conduct

To meet *Twombly*'s pleading standard that a complaint allege sufficient facts to "suggest that an agreement was made," 550 U.S. at 544, plaintiffs commonly "allege facts showing 'parallel action' along with 'additional circumstances—so-called plus factors—which, when viewed in conjunction with parallel conduct, would permit a factfinder to infer a conspiracy.'") *Mish Int'l Monetary Inc. v. Vega Capital London, Ltd.*, 596 F. Supp. 3d 1076, 1092 (N.D. Ill. 2022) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.,* 899 F.3d 87, 104 (2d Cir. 2018)).

Despite numerous allegations that Zelis and the MCOs acted in parallel (CAC ¶¶ 12–13, 74–75, 96, 135, 137, 200 & n.212, 237, 239, 306, 349–350, 352, 371), Defendants assert that Plaintiffs' parallel conduct allegations fall short without pleading "parallel OON reimbursement rates or price movements." MTD at 26. The CAC does not allege parallel rates or price movements as that information is unavailable without discovery. Such allegations are also unnecessary in this matter.

21

In a conspiracy concerning the reduction of available OON payment calculating entities, Plaintiffs do not need to allege uniform pricing. The allegation that "the defendants all switched from using traditional UCR benchmarks when calculating out-of-network service rates to MultiPlan's rate calculation and negotiation services" is "enough to plausibly allege parallel conduct." *MultiPlan,* 2025 WL 1567835, at *14; *see also In re High-Tech Antitrust Employee Antirust Litig.*, 985 F. Supp. 2d 1167, 1173, 1197 (N.D. Cal. 2013) (notwithstanding conspiracy, employers paid their employees disparate compensation according to merit and other factors).

As indicated by Zelis's June 13, 2016 announcement, CAC ¶¶ 8, 12, with 500 payors already participating and another 250 participating by August 2024, MCOs engaged in parallel conduct by abandoning independent pricing in favor of contracting for Zelis's repricing services. Id. ¶¶ 74–75. *MultiPlan* endorsed this way of showing parallel conduct, holding that plaintiffs' allegations that "the defendants all switched from using traditional UCR benchmarks when calculating out-of-network service rates to MultiPlan's rate calculation and negotiation services . . . is enough to plausibly allege parallel conduct." *MultiPlan,* 2025 WL 1567835, at *14 (citations omitted).

Defendants try to condemn the CAC for omitting an allegation that Defendants all began using Zelis's pricing in "close [temporal] proximity." MTD at 27. But a conspiracy does not require "simultaneous action." The Supreme Court instructs that "[i]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit v. U.S.*, 306 U.S. 208, 227 (1939) (citations omitted). *See also In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 723 (N.D. Ill. 2022) ("Simultaneous action is not a necessary element of parallel conduct."). The

22

*MultiPlan* court agreed. *See MultiPlan,* 2025 WL 1567835, at *14. Plaintiffs plead sufficient temporal "proximity."[8]

Defendants next overemphasize the significance of Zelis's "customizable" pricing tools. MTD at 28. According to Judge Kennelly, no matter the modifications made, so long as "competitors[] agree to abide by a third-party algorithm that guarantees a below market price, it would not matter if every price the algorithm recommended differed for each competitor based on each of the competitor's preferred settings." *MultiPlan,* 2025 WL 1567835, at *15 (an agreement to follow third-party algorithm that fixed prices within a specified "*range* is no different for antitrust purposes than an agreement to fix prices to a single point"). *See* CAC ¶ 14 ( "OON Payments [limited] to specific amounts, *ranges*, percentages, or below certain thresholds[.]"). With its "'97%'" savings retention rate for its repricing services, on a practical basis, MCOs almost never diverge from Zelis's OON payment determinations. *Id.* ¶ 241.

Also, a Defendant's ability to decline a given repricing by Zelis does not obviate parallel conduct or price-fixing. With Zelis boasting a "97% retained savings" for MCOs that accept Zelis's repricing "recommendation[s]," Plaintiffs plausibly allege that Zelis's recommendations "are more akin to mandates." CAC ¶¶ 127, 132, 135–36; *MultiPlan,* 2025 WL 1567835, at *15; *see also Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 703 (1969) (per curiam) (teaching that a disclaimer advising its partners to adopt prescribed regulations did not rebut an alleged price-fixing agreement). The pertinent allegations in the CAC emphasize that the repricing are not mere proposals," but that MCO Defendants nearly uniformly followed Zelis's OON payment determinations. *See, e.g.,*

---

[8] The two decisions Defendants cite for a stricter proximity change nothing. In *Musical Instruments & Equip. Antitrust Litig.,* the Ninth Circuit's holding that "slow adoption of similar policies" ("over a period of several years") does not raise the specter of collusion[,]" 798 F. 3d 1186, 1196 (9th Cir. 2015), does not reach Plaintiffs' allegations that more than 500 payers had agreed to participate at or near the beginning of the Conspiracy. And in *In re Concrete and Cement Additives Antitrust Litig.*, the court merely made the unremarkable and inapposite observations that a series of "isolated and unsynchronized price increases" or "disconnected or dissimilar events" does not mean parallel conduct. No. 24-md-3097 (LJL), 2025 WL 1755193, at *13–*14 (S.D.N.Y. June 25, 2025).

CAC ¶¶ 132, 134–36.

b.   Plaintiffs Allege Sufficient Plus Factors

Plaintiffs' CAC includes detailed allegations for several "plus factors," plausibly explaining that the Conspiracy, not independent competitive acts, drive Defendants' parallel conduct. Actions against self-interest and opportunity to collude are addressed herein.

***Actions Against Self-Interest***

Defendants lead off their discussion of self-interest by invoking the wrong standard. The District of Rhode Island discussed the standard more thoroughly as "proactive destructive conduct" inconsistent with "lawful independent conduct that furthers competition," but which do "tend to exclude an inference of independent conduct." *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 311 F.3d 468, 495 & n.34 (D.R.I. 2018). Plaintiffs so allege: "Agreements entered into between Commercial Payers and Zelis would, absent a conspiracy, be counter to the Commercial Payers' own independent economic interests." CAC ¶ 290. The CAC discusses the "first-mover" example, where a lone OON payer enters at its own peril into a repricing agreement with Zelis. *Id*. OON Providers would tend to avoid performing services for the lower paying first-mover's policyholders. The payer, in turn, would lose (and fail to gain) subscribers seeking OON treatment, who would migrate to other, higher-paying PPO networks that attracted more P. *Id*. ¶ 189; *see also MultiPlan,* 2025 WL 1567835, at *16 (following same reasoning to find action against self-interest). The substantial risk incurred by a first-mover absent an agreement that other MCOs will follow contributes to the Conspiracy's plausibility.

Defendants' effort to rebut this subscriber-loss dynamic opposes the economic effects alleged by Plaintiff—another factual issue to resolve later. Defendants argue that MCOs face subscriber defection if they pay too much to OON Providers and are forced to raise premiums. MTD at 30. However, this

24

assertion is arguably refuted by the NAIC allegations and graphs, which contradict Defendants' claim that repricing provides "savings" to policyholders. CAC ¶ 252–54.

Defendants next argue there is an innocent motivation for the other Defendants to ally with Zelis: slowing rising premiums. MTD at 30–31. But Plaintiffs allege this was neither Defendants' motive nor the effect of their alliance. In any event, Defendants' innocent motive arguments are factual disputes that cannot be resolved at the motion to dismiss stage.

It also amounts to weighing procompetitive justifications, which is improper in a *per se* case. As noted by Judge Kennelly, "a competitor price-fixing agreement cannot be justified, period – price fixing is illegal *per se*." *MultiPlan*, 2025 WL 1567835, at *7 (citing *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647 (1980)). It also disregards the direct injury suffered by OON Providers, the Conspiracy's actual victims. The same applies to Defendants' other attempts to legitimize other justifications, MTD at 31, all alien to per se analysis.

As supported by Judge Kennelly in *MultiPlan*, Plaintiffs further allege that an MCO Defendant's decision to share confidential, proprietary information is an act against self-interest, absent a conspiracy. *See MultiPlan,* 2025 WL 1567835, at *18 (finding that similar allegations evinced conduct harming payer's self-interest). Nevertheless, the MCOs shared confidential and competitively-sensitive verbal, written, and electronic information by, with, and through the Zelis Defendants, to further the conspiracy. *See, e.g.,* CAC ¶¶ 203–35, Plaintiffs have alleged that MCOs sharing CSI with Zelis would be against each respective MCO's interest, absent a conspiracy. *Id.* ¶ 292.

**B.    Plaintiffs Also Plausibly Allege a Hub-and-Spoke Conspiracy**

1. Plaintiffs Allege Direct Evidence of the Hub and Spokes

As conceded by Defendants, Plaintiffs allege bilateral vertical agreements between Zelis (the hub) and MCOs (the spokes) . . . ." MTD at 25. Defendants argue that this is insufficient as the "direct evidence"

25

included within Plaintiffs' CAC "merely references *bilateral* agreements between Zelis and *non*-defendant MCOs." MTD at 26 (citing CAC ¶¶ 262–266). However, the involvement of non-Defendants is in no way dispositive. Evidence of agreements concerning OON payment repricing entered into between Zelis and MCO co-conspirators operating on the same horizontal plane serves as "direct evidence" of improper horizontal agreements. *See Duffy*, 758 F. Supp. 3d at 1291 (W.D. Wash. 2024) ("Evidence of concerted, rather than independent, action among market competitors can include direct evidence of horizontal agreements between competitors"). Even if the agreements discussed in the CAC ¶¶ 262–266 do not concern named Defendants, they certainly concern other MCOs and possible co-conspirators, similarly positioned as the named Defendants on the same horizontal plane.

As recognized by the First Circuit*,* Section 1 liability extends to "vertical relationships" that "intersect with or give rise to an unlawful horizontal relationship." *Am. Steel Erectors,* 815 F.3d at 64. If such an "intersect[ion]" is not regarded as part of a horizontal analysis (discussed *supra*), then it appears applicable to Section 1 liability based on the hub-and-spoke approach. For example, Zelis may provide repricing services on a vertical basis while managing its PPO Networks on a horizontal basis. It is important to recognize, however, the significance of the exchange at issue: In exchange for MCOs abdicating their traditionally independent pricing determination roles, the Zelis Defendants assume pricing responsibility and specify OON pricing for them. In other words, Zelis gains extremely sensitive information, which it can use for its own competitive benefit on a horizontal basis. *See, e.g.,* ¶ 205 ("As Zelis obtains such private, confidential, hidden-to-the-public, CSI from approximately 770 involving over $240 billion in payments from Provider, it obtains knowledge about claims and pricing of OON healthcare services from a substantial portion of the OON reimbursement market.").

26

2.    The CAC Also Alleges Facts That Indirectly Evidence the Hub and Spokes

"To plead an agreement plaintiffs need only allege "enough factual matter (taken as true) to suggest an agreement was made." *Twombly*, 550 U.S. at 556; *see also In re New Motor Vehicles Canadian Export Antitrust Litig.*, 533 F.3d 1, 5–6 (1st Cir. 2008) (applying *Twombly*'s "suggest" standard). Plaintiffs allege indirect evidence that, at a bare minimum, "suggests" those agreements.

*MCO Defendants' Sharing of CSI*

Defendants dispute that the CAC includes allegations concerning MCOs sharing confidential information with or through Zelis. MTD at 32. They falsely assert that Plaintiffs refer to "exchanges of data that Plaintiffs conspicuously do *not* allege to be confidential," *id.*, inexplicably overlooking Plaintiffs' allegations that Zelis enables a form for "sharing of CSI" and "non-public pricing information." CAC ¶ 214; *see also id.* ¶ 229 ("Commercial Payers shared and continue to share confidential, proprietary, and CSI directly with each other").

Defendants assert that Plaintiffs' allegations can be disregarded as this plus factor is pled on information and belief, and because the CAC does not identify any such contractual provisions. MTD at 33. Without the benefit of discovery, this is hardly surprising. Also, alleging a written agreement is not required to allege the requisite agreement or understanding. As specified by the U.S. Supreme Court, "such agreement . . . was not a prerequisite to an unlawful conspiracy." *Interstate Circuit,* 306 U.S. at 226–27. The reasonable inference to be drawn from the CAC's detailed allegations is that Defendants reached an agreement—at minimum an understanding—that they would surrender their individual roles in determining OON pricing to Zelis. Zelis touts the "technology-enabled way to load ... contracts ... and process pricing," which drew Defendants to Zelis. *Id.* ¶ 210. Defendants do not appear to dispute that other contractual information was exchanged. *Compare* MTD *with* ¶¶ 76, 200, 205, 210, 221, 226, 233–36.

27

Defendants assert that their pricing has been publicly disclosed, but that argument conflicts with allegations assumed to be true. MTD at 32–33. Moreover, Defendants cite the federal regulation known as the Transparency in Coverage (TiC) Final Rule to claim this pricing information is public, *id.* 33 & n.8, but the TiC rule did not mandate public disclosure until July 1, 2022, while the Class Period dates from June 13, 2016. *See* Request for Information Regarding the Prescription Drug Machine-Readable File Requirement in the Transparency in Coverage Final Rule, 90 FR 23303-01, 2025 WL 1547404, at *23306 n.35 (June 2, 2025).

Defendants also dispute Plaintiffs' non-public allegations, asserting its "network benchmarking data" is based on "'publish[ed] data.'" MTD at 32–33. But Zelis distinguishes "'Public Data Sources'" from "other data types," including "'Internal Client Data,'" and "'Third Party Data.'" CAC ¶ 224. For network benchmarking, Zelis appears to use two ***non-public*** types of data. *Id.*

Also futile is Defendants' assertion that the CAC does not allege *what* CSI is purportedly transmitted among competitors through Availity. MTD at 33. That is not true. Plaintiffs allege, for example, that "[t]he strategic alliance between Zelis and Availity" appears to include plans to provide "a single source of access for payment and remit information, real-time analytics,. . . , and multi-modal disbursement configurations. . . ." CAC ¶ 232. Inserting clarity into this corporate obfuscation, this press release indicates that the information sharing alliance will include "payment . . . information," allowing for multiple "disbursement" (payment) methods as to all possible "channel[s]." *Id.* The Availity-Zelis Strategic Alliance will concern the sharing of payment information, delivered on an "omni-channel" basis, as shared with MCOs. *Id.*

Defendants argue that Plaintiffs' allegations that MCOs share CSI with and through Zelis is undermined by other allegations in the Complaint, but later, inconsistently, argue that Plaintiffs allege no

28

facts related to CSI sharing. MTD at 33. As discussed above, that is simply untrue; and at the very least fails to give Plaintiffs' allegations all inferences to which they are entitled.

The *MultiPlan* court held that information exchanges can plausibly support the existence of a conspiracy as "MultiPlan is alleged not just to have 'hid[den] behind its algorithm,' but also to have 'played an active role as a go-between' for third-party payors"; and that "MultiPlan promote[d] the amount of information it gets from third-party payors by claiming that it can 'align' payor rates for out-of-network services." *MultiPlan,* 2025 WL 1567835, at *17–*18. Plaintiffs here make similar allegations. For example, "Defendants improperly shared claims, pricing, and other commercially and competitively sensitive business information ('CSI') in at least the following ways: . . . Commercial Payers shared CSI *through Zelis* to other Commercial Payers." CAC ¶ 204. More specifically, Plaintiffs allege that after "'Zelis matches the claim to an eligibility file provided by [the Commercial Payer]. If a match is found, Zelis determines the reasonable and customary (R&C) charge.... *Zelis then includes that information in a file that is delivered to* [*the Commercial Payer*] *electronically*.'" *Id*. ¶ 228 (emphasis in CAC). Similarly, by "'film[ing]'" such competitor-competitor interactions for purposes of including such "'testimonials for the website,'" Zelis served as a hub or conduit for such information exchanges. *Id*. ¶ 230. Also, by entering into a "strategic alliance" with Availity, Zelis provided CSI to MCOs, including by "'unlock[ing] both front-end and back-end value, such as ... a single source of access for payment and remit information, real-time analytics and dashboard capabilities, and multi-modal disbursement configuration in an omni-channel experience.'" *Id*. ¶ 232. Of course, its capacity to "layer" different PPO network data with that from other, competing PPO networks necessarily involves the transfer of one's PPO network data to a rival: "Zelis admits that its electronic sharing capability 'layer[s]' the data from one PPO Network operator with that from other competing, PPO Network operators: 'Our proven data analytics platform leverages

provider *and competitor data* with the ability **to layer in additional data elements from your** organization or **our partners***....'" Id.* ¶ 222 (emphases added); *see also id.* ¶¶ 223–24 (alleging similar facts).

As alleged, in its efforts to align its interests with those of the other Defendants, Zelis also "promote[d] the amount of information it gets from third-party payors by claiming that it can 'align' payor rates for out-of-network services." *MultiPlan,* 2025 WL 1567835, at \*18. With respect to the massive scale of the information shared, Zelis's CEO, Amanda Eisel, explained that "'at Zelis, we download and process about 27 terabytes of MRF [machine-readable file] data each month for just the top four payers.'" CAC ¶ 228 & n.244; *see also id.* ¶ 224 ("Zelis describes how 'Zelis collects data from hundreds of plans and thousands of networks . . . . Zelis specializes in organizing and managing this data to support network analytics you can rely on.'").

Finally, with respect to disclosure of pricing or price ranges to MCOs, Defendants stress that "*MultiPlan's* allegations are notably different," and that "[t]here are no such allegations here." MTD at 33–-34. Even if careful not to specify a certain price, Zelis comes very close. Zelis's Kaitlyn Howard "explained that '[r]eference-based pricing sets a price limit on certain medical services based on a reference point, such as the Medicare reimbursement rate or the average cost of the service in a particular area.'" CAC ¶ 124. Similar to allegations in *MultiPlan* concerning "distributed white papers," a director of the MCO, Allied, knew that "*ERS <u>on average</u> yields a payment range as a percent of Medicare between 150% - 225%.*" *Id.* ¶ 119 (emphasis added).

       3.   <u>The CAC Also Alleges Evidence of a Rim.</u>

Defendants assert that Plaintiffs have "alleged only a 'rimless wheel' conspiracy[.]" MTD at 2; *see also id.* 22, 25–26. Plaintiffs' allegations sufficiently and plausibly allege the existence of a rim for purposes of pleading a hub-and-spoke conspiracy. Plaintiffs are not required to identify any explicit agreement between the spokes. *Interstate Circuit,* 306 U.S. at 226. Alleging some type of "connection"

or association suffices. *See, e.g., In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010); *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield,* 552 F.3d 430, 435-536 (6th Cir. 2008); *Dickson v. Microsoft Corp.*, 309 F. 3d 193, 203 (4th Cir. 2002). As Defendants acknowledge, Plaintiffs can sufficiently plead this type of conspiracy by way of circumstantial evidence from which a rim may be plausibly inferred. MTD at 22.

Plaintiffs' CAC sufficiently supports an inference of a connection between the MCO Defendants by alleging that interested MCO Defendants had a precise understanding of which and how many MCOs were participants. CAC ¶¶ 229–30, 236–39. As summarized by a Zelis marketing advisor, MCOs met and spoke with each other about their experiences using Zelis. *Id*. ¶ 230 & n.247. Plaintiffs also allege that DeSantis Breindel, Zelis's "B2B Marketing Advisor," reported during Zelis's annual client conference that "we *filmed* a dozen clients [i.e., MCOs] sharing stories about their experience with Zelis." *Id.* ¶ 229 & n.246. These facts confirm that Defendants met to discuss Zelis's services. Analysis of this film is likely to show the Zelis Conspiracy and depict the rim in action.

The "rim" connecting the health insurer "spokes" is further confirmed by ownership of, cooperation by, information sharing with, membership of, and board positions held by the MCOs. Described "as 'the largest real-time information network in healthcare, connecting two million providers, health plans, and their technology partners,'" Availity, was founded in 2001 by MCOs Humana and BCBS Florida. *Id.* ¶ 234. Availity's owners/shareholders now include MCOs HCSC, Elevance, and UnitedHealth Group. *Id.* ¶ 235. As alleged, "Availity 'works in partnership with several major insurance companies in order to provide its clients with secure data exchange capabilities across multiple networks. These partners include defendants Aetna, Cigna, Humana and United Healthcare.'" *Id.* ¶ 234. Availity markets its products as a "suite of dynamic products, built on a powerful, intelligent platform, enabl[ing] real-time collaboration for success in a competitive, value-based care environment.'" *Id.* ¶ 233. Availity's ownership, shareholder,

31

and partnership structure further supports communication and coordination between and among the Defendant-spokes. *See, e.g., id.* ¶ 235 (alleging that several MCOs, through their "'partnership'" with Availity, are in a "'strategic alliance'" with Zelis). Finally, the MCO "rim" is further supported by allegations that Defendants Aetna, Cigna, Elevance, and Humana are members of AHIP, which "'plays an important role in ***bringing together*** member companies and ***facilitating dialogues*** to advocate on shared interests,'" which, of course, include "controlling costs, and, correspondingly, minimizing OON payments to Providers." *Id.* ¶ 288 (emphases added). Plaintiffs allege that the CEOs of MCOs, including Cigna and Elevance, "hold positions on AHIP's Board of Directors." *Id.* ¶¶ 288–89. These "rim" allegations also support the opportunity to collude "plus factors." *Compare* CAC ¶¶ 283–89 *with* MTD at 34.[9]

## IV.    PLAINTIFFS ADEQUATELY PLEAD THE RELEVANT SERVICE AND GEOGRAPHIC MARKETS

### A.    The CAC Plausibly Alleges the Relevant Service Market

Defendants raise two objections to the CAC's definition of the relevant service market. Their first objection is that the relevant market as defined comprises diverse healthcare services that are not reasonably interchangeable. MTD at 37. This criticism fails for two reasons. First, it misperceives the relevant market Plaintiffs allege as simply the healthcare services they provide. More than providing healthcare services, the proper focus is on ***how*** those services are sold and purchased – their out-of-network transactional character. Plaintiffs claim that Defendants fix OON payments by abdicating their independent OON pricing roles to Zelis. *See, e.g.,* CAC ¶¶ 7, 8, 13, 52, 134. Second, the relevant services market is properly alleged even if defined by a variety of healthcare services. Defendants contend such "[C]luster" markets, including services that are not reasonably interchangeable, remain valid markets if

---

[9] With respect to the "plus factor," "motive to conspire," Defendants ignore and therefore waive Plaintiffs' allegation that the Commercial Payers had a non-profit-based motive to avoid legal and public relations scrutiny by having a third-party develop a repricing system. *See* CAC. ¶ 281.

"competitive dynamics are the same across the relevant products, and the cluster is an object of consumer demand." MTD at 38 (citing *FTC v. Staples,* 190 F. Supp. 3d at 117 (D.D.C. 2016) and *FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016)). Ignoring for the moment that the First Circuit has never required such a test to define a cluster market in a price fixing case, both conditions are satisfied here. As explained in *Advocate Health Care,* "[d]ifferent types of healthcare services may be grouped in a cluster market because healthcare services are often 'sold to commercial health plans and their members' in a package." *Id.* at 467–68 (both medical and dental services can be suitable cluster markets) (citing *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 640-641 (N.D. Ill. 2020)). Bundled-based relevant markets have been defined to include "cluster[s]" of healthcare services no matter which test applied.  *See ProMedica,* 749 F.3d at 568 (market definition based on "a cluster" of "primary (but not OB) and secondary inpatient [healthcare] services"); *MultiPlan*, 2025 WL 1567835, at \*10 (citing, in part, *In re Delta Dental*, 484 F. Supp. 3d at 640 (market of "'dental goods and services sold by plaintiffs to insurers'" to be plausible).  Like in *MultiPlan* and  *Delta Dental*, a cluster market of OON "services sold by plaintiffs to insurers" is a properly defined market. CAC ¶¶ 154-159.[10] Finally, defining a relevant market (clustered or not) is a fact-intensive inquiry inappropriate for dismissal at this stage. *See PDFFiller,* 2018 WL 1403330, at \*6 ("determination of the interchangeability of products is a fact-intensive process") (quoting *Eastman Kodak,* 504 U.S. at 482 ("'in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers'")). Plaintiffs allege a relevant market

---

[10] Defendants argue in footnote 11 that "emergency care" should be separated out from Plaintiffs' cluster-based relevant market, appearing to agree that groups of healthcare and dental services can be considered appropriate parts of a cluster market. MTD 38 at n.11. However, their basis for doing so makes no sense.  Whether "Providers are legally required to render emergency care to any MCO's members" makes the basis for inclusion in the proposed relevant market stronger, not weaker.  In that scenario, patients might have no say (or even be conscious) as to options in receiving medical care. Providers should be the last ones to risk collusively-based underpayments in those circumstances.  In any event, Defendants' argument self-implodes:  "competition among MCOs" likely occurs at or before signing up for insurance coverage (and its applicable cluster of healthcare services), not while on the operating table. *See, e.g.,* CAC ¶ 159. Plaintiffs do not concede that "'OON Commercial Payer Market' is inapplicable to "emergency care" or any other sub-segment of medical or dental care.  *Id.* ¶189.

based on a cluster of healthcare and dental services, all of which are subject to the same or reasonably similar competitive conditions, including how healthcare services are selected by MCOs for inclusion within insurance policies, how they are priced (or repriced), and how they are ultimately paid.

Plaintiffs also plausibly allege that the package of OON healthcare services sold to Plaintiffs by MCOs is itself an object of consumer demand. CAC ¶ 149; *see also id.* ¶¶ 153, 252–53 (charts summarizing per member premiums paid for health insurance). Defendants do not dispute that sufficient "consumer demand" exists for either healthcare services or health insurance products (including PPOs), and the CAC sufficiently pleads it. *See, e.g.,* CAC ¶¶ 4-5, 153, 233-234, 251-261, 334-335, 346, 349.[11]

Defendants' second objection is that the services market cannot be defined based on "*the method or amount* of payment services[.]" MTD at 38. Defendants' cases are distinguishable. As explained in *MultiPlan*, *Little Rock Cardiology Clinic* considered only differing *sources* of payment. *MultiPlan,* 2025 WL 1567835, at *12 (quoting *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 597 (8th Cir. 2009)). Judge Kennelly thus found that "the plaintiffs have plausibly alleged a distinct market for out-of-network services." *MultiPlan,* 2025 WL 1567835, at *25–*26. *Little Rock Cardiology* was an exclusive dealing case involving shut-out cardiologists. *Little Rock Cardiology,* 591 F.3d. at 597. Accordingly, the Eighth Circuit found that "the relevant inquiry is whether there are alternative patients available to the cardiologists." *Id.*[12] In contrast, *Zelis* is a *per se* price-fixing matter, where it is appropriate to define a market based on amounts (or methods) of payment. Also, including in-network transactions when defining a relevant market for OON healthcare services is inappropriate. *See MultiPlan,* 2025 WL 1567835, at *12 ("out-of-network services are not reasonably interchangeable with in-network services due to their substantially different rates.").

---

[11] To argue otherwise places "the entire value proposition of insurance . . . at risk." *Id.* at ¶ 346.
[12] *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57 (1st Cir. 2004), also cited by Defendants, is similarly inapt, and another exclusive dealing case governed by the rule of reason, where the alleged conduct was "not exclusionary or otherwise anti-competitive."

Defendants are responsible for the difference between OON and in-network payment amounts. CAC ¶¶ 107 (Zelis's HFN specifies a "'20% difference between in-network and out-of-network benefits'"); ¶ 267 (same). MCOs communicate this difference. *See id.* ¶ 166 ( "'Out-of-network rates are . . . usually higher than the amount your Aetna plan "recognizes" or "allows"'").

Defendants gain nothing by arguing that the proper focus in determining the relevant service market is "the *actual* substitutability of those services[.]" MTD at 38. That is precisely what Plaintiffs have done. For example, Plaintiffs' allegations describe obstacles patients face when moving from OON care to in-network care. CAC ¶ 161 (switching would require multiple contractual arrangements involving at least "[t]hree separate parties . . . agree[ing] to have that healthcare service performed under the constraints required by the PPO Network."). Defendants also ignore that identical in-network and OON services are not "actual[ly]" interchangeable. MTD at 38. That is, "a patient's decision to use OON healthcare services is often based on the ***unavailability*** of the procedure within that patient's PPO Network." CAC ¶ 162; *see also id.* ¶ 163 (similar).

Defendants and a third-party data broker consider the commercial OON healthcare service sector a separate and distinguishable market. *See id.* ¶¶ 167–72. Without citation, Defendants argue Plaintiffs "miss[] the point" for observing that "Defendants [that is, ***themselves***] and third parties allegedly treat it as distinct from in-network reimbursement." MTD at 39. But Defendants' own understanding and treatment of the market is relevant and can be persuasive. *See Solyndra Residual Trust by and through Neilson v. Suntech Power Holdings Co., Ltd.,* 62 F. Supp. 3d 1027, 1045 (N.D. Cal. 2014) (following how ***defendants*** treated geographic market at issue and, for relevant product market, following "views of '***industry analysts'***") (emphasis added).

**B.    Plaintiffs Also Plausibly Plead a Relevant Geographic Market**

Raising similar arguments rejected in *MultiPlan,* Defendants oppose Plaintiffs' nationwide market.

*See* MTD at 39–40. First, while Providers likely often treat patients in close geographic proximity to where they live or work, there are many exceptions where care is provided at locations far from the home or office. For example, patients might require care when traveling, or when seeking specialized care from eminent out-of-state practitioners or medical centers. *See* CAC ¶¶ 5, 144–47, 164. Defendants do not explain why a concentration of healthcare services performed near patients' homes and offices undercuts plausibility of a more expansive market. MTD at 38–39. *See also MultiPlan,* 2025 WL 1567835, at *23 (finding that "plaintiffs' allegations suggest that the process of negotiating payment is the same no matter the location.").[13]

The coast-to-coast nature of the financing of OON healthcare services, related in significant part where Defendants are located, as well as the nationwide breadth of OON Providers, makes a nationwide (plus D.C. and U.S. territories) geographic market appropriate. *See* CAC ¶¶ 25–38.[14]

The Court should disregard Defendants' assertion that most MCOs do "not 'insure patients across the country.'" MTD at 39. Even if true, it appears to conflict with the CAC. As alleged, Aetna and UnitedHealth Group have operations in "all 50 states[.]" Plaintiffs' nationwide market suffices here. *Id.* ¶¶ 34, 38. As indicated in *In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d at 641, "given that [plaintiffs] seek to represent a nationwide class and claim that defendants insure patients across the country, their identification of the United States and the respective territories in which defendants participate in the

---

[13] The cases Defendants rely on to impugn Plaintiffs' proposed geographic market are distinguishable. *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc.,* 357 F.3d 1 (1st Cir. 2004) involved an exclusive-dealing action subject to the rule of reason, not *per se* treatment. *Id.* at 5. And the alleged geographic market was restricted to a single university campus, which was economically insignificant. *Id.* at 3, 9. *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 WL 2797267 (N.D. Ala. June 28, 2017) ("*BCBS*") observed unremarkably that Providers *usually* treat patients "living or working in relatively close proximity to their offices or other facilities." MTD at 39 (citing *BCBS,* at *6). But the plaintiffs there did not allege, as Plaintiffs do here, that for diverse reasons many patients nonetheless obtain OON services. CAC ¶¶ 144–45.

[14] Plaintiffs' allegations show the likelihood of a cross-country claims repricing process. *See* CAC ¶¶ 25, 30–32, 36, 334 (supporting the path of an OON claim likely submitted by San Francisco-based PIMG to Elevance Health, Inc., a MCO headquartered in Indianapolis, and involving a repricing communication from Zelis, based in Boston).

market as buyers of [healthcare] . . . services is sufficient at this stage." This suffices for a nationwide geographic market.

### C.   Plaintiffs' Market Share Allegations Are Sufficiently Plausible at This Stage

Defendants also criticize Plaintiffs' market-share allegations as conflicting with market share details alleged in *MultiPlan*. MTD at 3, 11–12, 35–36, 40. However, *MultiPlan* confirmed that "[a]llegations concerning the market power of the alleged conspirators are unnecessary for competitor price-fixing claims. . . , whether or not the conspiring parties actually had the power to fix prices." *MultiPlan,* 2025 WL 1567835, at *8 (citing *Socony-Vacuum*, 310 U.S. at 224 n.59).

Nor does judicial estoppel apply because PIMG's allegations in *MultiPlan* and here neither concern "a mutually exclusive inconsistency," nor the "court's [actual] acceptance of the party's prior position." MTD at 35 (citing *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F. 3d 23, 33 (1st Cir. 2004)).

In the First Circuit, judicial estoppel can be "'applied only when the positions are truly inconsistent . . . .'" *United States v. Levasseur,* 846 F.2d 786, 794 (1st Cir. 1988) (citations omitted). Facially inconsistent facts are reconcilable on deeper inspection. First, the allegations are from different source materials. *See* CAC ¶¶ 176, 179, 270 (2023 annual report on the U.S. health insurance industry reported that Zelis had a market share of 65.5%): *id*. ¶ 178 (May 1, 2024 Association of Medical Colleges publication, reporting that "'[t]he top three large-group insurers hold an average of 82.2% of the market share in each state'"). Also, market-related details alleged here and in *MultiPlan* are not synchronous, failing to capture Zelis's substantial growth during the class period. *Compare MultiPlan*, 2025 WL 1567835, at *3, *17 *with* CAC ¶¶ 12 & n.13, 74–75 & n.80, 96 & n.108, 111 & n.126, 177 & n.192, 200 & n.212, 238 & n.255, 239, 242 & n.263, 306 & n.311, 350 & n.350. Additional research, specific to the parties at issue, was conducted as part of investigating the *Zelis* matter. In addition to the number of processed claims, there are different ways to measure market share, including (inexhaustively) number of

repricing customers, value of the transactions involved, or total amount of savings generated from repricing. Defendants confirm the potential for reconcilability of these two market share allegations by arguing that those alleged in the CAC are "independently flawed." MTD at 36. Related factual disputes refute Defendants' position.

With respect to Defendants' second prong, Judge Kennelly never "accept[ed] . . . the party's [PIMG's] prior position" because he ruled on the plaintiffs' Consolidated Amended Class Action Complaint and has never ruled on PIMG's earlier individual class action complaint. *See, generally*, *MultiPlan,* 2025 WL1567835, at *8, *23. "An amended complaint, once filed, normally supersedes the antecedent complaint[, and] the earlier complaint is a dead letter . . . .'" *Connectu LLC v. Zuckerberg,* 522 F.3d 82, 91 (1st Cir. 2008) (internal quotation omitted). *See MultiPlan* Case No. 1:24-cv-06795 (N.D. Ill. Nov. 18, 2024), ECF Nos. 171–172 (filing of amended complaints). Regardless, market power determinations "are ***unnecessary*** for competitor price-fixing claims . . . whether or not the conspiring parties actually had the power to fix prices." *MultiPlan*, 2025 WL 1567835, at *8 (citation omitted) (emphasis added). Judge Kennelly's assessment of those allegations, even if had made one, is something far from posing a "'risk of inconsistent court determinations'" or "a threat to judicial integrity.'" *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2010) (citations omitted). There has been no "unfair advantage," no "deliberate dishonesty," no "serious prejudice to the judicial proceedings or the position of the opposing party," or anything close to "'playing fast and loose with the courts.'" *Synopsys*, 374 F.3d at 33; *United States v. Owens*, 933 F. Supp. 76, 82 (D. Mass. 1996); *Desjardins v. Van Buren Community Hosp*., 37 F.3d 21, 23 (1st Cir. 1994); *Duggan v. Martorello*, No. 18-12277-JGD, 2021 WL 4295828, at *8 (D. Mass. Sept. 21, 2021)).

To the extent Defendants disagree that Zelis, through its relationships with other MCOs, has market shares approximating 65.5% to 82.2%, "[d]ismissals for insufficient pleading of market power are rare

38

pre-discovery." *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 340 (D. Vt. 2010).

<u>**CONCLUSION**</u>

For the reasons set forth above, Defendants' motion to dismiss this action should be denied in its entirety. Should the Court instead decide to grant the motion in whole or in part, Plaintiffs ask that it do so without prejudice, so as to allow Plaintiffs to amend the CAC.

Dated: September 22, 2025                                         Respectfully submitted,


Richard M. Paul III, *pro hac vice*
Mary Jane Fait, *pro hac vice*                              /s/Maureen E. Forsyth
Haley Hawn, *pro hac vice*                                  Maureen Forsyth (MA Bar No. 642390)
**PAUL LLP**                                                     Jason S. Hartley, *pro hac vice*
601 Broadway Blvd., Suite 600                         Jason M. Lindner, *pro hac vice forthcoming*
Kansas City, Missouri 64105                           Kenneth Frost, *pro hac vice forthcoming*
Telephone: (816) 984-8100                               **HARTLEY LLP**
Rick@PaulLLP.com                                          101 W. Broadway, Ste 820
MaryJane@PaulLLP.com                                San Diego, CA 92101
Haley@PaulLLP.com                                      Telephone: (619) 400-5822
                                                                      hartley@hartleyllp.com
                                                                      lindner@hartleyllp.com
Amanda F. Lawrence
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
156 South Main Street                                     Katrina Carroll
P.O. Box 192                                                    Kyle A. Shamberg
Colchester, CT 06415                                      **CARROLL SHAMBERG LLC**
Telephone: (860) 531-2606                               111 W. Washington Street
alawrence@scott-scott.com                             Suite 1240
                                                                      Chicago, IL 60602
Patrick Coughlin, *pro hac forthcoming*          Telephone: 872-215-6205
Fatima Brizuela, *pro hac forthcoming*            katrina@csclassactions.com
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**      kyle@csclassactions.com
600 West Broadway, Suite 3300
San Diego, CA 92101                                       Adam J. Zapala (245748)
Telephone: (619) 798-5308                               Elizabeth T. Castillo (280502)
pcoughlin@scott-scott.com                             Christian S. Ruano (352012)
fbrizuela@scott-scott.com                              **COTCHETT, PITRE & McCARTHY, LLP**
                                                                      840 Malcolm Road
                                                                      Burlingame, CA 94010
                                                                      Telephone: (650) 697-6000
                                                                      azapala@cpmlegal.com
                                                                      ecastillo@cpmlegal.com
                                                                      cruano@cpmlegal.com


39

John Landay (*pro hac vice forthcoming*)
**LANDAY ROBERTS LLP**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 648-4811
jlanday@landayroberts.com

Daniel J. Mogin (*pro hac vice forthcoming*)
**MOGIN LAW LLP**
4225 Executive Square, Suite 600
La Jolla, CA 92037
Telephone: (619) 687-6611
dmogin@moginlawllp.com

Daniel R. Karon (*pro hac vice forthcoming*)
**KARON LLC**
631 W. St. Clair Ave.
Cleveland, OH 44113
Telephone: (216) 622-1851
dkaron@karonllc.com

Solomon B. Cera (*pro hac vice forthcoming*)
**CERA LLP**
50 California Street, Suite 1500
San Francisco, CA 94111
Telephone: (415) 777-2230
scera@cerallp.com

C. Andrew Dirksen (MA Bar No. 568773)
**CERA LLP**
529 Main St., Suite P200
Boston, MA 02129
Telephone: (857) 453-6555
cdirksen@cerallp.com

David M. Cialkowski
(*pro hac vice application forthcoming*)
Ian F. McFarland
(*pro hac vice application forthcoming*)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
(612) 341-0400
david.cialkowski@zimmreed.com
ian.mcfarland@zimmreed.com

Garrett D. Blanchfield
Brant D. Penney
Roberta A. Yard
**REINHARDT WENDORF &
BLANCHFIELD**
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Telephone: (651) 287-2100
g.blanchfield@rwblawfirm.com
b.penney@rwblawfirm.com
r.yard@rwblawfirm.com

*Counsel for Plaintiffs and the Class*

40

## CERTIFICATE OF SERVICE

I certify that on September 22, 2025, I caused a true and correct copy of the foregoing Plaintiffs'

Opposition to Defendants' Joint Motion to Dismiss the Consolidated Amended Complaint, to be filed with

the Clerk of Court using the CM/ECF system which will serve as notification of such filing to the email

address of all counsel of record in this action.

*/s/ Maureen Forsyth*
Maureen Forsyth
