UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | ) | |
|---|---|---|
| **IN RE: ZELIS REPRICING ANTITRUST** | ) | |
| **LITIGATION,** | ) | **Lead Action Civil Action No.** |
| | ) | **25- 10734-BEM** |
| | ) | |
| **This Document Relates To:** | ) | **Consolidated with Case Nos.:** |
| | ) | 25-11092-BEM |
| **All Actions** | ) | 25-11167-BEM |
| | ) | 25-11537-BEM |
| | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTIONS TO COMPEL ARBITRATION**

**MURPHY, J.**

Plaintiffs brought this action alleging an antitrust conspiracy between Defendants, who are accused of using "repricing" technology solutions to recommend reimbursement amounts for certain "out of network" services offered by providers, resulting in suppressed payments to healthcare providers. Now before the Court are certain Defendants' motions to compel arbitration with certain Plaintiffs under arbitration clauses in their provider agreements. For the reasons below, the Court will grant all three motions to compel arbitration.

**I.   Background**

    **A.   Factual Background**

The following facts are drawn from Plaintiffs' amended and consolidated complaint, Dkt. 39 ("Complaint" or "Compl.") and are accepted as true for purposes of resolving the motions to compel arbitration.[1]

---

[1] The amended and consolidated complaint is 158 pages and consists of over 400 paragraphs. *See* Dkt. 39. Accordingly, the Court provides only an abbreviated overview here, with additional facts included in the analysis as needed.

1. **The Parties**

   a. **Plaintiffs**

Plaintiffs in the consolidated action are Pacific Inpatient Medical Group, Inc. ("PIMG"); Dennis C. Ayer, DDS, LLC ("Ayer"); Frank J. Scaccia, M.D., F.A.C.S., L.L.C. ("Scaccia"); James Paul Allen DDS d/b/a/ Allen Dental; Danny Bachoua Chiropractic, APC ("DBC"); and Smile Line, LLC.

Only four of the above plaintiffs are subject to the pending motions to compel arbitration: PIMG, Ayer, Scaccia, and DBF.  Based in California, PIMG is a team of approximately 100 doctors and healthcare professionals who practice general medical care, specialty consultation, surgical co-management, and related services in internal medicine, geriatrics, palliative care, and infectious diseases in hospitals, skilled nursing homes, and an ambulatory clinic.  Compl. ¶ 25. Ayer provides general dentistry services, emergency dentistry, and a comprehensive suite of oral healthcare services in Kansas.  *Id.* ¶ 26.  Scaccia is a solo otolaryngologist, whose practice includes medical and surgical management of conditions affecting the ears, nose, throat, and sinuses, in New Jersey.  *Id.* ¶ 27.  DBC provides chiropractic treatment to patients in California, including DTS spinal therapy, traction therapy, trigger point therapy, PNF stretching, and myofascial release. *Id.* ¶ 29.

   b. **Defendants**

Defendants in the consolidated action are Zelis Healthcare, LLC ("Zelis Healthcare"); Zelis Claims Integrity, LLC ("Zelis Claims"); Zelis Network Solutions, LLC ("Zelis Network") (collectively, with Zelis Healthcare and Zelis Claims, "Zelis"); Aetna, Inc. ("Aetna"); The Cigna Group ("Cigna"); The Elevance Health Companies, Inc. ("Elevance"); Humana Inc. ("Humana"); and UnitedHealth Group, Inc. ("United") (collectively with Aetna, Cigna, Elevance, and Humana, the "Commercial Payer Defendants").

2

Three Defendants have moved to compel arbitration: Aetna, Elevance, and United. Aetna is one of the largest U.S. commercial health insurance payors, with a commercial insurance network that pays claims for both in-network and out of network ("OON") care from healthcare providers nationwide. *Id.* ¶ 34. Elevance operates a nationwide network of healthcare providers, through which it offers various plans that issue insurance or provide administrative services for both in-network and OON claims. *Id.* ¶ 36. United is the largest U.S. healthcare insurance company, with a nationwide network of providers who operate through various plans that issue insurance or provide administrative services for both in-network and OON care. *Id.* ¶ 38.

2. **Allegations in the Complaint**

At a high level, Plaintiffs allege in a putative class action that Zelis and the Commercial Payer Defendants have conspired to adjust OON payment rates to healthcare service providers downward in violation of federal antitrust laws. Compl. ¶¶ 1, 8, 13–16. Specifically, Plaintiffs allege that the Commercial Payer Defendants' use of Zelis's repricing products and services in connection with reimbursement of OON medical care constitutes a conspiracy in violation of section 1 of the Sherman Act. *Id.* ¶¶ 7–10, 17, 384–402.

3. **Provider Agreements**

   a. **United**

United, through various corporate subsidiaries, entered into provider agreements with Ayer, PIMG, and Scaccia. *See generally* Dkt 106-1 at 5–8 [hereinafter "Ayer Agreement"]; *id.* at 10–13 [hereinafter "PIMG Agreement"]; *id.* at 15–18 [hereinafter "Scaccia Agreement"].[2] Generally, each agreement governs the relationship between the parties, including the medical

---

[2] As United filed all of the contracts on the docket together, rather than as separate attachments, the Court cites to the contract's internal pagination.

services covered, payment and processing of claims, duties of the medical group, duties of the insurer or payer, dispute resolution processes, and procedures for terminating the agreement. *See generally* Ayer Agreement; PIMG Agreement; Scaccia Agreement.

Ayer's agreement, signed by Ayer's representative on November 29, 2018, requires that disputes be submitted to "binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association [("AAA")], as they may be amended from time to time." Ayer Agreement at 6, 10. Disputes under the agreement include "disputes about [Ayer's and United's] business relationship, including, but not limited to, all questions of arbitrability, the validity, scope or termination of this Agreement or any term thereof." *Id.* at 6.

PIMG's agreement, signed by PIMG's representative on June 20, 2021, requires that "all" disputes be submitted "to binding arbitration in accordance with the Commercial Dispute Procedures of the American Arbitration Association within one year." PIMG Agreement at 7, 9 (citations omitted).

Scaccia's agreement, signed by Scaccia's representative on June 22, 2020, requires that disputes be submitted "to binding arbitration conducted by the American Arbitration Association." Scaccia Agreement at 5, 8. Disputes are defined as "any and all disputes between" the parties, including about "the existence, validity, scope or termination of this Agreement or any term thereof, and all question of arbitrability." *Id.* at 5.

      **b.**    <u>**Elevance**</u>

On July 14, 2010, Dr. Bachoua signed two chiropractic provider services agreements with American Specialty Health ("ASH") on behalf of Bachoua Chiropractic, one with ASH Plans of California, Inc., *see generally* Dkts. 111-1, 111-3, and one with ASH Networks of California, Inc., *see generally* Dkts. 111-2, 111-3. ASH is a provider services network and plan that contracts with Anthem Blue Cross of California ("BCCA"), a subsidiary company of Elevance. Dkt. 111 ¶¶ 3,

4

5. These agreements generally govern the relationship between the parties, including the medical services covered, payment and processing of claims, duties of the medical group, duties of the insurer or payer, dispute resolution processes, and procedures for terminating the agreement. *See generally* Dkts. 111-1, 111-2. The agreements also each contain a clause that requires arbitration of "any dispute" with payors that contract with ASH. Dkt. 111-1 §§ 18.01.1, 18.01.3; Dkt. 111-2 §§ 18.01.1, 18.01.3. ASH entered into a vendor agreement with BCCA to make BCCA a payor. *See generally* Dkt. 111-4. The agreements incorporate the Commercial Arbitration Rules of the National Arbitration Forum ("NAF") into the arbitration provision. Dkt. 111-1 § 18.01.3; Dkt. 111-2 § 18.01.3.

On April 24, 2015, Dr. Bouchoua signed a chiropractic practitioner services agreement between ASH Plans of California, Inc. and DBC. Dkt. 158-2 at 2. This agreement had similar terms to the 2010 contract. *Compare* Dkt. 111-1, *with* Dkt. 158-1. This agreement contains a clause that requires arbitration of "any dispute" with a "Client arising out of or relating to this Agreement." Dkt. 158-1 §§ 20.01.1, 20.01.03. "Client" is defined in the agreement as:

> a health care service plan, employer group, trust fund, or other third-party client, including, but not limited to a third party administrator, provider network, governmental agency, or other person or entity who contracts with ASH Plans to arrange for the provision of Covered Services to Members, or pay for or reimburse the cost of any Fee Schedule Amounts or other costs of Covered Services under a Chiropractic Benefit Plan.

*Id.* § 1.08. Such an arbitration is to be "conducted under the Commercial Arbitration Rules of the American Arbitration Association." *Id.* § 20.01.03.

On May 19, 2016, Dr. Bouchoua signed a chiropractic practitioner services agreement between ASH Plans of California, Inc. and DBC. Dkt. 158-4 at 2. This agreement also had similar terms. *Compare* Dkt. 111-1, *and* Dkt. 158-1, *with* Dkt. 158-3. This agreement contains an

5

identical arbitration provision as the 2015 agreement. *Compare* Dkt. 158-1 § 20.01, *with* Dkt. 158-3 § 20.01.

                c.        <u>**Aetna**</u>

Aetna and Ayer entered into a dental provider agreement, signed by Ayer's representative on November 8, 2018, which generally covers the relationship between the parties with respect to Ayer's provision of dental services to Aetna's members. *See generally* Dkt. 103-1. In relevant part, it states that "[Ayer] may bill or charge Members . . . [for] services that are not Covered Services . . . [if] the Member was advised in writing prior to the services being rendered that the specific services may not be Covered Services; and . . . the Member agreed in writing to pay for such services after being so advised." *Id.* § 4.3.1. Under the provider agreement, Aetna and Ayer agreed to arbitrate "[a]ny controversy or claim arising out of or relating to this Agreement including breach, termination, or validity of this Agreement." *Id.* § 8.3. Such arbitration is to be "administered by the American Arbitration Association" under their relevant rules. *Id.*

    **B.**        <u>**Procedural Background**</u>

On March 28, 2025, Plaintiff PIMG filed a class action complaint in federal court against Zelis, Aetna, Cigna, Elevance, and Humana. Dkt. 1. On May 7, 2025, the Court allowed Plaintiffs' motion to consolidate and appoint interim co-lead counsel, Dkt. 34, and on May 27, 2025, the Court consolidated the case with three other pending cases and appointed Jason S. Hartley of Hartley LLP and Richard M. Paul III of PAUL LLP as Interim Co-Lead Counsel, Dkt. 35. On June 11, 2025, Plaintiffs filed an amended and consolidated complaint. Dkt. 39. On July 8, 2025, Defendants filed an unopposed motion to consolidate the case with one additional case. Dkt. 76. On July 28, 2025, the Court granted the motion to consolidate. Dkt. 83. On August 11, 2025, Aetna moved to compel arbitration of Ayer's claims. Dkt. 101; *see also* Dkt. 102 ("Aetna Mem."); Dkt. 127 ("Aetna Opp."); Dkt. 156 ("Aetna Reply"); Dkt. 165 ("Aetna Sur-reply"). On August 11,

2025, United moved to compel arbitration of Dr. Ayer's, PIMG's, and Scaccia's claims.  Dkt. 105; *see also* Dkt. 106 ("United Mem."); Dkt. 128 ("United Opp."); Dkt. 154 ("United Reply"); Dkt. 167 ("United Sur-reply").  On August 11, 2025, Elevance moved to compel arbitration of DBC's claims.  Dkt. 108; *see also* Dkt. 110 ("Elevance Mem."); Dkt. 131 ("Elevance Opp."); Dkt. 157 ("Elevance Reply"); Dkt. 169 ("Elevance Sur-reply").  The Court held a hearing on January 15, 2026, and took the matters under advisement.[3]

## II.     Standard of Review

District courts apply the summary judgment standard to decide motions to compel arbitration under the Federal Arbitration Act ("FAA").  *See Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021).  A movant is entitled to arbitration where he shows no "genuine dispute of fact exists regarding the parties' agreement to arbitrate." *Id.* at 176.  In reviewing the record, the Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Id.* at 175.

## III.    Discussion

"A party seeking to compel arbitration under the FAA must demonstrate 'that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope.'" *Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 375 (1st Cir. 2011) (quoting *InterGen N.V. v. Grina,* 344 F.3d 134, 142 (1st Cir. 2003)).

---

[3] Defendants also jointly moved to dismiss on August 11, 2025, Dkt. 96, which the Court heard arguments on during the same hearing.  The Court's ruling on that motion will be issued in a separate opinion.

A. **The FAA Applies to Each Contract**

Ayer, PIMG, and Scaccia argue that the FAA does not govern because their claims do not "arise out of" their various provider agreements, and that section 2 of the FAA expressly limits the FAA to disputes "arising out of" the underlying contract.[4] United Opp. at 12–15. They contend that this statutory inquiry is distinct from the question of what claims fall within each arbitration clause's scope. *See id.*

Each Plaintiff argues that this Court must first determine whether an agreement is excluded from FAA coverage, even where there is a delegation clause. *See, e.g.*, *id.* at 22–23 (first citing *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 215 (3d Cir. 2019); and then citing *New Prime Inc. v. Oliveira*, 586 U.S. 105, 111–12 (2019)). The Third Circuit explained in *Singh* that:

> [Sections] 1 and 2 of the FAA identify the subset of arbitration agreements covered by the statute. Since they come before the FAA's enforcement clauses under §§ 3 and 4—which authorize a court to stay a proceeding and compel arbitration—the Supreme Court reasoned that §§ 3 and 4 cannot apply to an arbitration agreement that is excluded from the FAA's coverage by the terms of §§ 1 and 2.

939 F.3d at 215 (citing *New Prime*, 586 U.S. at 111–12).[5]

The question of how to apply the FAA's "arising out of" requirement has received little attention. *See Christian v. Uber Techs., Inc.*, 775 F. Supp. 3d 272, 280 (D.D.C. 2025) ("There is very little case law . . . on the FAA's 'arising out of' requirement."). The Court agrees with the growing weight of authority holding that "the plain[] text of § 2 seems to limit[] the FAA to 'controversies that actually stem from the contract containing the arbitration clause.'" *Id.* (quoting

---

[4] DBC does not make this argument in its opposition. *See generally* Elevance Opp. Regardless, the Court concludes that the FAA applies to DBC's agreements for the same reasons described herein.

[5] The Court notes that both *Singh* and *New Prime* concerned the scope of the FAA section 1 exception, and neither court commented on the scope of the "arising out of" requirement. *See Singh*, 939 F.3d at 219; *New Prime*, 586 U.S. at 111–12. In dicta, the *New Prime* Court stated that arbitrators cannot rule on "whether the contract itself falls within or beyond the boundaries of . . . [section] 2." *New Prime*, 586 U.S. at 111.

*Revitch v. DIRECTV, LLC*, 977 F.3d 713, 723–24 (9th Cir. 2020) (O'Scannlain, J., concurring)); *see also Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 652 n.4 (2022) ("[T]he terms of § 2 limit the FAA's enforcement mandate to agreements to arbitrate controversies that 'arise out of' the parties' contractual relationship."). Yet, as the court in *Christian* noted, such review is not without limits. *See Christian*, 775 F. Supp. 3d at 281.

Those courts that have determined that a dispute does not arise out of the contract at issue have generally done so on claims far less tethered to the agreements than those present here. *See, e.g.*, *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 276 (S.D.N.Y. 2021) ("Following *Smith* [*v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003)], the Ninth Circuit and a handful of district courts around the country have declined to compel arbitration of claims based on 'infinite arbitration clauses' where the claims at issue lack *any nexus whatsoever* to the agreement containing the clause." (emphasis added)). For example, the Eleventh Circuit held that the FAA did not apply to a dispute in which the defendant sought to invoke an arbitration agreement between the plaintiff and a third-party website, emphasizing that where the lawsuit did not name the third-party as a defendant or identify any wrongdoing by the third party, the lawsuit against this defendant was not "an immediate, foreseeable result of" accepting the third-party's terms of use. *See Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1207–08, 1213 (11th Cir. 2021). Thus, the issue is not really whether an arbitration clause is "infinite," but whether a party seeks to apply the clause to "compel arbitration of claims that are 'completely unrelated' to the underlying . . . contract in which the agreement to arbitrate was made." *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 125 (2d Cir. 2025) (Sullivan, J., concurring in part and dissenting in part) (*quoting Revitch*, 977 F.3d at 722 (O'Scannlain, J., concurring)).

9

Here, even construing the arbitration clauses as "infinite,"[6] the Court cannot conclude that Plaintiffs' allegations are "wholly unrelated" to their provider agreements. *See id.* at 119 (majority opinion) ("In determining whether the parties' arbitration agreement covers a particular claim . . . we 'focus[] on the factual allegations in the complaint rather than the legal causes of action asserted.'" (alteration in original) (quoting *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 36 (2d Cir. 2002))). The claims are founded, at least in part, on allegations that Defendants suppressed OON payments "so that they match or come close to in-network payment levels," Compl. ¶ 340, among other allegations directly concerning or otherwise related to in-network rates, *see, e.g.*, *id.* ¶¶ 3, 46, 94–96, 133–36, 298–303. Plaintiffs themselves put their various provider agreements at issue through these allegations. Further, the Court cannot assess which claims and services are OON without analyzing the provider agreements. Considering the arbitration clauses' broad language as to the claims subject to arbitration and the tie between the claims and agreements, the Court cannot conclude that the claims at issue lack the necessary nexus to the provider agreements.[7]

---

[6] Plaintiffs spend substantial portions of their briefing arguing that infinite arbitration clauses are unconscionable and unenforceable. *See, e.g.*, United Opp. at 18–20. Because the Court concludes that the claims are sufficiently related to the contracts, it need not resolve the broader issue of whether infinite arbitration clauses are unenforceable and unconscionable. *See infra* Section III(B)(2).

[7] By trying to apply a higher bar for the FAA's "arising out of" requirement, Plaintiffs really argue that the claims fall outside scope of the agreement. *See Bossé v. N.Y. Life Ins. Co.*, 992 F.3d 20, 28 (1st Cir. 2021) (classifying the question of whether the arbitration agreement and delegation clause apply to particular claims as one of arbitrability). But the Supreme Court expressly requires that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *PaineWebber Inc. v. Elahi*, 87 F.3d 589, 595 (1st Cir. 1996) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)); *see also PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010) ("[A]mbiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration." (alteration in original) (internal quotation marks omitted)). Further, for those provider agreements that contain a delegation clause, the Supreme Court has made it clear that a court has "no power" to determine whether a claim is arbitrable, where there is a delegation clause, even where "the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019). The Court discusses Plaintiffs' arguments on scope *infra*.

Thus, even assuming that this Court has an obligation to ensure that there is some connection between the contract and claims distinct from the scope of the arbitration agreement inquiry, "the Court disagrees with Plaintiffs that their claims are so far attenuated from [the provider agreements here] that the Court should not apply the FAA and the pro-arbitration canons of construction." *Christian*, 775 F. Supp. 3d at 281.

### B.  United's Motion

#### 1.  Delegation Clause

United argues that its provider agreements with Ayer, PIMG, and Scaccia each contain a delegation clause, which requires that an arbitrator determine whether the dispute is arbitrable. United Mem. at 20–22.  "[A] court has a somewhat straightforward task when presented with a 'delegation clause.'"  *Toth v. Everly Well, Inc.*, 118 F.4th 403, 409 (1st Cir. 2024) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)).  "[W]henever parties form a valid and enforceable delegation agreement, the FAA compels courts to send the entire action to arbitration." *Id.* (citing *Bossé v. N.Y. Life Ins. Co.*, 992 F.3d 20, 27 (1st Cir. 2021)).  "To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.  But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019) (citing 9 U.S.C. § 2); *see also Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024) ("In cases where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration.").

There is no dispute that the parties formed valid contracts, which contain arbitration clauses.[8] Instead, Ayer, PIMG, and Scaccia argue that, in Ayer's and Scaccia's arbitration clauses, there is no identifiable delegation clause and that, in PIMG's, there is no delegation clause at all, with the word "arbitrability" not even appearing. United Opp. at 23–24. But the arbitration clauses each state that all disputes are governed by the rules of the AAA's Commercial Arbitration Rules, Ayer Agreement at 6; PIMG Agreement at 7; Scaccia Agreement at 5, and those rules contain a delegation clause. Under binding First Circuit precedent, the mere "incorporation of the [American Arbitration Association's] arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability." *Bossé*, 992 F.3d at 29.[9]

Ayer, PIMG, and Scaccia also argue that the delegation clauses should be held unenforceable. *See* United Opp. at 24–25. They reiterate their argument on "infinite" clauses and unconscionability. *See id.* at 25. Both arguments merely restate the arguments raised as to the arbitration clause, rather than raise specific challenges to the delegation provision, and thus fail. *See Toth*, 118 F.4th at 416 (holding that challenges to "dispute-resolution section of the User Agreement" do not "make the delegation provision itself unfair or somehow restrict [plaintiff's] ability to challenge the validity of the arbitration agreement before an arbitrator."); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (holding that challenges to arbitration

---

[8] Ayer, PIMG, and Scaccia do not challenge the validity of the provider agreements, just the arbitration and delegation clauses therein.

[9] Ayer's and Scaccia's contracts each also contain language clearly indicating that questions of arbitrability would be submitted to an arbitrator. *See* Ayer Agreement at 6 (agreeing that "any disputes about [Ayer's and United's] business relationship, including . . . all questions of arbitrability, the validity, scope or termination of this Agreement" shall be submitted to "binding arbitration"); Scaccia Agreement at 5 (agreeing that "any and all disputes between" the parties, including about "the existence, validity, scope or termination of this Agreement or any term thereof, and all question of arbitrability" shall be submitted to "binding arbitration"). This language further constitutes clear and unmistakable evidence of delegation. *See Bossé*, 992 F.3d at 29.

12

clauses or contracts that fail to "challenge[] the delegation provision specifically" must be considered by the arbitrator—not the court—under the delegation clause).

Simply put, whether the agreement covers this particular controversy is a "'gateway' question[] of 'arbitrability.'" *See Henry Schein*, 586 U.S. at 68 (quoting *Rent-A-Center*, 561 U.S. at 68–69). Given the Court's conclusion that each agreement contains a valid delegation clause, the Court's hands are tied. *See Exothermics, Inc. v. Ernst & Young U.S. LLP*, 765 F. Supp. 3d 97, 101–02 (D.N.H. 2025); *see also Henry Schein*, 586 U.S. at 68 (holding that in the face of a valid delegation clause, all questions of arbitrability must go to the arbitrator, even where the argument made in favor of arbitrability appears "wholly groundless"); *Toth*, 118 F.4th at 409 (noting that federal courts may only consider challenges to the arbitration clause, not other aspects of the contract).[10] Because the language of the arbitration clauses shows that United, Ayer, Scaccia, and PIMG delegated questions of arbitrability to the arbitrator, the Court cannot consider arguments as to the arbitrability of the claims.

### 2. **Unconscionability**

Ayer, PIMG, and Scaccia also argue that applying United's "infinite arbitration clause" to this dispute would be unconscionable. United Opp. at 18–20. Having concluded that this dispute falls under the presumption of arbitrability and that the delegation clauses are valid and enforceable, *see supra* Sections III(A), III(B)(1), the Court need not determine whether the arbitration clause is in fact "infinite" as to raise concerns about unconscionability, *see Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 12 (1st Cir. 2009) ("The question here is simply who should

---

[10] To the extent that there is some level of review of scope available to the Court even in the face of a delegation clause, United has sufficiently demonstrated that there is at least an argument that the dispute falls within the scope of the agreement. *See Vaiano v. United Nat'l Corp.*, 733 F. Supp. 3d 32, 44 (D. Mass. 2024) ("The Supreme Court [has] made clear that where an agreement to arbitrate some issues exists, and there is a dispute over the scope of the arbitration agreement, the law requires that those matters be presumed to be arbitrable 'unless it is clear that the arbitration clause has not included them.'" (alteration in original) (quoting *Bossé*, 992 F.3d at 31)).

decide the unconscionability issue, and the arbitration clause said in effect that this was for the arbitrator.").

### 3. Scaccia's Termination

Scaccia separately argues that his arbitration clause is unenforceable because he terminated his agreement. United Opp. at 22. This is a question of scope, and thus the delegation clause authorizes the arbitrator to resolve the issue, rather than this Court.[11] *See Biller v. S-H OpCo Greenwich Bay Manor, LLC*, 961 F.3d 502, 512–14 (1st Cir. 2020) (finding that the court could determine whether the arbitration clause survived termination of the contract only because the parties had not delegated arbitrability to the arbitrator).[12]

### C. Elevance's Motion

#### 1. Valid Agreement to Arbitrate

Elevance submitted several agreements, arguing that they all demonstrate an agreement with DBC to arbitrate. *See generally* Elevance Mem.; Elevance Reply. DBC takes issue with "missing" agreements for years relevant to this litigation but does not otherwise dispute that there is at least one valid provider agreement, containing an arbitration clause, for at least part of the relevant time. *See* Elevance Sur-reply at 2–4. While the Court generally disfavors new evidence introduced through a reply brief, given that the Court provided leave for DBC to file a sur-reply

---

[11] The Courts notes that, even on the merits, Scaccia's reliance on *In re Miller's Estate*, 90 N.J. 210 (1982), is misplaced. The mere fact that perpetual contracts are generally disfavored in New Jersey does not render all perpetual contracts unenforceable. The Court also notes that the contract specifically states the arbitration clause will survive termination. *See Bossé*, 992 F.3d at 29 ("The survival clause reinforces the parties' intent that issues of arbitrability be decided by an arbitrator even after that Agreement was terminated."). In the face of the delegation clause, however, the Court will not opine further on the merits.

[12] Having concluded the FAA applies, the Court need not resolve whether California's *Discover Bank* rule renders the arbitration clause unconscionable. *See* United Opp. at 20–21 (recognizing that the argument that *Discover Bank v. Superior Court*, 36 Cal.4th 148 (2005), renders the arbitration clause in PIMG's agreement unconscionable only applies if the FAA does not govern).

even before the reply was filed, Dkt. 138, the Court finds that DBC has not been prejudiced and takes no issue with the new evidence.[13]

Elevance has submitted provider agreements between DBC and ASH from April 2015 and July 2016. Dkts. 158-1, 158-2, 158-3, 158-4. DBC does not dispute that these agreements are valid and binding. *See generally* Elevance Sur-reply. DBC does, however, dispute whether Elevance can enforce the arbitration provisions. Elevance Opp. at 15 n.4. For substantially the reasons in Elevance's papers, *see* Elevance Mem. at 12 n.8; Elevance Reply at 5–6, the Court concludes that Elevance can enforce the agreement under the principle of equitable estoppel.[14] Thus, the Court holds that Elevance has met its burden to establish a binding agreement to arbitrate.

### 2. Delegation

The 2015 and 2016 agreements contain a delegation clause, and thus the remaining arguments must be made to the arbitrator. *Henry Schein*, 586 U.S. at 69 ("[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."). As discussed above, *see supra* Section III(B)(1), since the 2015 and 2016 agreements state that all disputes are governed by the Commercial Arbitration Rules of the AAA, Dkts. 158-1 § 20.01.03, 158-3 § 20.01.03, those agreements contain clear and unmistakable evidence of the parties' intent to delegate arbitrability, *Bossé*, 992 F.3d at 29. Thus, the Court cannot consider arguments as to the arbitrability of the claims.

---

[13] DBC cites the Supreme Court's decision in *Coinbase* to argue that "Elevance has waived arbitration pursuant to any other contract" aside from the 2010 agreements. Elevance Opp. at 26. But *Coinbase* concerned waiver by failing to raise the argument in a lower court, not the failure to make the argument in an opening brief. *See Coinbase*, 602 U.S. at 151 n.*.

[14] The Court notes that, despite arguing that Elevance failed to offer a "substantive argument why equitable estoppel applies here," Elevance Opp. at 15 n.4, DBC failed to respond to Elevance's argument when given the opportunity in a sur-reply, *see generally* Elevance Sur-reply.

15

D.    **Aetna's Motion**

Aetna seeks to compel arbitration under its provider agreement with Ayer, which contains an arbitration clause, Dkt. 101-1 § 8.3, arguing that Ayer's claims fall within the scope of their agreement, Aetna Mem. at 3–4.  The parties agree that there is no delegation clause in their agreement and dispute only whether the present action falls within the scope of the main arbitration clause.

"The FAA codifies the 'fundamental principle that arbitration is a matter of contract.'" *Toth*, 118 F.4th at 409 (quoting *Rent-A-Center*, 561 U.S. at 67).  "Therefore, the first principle that underscores all of the Supreme Court's arbitration decisions is that '[a]rbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration.'"  *Dialysis Access*, 638 F.3d at 376 (alteration and emphasis in original) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 298 (2010)).  Thus:

> courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue.  Where a party contests either or both matters, "the court" must resolve the disagreement.

*Id.* (emphasis in original) (quoting *Granite Rock,* 561 U.S. at 299–300); *see also AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) ("[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (internal quotation marks, brackets, and citation omitted)); *Mundi v. Union Sec. Life Ins. Co.,* 555 F.3d 1042, 1044–45 (9th Cir. 2009) ("The presumption in favor of arbitration . . . does not apply if contractual language is plain that arbitration of a particular controversy is not within the scope of the arbitration provision." (internal quotation marks and citation omitted)).

"When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Dialysis Access*, 638 F.3d at 376 (quoting *First Options*, 514 U.S. at 944). In the process, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." *Id.* (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)). To that end, courts must "(1) apply[] the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adher[e] to the presumption and ordering arbitration only where the presumption is not rebutted." *Id.* (quoting *Granite Rock*, 561 U.S. at 301).

Ayer mainly challenges the scope of the arbitration agreement. He argues that the claims at issue—antitrust claims arising from an alleged conspiracy to suppress OON pricing—do not arise out of or relate to the network agreements containing the arbitration clauses. Aetna Opp. at 5–7. He further argues that under Kansas law, "[n]o reasonable person would think that signing Aetna's network agreement would force them to arbitrate out-of-network disputes." *Id.* at 8. But Ayer concedes that "a reasonable person" could understand their agreement to express "an intent to agree to arbitrate disputes connected in some way to the network agreement." *Id.* at 8. As explained above, *see supra* Section III(A), Ayer's claims are founded, at least partially, on allegations that directly compare the OON payments he received to in-network payment levels, Compl. ¶ 340, alongside other allegations about in-network rates, *e.g.*, *id.* ¶¶ 3, 46, 94–96, 133–36, 298–303. These allegations put the in-network agreements at issue. Further, the arbitration clause is broad in scope. Dkt. 101-1 § 8.3 (defining a dispute subject to arbitration as "[a]ny controversy or claim arising out of or relating to this Agreement including breach, termination, or validity of

17

this Agreement"). Taking these facts together, the Court cannot conclude that the claims at issue fall outside the scope of the agreements. *See Bekele v. Lyft*, 199 F. Supp. 3d 284, 313 (D. Mass. 2016) ("The use of phrases such as 'arising under' or 'arising out of' in an arbitration provision generally indicates an intent to arbitrate a broad scope of claims."); *United States ex rel. Hagerty v. Cyberonics, Inc.*, 146 F. Supp. 3d 337, 247 (D. Mass. 2015) (collecting cases).

At the very least, the terms in each agreement are ambiguous as to whether the contract covers disputes over OON pricing. "The Supreme Court [has] made clear that where an agreement to arbitrate some issues exists, and there is a dispute over the scope of the arbitration agreement, the law requires that those matters be presumed to be arbitrable 'unless it is clear that the arbitration clause has not included them.'" *Vaiano v. United Nat'l Corp.*, 733 F. Supp. 3d 32, 44 (D. Mass. 2024) (alteration in original) (quoting *Bossé*, 992 F.3d at 31); *see also Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 7 (1st Cir. 2014) ("[A]mbiguities as to the scope of the arbitration clause itself [must be] resolved in favor of arbitration." (alteration in original) (quoting *PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 15 (1st Cir. 2010))).

## IV. Conclusion

For the foregoing reasons, Defendant Aetna, Inc.'s motion to compel arbitration, Dkt. 101; Defendant UnitedHealth Group, Inc.'s motion to compel arbitration, Dkt. 105; and Defendant The Elevance Health Companies, Inc.'s motion to compel arbitration, Dkt. 108; are each GRANTED. The case is STAYED pending arbitration solely as to these Plaintiffs' claims against these specific Defendants.

**So Ordered.**

Dated: March 3, 2026

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court