**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| IN RE: ZELIS REPRICING ANTITRUST LITIGATION, | ) ) ) ) | Lead Action Civil Action No. 25- 10734-BEM |
| This Document Relates To: | ) ) ) | Consolidated with Case Nos.: 25-11092-BEM |
| All Actions | ) ) ) ) ) | 25-11167-BEM 25-11537-BEM |

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTION TO DISMISS**

**MURPHY, J.**

Plaintiffs brought this action alleging an antitrust conspiracy between Defendants, who are accused of using "repricing" technology solutions to recommend reimbursement amounts for certain "out of network" services offered by providers, resulting in suppressed payments to healthcare providers. Before the Court now is Defendants' motion to dismiss. For the reasons set forth below, the Court will deny the motion to dismiss.

**I.      Background**

**A.      Factual Background**

The following facts are drawn from Plaintiffs' amended and consolidated complaint, Dkt. 39 ("Complaint" or "Compl.") and are accepted as true for purposes of resolving Defendants' motion to dismiss.[1]

---

[1] The amended and consolidated complaint is 158 pages and consists of over 400 paragraphs. Accordingly, the Court provides only an abbreviated overview here, with additional facts included in the analysis as needed.

1.    **The Parties**

a.    **Plaintiffs**

Plaintiffs in the consolidated action are Pacific Inpatient Medical Group, Inc. ("PIMG");

Dennis C. Ayer, DDS, LLC ("Ayer"); Frank J. Scaccia, M.D., F.A.C.S., L.L.C. ("Scaccia"); James

Paul Allen DDS d/b/a/ Allen Dental ("Allen"); Danny Bouchoua Chiropractic, APC ("DBC"); and

Smile Line, LLC (collectively, "Plaintiffs").[2]    Based in California, PIMG is a team of

approximately 100 doctors and healthcare professionals who practice general medical care,

specialty consultation, surgical co-management, and related services in internal medicine,

geriatrics, palliative care, and infectious diseases in hospitals, skilled nursing homes, and an

ambulatory clinic. Compl. ¶ 25.  Ayer provides general dentistry services, emergency dentistry,

and a comprehensive suite of oral healthcare services in Kansas.  *Id.* ¶ 26.  Scaccia is a solo

otolaryngologist, whose practice includes medical and surgical management of conditions

affecting the ears, nose, throat, and sinuses, in New Jersey. *Id.* ¶ 27.  Allen provides dental services

in Wisconsin.  *Id.* ¶ 28.  DBC provides chiropractic treatment to patients in California, including

DTS spinal therapy, traction therapy, trigger point therapy, PNF stretching, and myofascial release.

*Id.* ¶ 29.  Each Plaintiff alleges that throughout the class period, they provided out-of-network

("OON") healthcare services which form the basis of their antitrust claims.

b.    **Defendants**

Defendants in the consolidated action are Zelis Healthcare, LLC ("Zelis Healthcare"); Zelis

Claims Integrity, LLC ("Zelis Claims"); Zelis Network Solutions, LLC ("Zelis Network")

(together with Zelis Healthcare and Zelis Claims, "Zelis"); Aetna, Inc. ("Aetna"); The Cigna

---

[2] Smile Line, LLC is a consolidated plaintiff from a case that was consolidated after the filing of the amended and consolidated complaint, and so the amended and consolidated complaint contains no information about Smile Line, LLC.  No party raises any concerns about this.

Group ("Cigna"); Elevance Health Companies, Inc. ("Elevance"); Humana Inc. ("Humana"); and UnitedHealth Group, Inc. ("United") (together with Aetna, Cigna, Elevance, and Humana, the "Commercial Payer Defendants").

Zelis is a healthcare technology company that provides a "comprehensive array of network management, claims integrity, payment remittance solutions, and analytical services" through its various corporate entities. *Id.* ¶¶ 12, 33. Plaintiffs further allege that Zelis owns, operates, and/or manages various medical and dental networks nationwide and directly pays claims—including OON claims—and as such "directly competes with other health insurance companies, [Preferred Provider Organizations ("PPOs")], managed care organizations ("MCOs"), self-funded plans, third-party administrators ("TPAs"), and self-insured entities (collectively, "Commercial Payers")." *Id.* ¶¶ 90, 92–110.

Aetna is one of the largest U.S. commercial health insurance payors, with a commercial insurance network that pays claims for both in-network and OON care from healthcare providers nationwide. *Id.* ¶ 34. Cigna operates various commercial health insurance plans and prescription drug plans, through which it issues insurance or provides administrative services for both in-network and OON claims from healthcare providers. *Id.* ¶ 35. Elevance operates a network of healthcare providers in at least fourteen states, through which it offers various plans through which it issues insurance or provides administrative services for both in-network and OON claims. *Id.* ¶ 36. Humana similarly operates various commercial health insurance plans and prescription drug plans through which it issues insurance or provides administrative services for both in-network and OON claims. *Id.* ¶ 37. United is the largest U.S. healthcare insurance company, with a nationwide network of providers who operate through various plans through which it issues insurance or provides administrative services for both in-network and OON care. *Id.* ¶ 38.

### 2.    Zelis Repricing

While the Complaint refers broadly to a variety of these technologies and services, Plaintiffs' allegations focus on two tools related to OON benefits, *id.* ¶ 14, specifically Zelis's "Established Reimbursement Solution" ("ERS"), *id.* ¶¶ 116–21, and Reference Based Pricing ("RBP"), *id.* ¶¶ 122–27.  ERS is a "fee schedule representing the market payment rates that providers typically accept as payment for services," though Plaintiffs allege that, because it uses in-network rate data, it is "an improperly-pooled and downwardly-biased payment data set" when used to reprice OON claims.  *Id.* ¶¶ 117–18.  RBP "sets maximum reimbursement amounts using pre-defined prices."  *Id.* ¶ 123.  MCOs can and do use these tools to have Zelis "reprice" providers' claims and offer a lower reimbursement rate for OON claims.  *Id.* ¶¶ 115, 129–30.

### 3.    Antitrust Allegations

Plaintiffs allege that Zelis and the Commercial Payer Defendants conspired to suppress OON payments to healthcare providers using Zelis's repricing tools.  *Id.* ¶¶ 1, 296–98.  Specifically, Plaintiffs allege that OON providers are:

> forced either to accept the severely downwardly adjusted ("repriced") amount as payment; to engage in time-pressured and one-sided "negotiations" with Zelis; or to file an "appeal" of the downwardly-adjusted claim with Zelis.  But these options rarely, if ever, result in an increase in the payment and ultimately result in the incursion of an expense in the form of delay, if not a further decrease in payment of the Provider's originally submitted claim.

*Id.* ¶ 115; *see also id.* ¶¶ 132–37 (alleging that Zelis's repriced claims "are not mere proposals, recommendations, or suggestions"); *id.* ¶¶ 138–41 (alleging that Zelis's negotiations and appeals process are "[e]ffectively [n]on-[e]xistent" and that "the amount offered is essentially a 'take-it-or-leave-it' proposition for the Provider").  Zelis then receives a percentage of the difference between the amount an OON provider charges, and the amount actually paid.  *Id.* ¶¶ 8,

83–86. According to Plaintiffs, this conspiracy has resulted in reimbursements for OON claims far below that which would have occurred in a competitive market. *Id.* ¶¶ 1, 386.

### B.    **Procedural Background**

On March 28, 2025, Plaintiff PIMG filed a class action complaint in federal court against Zelis, Aetna, Cigna, Elevance, and Humana. Dkt. 1. On May 7, 2025, the Court allowed Plaintiffs' motion to consolidate and appoint interim co-lead counsel, Dkt. 34, and on May 27, 2025, the Court consolidated the case with three other pending cases, and appointed Jason S. Hartley of Hartley LLP and Richard M. Paul III of PAUL LLP as Interim Co-Lead Counsel, Dkt. 35. On June 11, 2025, Plaintiffs filed an amended and consolidated complaint. Dkt. 39. On July 8, 2025, Defendants filed an unopposed motion to consolidate the case with one additional case. Dkt. 76. On July 28, 2025, the Court granted the motion to consolidate. Dkt. 83. On August 11, 2025, Defendants filed a joint motion to dismiss. Dkt. 96; *see also* Dkt. 97 ("Joint Mem."); Dkt. 99 ("Humana Mem."); Dkt. 129 ("Joint Opp."); Dkt. 130 ("Humana Opp."); Dkt. 155 ("Joint Reply"); Dkt. 153 ("Humana Reply"); Dkt. 168 ("Joint Sur-reply"); Dkt. 166 ("Humana Sur-reply").[3] The Court held a hearing on January 15, 2026, and took the matter under advisement.[4]

---

[3] Humana raised additional arguments in support of dismissal of the claims specifically against Humana in a separate memorandum. *See generally* Humana Mem.

[4] On March 4, 2026, the Court granted Aetna's, United's, and Elevance's motions to compel arbitration as to certain Plaintiffs under the Federal Arbitration Act, staying those Plaintiffs' claims against those three Defendants. Dkt. 184.

## II.     Standard of Review

### A.     12(b)(1)

"When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first."[5]  *Katz v. Pershing, LLC*, 806 F. Supp. 2d 452, 456 (D. Mass. 2011), *aff'd*, 672 F.3d 64 (1st Cir. 2012). "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010) (citing *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001)).  The Court, however, may also look beyond the pleadings to any evidentiary materials submitted by the parties to determine whether it has jurisdiction.  *Martínez-Rivera v. Puerto Rico*, 812 F.3d 69, 74 (1st Cir. 2016).

### B.     12(b)(6)

Courts analyzing claims under Federal Rule 12(b)(6) must determine whether a plaintiff's factual allegations—disregarding all "conclusory" statements—"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  At the pleading stage, plaintiffs need not demonstrate that they are likely to prevail, but "[their] claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" *García-Catalán v. United States*, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).  "The inquiry is usually limited to the facts alleged in the complaint, incorporated into the complaint, or susceptible to judicial notice," *Whelden v. U.S. Bank Nat'l Ass'n*, 494 F. Supp. 3d 68, 73 (D. Mass. 2020) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)), "but the court may also consider

---

[5] Defendants challenge Plaintiffs' Article III standing, *see* Mem. at 27, which is a jurisdictional challenge under Rule 12(b)(1).  *See Reddy v. Foster,* 845 F.3d 493, 500 (1st Cir. 2017) (describing standing as a jurisdictional requirement under Article III).

other documents the authenticity of which is not disputed by the parties, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint," *id.* (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). "In antitrust cases, 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'" *Meijer, Inc. v. Ranbaxy Inc.*, 2016 WL 4697331, at *8 (D. Mass. Sept. 7, 2016) (quoting *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

## III.    Standing

A plaintiff's standing to sue is "part of the common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). Therefore, "the absence of standing sounds the death knell for a case." *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 39 (1st Cir. 2000). Establishing standing requires a showing that a plaintiff "has suffered, or will suffer, an injury that is '[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). This requirement prevents "federal courts [from] operat[ing] as an open forum for citizens 'to press general complaints.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)).

Importantly, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734 (1st Cir. 2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). "For standing purposes, we accept as valid the merits of [plaintiff's] legal claims." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022). The "only question is, putting the merits aside, whether [plaintiffs] plausibly allege[] [they were] injured under [their] theory of the underlying legal claim." *Laufer v. Acheson Hotels, LLC*, 50 F.4th 259, 267 (1st Cir. 2022), *vacated and remanded on other grounds*, 601 U.S. 1 (2023). "[I]f

7

at least one plaintiff has standing, the suit may proceed." *Capen v. Campbell*, 134 F.4th 660, 668 (1st Cir. 2025) (quoting *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)).

Defendants first argue that the standing analysis must be done plaintiff-by-plaintiff and claim-by-claim. Joint Mem. at 21. Rather, "when there are multiple plaintiffs[,] [a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439–40 (2017). Here, this case involves a single antitrust claim, alleging a single type of conduct and resultant harm, seeking damages and an injunction on one theory of relief. *See* Compl. ¶¶ 384–402 (alleging one cause of action). Thus, so long as one plaintiff has standing for the Section 1 claim asserted, the case may proceed. Defendants' reliance on *Hochendoner v. Genzyme Corp.*, 823 F.3d 724 (1st Cir. 2016), is misplaced. *Hochendoner* involved toxic tort claims, in which the various theories in the complaint "allege[d] different injuries and causal chains," and thus "the plaintiff-by-plaintiff and claim-by-claim analysis required by standing doctrine demands allegations linking each plaintiff to each of these injuries" because "[s]uffering one species of injury does not confer standing on a plaintiff to press claims based on another species of injury, even if the injuries share a common genus." 823 F.3d at 734. However, the same is not true of every multi-plaintiff suit. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) ("[We] have at least one individual plaintiff who has demonstrated standing. . . . Because of the presence of this plaintiff, we need not consider whether the other plaintiffs have standing to maintain the suit."); *Capen*, 134 F.4th at 668 ("[I]f at least one plaintiff has standing, the suit may proceed." (quoting *Biden*, 600 U.S. at 489)).

Defendants also argue that Plaintiffs have not demonstrated injury-in-fact or traceability, because "the Complaint does not plead facts showing that: (1) any specific Defendant actually

used Zelis to reprice a specific claim from a specific Plaintiff; or (2) the payment on that claim was below a competitive market price as a result of that Zelis repricing." Joint Mem. at 20–21. But the Complaint does specifically allege that Defendants used Zelis repricing tools on a reimbursement claim by Plaintiffs, *see, e.g.*, Compl. ¶ 334 (alleging that "[PIMG] submitted a claim, which was repriced by Zelis and the associated Commercial Payer at a discount of over 88%"), and that the use of Zelis's tools results in claims' being reimbursed at a rate below the competitive market price, *see, e.g.*, *id.* ¶¶ 117–21, 201, 347–48. Plaintiffs have alleged that the same harm occurred with respect to each Plaintiff, *see, e.g.*, *id.* ¶¶ 25–29, 328, and that their harms flow directly from Defendants' conduct, *see, e.g.*, *id.* ¶¶ 246–49, 326–27, 330–37. These allegations are sufficient to establish that Plaintiffs were "injured under [their] theory of the underlying legal claim." *See Laufer*, 50 F.4th at 267.

## IV.    Merits

"Section 1 of the Sherman Act prohibits '[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce.'" *Euromodas, Inc., v. Zanella, Ltd.*, 368 F.3d 11, 16 (1st Cir. 2004) (alterations in original) (quoting 15 U.S.C. § 1). Defendants challenge the sufficiency of Plaintiffs' antitrust standing and injury; their conspiracy allegations; and their definition of the relevant market. *See generally* Joint Mem. The Court addresses each in turn.[6]

### A.    Antitrust Standing

In antitrust cases, "plaintiffs must not only meet the typical requirements of Article III standing but also the requirements of the so-called 'antitrust standing' doctrine."[7] *Vazquez-Ramos*

---

[6] The Court declines Plaintiffs' request that it take judicial notice of certain documents reflecting an antitrust settlement in a separate case. *See* Dkt. 172.

[7] Antitrust standing is treated as a substantive element of an antitrust claim and so is assessed, at this stage, under Rule 12(b)(6). *See, e.g.*, *Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 72–73 (1st Cir. 2005).

*v. Triple-S Salud, Inc.*, 55 F.4th 286, 293 (1st Cir. 2022).  As the First Circuit has explained, "[t]he purpose of the antitrust standing doctrine is 'to avoid overdeterrence' and to 'ensure that suits inapposite to the goals of the antitrust laws are not litigated and that persons operating in the market do not restrict procompetitive behavior because of a fear of antitrust liability.'"  *Id.*  To have antitrust standing, a plaintiff must have "suffered an injury of the kind antitrust laws were intended to prevent, such that Plaintiff is a proper party to bring a federal antitrust suit."  *Id.*  Courts use a six-factor test to determine whether a plaintiff has standing to bring an antitrust action:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.

*RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 14 (1st Cir. 2001) (quoting *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 10 (1st Cir. 1999)).

### 1.    Causation and Directness

The First Circuit "has emphasized the causation requirements of [the antitrust standing] test."  *Id.*  "[E]ven though the third factor does not expressly reference causation, the Supreme Court has defined 'antitrust injury' as 'injury of the type the antitrust laws were intended to prevent and that *flows from that which makes the defendants' acts unlawful.*'"  *MJ's Mkt., Inc. v. Jushi Holdings, Inc.*, 766 F. Supp. 3d 197, 210 (D. Mass. 2025) (emphasis in original) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  A plaintiff "need not prove that that the antitrust violation was the sole cause of their injury, but only that it was a material cause."  *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 267 (D. Mass. 2014) (quoting *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 14 (1st Cir. 1979)) [hereinafter *Nexium I*], *aff'd*, 842 F.3d 34 (1st Cir. 2016) [*hereinafter Nexium II*].

10

Defendants argue that Plaintiffs cannot show that their injuries were directly caused by Defendants' use of Zelis's repricing tools because Plaintiffs can still negotiate a higher reimbursement rate and can—but choose not to—balance-bill the difference to patients directly. Joint Mem. at 23–25. But Plaintiffs have alleged both that they cannot negotiate the repriced claims and that they are prohibited from balance-billing patients. *See e.g.*, Compl. ¶¶ 132–41, 191, 195. Defendants cite to various allegations in the Complaint that they contend demonstrate that the repriced claims are merely conditional, *see, e.g.*, Joint Reply at 11 (citing Compl. ¶¶ 365–69), and that the providers voluntarily choose not to balance-bill patients, *see, e.g.*, Joint Mem. at 24 (citing Compl. ¶¶ 345–46). While these could be read to contradict the allegations that providers cannot negotiate the claims or balance-bill patients, on a motion to dismiss, the Court must draw all reasonable inferences in Plaintiffs' favor. *See Lawrence Gen. Hosp. v. Cont'l Cas. Co.*, 90 F.4th 593, 598 (1st Cir. 2024). In light of these allegations, which distinguish this case from those cited by Defendants, *see* Joint. Mem. at 23, Plaintiffs' injuries flow directly from the use of Zelis's repricing tools, not merely from intervening third-party decisions, *see In re MultiPlan Health Ins. Provider Litig.*, 789 F. Supp. 3d 614, 626–27 (N.D. Ill. June 3, 2025) (concluding, based on similar allegations, that the plaintiffs had adequately pled a direct injury caused by the defendants' conduct).[8] The Court finds these allegations sufficient at the pleading stage.

### 2.    <u>Injury</u>

Similarly, "Plaintiffs bear the burden of proving an antitrust injury." *MJ's Mkt.*, 766 F. Supp. 3d at 210 (citing *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011)). "Plaintiffs must show not only that they were injured as a result of the defendant's actions and that

---

[8] The Court sees no reason to depart from the *Multiplan* court's well-reasoned analysis, which, contrary to Defendants' contention, does not conflict with the First Circuit's approach. *Cf. RSA Media*, 260 F.3d at 14 (emphasizing the "causation requirement" and noting that the "fourth factor[] [(directness of the injury)] expressly require[s] causation between the alleged violation and the alleged harm.").

11

those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause *to competition.*"  *Sterling Merch.*, 656 F.3d at 121 (emphasis in original).  Again, a plaintiff "need not prove that that the antitrust violation was the sole cause of their injury, but only that it was a material cause."  *Nexium I*, 42 F. Supp. 3d at 267 (quoting *Engine Specialties*, 605 F.2d at 14).

Defendants characterize Plaintiffs' alleged "injury" as merely "lower costs of healthcare services" and argue that this is "not the type of injury the antitrust laws were meant to prevent." Joint Mem. at 26.  Defendants' argument incorrectly focuses only on how its actions have resulted in lowered prices for patients.  Courts consistently find plausible antitrust injuries based on allegations that defendants' anticompetitive behavior has forced sellers to accept lowered prices. *See, e.g.*, *Sitts v. Dairy Farmers of Am., Inc.*, 276 F. Supp. 3d 195, 208 (D. Vt. 2017) ("Where, as here, suppliers to an alleged monopsonist are paid depressed prices and the monopsonist, as a result, reaps the benefits . . . , the suppliers may plausibly allege antitrust injury."); *accord Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1133–34 (10th Cir. 2002) (observing that "[t]he Supreme Court's treatment of monopsony cases strongly suggests that suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not harm end-users").

Here, Plaintiffs allege that they have been injured by being forced to accept OON claim reimbursements far below that which would have occurred in a competitive market.  *See, e.g.*, Compl. ¶¶ 1, 386; *see also id.* ¶¶ 246–48 (alleging that Defendants' anticompetitive conduct has "squeeze[d] small medical practices" and cut some providers' OON revenue by "half or more," forcing some "practitioners to consider other business arrangements or to close entirely").  While Defendants' actions may also have had the effect of lowering prices for patients, "[e]very precedent in the field makes clear that the interaction of competitive forces, not price-rigging, is

what will benefit consumers."[9] *W. Penn. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 105 (3d Cir. 2010) (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000)); *see also Knevelbaard Dairies*, 232 F.3d at 989 ("Clearly mistaken is the occasional court that considers low buying prices pro-competitive or that thinks sellers receiving illegally low prices do not suffer antitrust injury."); *Multiplan*, 789 F. Supp. 3d at 629 ("Nor can the defendants justify an alleged price-fixing agreement by touting lower prices for its members and patients.").

In short, Plaintiffs' allegations suffice for the pleading stage. "Price-fixing agreements between competitors cannot be justified *at all*, let alone by the argument that currently-fixed prices are more 'reasonable.'" *Multiplan*, 789 F. Supp. 3d at 629 (emphasis in original) (quoting *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980)). "Whether [Zelis] facilitates a third-party payor price-fixing agreement or is simply another pricing option for payors is thus a factual dispute that cannot be resolved on a motion to dismiss." *Id.*

## B.    Conspiracy

Plaintiffs have alleged two forms of a conspiracy: horizontal and hub-and-spoke. *See, e.g.*, Compl. ¶¶ 387–88. Defendants attack both theories.

### 1.    Horizontal

As relevant here, to allege a horizontal conspiracy, Plaintiffs must allege facts showing an agreement between competitors "in the relevant market" for OON services. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 3–6 (2006). Defendants argue that Plaintiffs have failed to allege that Zelis competes with MCOs in the relevant market: OON reimbursements. Joint Mem. at 29–30. But the Complaint specifically alleges that "Zelis purchases out-of-network healthcare services

---

[9] The Court notes that Plaintiffs specifically allege that Defendants' actions have *not* lowered healthcare costs for patients, pointing to rising insurance premiums despite lowered OON payment amounts. *See* Compl. ¶¶250–54, 258–61.

performed by OON Providers."[10]  Compl. ¶ 109; *see also id.* ¶¶ 90, 92–110.  That distinguishes this case from *Multiplan*, the key case upon which Defendants rely.  *See Multiplan*, 789 F. Supp. 3d at 635–36 ("There are no allegations, however, that MultiPlan purchases out-of-network services through its PPO network. . . . By only alleging facts relating to MultiPlan's PPO network services to show competition with other third-party payors, the plaintiffs have not plausibly alleged MultiPlan competes with third-party payors in the market for out-of-network healthcare services.").  At the pleading stage, the Court must credit Plaintiffs' allegations, and so Plaintiffs have plausibly alleged that Zelis competes with third-party payors in the market for OON services.[11]

Defendants also cursorily argue that the Complaint "lacks factual allegations that Zelis's ERS or RBP customers directly compete against one another in Plaintiffs' alleged market."  Joint Mem. at 31.  But the Complaint does allege that Commercial Payer Defendants compete against each other, *see, e.g.*, Compl. ¶¶ 154, 189, and details the alleged agreements underpinning the alleged conspiracy, *see, e.g.*, *id.* ¶¶ 203–240.  Thus, the Court finds the allegations as to a horizontal conspiracy sufficient at this stage.

### 2.    Hub-and-Spoke

Plaintiffs allege, in the alternative, a hub-and-spoke conspiracy, should Zelis be found not to compete directly with Commercial Payer Defendants.  Compl. ¶ 388.  "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub;

---

[10] Defendants curiously do not acknowledge this allegation in their brief, despite citing to the immediately preceding paragraphs.  *See* Joint Mem. at 30 (citing Compl. ¶¶ 107–08).

[11] Defendants' assertion that Zelis does not pay OON claims directly may well be true.  But that is not a dispute that the Court can resolve on a motion to dismiss.  *See Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 76 (1st Cir. 2020) ("At this stage, our analysis begins and ends with the allegations in the complaint.").

and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015); *see also Nexium II*, 843 F.3d at 56–57 (analyzing hub-and-spoke conspiracy).  Defendants argue that Plaintiffs "fail to allege an agreement at the 'rim' of the wheel."  Joint Mem. at 32.

At a minimum, the Court concludes that Plaintiffs have sufficiently pled the rim of their alleged hub-and-spoke conspiracy through circumstantial allegations.[12]  "For circumstantial evidence to indicate an agreement, the plaintiffs must allege (1) 'parallel conduct' by the defendants and (2) 'context that raises a suggestion of a preceding agreement'—often called 'plus factors.'"  *Multiplan*, 789 F. Supp. 3d at 637 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Nexium II*, 842 F.3d at 56–57 (requiring "'plus factors'—i.e. 'additional facts or factors required . . . as a prerequisite to finding that parallel action amounts to a conspiracy'" among the "rim" competitors (alteration in original) (citations omitted)).

Plaintiffs have identified both parallel conduct and a number of "plus factors" to suggest that there is more than "conscious parallelism" at work here.  *See Nexium II*, 842 F.3d at 56 ("The law distinguishes illegal tacit agreements from "mere conscious parallelism" through evidence of "uniform behavior among competitors, *preceded by conversations* implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision.'" (emphasis in original) (quoting *White v. R.M. Packer Co.*, 635 F.3d 571, 575 (1st Cir. 2011))).  These allegations include: parallel conduct between the Commercial Payer Defendants in the use of Zelis's repricing tools, *e.g.*, Compl. ¶¶ 8,

---

[12] Because the Court concludes that these allegations are sufficient to plausibly state a claim, it need not and does not address whether Plaintiffs have directly alleged this aspect of the conspiracy.

12, 74–75, 239, 242;[13] various actions against self-interest by Commercial Payer Defendants, including the use of tools like Zelis's, where uncoordinated adoption risks loss of subscribers after providers stop accepting their patients due to the decreased reimbursements, *id.* ¶¶ 189, 198–99, 204–07, 290,[14] and that Zelis shares competitively sensitive information between purported competitors (such as Commercial Payer Defendants), *id.* ¶¶ 203–35, 238, 292, 296, 298;[15] and that Commercial Payers Defendants had a motive, apart from profit, to avoid legal and public relations scrutiny by having a third-party develop a repricing system, *id.* ¶ 281. At this stage, taken as a whole, these allegations are sufficient to infer plausibly an agreement to fix prices, rather than just independent parallel behavior.[16] *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013) ("[A]llegations contextualizing agreement need not make any unlawful agreement more likely than independent action nor need they rule out the possibility of independent action at the motion to dismiss stage."); *see also United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) (concluding that the distributors had agreed to fix prices through their

---

[13] Defendants provide no authority for their contention that Plaintiffs need to identify the specific time each Defendant allegedly joined the conspiracy. Plaintiffs allege that, when the Class Period began on June 13, 2016, 500 payors used Zelis's repricing tools, Compl. ¶¶ 12, 371, which had grown to "more than 750" by 2024, *id.* ¶ 75. It is a reasonable inference at this stage that Commercial Payer Defendants were part of those 500 payors in 2026. *See Multiplan*, 789 F. Supp. 3d at 637 (discussing similar allegations and finding they constituted parallel conduct). Moreover, Plaintiffs specifically allege that the conspiracy began on or around June 13, 2016. Compl. ¶ 301 (referring to "Defendants" collectively).

[14] *See Multiplan*, 789 F. Supp. 3d at 640 (discussing similar allegations and finding they constituted action against self-interest). While Defendants argue that lowering OON reimbursements is a rationale objective of MCOs, rather than an action against self-interest, on a motion to dismiss, the Court must credit Plaintiffs' well-pled allegations and draw all reasonable inference in their favor. *See Lawrence*, 90 F.4th at 598. Should a more fulsome record undermine Plaintiffs' allegations or the inferences drawable therefrom, Defendants will have the opportunity to renew their arguments.

[15] *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 457 (1978) ("[T]he exchange of price information among competitors carries with it the added potential for the development of concerted price-fixing arrangements which lie at the core of the Sherman Act's prohibitions."); *In re Broiler Chicken Antitrust Litig.*, 2025 WL 461407, at *4 (N.D. Ill. Feb. 11, 2025) ("It is well-settled that the exchange of price information among competitors is indicative of anticompetitive agreement.").

[16] The Court notes that this is merely a sample of the allegations regarding "plus factors" in the Complaint.

"express delegation" to defendant, which was "just as illegal as the fixing of prices by direct, joint action").[17]

## C.    Relevant Market

To demonstrate market power necessary to state a claim under Section 1 of the Sherman Act, Plaintiffs must allege both the existence of a relevant product market and relevant geographic market. *E. Food Servs., Inc. v Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 9 (1st Cir. 2004) (affirming dismissal in part based on failure to allege a proper geographic market); *see also Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196–97 (1st Cir. 1996) (distinguishing between "direct evidence of market power" and "circumstantial evidence of market power," such as evidence "showing that the defendant has a dominant share in a well-defined relevant market and that there are significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in the short run"). Defendants challenge both elements.

---

[17] Defendants also argue that Plaintiffs "should be estopped from" arguing that Zelis has as high of a market share as alleged in this case, because this allegation is directly at odds with allegations made in *Multiplan*, 789 F. Supp. 3d at 629 ("[T]he plaintiffs allege MultiPlan is the dominant force in the market, having agreements with over 700 third-party payors and processing over 80% of out-of-network service payments."), a case in which one Plaintiff from this case (PIMG) is also a plaintiff, Joint Mem. at 42. The allegations between the two cases do seem inconsistent. That said, the Court will not apply judicial estoppel at this time. For judicial estoppel to attach:

> First, the estopping position and the estopped position must be directly inconsistent, that is, mutually exclusive. Second, the responsible party must have succeeded in persuading a court to accept its prior position. The presence of these elements creates the appearance that either the first court has been misled or the second court will be misled, thus raising the specter of inconsistent determinations and endangering the integrity of the judicial process.

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004) (citations omitted). Plaintiffs have provided several reasons that may explain the apparent inconsistency. Joint Opp. at 44–45. Additionally, because both cases are class actions in which the common plaintiff (PIMG) is one of many, the Court is not convinced the competing allegations reflect a situation where Plaintiffs are "playing fast and loose with the courts." *Alt. Sys. Concepts*, 374 F.3d at 33 (quoting *Patriot Cinemas, Inc. v. Gen. Cinema Corp.*, 834 F.2d 208, 212 (1st Cir. 1987)). Nor is this a situation in which inconsistent positions will necessarily result in inconsistent determinations, as discovery will illuminate which formulation of market share is appropriate prior to any final decisions.

### 1.     <u>Relevant Product Market</u>

Defendant argues that OON services does not qualify as an appropriate product market, because it combines services that are not reasonably interchangeable and because the only distinction between in-network and OON services is the reimbursement rate (but that the service itself is the same).  Joint Mem. at 44–46.  Based on the allegations in their Complaint, Plaintiffs argue that OON services constitute a permissible "cluster" market because the services "are subject to the same or reasonably similar competitive conditions," including selection by MCOs and "how they are priced," and that the relevant market can be defined by OON services because Defendants themselves established the distinction in the market.  Joint Opp. at 39–42; *see also* Compl. ¶¶ 149–72.  At this stage, drawing all reasonable inferences in Plaintiffs' favor, the Court agrees. *See MultiPlan*, 789 F. Supp. 3d at 632–34 (finding on similar allegations that plaintiffs "plausibly alleged a market for all types of out-of-network services" and noting that "different types of healthcare services may be grouped in a cluster market because healthcare services are often 'sold to commercial health plans and their members' in a package" (quoting *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467–68 (7th Cir. 2016))).  As the court in *Multiplan* helpfully explained:

> To be clear, the Court is not finding that the defendants' critiques of the relevant market are baseless.  The defendants raise fair concerns regarding the scope and type of services covered by the plaintiffs' alleged nationwide market for out-of-network healthcare services.  But the bulk of these criticisms amount to factually disputing the plaintiffs' allegations, which are disputes the Court may not resolve at this stage of review.  *See also In re Delta Dental*, 484 F. Supp. 3d [627,] 640 [(N.D. Ill. 2020)] (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) (Sotomayor, J.)) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

*Id.* at 635.  As such, the Court concludes that Plaintiffs' proposed product market is sufficiently plausible to survive a motion to dismiss.

## 2.    Relevant Geographic Market

Defendant argues that a nationwide market is inappropriate because most Defendants do not insure patients across the whole country and because providers are not interchangeable across the country.  Joint Mem. at 46–47.  Plaintiffs argue that they have pled that some Defendants operate nationwide and that just because patients tend to receive care in geographic regions close to their home or office does not mean that they do not seek care in other locations, which patients could seek anywhere throughout the country.  Joint Opp. at 42–44.

Defendants' argument fails because it does not reflect the allegations in the Complaint, which the Court must accept as true on a motion to dismiss.  The Complaint alleges that Zelis and at least two Commercial Payer Defendants operate nationwide,[18] Compl. ¶¶ 34, 38, 93, and that patients seek care nationwide, even if that is less common than remaining near their homes or offices, *id.* ¶¶ 144–47.  That suffices at this stage.  *See MultiPlan*, 789 F. Supp. 3d at 633 ("The providers allege several facts that support a nationwide market, including that patients often utilize out-of-network services because of frequent travel, patients from anywhere in the United States can and do obtain out-of-network services across the nation, and third-party payors purchase out-of-network services from healthcare providers nationwide."); *Delta Dental*, 484 F. Supp. 3d at 641 ("Plaintiffs will undoubtedly have to develop the record to define more precisely the geographic market that is relevant to their claims, but given that they seek to represent a nationwide class and claim that defendants insure patients across the country, their identification of the United

---

[18] For some of the other Defendants, Plaintiffs do not specify or merely state that they operate "in the United States."  Compl. ¶¶ 35, 37.

States and the respective territories in which defendants participate in the market as buyers of dental goods and services is sufficient at this stage.").[19]

### D.    Humana's Separate Grounds

Humana separately argues that claims against it should be dismissed on the basis that the Complaint "specifically [alleges] that [Humana] stopped selling the commercial health insurance products at issue in this case in 2024" and includes no facts about Humana's joining the alleged conspiracy.  Humana Mem. at 4.  These arguments both fail.  As the Court discussed above, Plaintiffs have plausibly pled a conspiracy to fix prices.  *See supra* Section IV.B.  That Plaintiffs did not make explicit allegations against each Defendant—in a detailed complaint that is 158 pages and consists of over 400 paragraphs—does not undermine this conclusion.  *See, e.g.*, *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 887 (N.D. Ill. 2022) ("The plaintiffs are not required to cite evidence specific to each defendant in their complaint.").  The First Circuit has explained that a "'complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible.'"  *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14–15 (1st Cir. 2011) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). *Ocasio-Hernández* makes it clear that plaintiffs are not required to allege every single fact that supports their claim in their complaint.  *Id.* at 13.  "In short, an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim."  *Id.* at 12.

---

[19] As Defendants note, the *Delta Dental* court later rejected the nationwide class at class certification.  *See* Joint Reply at 14 (citing *In re Delta Dental Antitrust Litig.*, 800 F. Supp. 3d 898, 919–20 (N.D. Ill. 2025)) [hereinafter *Delta Dental II*].  But that court did so after considering a "substantial evidentiary record" developed "over five years" that is not present here.  *Delta Dental II*, 800 F. Supp. 3d at 919.  This Court cannot undermine Plaintiffs' allegations with a factual determination from another case.  It very well may be true that Plaintiffs will fare no better after developing the record.  But as previously stated, the allegations in the Complaint must control at this stage.  *See Lee*, 958 F.3d at 76.

As described in more detail above, Plaintiffs have alleged that Humana and the other Commercial Payer Defendants agreed to, and did, use Zelis's repricing tools and share confidential claims data to suppress OON payments to providers, such as Plaintiffs. *See, e.g.*, Compl. ¶¶ 1, 8, 198, 203–35, 238–39, 242, 246–48, 292, 296–98, 327, 330, 336, 363, 366. Additionally, that Humana withdrew from the market in 2024, *id.* ¶ 37, does not negate the allegation that it was involved in the conspiracy prior to 2024. Whether such a withdrawal from the market—as many as eight years after allegedly joining the conspiracy—would undermine any basis to have entered into the conspiracy in the first place is a factual issue the Court cannot resolve at this stage.[20] Taken together, Plaintiffs' allegations both state a plausible claim and adequately provide Humana fair notice.

## V.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss, Dkt. 96, is DENIED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy

Dated: March 30, 2026                    Judge, United States District Court

---

[20] Similarly, Humana's arguments about when it started planning its exit are not allegations from the Complaint, and thus not appropriate for consideration at this stage.