**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **IN RE: ZELIS REPRICING ANTITRUST LITIGATION,**<br><br>**This Document Relates To:**<br><br>**All Actions** | **Lead Action Civil Action No. 25-10734-BEM**<br><br>**Consolidated with Case Nos.: 25-11092-BEM 25-11167-BEM 25-11537-BEM** |

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION TO DISMISS**

**MURPHY, J.**

Plaintiffs, healthcare providers who perform "out of network" ("OON") healthcare services, brought this action alleging an antitrust conspiracy between Defendants, health insurance companies and entities that "reprice" the claims those insurers pay. Defendants are accused of conspiring to suppress payments for OON services offered by Plaintiffs. Before the Court now is a motion to dismiss filed by Defendant Aetna, Inc. ("Aetna"). For the reasons set forth below, the Court will grant the motion to dismiss.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiffs' second amended and consolidated class action complaint, Dkt. 273 ("Second Amended Complaint" or "SAC") and are accepted as true for purposes of resolving Aetna's motion to dismiss. The Court presumes familiarity with the factual background set forth in the Court's order on Defendants' motion to dismiss the first amended complaint. *See In re Zelis Repricing Antitrust Litig.*, 2026 WL 867668, at *1–3 (D. Mass. Mar. 30, 2026) ("*Zelis I*").

### 1. The Parties

#### a. Plaintiffs

Plaintiffs in the SAC are Pacific Inpatient Medical Group, Inc. ("PIMG"); Dennis C. Ayer, DDS, LLC ("Ayer"); Frank J. Scaccia, M.D., F.A.C.S., L.L.C. ("Scaccia"); Danny Bouchoua Chiropractic, APC ("DBC"); Chelsea Foot and Ankle ("CFA"); and 4 Missing Peace Corps, Inc. ("4MPC") (collectively, "Plaintiffs"). The Plaintiffs added to the SAC are CFA and 4MPC. CFA is a physician-owned podiatry practice in New York. SAC ¶ 29. 4MPC is a mental health practice in California. *Id.* ¶ 30.[1]

#### a. Defendants

Defendants in the SAC are Zelis Healthcare, LLC ("Zelis Healthcare"); Zelis Claims Integrity, LLC ("Zelis Claims"); Zelis Network Solutions, LLC ("Zelis Network") (together with Zelis Healthcare and Zelis Claims, "Zelis"); Aetna, Inc. and its subsidiary Meritain Health, Inc. (together, "Aetna Defendants"); The Cigna Group ("Cigna") and its subsidiary Cigna Health and Life Insurance Company (together, "Cigna Defendants"); Defendants Elevance Health, Inc., formerly Anthem, Inc. ("Elevance"), and its subsidiary Blue Cross of California, Inc. d/b/a Anthem Blue Cross of California (together, "Elevance Defendants"); Humana Inc. ("Humana"); UnitedHealth Group, Inc. ("UnitedHealth") and its subsidiaries HealthSCOPE Benefits, Inc., and UMR, Inc., (together, "UnitedHealth Defendants") (together with Aetna Defendants, Cigna Defendants, Elevance Defendants, and Humana, the "Commercial Payer Defendants").

[1] The other Plaintiffs remain as described in the Court's order on Defendants' motion to dismiss the first amended complaint. *See Zelis I*, 2026 WL 867668, at *1.

The SAC added subsidiaries of Aetna, Cigna, Elevance, and UnitedHealth as defendants. *Id.* ¶¶ 35–38, 40–41.[2] Meritain Health, Inc. ("Meritain Health"), one of those added defendants, is a health insurance company that is the subsidiary of Aetna. *Id.* ¶ 35.

**2. <u>Antitrust Allegations</u>**

Plaintiffs allege that Zelis and the Commercial Payer Defendants conspired to suppress OON payments to healthcare providers. *Id.* ¶¶ 1, 6, 14, 42. Zelis determines "repriced" OON payments to providers using its proprietary analytical tools, including, but not limited to, Zelis's "Established Reimbursement Schedule" or "Established Reimbursement Solution" ("ERS") and its "Reference-Based Pricing" ("RBP") services. *Id.* ¶¶ 14–15. These tools use confidential claims, pricing, and contractual data obtained from Commercial Payer Defendants. *Id.* ¶ 15. Plaintiffs allege that when Zelis presents a repriced offer to an OON provider, they are "forced either to accept the severely downwardly adjusted ('repriced') amount as payment; to engage in time-pressured and one-sided 'negotiations' with Zelis; or to file an 'appeal' of the downwardly-adjusted claim with Zelis." *Id.* ¶ 118.

"[O]ne or more Commercial Payers" purchase repricing services from Zelis, and in exchange, Zelis receives a commission based on the difference between the amount an OON provider billed and the amount actually paid to the commercial payer. *Id.* ¶ 8. Plaintiffs allege that Commercial Payer Defendants have abandoned their independent pricing roles and delegated pricing authority to Zelis. *Id.* ¶¶ 16, 137, 204. As a result, Plaintiffs allege OON healthcare services are priced below what providers would have been paid absent the alleged conspiracy. *Id.* ¶¶ 15, 204, 356, 389.

---

[2] All other Defendants remain as described in the order on Defendants' motion to dismiss the first amended complaint. *See Zelis I*, 2026 WL 867668, at *1–2.

### B. Procedural Background

On March 28, 2025, Plaintiff PIMG filed a class action complaint against Zelis, Aetna, Cigna, Elevance, and Humana. Dkt. 1. On May 27, 2025, the Court consolidated the case with three other pending cases and appointed interim co-lead counsel. Dkt. 35. On June 11, 2025, Plaintiffs filed an amended and consolidated complaint. Dkt. 39 ("First Amended Complaint" or "FAC"). On July 28, 2025, the Court granted Defendants' motion to consolidate the case with one additional case. Dkt. 83. On August 11, 2025, Defendants filed a joint motion to dismiss, Dkt. 96, which the Court denied on March 30, 2026, Dkt. 185. On March 4, 2026, the Court also granted Aetna's, UnitedHealth's, and Elevance's motions to compel arbitration as to certain plaintiffs under the Federal Arbitration Act, staying those plaintiffs' claims against those three defendants. Dkt. 184.

On May 20, 2026, the Court entered a scheduling order which set deadlines for discovery. Dkt. 222. UnitedHealth, Cigna, Aetna, Zelis, Elevance, and Humana, filed answers to the amended complaint on June 8, 2026. Dkts. 231–36. On July 6, 2026, Plaintiffs filed a motion for leave to file a second amended and consolidated class action complaint, Dkt. 245, which the Court granted on August 3, 2026, Dkt. 272.[3] Plaintiffs filed the Second Amended Complaint the same day. Dkt. 273. On August 17, 2026, Elevance, Zelis, Cigna, and Humana filed answers to the second amended complaint. Dkts. 281–82, 285–86. The same day, Aetna filed a motion to dismiss for lack of standing and failure to state a claim. Dkt. 283.

[3] While Defendant did not object to the filing of the SAC, it submitted a response to "correct inaccuracies" in Plaintiffs' memorandum in support of their motion for leave to amend the complaint. Dkt. 271 at 1.

## II. Legal Standard

### A. 12(b)(1)

"When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010) (citing *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001)). "[D]ismissal for lack of constitutional standing . . . should be granted under Rule 12(b)(1)." *Katz v. Pershing, LLC*, 806 F. Supp. 2d 452, 456 (D. Mass. 2011), *aff'd*, 672 F.3d 64 (1st Cir. 2012) (quoting *Harold H. Huggins Realty, Inc. v. FNC, Inc.,* 634 F.3d 787, 795 n.2 (5th Cir. 2011)). "In deciding Rule 12(b)(1) motions . . . the court may consider materials outside the pleadings, and factual disputes may be resolved." *Stauffer v. IRS*, 285 F. Supp. 3d 474, 487 (D. Mass. 2017).

### B. 12(b)(6)

Courts analyzing claims under Federal Rule 12(b)(6) must determine whether a plaintiff's factual allegations—disregarding all "conclusory" statements—"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). At the pleading stage, plaintiffs need not demonstrate that they are likely to prevail, but "[their] claim must suggest 'more than a sheer possibility that a defendant has acted unlawfully.'" *García-Catalán v. United States*, 734 F.3d 100, 102–03 (1st Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "The inquiry is usually limited to the facts alleged in the complaint, incorporated into the complaint, or susceptible to judicial notice," *Whelden v. U.S. Bank Nat'l Ass'n*, 494 F. Supp. 3d 68, 73 (D. Mass. 2020) (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir.

2003)), "but the court may also consider other documents the authenticity of which is not disputed by the parties, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint," *id*. (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)).

## III. Discussion

Aetna identifies "significant alterations" to the First Amended Complaint in the Second Amended Complaint that give rise to its motion to dismiss. Dkt. 284 at 8. Namely, Aetna characterizes the amendments in the SAC as: (1) adding Meritain Health as a defendant on the grounds that it uses Zelis's repricing tools, and (2) avoiding, "through their use of layers upon layers of disjunctive allegations," any assertion that "Aetna Inc. used any of the out-of-network repricing tools that underlie . . . [the] lawsuit." *Id*. at 8–9. Aetna argues that without allegations that it used Zelis's repricing tools, Plaintiffs lack Article III standing to bring a claim against Aetna, and also cannot sustain their conspiracy allegations.[4] Because both arguments substantially turn on whether the SAC still alleges that Aetna uses Zelis's repricing tools, the Court begins with that determination. The Court then turns to standing and then to conspiracy. *See Katz*, 806 F. Supp. 2d at 456 ("When faced with motions to dismiss under both 12(b)(1) and 12(b)(6), a district court, absent good reason to do otherwise, should ordinarily decide the 12(b)(1) motion first.").

---

[4] While Plaintiffs argue that Aetna seeks to "relitigate" rejected arguments contrary to the law of the case, Dkt. 297 at 7, 10, the Court will consider whether Plaintiffs' amended allegations remain sufficient for both standing and their conspiracy claim. *See InterGen N.V. v. Grina*, 344 F.3d 134, 144–45 (1st Cir. 2003) ("An amended complaint supersedes the original complaint, and facts that are neither repeated nor otherwise incorporated into the amended complaint no longer bind the pleader.").

**A. <u>Allegations Regarding Aetna's Use of Zelis's Repricing Tools</u>**

The Court agrees with Aetna that the SAC no longer contains explicit allegations that Aetna uses Zelis's repricing tools.[5] *See* SAC ¶ 8 ("*one or more* Commercial Payers agreed to purchase repricing services from Zelis" (emphasis added)); *see also id.* ¶¶ 42, 114, 193. Whenever the Complaint discusses the use of Zelis's repricing tools, it does so in qualified and ambiguous terms that stop short of alleging that Aetna entered into repricing agreements with Zelis. To take one illustrative example, the SAC alleges that:

> Aetna, Cigna, Elevance, Humana, UnitedHealth, and other PPO insurers have each entered into one or more OON agreements with Zelis, issued or delivered one or more OON payments to Providers performing out-of-network healthcare services at payment levels below competitive amounts, shared proprietary, confidential, competitively-sensitive information regarding claims, pricing, and contractual information with horizontal competitors, surrendered its pricing authority to a third party, and/or otherwise participated in the conspiracy, committed or omitted acts, and/or made statements in furtherance of, and is a member of, the Zelis Conspiracy.

*Id.* ¶ 42.[6] As amended, the allegation is vague regarding whether "an OON agreement" is a repricing agreement, especially when read in conjunction with the separate allegation that Zelis provides "repricing" services "for multiple"—but not necessarily all—"Commercial Payers." *Id.* ¶ 114. Additionally, as Aetna identifies, *see* Dkt. 307 at 4, one plausible reading of the allegation is simply the conclusory statement that Aetna "otherwise participated in the conspiracy," SAC ¶ 42.

---

[5] The parties dispute whether the Plaintiffs were motivated to amend the FAC by Aetna's representation to Plaintiffs in correspondence that it has never used Zelis's repricing tools. Dkt. 284 at 5, 7–8; Dkt. 297 at 6, 12. However, the Court will not consider Aetna's assertion that it has not used such tools, or rely on any correspondence between the parties to clarify the meaning of amended allegations that are facially unclear. On a motion to dismiss, the Court's "analysis begins and ends with the allegations in the complaint." *Lee v. Conagra Brands, Inc.*, 958 F.3d 70, 76 (1st Cir. 2020).

[6] In their memorandum in support of the motion for leave to further amend the FAC, Plaintiffs categorized the amendments in paragraphs 42 and 114, as well as others giving rise to Aetna's motion to dismiss, under the subheading "[r]epairing limited, inadvertent typographical errors." Dkt. 246 at 11–15 (describing amendments made to various paragraphs, including SAC ¶¶ 8, 14, 42, 114, 193). That characterization understates the substantive import of these amendments.

Further, the SAC uses "Aetna" to refer to Aetna and Meritain Health without distinction. *Id.* ¶ 35. That usage raises doubt over whether the SAC attributes particular conduct to Aetna, Meritain Health, or both when making allegations against "Aetna" or "Commercial Payers." *See, e.g.*, *id.* ¶ 42 ("Aetna, Cigna, Elevance, Humana, UnitedHealth, and other PPO insurers have each entered into one or more OON agreements with Zelis"). "[P]laintiffs' decision to lump together certain related defendants and refer to them by a single name, without differentiating between them, is flawed." *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, WL 7053807, at *13 (E.D.N.Y. Jan. 4, 2011), *report and recommendation adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012). Some courts have found this method of corporate group pleading in antitrust cases insufficient to give defendants fair notice of what is being alleged against them. *See id.* at *15 (collecting cases). However, this District has previously recognized that "[a]t the motion to dismiss stage a complaint generally will only be dismissed where it is 'entirely implausible' or impossible for the grouped defendants to have acted as alleged." *Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 53 (D. Mass. 2014) (quoting *GMO Trust ex rel. GMO Emerging Country Debt Fund v. ICAP plc,* 2012 WL 5197545, at *8 (D. Mass. Oct. 18, 2012)). Under either approach, the SAC fails to allege Aetna's use of repricing tools. Unlike in *Zond*, here, it cannot "be reasonably inferred that each and every allegation is made against each individual defendant," *id.* at 53–54, because the allegations related to the use of repricing tools allege that "multiple," SAC ¶ 114, and "one or more," SAC ¶ 8, but not necessarily "all" Commercial Payer Defendants use such tools.

In addition to what it calls the "explicit allegations" in the SAC, Plaintiffs argue that Zelis's public statements provide for a reasonable inference that Aetna used Zelis's repricing tools. Dkt. 297 at 17–18. The relevant paragraphs of the SAC rely on Zelis's own statements to allege that

Zelis's "platform serves more than 750 payers, including the top 5 national health plans," SAC ¶ 78 & n.84, and that "Zelis counts approximately 770 health insurers, including the nation's 'top 5' national health insurers, among its repricing customers," *id.* ¶ 245. It is unclear whether Zelis's determination of the "top 5" insurers includes Aetna, how that determination accounts for parent companies and subsidiaries, and whether use of Zelis's "platform" constitutes use of "repricing tools" like ERS and RBP.[7] Other allegations citing Zelis's statements regarding the number of clients Zelis has are also too vague, taken alone, to allege a claim against Aetna. *See, e.g.*, *id.* ¶ 177; *see also id.* ¶¶ 12, 77, 99, 180, 208, 241–42, 245, 273, 309, 352–53. Previously, this Court indicated that an allegation citing a 2016 Zelis press release that mentioned Zelis's "over 500 payor clients" could provide for a reasonable inference that all Commercial Payer Defendants had used Zelis's repricing tools around that time. *See Zelis I*, 2026 WL 867668 at *8 n.13. However, the FAC also contained more explicit allegations, which are missing in the SAC, that "Commercial Payers agreed to purchase repricing services from Zelis." FAC ¶ 8. Read in light of the SAC "as a whole," *Ocasio-Hernández v. Fortuno-Burset*, 640 F.3d 1, 14–15 (1st Cir. 2011) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)), the paragraphs referencing Zelis's statements are insufficient to allege that Aetna uses Zelis's repricing tools. All told, the relevant paragraphs of the SAC do not make plausible allegations, either direct or inferential, that Aetna used such tools.

[7] In fact, Plaintiffs allege that Zelis's reference to the top 5 national health plans "is incredibly specific" and provides a list of the five biggest insurance companies pulled from a separate data source, which does not include Aetna. SAC ¶ 242. And while the SAC says that Zelis counts 770 health insurers "among its repricing customers," that statement is confusing in light of the same paragraph referring to the transactions processed using the "'ZAPP' *repricing* platform," *id.* ¶ 245 (emphasis added), which the SAC describes elsewhere as a "*payments* platform" named the "Zelis Advanced Payments Platform," *id.* ¶ 183 (emphasis added). ZAPP is not mentioned in the section of the SAC describing the "repricing services" offered by Zelis, such as ERS and RBP. *Id.* ¶¶ 114–44. Simply put, it requires significant speculation to infer from the SAC's allegations that Aetna specifically used the Zelis repricing tools forming the basis of Plaintiffs' antitrust claims.

### B. <u>Standing</u>

Article III standing requires a showing that a plaintiff "has suffered, or will suffer, an injury that is '[1] concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). Aetna contends that Plaintiffs' injuries are not "traceable" to its specific conduct because Plaintiffs "have dropped any allegations that Aetna Inc. used the 'Zelis repricing tools' that caused the 'harms' of which they complain." Dkt. 284 at 17–18 (quoting *Zelis I*, 2026 WL 867668, at *4). In *Zelis I*, this Court found that the FAC plausibly alleged that "the use of Zelis's tools results in claims being reimbursed at a rate below the competitive market price" and that the harms Plaintiffs alleged "flow[ed] directly from Defendants' conduct." *Zelis I*, 2026 WL 867668, at *4. However, having found that the SAC does not allege that Aetna used Zelis's repricing tools, the Court now analyzes whether the harms alleged in the SAC may still be fairly traced to the remainder of Aetna's alleged conduct.

Plaintiffs argue that even if Aetna does not use Zelis's repricing tools directly, that "does not foreclose the traceability of harm" because of Aetna's relationship with Meritain Health. Dkt. 297 at 23. Plaintiffs characterize Meritain Health as an intermediary that "enters into repricing agreements with Zelis and uses Zelis's repricing services," with Aetna serving as "the ultimate payer" of the repriced claims. *Id.* Further, Plaintiffs argue that Aetna still inflicts harm fairly traceable to it by benefitting from its subsidiary's use of Zelis's repricing tools. *Id.*

The SAC does not specifically allege this "ultimate payer" relationship, or characterize the relationship between Aetna and Meritain Health in any way apart from stating that they are parent and subsidiary. SAC ¶ 35. The mere fact that Aetna benefits from its subsidiary's conduct as a parent company is insufficient to show traceability, because traceability requires "a causal connection between the injury and the conduct complained of," not just a demonstration that an

entity passively benefits from another entity's conduct. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "line of causation" from Aetna's conduct to the harms experienced by Plaintiffs "must not be too speculative or too attenuated." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). Therefore, Plaintiffs lack the standing necessary to proceed with their claims against Aetna.

### C. Conspiracy

Even if the Plaintiffs had standing, Plaintiffs also fail to allege that Aetna participated in the conspiracy. "Section 1 of the Sherman Act prohibits '[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce.'" *Euromodas, Inc., v. Zanella, Ltd.*, 368 F.3d 11, 16 (1st Cir. 2004) (alterations in original) (quoting 15 U.S.C. § 1). The SAC alleges two forms of conspiracy: horizontal and hub-and-spoke. SAC ¶¶ 390–391. As it relates to Aetna's motion to dismiss, either theory rises or falls based on whether the SAC plausibly alleges that Aetna entered into an "agreement" with co-conspirators. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 3–6 (2006) (requiring an "agreement" between competitors "in the relevant market" to find a horizontal conspiracy); *In re MultiPlan Health Ins. Provider Litig.,* 789 F. Supp. 3d 614, 636–37 (N.D. Ill. 2025) (requiring "circumstantial evidence to indicate an agreement" to sufficiently plead a hub-and-spoke conspiracy). "Two types of evidence can be used to indicate an agreement: direct and circumstantial." *MultiPlan*, 789 F. Supp. 3d at 636. To plead such an agreement through circumstantial allegations, Plaintiffs must allege "(1) 'parallel conduct' by the defendants and (2) 'context that raises a suggestion of a preceding agreement'—often called 'plus factors.'" *Id.* at 637 (quoting *Twombly*, 550 U.S. at 557).

Aetna argues that Plaintiffs "do not—and cannot—allege that Aetna Inc. used Zelis's repricing tools, the parallel conduct underpinning Plaintiffs' conspiracy claims." Dkt. 284 at 10. As set forth above, the Court agrees that the SAC does not allege that Aetna used these tools. The

Court also agrees that *Zelis I* found "parallel conduct between the Commercial Payer Defendants in the use of Zelis's repricing tools." *Zelis I*, 2026 WL 867668, at *8. Accordingly, the Court analyzes whether Plaintiffs have alleged parallel conduct and conspiracy by alternate means. Plaintiffs argue that their allegations that Commercial Payer Defendants, including Aetna, shared confidential pricing and claims information, are sufficient. *See* Dkt. 297 at 10–13, 18–21.

Even putting aside concerns regarding the grouping of claims plausibly pertaining to either or both parent company and subsidiary, and accepting Plaintiffs' contention that the SAC alleges without qualification that Aetna shared such information, *id.* at 7 (citing SAC ¶ 8), the Court finds this, without more, insufficient to constitute parallel conduct. "[I]nformation exchanges among competitors are not *per se* illegal" but remain "'a facilitating practice that can help support an inference of a price-fixing agreement.'" *Cornish-Adebiyi v. Caesars Ent., Inc.,* 184 F.4th 172, 189 (3d Cir. 2026) (quoting *Todd v. Exxon Corp*., 275 F.3d 191, 198 (2d Cir. 2001)); *see also id.* at 187–88 (categorizing "non-economic evidence showing exchange of non-public commercial information" as a "plus factor[]"). In *Cornish-Adebiyi,* the court found such an inference plausible "in the context of AI-driven dynamic pricing" because the complaint alleged that "each casino-hotel" understood that the pricing recommendations they received from a software product were based on the pricing and occupancy data they collectively shared with the software company's platform. *Id.* at 190. But here, the SAC fails to allege that Zelis gave Aetna "the benefit of their competitors' non-public data in formulating a price recommendation," because the SAC does not allege that Aetna uses Zelis's repricing services. *Id.* at 191. Therefore, the Court does not have sufficient basis to infer from context that Aetna's alleged information sharing facilitates a conspiracy which includes Aetna.

The SAC also makes allegations regarding other circumstantial evidence of conspiracy, such as Aetna's membership in AHIP, an association including several Commercial Payer Defendants, and its participation in annual Zelis client conferences. *See, e.g.*, SAC ¶ 211; *see also id.* ¶¶ 233, 238, 287–89, 291, 296. The Court similarly finds that these are "plus factors" insufficient to allege that Aetna participated in the conspiracy. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 832 F.3d 1, 14 (1st Cir. 2016) ("Although the existence of a trade association remains a plus factor, a defendant's mere participation in one does not create a triable issue.").

Nor can Aetna be alleged to have participated in the conspiracy through its subsidiary. To allege liability against a defendant that is a parent corporation, "plaintiffs must set forth facts establishing the parent corporations' direct and independent participation in the alleged conspiracy." *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688 (E.D. Pa. 2009). While Plaintiffs argue that Aetna "benefits" from its subsidiary's direct use of Zelis's repricing services because such use "lower[s] its OON costs for its traditional insurance business," Dkt. 297 at 13–14, "Plaintiffs fail to allege, or even explain, how parent defendants' approval and acquiescence aided or assisted their subsidiaries or others in carrying out the conspiracy," *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d at 688. Again, the SAC does not describe Aetna and Meritain Health's relationship besides stating that they are parent and subsidiary.[8] SAC ¶ 35.

Plaintiffs also argue that every defendant need not engage in the same conduct and that Plaintiffs' need not assign specific conduct to specific defendants. Dkt. 297 at 14–16. To be sure, when alleging a defendant's participation in a conspiracy, absolute uniformity is not required to

[8] The SAC also does not allege "a basis to disregard the separate corporate forms of these entities and impose liability on the Parent Companies" by piercing Aetna's corporate veil. *In re Digit. Music Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011). The SAC contains no allegations suggesting that Aetna's corporate veil may be pierced, and Plaintiffs argues only argue for veil-piercing on the conclusory ground that "there is no actual separation as between Aetna and Meritain." Dkt. 297 at 21 n.4.

allege parallel conduct. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791–92 (N.D. Ill. 2017) (collecting cases); *see also MultiPlan*, 789 F. Supp. 3d at 638 ("[T]he defendants do not have to use MultiPlan in identical ways for their use to be considered parallel conduct."). However, while a conspiracy may exist where a defendant engages in a variant of some core parallel conduct, it cannot be found where a defendant does not engage in the core conduct altogether. "If competitors agree to abide by a third-party algorithm that guarantees a below market price, it would not matter if every price the algorithm recommended differed for each competitor based on each of the competitor's preferred settings," *MultiPlan*, 789 F. Supp. 3d at 638, and it would not matter if defendants did not "start[] using the [algorithm] at the same time," *id.* at 637—but it *would* matter if a defendant did not use the algorithm at all. Here, the SAC does not allege that Aetna used Zelis's repricing tools, and therefore parallel conduct is not plausibly alleged.

Relatedly, while a complaint "need not be detailed with overt acts by each defendant," *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010), "at the pleading stage in this antitrust case . . . each defendant is entitled to know how he is alleged to have conspired, with whom and for what purpose," *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 383–84 (S.D.N.Y. 2016) (citing *Twombly*, 550 U.S. at 557–58). Plaintiffs can make general allegations and "are not required to cite evidence specific to each defendant in their complaint." *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 887 (N.D. Ill. 2022). But, on their face, Plaintiffs' general allegations forming the basis of its conspiracy claim do not clearly include Aetna, and thus do not provide fair notice of how Aetna is alleged to have conspired. *Compare, e.g.*, SAC ¶ 8 ("one or more Commercial Payers agreed to purchase repricing services from Zelis") *with Multiplan*, 789 F. Supp. 3d at 647 ("The direct action plaintiffs have alleged enough facts to put

these TPA defendants on notice . . . . These plaintiffs allege that Benefit Plans Administrators, Consociate Health, and Secure Health all contracted with MultiPlan to use its Data iSight algorithm.”).

The SAC cannot be read on its face to contain allegations of parallel conduct. Therefore, the SAC fails to plausibly state a conspiracy claim involving Aetna, and must be dismissed.

## IV. Conclusion

For the foregoing reasons, Aetna’s motion to dismiss, Dkt. 283, is GRANTED. Plaintiffs and Commercial Payer Defendants are instructed to meet and confer, and file a status report by October 6, 2026, regarding any deficiencies in the pleadings identified by this Memorandum and Order that may affect claims against other individual Commercial Payer Defendants. To the extent that individual defendants raise issues, the parties should attempt to resolve them in an efficient manner without the need to file overlapping motions. If necessary, Plaintiffs may seek leave to amend the SAC to rectify deficiencies.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated: September 30, 2026